## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 05 2014

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

NATHAN F. AUSTIN, derivatively on
behalf of WAL-MART STORES, INC.,

    Plaintiff,

v.

S. ROBSON WALTON, et al.,

    Defendants,

    -and-

WAL-MART STORES, INC.,

    Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:14 cv 528 JM

This case assigned to District Judge _____
and to Magistrate Judge _____ .

## DEFENDANTS' NOTICE OF REMOVAL TO THE
## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF ARKANSAS, WESTERN DIVISION

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1441(a), defendants Aida M. Alvarez, James W. Breyer, M. Michele Burns, James I. Cash, Jr., Roger C. Corbett, Douglas N. Daft, Michael T. Duke, Gregory B. Penner, Steven S. Reinemund, H. Lee Scott, Jr., Arne M. Sorenson, Jim C. Walton, S. Robson Walton, Christopher, J. Williams, Linda S. Wolf, and Eduardo Castro-Wright, (the "Individual Defendants") and nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart") (collectively, "Defendants") hereby remove this civil action—formerly pending as *Austin v. Walton*, No. CV-2012-201, in the First Division of the Circuit Court of Pope County, Arkansas—to the United States District Court for the Eastern District of Arkansas, Western Division.  Removal is based on federal question jurisdiction pursuant to 28 U.S.C. § 1331, as more fully set forth below.

## I.   BACKGROUND FACTS

1.   Plaintiff Nathan Austin purportedly is a stockholder of Wal-Mart.

Wal-Mart is a Delaware corporation with its principal place of business in

Bentonville, Arkansas, which is located within the Western District of Arkansas.

Plaintiff brings claims purportedly on behalf of Wal-Mart against various

individual defendants who are for the most part current or former directors or

officers of Wal-Mart.[1]

2.   Plaintiff filed this shareholder derivative action on May 17, 2012 in

the Circuit Court of Pope County, Arkansas, which is located within the Eastern

District of Arkansas, Western Division.  The complaint as filed contained purely

state law theories of liability, none of which specifically was premised on any

alleged violation of federal law.

3.   On July 21, 2014, Defendants moved to dismiss the complaint,

arguing that the complaint failed to plead with particularity, as required under Rule

23.1 of the Arkansas Rules of Civil Procedure, why Plaintiff was excused from

make a demand on the Wal-Mart Board of Directors prior to bringing suit.

4.   On August 8, 2014, Plaintiff filed his Memorandum in Opposition to

Defendants' Motion to Dismiss (the "Opposition"), in which Plaintiff for the first

time asserted that his claims are premised on the theory that the Individual

---

[1]       Two defendants named in the complaint—Eduardo Solorzano Morales and Jose Luis
Rodriguezmacedo Rivera—have never been served and never appeared in this action when it was pending in Pope
County, Arkansas.  Defendant Rodriguezmacedo Rivera is not a current or former director or officer of Wal-Mart.

Defendants violated, or caused Wal-Mart to violate, Section 10(b) of the federal Securities Exchange Act of 1934.

5.    Specifically, Plaintiff argues in the Opposition, among other things:

- "the challenged conduct involves the Board's decision to allow Wal-Mart to file a false and misleading SEC Form 10-Q in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act")." Opp. 24;

- "Wal-Mart's Board exercised control over Wal-Mart's quarterly report but chose to allow its filing despite knowing that it was false." Opp. 25;

- "Defendants allowed Wal-Mart to file a quarterly report with the SEC knowing full well that it misrepresented the facts(.)" *Id.*;

- "In violation of the federal securities laws, this statement (in the December 8, 2011 SEC Form 10-Q) misleadingly suggests that the Company first learned of the FCPA violations at Wal-Mex in 2011(.)" *Id.*;

- "Wal-Mart's quarterly report was false and violated Section 10(b) of the Exchange Act of 1934." Opp. 27; and

- the United States Magistrate Judge's Report and Recommendation in *City of Pontiac Gen. Employees Ret. Sys. v. Wal-Mart Stores, Inc.,*

Civil Action No. 5:12-cv-05162 SOH in the Western District of

Arkansas, Fayetteville Division, is "persuasive authority that

Plaintiff's Complaint in this case sufficiently pleads that Wal-Mart's

Board knowingly filed the false SEC Form 10-Q(.)" *Id.*

## II.   JURISDICTIONAL STATEMENT

6.     This Court has original jurisdiction over this action pursuant to 28

U.S.C. § 1331 because, as made clear by the arguments in the Opposition, this

action raises a federal question. This action, therefore, may be removed to federal

court pursuant to 28 U.S.C. § 1441(a).

7.     Plaintiff raises a federal question in the Opposition when he expressly

asserts for the first time that Defendants violated, or caused the Company to

violate, Section 10(b), as set out above. Plaintiff therefore seeks a judicial

determination whether the Individual Defendants violated Section 10(b). At the

demand futility stage, Plaintiff further seeks a judicial determination that the

Individual Defendants face a substantial likelihood of liability under Section 10(b)

sufficient to excuse Plaintiff from making a pre-suit demand under Rule 23.1.

8.     Because it is now clear that resolution of a federal question is

necessary for the resolution of both the question of demand futility and the claims

asserted in the complaint, this Court has jurisdiction over this action.

### III.   **COMPLIANCE WITH REMOVAL PROCEDURE**

9.     In accordance with 28 U.S.C. § 1446(a), Defendants attach hereto a copy of the complaint, all other process, pleadings, and orders filed or served upon Defendants in the state court action, and all documents filed in the state court action, as Exhibit A.

10.     The Circuit Court of Pope County, Arkansas is located within the Eastern District of Arkansas, so removal to this Court is proper pursuant to 28 U.S.C. § 1446(a).

11.     This Notice of Removal is timely because it is filed within thirty days of Defendants' receipt of the Opposition, the first document filed by Plaintiff that demonstrates that Plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law, as required by 28 U.S.C. § 1446(b)(1).  *See, e.g.*, *Chaganti & Associates, P.C. v. Nowotny*, 470 F.3d 1215, 1219-20 (8th Cir. 2006); *Emory v. Duke*, 5:12-cv-05171, slip op., at 4-5 (W.D. Ark. Mar. 19, 2013); *Staehr v. W. Capital Res., Inc.*, CIV. 10-1806, 2010 WL 4338652 (D. Minn. Sept. 24, 2010) report and recommendation adopted sub nom. *Steven Staehr v. W. Capital Res., Inc.*, CIV. 10-1806, 2010 WL 4321542 (D. Minn. Oct. 26, 2010); *Landers v. Morgan Asset Mgmt.*, 2009 U.S. Dist. LEXIS 30891, at *19-31 (W.D. Tenn. Mar. 31, 2009).

12.     All Defendants who were properly served in this action consent to removal and have joined this Notice of Removal, in accordance with 28 U.S.C. § 1446(b)(2).

13.     Defendants will promptly serve a copy of this Notice of Removal on all other parties to the state court action and will file a copy of this notice with the clerk of the Circuit Court of Pope County pursuant to 28 U.S.C. § 1446(d).

14.     Concurrently with this motion, Defendants also are filing a motion to transfer this action to the United States District Court for the Western District of Arkansas, where a related action making substantially similar allegations—*In re Wal-Mart Stores, Inc. Shareholder Derivative Litigation*, No. 4:12-cv-4041—is pending before the Honorable Susan O. Hickey.

## IV.   <u>CONCLUSION</u>

This Court has jurisdiction over this action under 28 U.S.C. § 1331, and this action is properly removed to this Court pursuant to 28 U.S.C. § 1441(a).  No admission of fact, law, or liability is intended by this Notice of Removal, and Defendants expressly reserve all defenses, affirmative defenses, and motions otherwise available to them.  Defendants also reserve the right to supplement this Notice of Removal.

WHEREFORE, Defendants respectfully request that this Court assume jurisdiction over this action so that this case may proceed before this Court as an action properly removed to federal court.

Respectfully submitted,

| | |
|---|---|
| THEODORE J. BOUTROUS JR. | JESS ASKEW III |
| JONATHAN C. DICKEY | (Ark. Bar No. 86005) |
| MARK A. PERRY | jess.askew@kutakrock.com |
| GEORGE H. BROWN | TERESA WINELAND |
| BRIAN M. LUTZ | (Ark. Bar No. 81168) |
| GIBSON DUNN & CRUTCHER LLP | teresa.wineland@kutakrock.com |
| 333 SOUTH GRAND AVENUE | KUTAK ROCK LLP |
| LOS ANGELES, CA 90071-3197 | 124 W. CAPITOL AVE., STE. 2000 |
| TELEPHONE:  (213) 229-7000 | LITTLE ROCK, AR 72201-3706 |
| FAX: (213) 229-7520 | TELEPHONE: (501) 975-3000 |
| | FAX: (501) 975-3001 |

*Counsel for Defendants S. Robson Walton, Aida M. Alvarez, James W. Breyer, M. Michele Burns, James I. Cash, Jr., Roger C. Corbett, Douglas N. Daft, Michael T. Duke, Gregory B. Penner, Steven S. Reinemund, H. Lee Scott, Jr., Arne M. Sorenson, Jim C. Walton, Christopher J. Williams, Linda S. Wolf, and Eduardo Castro-Wright, and Nominal Defendant Wal-Mart Stores, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 5th day of September, 2014, I served a copy of the foregoing on the plaintiff by means of the CM/ECF system to his attorneys at the following addresses:

James A. Streett
james@streettlaw.com

Alex G. Streett
alex@streetlaw.com

Joe P. Leniski, Jr.
jleniski@branstetterlaw.com

_____
Jess Askew III

*Original*

# EXHIBIT A

DEFENDANTS' NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF ARKANSAS

IN THE CIRCUIT COURT OF POPE COUNTY, ARKANSAS

NATHAN F. AUSTIN,                               )
Derivatively On Behalf of                       )
WAL-MART STORES, INC.                            )
                                                )
    Plaintiff,                                  )
                                                )     Case No. CV-2012- 201
        vs.                                     )
                                                )
                                                )     JURY DEMAND
S. ROBSON WALTON, MICHAEL T. DUKE,              )
H. LEE SCOTT, JR., JIM C. WALTON,               )
DOUGLAS N. DAFT, ROGER C. CORBETT,              )
AIDA M. ALVAREZ, JAMES W. BREYER,               )
M. MICHELE BURNS, JAMES I. CASH, JR.,           )
GREGORY B. PENNER, STEVEN S.                    )
REINEMUND, ARNE M. SORENSON,                    )
CHRISTOPHER J. WILLIAMS, LINDA S.               )
WOLF, EDUARDO CASTRO-WRIGHT,                    )
EDUARDO SOLORZANO MORALES and                   )
JOSE LUIS RODRIGUEZMACEDO RIVERA,               )
                                                )
    Defendants.                                 )
                                                )
        -and-                                   )
                                                )
WAL-MART STORES, INC.,                          )
                                                )
    Nominal Defendant.                          )
_____)

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
## FOR BREACH OF FIDUCIARY DUTIES

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint for

Breach of Fiduciary Duty (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.     This is a shareholders' derivative action brought pursuant to Arkansas Annotated

Code §4-26-714, §4-27-740 and Arkansas Rule of Civil Procedure 23.1 by shareholders of and for

the benefit of nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") against

1

its entire Board of Directors and certain top officers of Wal-Mart's to remedy defendants' violations of law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that occurred between January 1, 2005 and the present (the "Relevant Period").

2.      Specifically, this shareholders derivative action asserts claims for breach of fiduciary duty against defendants S. Robson Walton, Michael T. Duke, H. Lee Scott, Jr., Jim C. Walton, Douglas N. Daft, Roger C. Corbett, Aida M. Alvarez, James W. Breyer, M. Michele Burns, James I. Cash, Jr, Gregory B. Penner, Steven S. Reinemund, Arne M. Sorenson, Christopher J. Williams, and Linda S. Wolf (the "Director Defendants" or the "Board"), as well as Company officer defendants Eduardo Castro-Wright, Eduardo Solorzano Morales and Jose Luis Rodriguezmacedo Rivera (the "Officer Defendants"). Collectively, the Director Defendants and the Individual Defendants are referred to as the "Individual Defendants".

3.      The Complaint sets forth allegations of fact that since at least 2005, the Company's largest foreign subsidiary, Wal-Mart de Mexico ("Wal-Mex") engaged in widespread and illegal bribery of Mexican officials to gain the permits necessary to further Wal-Mex's business interests in that country, while high-level officers and directors of Wal-Mart in the United States attempted to and did cover-up this illicit scheme. Wal-Mart holds a nearly 70% stake in Wal-Mex, which by the end of 2005 was one of Mexico's largest retailers and a jewel of Wal-Mart's $56 billion international arm.

4.      For nearly six years, top executives and directors of Wal-Mart were able to conceal the corrupt business practices being orchestrated all across Mexico by Wal-Mex. However, in a filing with the Securities and Exchange Commission ("SEC") on December 8, 2011, Wal-Mart was forced to disclose that during fiscal year 2012, the Company had begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in

compliance with the U.S. Foreign Corrupt Practices Act ("FCPA").  Although Wal-Mart indicated that it had notified the Justice Department of the commencement of its investigation, it informed the investing public that it did "not believe that these matters will have a material adverse effect on [Wal-Mart's] business."  At the time of this SEC filing, however, the Company was well-aware of the illegal conduct that was being perpetuated by its Mexican subsidiary and its efforts to bury the truth about this conduct from the public.

5.      The truth about the Company's actions would not stay buried for long.  As reported by *The New York Times* ("NYT") in an article by David Barstow titled, *At Wal-Mart in Mexico, a Bribe Inquiry Silenced,* N.Y. TIMES (Apr. 21, 2012)(available at http://www.nytimes.com/2012/04/22/business/at-walmart-in-mexico-a-bribe-inquiry-silenced.html (last visited May 8, 2012)), it had been conducting an investigation which revealed that from 2005 to present, Wal-Mex had paid approximately $24 million in bribes to officials and bureaucrats throughout Mexico in order to obtain new-store building permits and expand its market presence.  The NYT investigation described how in September 2005, a former Wal-Mex executive emailed a senior Wal-Mart attorney detailing how Wal-Mex, with the knowledge and consent of  former Wal-Mex Chief Executive Officer ("CEO") defendant Eduardo Castro-Wright, designed and executed the corrupt bribery operation.   Upon receiving the email, Wal-Mart executives deemed it credible and sent an internal investigation team to Mexico City.  Shortly after arriving, the investigators found evidence confirming the bribery allegations in the email, and concluded that "There is reasonable suspicion to believe that Mexican and USA laws have been violated." The lead investigator, himself a former-FBI agent, recommended that Wal-Mart enhance their investigation efforts by questioning defendant Castro-Wright and other top Wal-Mex officials about their awareness and roles regarding the bribes.

6.     Rather than expose the full scope of this criminal wrongdoing and fulfill their fiduciary duties of good faith and loyalty to the Company, Individual Defendants and the other officers and directors of Wal-Mart at that time halted any further investigation into the bribery scandal involving Wal-Mex and defendant Castro-Wright.  The investigation was shut down in order to prevent damaging the business reputation of Wal-Mex and in particular defendant Castro-Wright, the recently-appointed CEO of Wal-Mart Stores USA, who was widely-considered a "rising star" in the Company and a possible candidate to replace then-Wal-Mart CEO defendant H. Lee Scott Jr. ("Scott").

7.     By shutting down the investigation, Individual Defendants successfully covered-up the illegal activities orchestrated by Wal-Mex and defendant Castro-Wright, and thus no Wal-Mex executives were ever punished. In fact, Individual Defendants rewarded defendant Castro-Wright by promoting him to the Company's vice chairman position in 2008.

8.     The self-serving and disloyal conduct exhibited by the Individual Defendants not only placed the Defendants' interests squarely in conflict with the best interests of the Company, itself and utter abdication of their fiduciary duties, but also exposed Wal-Mart to significant liability and expenses due to its alleged violations of the FCPA, not to mention significant damage to its reputation and goodwill.  The faithless behavior of the Individual Defendants has and will constitute a waste of corporate assets, gross mismanagement, and abuse of their power as directors and officers of the Company.

9.     Any demand upon the Director Defendants to remedy these damages would be a futile gesture, as they themselves are responsible for inflicting these harms upon the Company, and could not be reasonably expected to sue themselves or other directors to whom they are beholden, through business connections, or otherwise. This derivative lawsuit is necessary to help recover the damages suffered by Wal-Mart, and to protect the Company from the Board of

. 4

Directors' continuing breaches of fiduciary duty, conflicts of interest and violations of statutory law.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Ark. Code Ann. §16-4-101 *et seq.* This Court has jurisdiction over each of the defendants because at all relevant times, they conducted business in, resided in and/or were citizens of Arkansas.  Wal-Mart is incorporated in the State of Delaware and its principal place of business was, at all relevant times, in the State of Arkansas.

11.     Venue is proper in this County pursuant to Ark. Code Ann. §16-55-213, *et seq.*, in that the plaintiff, a Wal-Mart shareholder, is a resident of this County.

12.     This action arises solely under State laws of Arkansas and Delaware.  No Federal Question is presented by this complaint. This action is a shareholder derivative action on behalf of Wal-Mart seeking both damages and injunctive relief, and solely involves the internal affairs or governance of a corporation.

## PARTIES

13.     Plaintiff Nathan F. Austin is a resident of Pope County, Arkansas, and at all times relevant hereto, is and was an owner and holder of Wal-Mart stock at the time of the transactions complained of in this Action under in accordance with Ark. Code Ann. §4-26-714(a) and §4-27-740(a).

14.     Nominal defendant Wal-Mart is a Delaware corporation whose headquarters are located at 702 Southwest 8th Street, Bentonville, Arkansas.  The Company is the world's 18th largest public corporation, according to the Forbes Global 2000 list and the largest public corporation ranked according to revenue. The Company was founded by Sam Walton in 1962 and the Walton family still controls a majority of the shares. Wal-Mart operates discount retail stores,

supercenters and markets world-wide, selling a variety of merchandise including clothing, housewares, electronic, music and DVD's and hardware.

15.     Defendant S. Robson Walton ("R. Walton") is the eldest son of Wal-Mart's founder, Sam Walton, has worked for Wal-Mart since 1969, and has served as the Chairman of the Board since 1992.  Defendant R. Walton has previously served as senior vice president, secretary and general counsel and vice chairman of the Company.  Prior to joining Wal-Mart, defendant R. Walton was a law partner with the law firm of Conner & Winters in Tulsa, Oklahoma.

16.     Defendant Michael T. Duke ("Duke") is the current President and CEO of Wal-Mart and a Director of the Company since 2008.  Duke joined Wal-Mart in 1995 and served as vice chairman of the Company in charge of Wal-Mart International from 2005 to 2009, and in that capacity he was responsible for responding to the bribery charges regarding Wal-Mex, thus making him directly responsible for the resulting cover-up that has inflicted significant damages upon the Company.  Prior to joining the Company, Mr. Duke had 23 years of experience in retailing with Federated Department Stores and May Department Stores. Mr. Duke is a director of Arvest Bank and serves on the board of directors of the Consumer Goods Forum, the executive committee of Business Roundtable and is on the executive board of Conservation International's Center for Environment Leadership in Business. He also serves on the board of advisors for the University of Arkansas and the advisory board of the Tsinghua University School of Economics and Management in Beijing, China.

17.     Defendant H. Lee Scott, Jr. ("Scott") served as CEO of Wal-Mart from 2000 through 2009, and is a Director of the Company. Scott joined Wal-Mart in 1979. Mr. Scott served as a director of the Goldman Sachs Group, Inc. from May 2010 to May 2011. He currently serves on the advisory board of the Tsinghua University School of Economics and Management in

Beijing, China. Along with defendant Duke, Scott was responsible for responding to the bribery charges regarding Wal-Mex, thus making him directly responsible for the resulting cover-up that has inflicted significant damages upon the Company.

18.     Defendant Jim C. Walton ("J. Walton") has been a Director of Wal-Mart since 2005. J. Walton is the youngest son of Wal-Mart founder Sam Walton and the brother of R. Walton. He is the CEO and Chairman of the Board of Arvest Bank, a Walton family owned bank which has branches in Arkansas, Kansas, Oklahoma and Missouri. J. Walton is also Chairman of the Board of Community Publishers, Inc.

19.     Defendant Douglas N. Daft ("Daft") has been a Director of Wal-Mart since 2005. Mr. Daft served as the CEO and Chairman of the Board of the Coca-Cola Company from 2000 to 2004. Currently, Mr. Daft serves as a director of McGraw-Hill Companies, Inc. and Green Mountain Coffee Roasters, Inc.

20.     Defendant Roger C. Corbett ("Corbett") has been a Director of Wal-Mart since 2006. Mr. Corbett is the retired CEO and Group Managing Director of Woolworths Limited, an Australian retail company. He is a director of the Reserve Bank of Australia, Fairfax Media Limited and Chairman of the Board of Directors of ALH Group Pty Limited. He also serves on the board of Outback Stores.

21.     Defendant Aida M. Alvarez ("Alvarez") has been a Director of Wal-Mart since 2006, and currently serves on the Company's Audit Committee. She is the former Administrator of the United States Small Business Administration and served as the Founding Director of the US Office of Federal Housing Enterprise Oversight, the financial regulator of Fannie Mae and Freddie Mac, from 1993 to 1997. Ms. Alvarez is a director of UnionBanCal Corp. and Progreso Financiero.

22.     Defendant James W. Breyer ("Breyer") has been a Director of Wal-Mart since 2001. He is the Managing Partner of Accel Partners and a director of RealNetworks, Inc., Marvel Entertainment, Inc., and several private companies. Currently, he serves as the Company's Presiding Director.

23.     Defendant M. Michele Burns ("Burns") has been a Director of Wal-Mart since 2003. She is the Chairman and CEO of Mercer Human Resources Consulting, a subsidiary of Marsh and McLennan Companies, Inc. Ms. Burns is also a director of Cisco Systems, Inc.

24.     Defendant James I. Cash, Jr. ("Cash") has been a Director of Wal-Mart since 2006, and currently serves on the Company's Audit Committee. Mr. Cash is a retired Professor of Business Administration at Harvard Business School and a Former Senior Associate Dean and Chairman of HBS Publishing. Mr. Cash is a director of the Chubb Corporation, General Electric Company and other private companies and a former director of Microsoft Corporation.

25.     Defendant Gregory B. Penner ("Penner") has been a director of Wal-Mart since 2008. From 2002 to 2005, he served as Wal-Mart's Senior Vice president and Chief Financial Officer-Japan. Mr. Penner is a former General Partner at Peninsula Capital and a former financial analyst for Goldman, Sachs & Co. He is a member of the board of directors of Baidu.com, Inc., 99Bill Corporation, Cuil Inc., and Global Hyatt Corp.

26.     Defendant Steven S. Reinemund ("Reinemund") has been a Director of Wal-Mart since 2010. Mr. Reinemund worked for PepsiCo for 22 years and served as PepsiCo's CEO and Chairman of the Board from 2001 to 2006. Currently, he is the Dean of the Calloway School of Business and Accountancy and Babcock Graduate School of Management at Wake Forest University. He is a director of Exxon Mobil Corporation, American Express Company and Marriott International, Inc.

27.     Defendant Arne M. Sorenson ("Sorenson") has been a Director of Wal-Mart since 2008, and currently serves on the Company's Audit Committee. Mr. Sorenson is the Executive Vice president and Chief Financial Officer of Marriott International, Inc., a position he has held since 1998. He was a former partner in the law firm of Latham & Watkins in Washington, D.C.

28.     Defendant Christopher J. Williams ("Williams") has been a Director of Wal-Mart since 2004, and currently serves on the Company's Audit Committee. Mr. Williams is the Chairman and CEO of The Williams Capital Group, L.P., Chairman and CEO of Williams Capital Management, LLC and a director of Harrah's Entertainment, Inc.

29.     Defendant Linda S. Wolf ("Wolf") has been a Director of Wal-Mart since 2005. She is the former chairman of the board and CEO of Leo Burnett Worldwide, Inc., a division of Publicis Groupe, S.A. She is a trustee for investment funds advised by the Janus Capital Group, Inc.

30.     Defendant Eduardo Castro-Wright ("Castro-Wright") was the CEO of Wal-Mex and headed the Company's Mexican operation from 2002 to 2005. Defendant Castro-Wright was promoted to CEO of Wal-Mart Stores USA in 2005, and named a Vice-Chairman of the Company in 2008. Former executives quoted in the New York Times on April 21, 2012, called defendant Castro-Wright the "driving force behind years of bribery" in Mexico.

31.     Defendant Eduardo F. Solorzano Morales ("Morales") replaced defendant Castro-Wright as CEO of Wal-Mex in 2005, and presently serves as Chief Executive of Wal-Mart Latin America. Defendant Morales vehemently opposed Wal-Mart's internal investigation into Wal-Mex's corrupt business practices in 2005 in an effort to conceal his and other executive's roles in the illegal bribery and record falsification scheme.

32.     Defendant Jose Luis Rodriguezmacedo Rivera ("Rodriguezmacedo") was the General Counsel of Wal-Mex in 2005. Defendant Rodriguezmacedo was one of the targets in

Wal-Mart's bribery investigation in 2005, but eventually defendants Scott and Duke turned control of the investigation over to his supervision. He was senior vice president for legal, ethics and compliance at Wal-Mart Mexico until he was reassigned on April 20, 2012, shortly after the NYT ran its story.

## ALLEGATIONS OF WRONGFUL CONDUCT

33.     This shareholder derivative action results from the uncovering of a widespread bribery scheme being perpetrated by executive officers at Wal-Mex, the Company's largest subsidiary located in Mexico, a resultant effort by Individual Defendants to hide the truth about the wrongdoing occurring at Wal-Mex, and the Wal-Mart Board's failure to implement and execute an effective system of internal controls that would prevent the Company and/or its employees from paying or offering to pay a foreign official anything of value to obtain business, thus violating the FCPA. The factual allegations herein are the result of pervasive malfeasance committed by Wal-Mart and Wal-Mex executives who are under the direct monitor and control of the Board and senior management. Perpetrated at the highest levels of the Company and covered-up by these same individuals, the wrongdoing being challenged by this shareholder action demonstrates that the Individual Defendants cannot impartially consider a demand to remedy the grievous harm inflicted upon the Company and its reputation.

### A.     The Foreign Corrupt Practices Act

34.     Under the FCPA's anti-bribery provisions, U.S. companies and citizens, foreign companies listed on a U.S. stock exchange, or any person acting while in the United States are generally prohibited from corruptly paying or offering to pay, directly or indirectly, money or anything of value to a foreign official a foreign political party or official, or a candidate for foreign political office for purposes of influencing any act or decision (including a decision not to act) of such official in his or her official capacity, inducing the official to do any act in violation

of his or her lawful duty, or to secure any improper advantage in order to assist the payor in obtaining or retaining business for or with any person, or in directing business to any person. In addition, the FCPA established accounting control requirements for issuers subject to either the registration or reporting provisions of the Exchange Act.

35.    The FCPA also requires every issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements; and (iii) to maintain accountability for assets. Proof of a U.S. territorial nexus is not required for FCPA implication against U.S. companies and citizens, and FCPA violations can, and often do, occur even if the prohibited activity takes place entirely outside of the United States.

36.    Significantly, a key 'best practices' FCPA compliance program component is to utilize internal audit to monitor for FCPA compliance issues on a regular basis to not only assess compliance but to also identify anything which warrants further investigation. Taken a step further, a continuous controls monitoring program can assist a company to identify unusual expenses, budgeted items, or any other event which is outside an established norm and "red flag" such expense, item or event for further investigation.

37.    The Department of Justice ("DOJ") and the SEC jointly enforce the FCPA. The DOJ is responsible for all criminal enforcement and for civil enforcement of the anti-bribery provisions with respect to domestic concerns and foreign companies and nationals. The SEC is responsible for civil enforcement of the anti-bribery provisions with respect to issuers.

38.    The following criminal penalties may be imposed for violations of the FCPA's anti-bribery provisions: corporations and other business entities are subject to a fine of up to

$2,000,000; officers, directors, stockholders, employees, and agents are subject to a fine of up to $100,000 and imprisonment for up to five years. Moreover, under the Alternative Fines Act, these fines may be quite higher -- the actual fine may be up to twice the benefit that the defendant sought to obtain by making the corrupt payment. Importantly, fines imposed on individuals may not be paid by their employer or principal.

39.     In addition to the criminal penalties, the Attorney General or the SEC, as appropriate, may bring a civil action for a fine of up to $10,000 against any firm as well as any officer, director, employee, or agent of a firm, or stockholder acting on behalf of the firm, who violates the anti-bribery provisions. In addition, in an SEC enforcement action, the court may impose an additional fine not to exceed the greater of (i) the gross amount of the pecuniary gain to the defendant as a result of the violation, or (ii) a specified dollar limitation. The specified dollar limitations are based on the egregiousness of the violation, ranging from $5,000 to $100,000 for a natural person and $50,000 to $500,000 for any other person.

40.     The Attorney General or the SEC, as appropriate, may also bring a civil action to enjoin any act or practice of a firm whenever it appears that the firm (or an officer, director, employee, agent, or stockholder acting on behalf of the firm) is in violation (or about to be) of the anti-bribery provisions.

41.     In addition to the criminal and civil penalties and fines, under guidelines issued by the Office of Management and Budget, a person or firm found in violation of the FCPA may be barred from doing business with the Federal government. Indictment alone can lead to suspension of the right to do business with the government. The President has directed that no executive agency shall allow any party to participate in any procurement or non-procurement activity if any agency has debarred, suspended, or otherwise excluded that party from participation in a procurement or non-procurement activity.

42.    Furthermore, a person or firm found guilty of violating the FCPA may be ruled ineligible to receive export licenses; the SEC may suspend or bar persons from the securities business and impose civil penalties on persons in the securities business for violations of the FCPA; the Commodity Futures Trading Commission and the Overseas Private Investment Corporation both provide for possible suspension or debarment from agency programs for violation of the FCPA; and a payment made to a foreign government official that is unlawful under the FCPA cannot be deducted under the tax laws as a business expense.

43.    As of March, 2009, there emerged three distinct trends in the enforcement of FCPA which legal analysts identified and publicly reported. First, the number of FCPA matters pursued by the DOJ (including deferred prosecutions and non-prosecution agreements) and the SEC steadily increased between 2002 and 2008, including a sharp increase in enforcement actions against both corporation and individuals. Secondly, there was a strong trend of actions against individuals being brought separately—often in advance—of charges against their employers and then, in all likelihood, following classic prosecutorial strategy of working up the chain of command, using the individuals to build the government's case against their superiors and eventually the company. Third, penalties assessed against corporations have increased over the same period, both in the aggregate (including all fines, penalties, restitution, and disgorgement) and in individual cases.

44.    Because the Individual Defendants have authorized Wal-Mart to operate in over 100 countries, some of which involve a higher than normal risk of violations of the anticorruption laws, including the FCPA, the Wal-Mart Board had a fiduciary duty to install and maintain internal controls and an accounting system for compliance with the FCPA.

**B.     Whistleblower in 2005 Revealed Systemic Bribery and Corruption Scheme at Wal-Mex Spearheaded By Defendant Castro-Wright**

45.     In 2004, Ms. Maritza I. Munich ("Munich"), a senior attorney at Wal-Mart, implored the board to adopt a strict anticorruption policy that prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart." Under the proposed policy, every employee would be required to report the first sign of corruption, and it would bind Wal-Mart's agents to the same exacting standards. The board, however, resisted this proposal, which would eventually have significant ramifications for the Company.

46.     As reported in the recently-published The New York Times article, on September 21, 2005, former Wal-Mex in-house attorney Sergio Cicero Zapata ("Cicero") e-mailed Munich stating that he was in possession of information about "irregularities" authorized "by the highest levels" at Wal-Mex, and concluding that "I hope to meet you soon." A few days later, Wal-Mart hired a local Mexico attorney to question Cicero. In that interview, he told how Wal-Mex's leaders had engaged in a systematic campaign of bribery throughout Mexico in order to ensure quick and easy approval of building permits for Wal-Mex's new stores.

47.     According to Cicero, the person most responsible for this conduct was defendant Castro-Wright, but several Wal-Mex leaders, including its board chairman, its general counsel, its chief auditor and its top real estate executive, were also implicated in the scheme. Cicero stated that while he had knowledge of the occasional bribe being paid before defendant Castro-Wright's arrival, the illegal practice exploded once defendant Castro-Wright took over as Wal-Mex's top executive in 2002. Setting the tone at the top, defendant Castro-Wright set "very aggressive growth goals," which required opening new stores "in record times," thus applying pressure to Wal-Mex executives to do "whatever was necessary" to obtain permits.

14

48.     As quoted in the *The New York Times* article, Cicero recounted how defendant Castro-Wright had encouraged the payments for a specific strategic purpose: build hundreds of new stores so fast that competitors would not have time to react. Specifically, Cicero explained how the bribes were funneled to government officials through Mexican intermediaries called "gestores" (loosely translated as "managers"), and how Wal-Mex prepared false invoices to make it seem as if the payments made to the *gestores* were legitimate business expenses. Wal-Mex used

bribes to accelerate growth by, amongst other things, changing zoning maps, overcoming environmental objections, and drastically shortening the time for processing permits. "What we were buying was time," he said.

49.     Wal-Mart investigators were able to substantiate Cicero's revelations through both his documentation as well as materials they uncovered in the course of their investigations in Mexico City. According to the Wal-Mart investigators, each month, Mr. Castro-Wright and other top Wal-Mex executives received a detailed schedule of all of the payments performed. Wal-Mex then falsified the payments in accounting records as simple legal fees. These false records were then passed on to the Company's headquarters in Bentonville. The investigators concluded that Cicero's account of the criminality at the top of Wal-Mex was extremely credible, as he had clearly been in a position to witness the events he described.

## C.     The Company Concealed Earlier Known Corruption By Wal-Mex and Defendant Castro-Wright

50.     Wal-Mart's investigation into Cicero's allegations was not the Company's first indication of corruption at Wal-Mex by defendant Castro-Wright. A confidential investigation, conducted for Wal-Mart in 2003 by Kroll Inc., a leading investigation firm, discovered that Wal-Mex had systematically increased its sales by helping favored high-volume customers evade sales taxes. A draft of Kroll's report, obtained by The New York Times, concluded that top Wal-Mex

executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Wal-Mex was "carrying out a tax fraud. (The company ultimately paid $34.3 million in back taxes.) Wal-Mart then asked Kroll to evaluate Wal-Mex internal audit and antifraud units. Kroll wrote another report that branded the units "ineffective." Many employees accused of wrongdoing were not even questioned; some received a promotion shortly after the suspicions of fraudulent activities had surfaced.

### D. Despite His Role In Wal-Mex Corruption, Defendant Castro-Wright Is Placed In Charge of All Wal-Mart Stores in the United States

51. The stunning growth at Wal-Mex made defendant Castro-Wright a rising star in the eyes of the Company's senior leaders, despite the already clear warnings that something was amiss at Wal-Mex under his leadership. Just days before Wal-Mart investigators first interviewed Mr. Cicero, Mr. Castro-Wright was promoted and put in charge of all Wal-Mart stores in the United States, one of the most prominent and powerful jobs in the Company. In early 2005, when he was promoted to a senior position in the United States, Mr. Duke would cite his "outstanding results" in Mexico.

### E. Individual Defendants Reject An Independent and Thorough Investigation of Defendant Castro-Wright and Wal-Mex

52. Defendant Duke, who is presently Wal-Mart's CEO, received an email with a note stating "You'll want to read this" on October 15, 2005 which detailed Cicero's allegations. Duke received this email in his capacity as then-Vice Chairman of the Company in charge of Wal-Mart's foreign subsidiaries.

53. Following the Company's initial investigation of Cicero's claims, Wal-Mart senior attorney Munich sent memos detailing the corruption scheme to Wal-Mart's senior management, including Thomas A. Mars, Wal-Mart's general counsel and a former director of the Arkansas

State Police; Thomas D. Hyde, Wal-Mart's executive vice president and corporate secretary; Michael Fung, Wal-Mart's top internal auditor; Craig Herkert, the chief executive for Wal-Mart's operations in Latin America; and Lee Stucky, a confidant of Lee Scott's and chief administrative officer of Wal-Mart International.

54.     As a result of Munich's memos, Wal-Mart contacted the law firm of Willkie Farr & Gallagher ("Willkie Farr") and asked them to outline the course of a possible investigation into whether any employees of the Company had engaged in violations of the Foreign Corrupt Practices Act. Willkie Farr submitted a plan calling for tracing all payments to anyone who had helped Wal-Mex obtain permits for the previous five years, stating that it would scrutinize "any and all payments" to government officials and interview every person who might know about payoffs, including "implicated members" of Wal-Mex's board. Willkie Farr recommended that the investigation be allowed to proceed for approximately four months and argued that it should be independent and thorough, as fitting an investigation in which top executives such as defendant Castro-Wright may be implicated.

55.     Despite this call for a robust investigation into Wal-Mex, the Company rejected the firm's proposal.  Instead, records show, they decided Wal-Mart's lawyers would supervise a far more limited "preliminary inquiry" by Wal-Mart's internal Corporate Investigations Unit. However, as the Company knew full well, this in-house investigation team was ill-equipped to take on a major investigation of this type, particularly one involving a foreign country such as Mexico. It had fewer than 70 employees, and most were assigned to chasing shoplifting rings and corrupt vendors. Just four people were specifically dedicated to investigating corporate fraud, a number Joseph R. Lewis ("Lewis"), Wal-Mart's director of corporate investigations, described in a confidential memo as "wholly inadequate for an organization the size of Wal-Mart." As a confidential memo explained, this team's inquiry would take two weeks, not the four months

17

proposed by Willkie Farr; analyze the permits of just a few specific stores; and conduct interviews "only when absolutely essential to establishing the bona fides" of Cicero. Only if the Corporate Investigations Unit discovered a "likelihood" that laws had been violated would the Company consider conducting a "full investigation."

56.    The decision to conduct a much more limited investigation into Wal-Mex and defendant Castro-Wright allowed Wal-Mart's senior management to directly oversee and control the scope of the inquiry, thus continuing the Company's disturbing trend of tightly restricting investigations of its own leaders and calling into question their effectiveness. For example, in October, Wal-Mart's vice chairman, John B. Menzer ("Menzer"), intervened in an internal investigation into a senior vice president who reported to him. According to internal records, Menzer told Kenneth H. Senser ("Senser"), Walmart's vice president of global security, that he did not want Corporate Investigations to handle the case "due to concerns about the impact such an investigation would have." One of the senior vice president's subordinates, he concluded, "would be better suited to conduct this inquiry." Soon after, records show, the subordinate cleared his boss. The other case involved the president of Wal-Mart Puerto Rico. A whistle-blower had accused the president and other executives of mistreating employees. Although Corporate Investigations was supposed to investigate all allegations against senior executives, the president had instead assigned an underling to look into the complaints -- but to steer clear of those against him.

F.    **Wal-Mart's Limited Inquiry Yielded Overwhelming Evidence of Wrongdoing Committed by Wal-Mex and Wal-Mex Officials**

57.    Even though the Company authorized only a limited inquiry, into Wal-Mex, the results were overwhelming and confirmed the allegations made by Cicero. The investigation confirmed almost all of Cicero's findings, including the fact that approximately $24 million in

suspect payments had been made to Mexican officials and specific records showing payments of $8.5 million to two of the *gestores* named by Cicero in his interviews. The investigators also found documents showing that Wal-Mex's top executives knew about the payments, and instead of halting the practice, ramped up the scheme ("implement this plan as soon as possible") and took steps to conceal them. These executives included defendants Castro-Wright and Rodriguezmacedo, who was then Wal-Mex General Counsel. Defendant Rodriguezmacedo claimed the company had stopped using *gestores* after Cicero departed the company, yet even as Cicero was being debriefed in October 2005, records show Wal-Mex real estate executives made a request to pay a gestore $14,000 to get a construction permit.

58.   The investigative team wrote confidential reports to Wal-Mart's top executives in December 2005 laying out all the evidence that corroborated Cicero's allegations: hundreds of gestore payments, the mystery codes, the rewritten audits, the evasive responses from Wal-Mart Mexico executives and the evidence *gestores* were still being used. "There is reasonable suspicion," the report concluded, "to believe that Mexican and USA laws have been violated." There was simply "no defendable explanation" for the millions of dollars in payments to *gestores*.

59.   The leader of the Corporate Investigations team, Ronald Halter ("Halter"), submitted an "action plan" for a deeper investigation that would more fully-vet the extent of the corruption at Wal-Mex and reveal those who were responsible. Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history." Halter also proposed a thorough investigation of the two primary *gestores* mentioned by Cicero. He had forgone such interviews in Mexico for fear of his safety. ("I do not want to expose myself on what I consider to be an unrealistic attempt to get Mexican lawyers to admit to criminal activity," he had explained to his bosses.) Now Halter wanted Wal-Mart to hire private investigators to interview and monitor both of the primary *gestores*. He also proposed a round of adversarial

19

interviews with Wal-Mex senior executives, including the sensitive step of questioning defendant Castro-Wright about his role in the gestore payments.

60.     Around January 2006, Munich wrote a memo in which she agreed with Halter's assessments and recommendation that the Company enlarged the scope of the bribery investigation, noting that "[t]he bribery of government officials is a criminal offense in Mexico."

### G.     Individual Defendants Chose To Cover-Up The Bribery Scheme At Wal-Mex and Exonerate Those Responsible For The Wrongdoing

61.     There can be no doubt that the Individual Defendants with the Company in 2005 were on notice of the rampant corruption in Wal-Mart's global business sector and the need to redress it.  In addition to the proposal from Halter, others involved in the investigation argued that it was time to take a stand against signs of rising corruption in Wal-Mart's global operations, which was becoming a significant dilemma facing the Company. Each year the Company received hundreds of internal reports of bribery and fraud. In Asia alone, there had been 90 reports of bribery just in the previous 18 months.  So dire was this problem that in 2005, Wal-Mart summoned its top procurement executives to its corporate headquarters where Company Vice Chairman Menzer scolded them over the corruption, stating in succinct fashion that "Times have changed" and such wrongdoing was creating an unacceptable risk given the government's stepped-up enforcement of the FCPA.  Moreover, even as they pondered Halter's action plan, the Company received new disturbing evidence of additional wrongdoing at Wal-Mex. In January 2006, Scott, Duke and Wal-Mart's chairman, S. Robson Walton, received an anonymous e-mail accusing Wal-Mex's top real estate executives of receiving kickbacks from construction companies, and pleading with these defendants "Please you must do something."

62.     Wal-Mart's leaders had agreed to consider a full investigation if the preliminary inquiry found Cicero's allegations credible.  They were now confronted with clear and compelling

evidence that one of the Company's rising stars, already being publicly discussed as a potential successor to CEO Scott, was implicated in serious criminal wrongdoing and had taken steps to cover it up. On this point, Wal-Mart's ethics policy offered clear direction: "Never cover up or ignore an ethics problem..." Yet this is exactly what the Individual Defendants did.

63.     Throughout the scaled-down investigation process and beyond, the Company's board received considerable push-back against casting any spotlight on the wrongdoing at Wal-Mex. Senior Executives at Wal-Mex complained bitterly to top Company management including defendants Scott and Duke, who himself traveled to Mexico in October 2005 to meet with enraged Wal-Mex officials, that the internal investigation was too heavy-handed and intrusive. Defendant Morales, then the CEO of Wal-Mex, criticized the investigators for being too secretive and accusatory. Senior Wal-Mart executives accused Lewis and the Corporate Investigation team of being overbearing, disruptive and naïve about the ambiguities of doing business abroad. They argued that Corporate Investigations should focus more on quietly "neutralizing" problems than on turning corrupt employees over to law enforcement. Unfortunately, the Company yielded to these voices.

64.     On February 3, 2006, defendant Scott called a meeting to discuss revisions to Wal-Mart's internal investigation process, and to resolve the issue of how to deal with Cicero's allegations. During that meeting, Lewis and his team were criticized for being "overly aggressive" and having too much of a "law enforcement approach".

65.     At the end of the meeting on February 3, defendant Scott ordered Mr. Sensor to produce a new protocol for corporate investigations within 24 hours, which he did. The new protocol that resulted was a highly bureaucratic process that gave senior Wal-Mart executives—including executives at the business units being investigated—more control over internal investigations. The policy included multiple "case reviews." It also required senior executives to

21

conduct a "cost-benefit analysis" before signing off on a full-blown investigation. Most critically, the new policy mandated that Mr. Lewis and his team would only investigate "significant" allegations, including those involving potential crimes or senior executives. Lesser allegations would be left to the affected business unit to investigate. Wal-Mart's senior leaders now had the ability to hamper any internal investigation and cover up the misconduct of what they deemed to be valuable assets to the Company, irrespective of the severity or illegality of the conduct at issue.

66.     Just four days after the February 3, 2006 meeting, pursuant to the new protocol that they authorized, Wal-Mart's leaders transferred control of the investigation of Wal-Mex to one of the individual's at the heart of the inquiry into the wrongdoing, Mr. Rodriguezmacedo. By taking such action, they appeared to violate even the modified weak protocol for investigations as it involved potential crimes and senior executives. Wal-Mart attorney Munich, who had strenuously objected when the Company instructed her to substantially narrow the scope of the Wal-Mex investigation, resigned from Wal-Mart in February, 2006. In an e-mail to Wal-Mart executives, she emphasized the need for "professional, independent investigative resources," and complained that the investigation was "at the direction of the same company officer who is the target of several of the allegations."

67.     Although Wal-Mart's senior investigators uniformly believed that that a proper, full-blown investigation of defendant Castro-Wright would take months to complete given that he had never been questioned or asked to produce documents, defendant Rodriguzemacedo, the Wal-Mex official now in charge, saw it differently. He wrapped up the case in a few weeks, with little additional investigation, and detailed his conclusions in a report to Wal-Mart leaders (the "Rodriguezmacedo report"). "There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits." That conclusion, the Rodriguezmacedo report explained, was largely based

on the denials of his fellow executives.  According to his report, not one "mentioned having ordered or given bribes to government authorities."

68.    The Rodriguezmacedo report, just six pages long in total, neglected to note that he had been implicated in the same criminal conduct. While the report conceded that Wal-Mart Mexico executives had authorized years of payments to *gestores*, it never bothered to try to explain what these executives expected the payments would be used for if not to bribe officials to facilitate permits. Nor did the report address the improper and fraudulent audits prepared by Wal-Mex.  The Rodriguezmacedo report promised a series of corrective steps including a ban on the use of *gestores* but did not recommend any disciplinary action against any of his colleagues.

69.    A plain reading of the Rodriguezmacedo report shows that he devoted most of it to unsubstantiated attacks on Cicero.  In building his case against Cicero, the Rodriguezmacedo report included several false statements, for example, stating that Cicero was subject to "dismissal" when records showed he had resigned, and stating falsely that Kroll's investigation of Mr. Cicero concluded that he "had a considerable increase in his standard of living during the time in which payments were made to the *gestores*."  The Rodriguezmacedo report further suggested scouring Cicero's records and determining if any legal action could be taken against him.

70.    The Rodriguezmacedo report was given to senior executives at Wal-Mart's corporate headquarters, including defendant Scott. By way of an e-mail, Lewis told his superiors the report was clearly "lacking" and had no basis to support its claim that no further action was needed regarding Wal-Mex. Rodriguezmacedo responded by adding a paragraph to the end of his report which stated that "criminal actions" were not brought against Cicero because "[Wal-Mex] did not have a strong case." This paragraph did not answer any of the questions as to why Wal-

Mex did not wish to pursue an investigation of defendant Castro-Wright and other top executives implicated in the wrongdoing.

71.    Despite the fact that the Rodriguezmacedo report was hastily put together, lacked support for its conclusions, and was criticized by members of the Company's own investigatory team, on May 10, 2006, Wal-Mart executives told Rodriguezmacedo to put his report "into final form, thus concluding this investigation." The Company did not publicly disclose anything regarding the allegations of bribery and corruption at Wal-Mex, nor did it discipline anyone for their involvement in the alleged scheme. From the Company's perspective, the Wal-Mex affair was officially closed.

## INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND/OR MISLEADING STATEMENTS REGARDING THEIR PRIOR KNOWLEDGE OF CORRUPTION AT WAL-MEX

72.    In approximately December 2011—five-and-a-half years after the Wal-Mart board shut down and quietly shelved its Wal-Mex investigation, Wal-Mart officials first learned that *The New York Times* was investigating its operations in Mexico in connection with possible violations of the FCPA by defendant Castro-Wright and other Wal-Mex executives. On December 8, 2011, in a Form 10Q filed with the SEC, Individual Defendants made the following disclosure:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anticorruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters.

> However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

73. This statement found in the Company's Form 10Q was extremely misleading. As written, it strongly suggests that the Company first learned of the Wal-Mex FCPA violations in 2012, then and only as the result of a voluntary internal review. In truth, as detailed above, the Company had known about the corrupt practices in Mexico concerning Wal-Mex's permits for several years and had taken the extraordinary steps detailed above to cover it up. Furthermore, the investigation that was launched in 2012 to review wrongdoing the Company had long known about in Mexico was not purely a "voluntary" effort, but was undoubtedly driven by the impending New York Times article.

74. At this time, Individual Defendants knew full well that they had caused the Company to engage in serious wrongdoing by failing to implement any proper controls to combat corruption and by engaging in a six year campaign to cover up evidence of serious and unlawful corruption committed by senior executives at Wal-Mex, the Company's most important foreign subsidiary. Their willingness to issue false and misleading statements about their knowledge of such wrongdoing is indicative of their unwillingness to acknowledge their role and remedy the damages that have or will befall the Company, thus justifying the need for this shareholder derivative action.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

75. By reason of their positions as officers and/or directors and fiduciaries of Wal-Mart and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Wal-Mart, Plaintiff and other common public shareholders fiduciary obligations of trust, loyalty, good faith fair dealing, due care, and candor, and were and are required to use their utmost ability to control and manage Wal-Mart in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wal-Mart and its shareholders so as to benefit all shareholders equally and not in

25

furtherance of their personal interest or benefit. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wal-Mart, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

76.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wal-Mart's, and was at all times acting within the course and scope of such agency.

77.     To discharge their duties, the officers and directors of Wal-Mart were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. In accordance with these fiduciary duties as officers and directors of Wal-Mart, the Individual Defendants as were required to, among other things:

        a.     Manage, conduct, supervise and direct the business affairs of Wal-Mart in accordance with all applicable laws, including federal and states laws, regulations and policies of the Company;

        b.     Neither violate, nor permit any officer, director or employee of Wal-Mart to violate applicable laws, rules and regulations, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA");

        c.     Remain informed as to the status of Wal-Mart's operations, including its compliance with the FCPA and the financial reporting requirements under the FCPA and the federal securities laws, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

        d.     Conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, to avoid conflicts of interest between their own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Wal-Mart's public stockholders, and to maximize the value of the Company's stock.

78.     Pursuant to the Company's Corporate Governance Guidelines, the Board is tasked with responsibility for, among other things, "[r]eviewing compliance with applicable laws and regulations and adopting policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls."

79.     Under the Corporate Governance Guidelines, Directors are also expected "to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders, and to perform their duties of care and loyalty."

80.     Additionally, all directors are also required to participate in an orientation plan upon his or her election to the Board. This plan includes "familiarizing new directors with the Company's strategic plans, *its significant financial, accounting and risk management issues, its compliance programs*, its Statement of Ethics, its principal officers, and its internal and independent auditors." (emphasis added).

81.     As stated in Wal-Mart's Code of Business Conduct and Ethics, Individual Defendants are directed to "[n]ever cover up or ignore an ethics problem. The anti-bribery laws of many countries, including the U.S. Foreign Corrupt Practices Act ("FCPA"), prohibit Wal-Mart from offering or giving any money or other thing of value, directly or indirectly through a third party, to any foreign government official for the purpose of improperly obtaining or maintaining business or securing an improper advantage. A "thing of value" could include gifts or gratuities of any kind, travel and entertainment, offers of employment or contributions to charity.

27

82.     Wal-Mart also has a Code of Ethics for the CEO and all Senior Financial Officials that was in effect from November 20, 2003 through the present.  In particular, the CEO and all Senior Financial Officers (including the CFO and Corporate Controller) are bound by these provisions.  This Code of Ethics assigns certain reporting obligations to the CEO, CFO and Corporate Controller, who fulfill those obligations by reporting specified matters, such as information about conflicts of interest or "evidence of a material violation of securities of other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof" *to the Audit Committee of the Board* and the Company's Internal Audit Services.  Other Senior Financial Officers may report such matters to their superior or the Audit Committee.

83.     Defendants Alvarez, Cash, Sorenson and Williams are members of the Board's Audit Committee, and therefore have enhanced duties as detailed in the Company's Audit Committee Charter.   Generally these defendants have a duty to review and monitor the Company's compliance with all legal and regulatory requirements. Specifically, the Charter requires the Audit Committee to "[d]iscuss with management and the Outside Auditor, and advise the Board with respect to, the Company's policies, processes and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics, and instances of non-compliance therewith." As such, they are directly responsible for overseeing Wal-Mart's compliance with the FCPA. In this capacity, Defendants Alvarez, Cash, Sorenson and Williams breached their fiduciary duties by both (1) knowingly and/or recklessly undermining the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme; and (2) failing to install internal controls sufficient to avoid violations of the FCPA, rendering them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

84. As directors and officers of Wal-Mart, Individual Defendants owed a duty to be reasonably informed about the business and operations of the Company. Moreover, the Individual Defendants who are also officers of Wal-Mart also assumed important managerial responsibilities at the Company which required them to be well informed about the day-to-day operations of the Company, and to only conduct the business affairs of Wal-Mart in the best interests of the Company and its shareholders. The Company's governance and reporting system presumably worked to inform Director Defendants of all important aspects of the Company's business, including the business activities of its single-largest global subsidiary, Wal-Mex.

85. Rather than fulfill these important fiduciary duties, upon information and belief, Individual Defendants actively participated in or knowingly encouraged, sponsored or approved the conduct complained of herein, and/or breached their fiduciary duties to Wal-Mart by purposefully, recklessly and/or negligently disregarding this conduct.

86. The Individual Defendants, in derogation of their responsibilities to Wal-Mart, failed to properly manage the affairs of the Company and failed to protect the interests of Wal-Mart and its shareholders. The Individual Defendants consciously acted in blatant disregard for their fiduciary duties by directly sabotaging the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme. Additionally, Individual Defendants failed to adequately exercise control as required by law and by their own Code of Business Conduct and Ethics by failing to: (a) prevent the payment of illegal bribes and kickbacks; (b) fully inform themselves of the scheme and/or the attempt to cover-up this wrongdoing involving its own directors and officers, (c) take direct responsibility in decision-making regarding these issues, and (d) establish and maintain adequate internal controls over management and the affairs of Wal-Mart designed to prevent these issues from occurring.

29

87.    Individual Defendants, because of their positions of control and authority as directors, members of the Audit Committee and/or officers of Wal-Mart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive, managerial and/or directorial positions with Wal-Mart, each of the defendants had access to adverse, non-public information concerning the lack of a system of accounting controls that permitted them to know of and prevent the payment of illegal bribes and kickbacks. The Individual Defendants breached their fiduciary duties by: (1) knowingly and/or recklessly electing to weaken internal controls for complying with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Wal-Mart; and (2) knowingly and/or recklessly failing to require Wal-Mart to implement such internal controls.

88.    The Individual Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at Wal-Mart, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with Wal-Mart and the financial benefits that flow therefrom.

89.    As direct and proximate result of the Individual Defendants' breaches of fiduciary duties and their failures described herein, Wal-Mart has expended, and will continue to expend, significant sums of its capital, both reputational and economic, addressing the illegal and reprehensible payments that were paid in its name. Likewise, the illegal payments have and will continue to irreparably damage Wal-Mart's corporate image and goodwill and jeopardize its ability to do business in foreign countries.

## WAL-MART HAS AND SHALL SUFFER DAMAGES
## RESULTING FROM INDIVIDUAL DEFENDANTS' CONDUCT

90.     On May 17, 2012, the Company filed an SEC Form 8-K addressing the scope of

the investigations into the alleged wrongdoing at Wal-Mex and discussing the financial impact

and other damages to the Company that may result, which could be material: (emphasis added)

> The Audit Committee of the Company's Board of Directors (the "Audit
> Committee"), which is composed solely of independent directors, is conducting
> an internal investigation into, among other things, alleged violations of the U.S.
> Foreign Corrupt Practices Act (the "FCPA") and other alleged crimes or
> misconduct in connection with foreign subsidiaries including Wal-Mart de
> México, S.A.B. de C.V. ("Walmex") and whether prior allegations of such
> violations and/or misconduct were appropriately handled by the Company. The
> Audit Committee and the Company have engaged outside counsel from a number
> of law firms and other advisors who are assisting in the on-going investigation of
> these matters. The Company is also conducting a voluntary global review of its
> policies, practices and internal controls for FCPA compliance. The Company is
> engaged in strengthening its global anti-corruption compliance programs through
> appropriate remedial anti-corruption measures. In November 2011, the Company
> voluntarily disclosed that investigative activity to the U.S. Department of Justice
> (the "DOJ") and the SEC.

> The Company has been informed by the DOJ and the SEC that it is also the
> subject of their respective investigations into possible violations of the FCPA. The
> Company is cooperating with the investigations by the DOJ and the SEC. A
> number of federal and local government agencies in Mexico have also recently
> initiated investigations of these matters. Walmex is cooperating with the Mexican
> governmental agencies conducting these investigations. Furthermore, lawsuits
> relating to the matters under investigation have recently been filed by several of
> the Company's shareholders against it, its current directors, certain of its former
> directors, certain of its current and former officers and certain of Walmex's
> current and former officers.

> ***The Company could be exposed to a variety of negative consequences as a
> result of the matters noted above.*** There could be one or more enforcement
> actions in respect of the matters that are the subject of some or all of the ongoing
> government investigations, and such actions, if brought, may result in judgments,
> settlements, fines, penalties, injunctions, cease and desist orders or other relief,
> criminal convictions and/or penalties. The shareholder lawsuits may result in
> judgments against the Company and its current and former directors and officers
> named in those proceedings. The Company cannot predict accurately at this time
> the outcome or impact of the government investigations, the shareholder lawsuits,
> or its own internal investigation and review. In addition, the Company expects to
> incur costs in responding to requests for information or subpoenas seeking

31

documents, testimony and other information in connection with the government investigations, in defending the shareholder lawsuits, and in conducting its internal investigation and review, and it cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of the Company's senior management that could impinge on the time they have available to devote to other matters relating to the business. The Company may also see ongoing media and governmental interest in these matters that could impact the perception among certain audiences of its role as a corporate citizen.

The Company is in the early stages of assessing and responding to the governmental investigations, the shareholder lawsuits, and its internal investigation and review are on-going. Although the Company does not presently believe that these matters will have a material adverse effect on its business, given the inherent uncertainties in such situations, *the Company can provide no assurance that these matters will not be material to its business in the future.*

91.     As a result of the faithless, disloyal actions of the Individual Defendants, Wal-Mart has and will sustain varying, significant damages. As the Form 8-K filed by the Company on May 17, 2012 confirmed, Wal-Mart will undoubtedly have to defend against lengthy probes by the DOJ and the SEC into Wal-Mart's foreign operations, not only in Mexico but worldwide. Wal-Mart's defense against these regulatory actions, which have already commenced, will be time-consuming, distracting and expensive.

92.     Wal-Mart executives, including many of the Individual Defendants, face the possibility of criminal prosecutions and civil liability which will undoubtedly distract and deter them from the performance of their duties. The DOJ has placed a high premium on investigating and prosecuting violations of the FCPA and bribery laws and will undoubtedly pursue any case against the Company vigorously. As stated above, Wal-Mart also faces charges under the FCPA which can lead to very substantial fines and penalties totaling in the hundreds of millions. The scale of the bribery in Mexico and the subsequent cover-up by senior Wal-Mart executives and directors make it even more likely that Wal-Mart will have to pay the stiffest of penalties to resolve the matter.

93.    The improper actions of the Individual Defendants will also cost Wal-Mart n terms of its future growth and loss of goodwill. Already, activists and competitors have signaled that they will use the improprieties committed by the Individual Defendants against the Company when it attempts to opens stores in the U.S. and abroad. Much of Wal-Mart's recent growth has come from opening stores overseas, and so any increased regulatory activity against it will undoubtedly hinder the Company's overall growth.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.    Plaintiff brings this action derivatively in the right and for the benefit of Wal-Mart to redress injuries suffered, and to be suffered, by Wal-Mart as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Wal-Mart is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiffs will adequately and fairly represent the interests of Wal-Mart in enforcing and prosecuting its rights. Plaintiff is and was owner of the stock of Wal-Mart during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

95.    The Board of Directors of Wal-Mart at the time of this filing consisted of the following fourteen (14) individuals: S. Walton, Scott, J. Walton, Daft, Corbett, Alvarez, Breyer, Burns, Cash, Penner, Reinemund, Sorenson, Williams, and Wolf. Plaintiff did not make a pre-suit demand on the Board of Directors of Wal-Mart to institute this action because by reason of their own personal interest in the outcome of such a decision or the effect their decision would have on

another Wal-Mart Board member who dominated and controlled them, a majority the members of the Wal-Mart Board could not independently and disinterestedly consider whether to bring the allegations alleged herein, rendering such a demand a futile, wasteful and useless act.

96.     Pre-suit demand would have been futile because a majority of the Wal-Mart Board members personally participated in the misconduct described herein for his own personal gain or by improperly abrogating his oversight duties to other defendants. As a result of the Wal-Mart Board members' direct access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management, Board and Board Committee meetings, a majority of the Individual Defendants knew of the corruption scheme at Wal-Mex and yet consciously acted to cover it up and allow the Company to maintain insufficient internal controls required by the FCPA.

97.     Demand would have been futile because in order to bring this suit, a majority of the directors of Wal-Mart would have been forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand. Specifically, a majority of the Director Defendants are prevented from independently and disinterestedly considering a demand to commence and vigorously pursue the allegations contained herein for the following reasons:

98.     There is a reasonable doubt that the actions alleged herein, including the following, by the Director Defendants' were the product of a valid exercise of business judgment, for the following reasons:

        a. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson (all of whom were appointed to Board after June, 2006) were fully aware by December, 2005 of the allegations by Cicero and the subsequent documentation and findings produced by the Company's investigation team which substantiated those allegations, including the fact that approximately *$24 million* in suspect payments had been made to Mexican officials; that Wal-Mex's top executives including Castro-Wright and Rodriguezmacedo knew about the

34

payments and had taken steps to conceal them; that Rodriguezmacedo falsely claimed the company had stopped using *gestores* after Cicero departed the company, yet records show that in October 2005, Wal-Mex real estate executives made a request to pay a *gestore* $14,000 to get a construction permit; that hundreds of *gestore* payments were still being used; and that the investigation team concluded that "There is reasonable suspicion to believe that Mexican and USA laws have been violated.";

b. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, acted against the recommendations of senior attorney Menzer and outside legal counsel Willkie Farr to conduct a thorough, effective investigation into Wal-Mex and its senior executives which would have complied with the FCPA, choosing instead to have the Company's internal investigation team, which lacked adequate resources to fully vet such substantial allegations of wrongdoing, to conduct a "preliminary" investigation into Wal-Mex;

c. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, rejected the plan by lead investigator Halter to follow-up on the Company's "preliminary" investigation, which uncovered overwhelming evidence of criminal bribery and other wrongdoing at Wal-Mex, with a more thorough investigation which would include hiring private investigators to interview and monitor both of the primary *gestores*, and a round of adversarial interviews with Wal-Mex senior executives, including defendant Castro-Wright;

d. All current Board members in January, 2006 except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, criticized the "overly aggressive" tactics of their internal investigation team and substantially revised the Company's internal investigation protocol away from a "law enforcement approach" that gave senior Wal-Mart executives—including executives at the business units being investigated—more control over internal investigations;

e. All current Board members in February, 2006 except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, yielded control and supervision over the investigation into Wal-Mex to defendant Rodriguezmacedo, the Wal-Mex official originally implicated in the wrongdoing, thus violating even the new weakened investigation protocol established by the Company;

f. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, allowed Rodriguezmacedo to conduct a minimal inquiry which conducted little additional investigation, and which resulted in report which concluded that there was no evidence of bribes, exonerated Wal-Mex senior officials including defendant Castro-Wright, and spent most of its six-pages baselessly attacking whistleblower Cicero;

g. All current Board members in May, 2006, except Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, accepted the Rodriguezmacedo report as the final word on the Wal-Mex bribery scandal and closed the matter, despite the fact that the

report was hastily put together, lacked support for its conclusions, and was criticized by members of the Company's own investigatory team;

h. All current Board members have either explicitly or implicitly endorsed the Company's inexplicable exoneration and continued promotion of defendant Castro-Wright, who they knew or should have known to have been directly implicated by both Cicero and their own internal investigation as orchestrating the illegal bribery scheme at Wal-Mex;

i. All current Board members in December, 2011 caused the Company to issue a false and misleading Form 10Q which strongly suggests that the Company first learned of the Wal-Mex FCPA violations in 2012, then and only as the result of a voluntary internal review. This conceals the fact that they Company had known about the corrupt practices in Mexico concerning Wal-Mex's bribery scheme.

99.    The Company has a governance and reporting system by which all the Director Defendants are presumably informed of all important and/or material aspects of Wal-Mart's business, including the activities of its largest global subsidiary, Wal-Mex.   For example, the Company's Corporate Governance Guidelines requires directors to participate in an orientation plan upon his or her election to the Board, which includes "familiarizing new directors with the Company's strategic plans, *its significant financial, accounting and risk management issues, its compliance programs*, its Statement of Ethics, its principal officers, and its internal and independent auditors." (emphasis added.)

100.    Because the Company has a corporate governance structure in place, there is a presumption that the corporate governance and reporting procedures were followed and that all of the Director Defendants knew of the bribery scheme at Wal-Mex and subsequent cover-up and yet decided against further investigating, reporting, or rectifying this wrongdoing, or punishing any official implicated in the scheme.

101.    As alleged above, all current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson received a large number of reports of the bribery scheme at Wal-Mex.   Moreover, because the Company's Corporate Governance Guidelines, it may

reasonably be inferred that all Director Defendants knew of Wal-Mex's continued misconduct and chose to disregard it. Given the extensive paper trail generated by both a Wal-Mex whistleblower and the Company's own investigation team concerning the violations, the Board's direct and/or inferred awareness of the problems, and the ensuring effort to cover-up the wrongdoing from public discovery, there was a sustained and systematic failure of the board to exercise oversight which can only be considered intentional, in that the directors knew of the violations of law and yet took no steps in an effort to prevent or remedy the situation. The Board's failure to take any action regarding illegal activity of such substantial magnitude and duration until threatened with exposure by the media indicates that the directors' decision to not act was not made in good faith and was contrary to the best interests of the company, and has and will result in substantial losses to the Company.

102.    Director Defendants, as a result of their control over the internal controls relating to Wal-Mart's investigation and subsequent cover-up of the Wal-Mex bribery scheme and their knowledge of the deficiencies in internal controls associated therewith, caused the Company to illegally sanction what they knew or should have known were violations of the FCPA, and thus there is reasonable doubt that their actions resulted from the exercise of valid business judgment.

103.    Director Defendants, as a result of their control over the internal controls relating to Wal-Mart's investigation and subsequent cover-up of the Wal-Mex bribery scheme and their knowledge of the deficiencies in internal controls associated therewith, elected not to maintain adequate internal controls over the business practices by Wal-Mex and/or ensure that all such practices were legally performed, and thus there is reasonable doubt that their actions resulted from the exercise of valid business judgment.

104.    Director Defendants, despite having direct evidence of substantial wrongdoing by and amongst the Individual Defendants, has chosen not to hold any of these individuals

accountable for causing harm to Wal-Mart and exposing the Company to serious reputational and pecuniary damages. This inaction by the Board is not surprising given that Director Defendants themselves are directly implicated in the wrongdoing by their cover-up of the Company's violations of the FCPA and their own deliberate neglect in failing to plan or maintain internal controls to ensure Wal-Mart's compliance with the FCPA.

105.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on intentional, reckless and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the current Board, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

106.   There is a substantial likelihood that a majority of the Director Defendants will be held liable for their breaches of fiduciary duties, as alleged herein, and therefore are not disinterested in this action.  Director Defendants S. Walton, Scott, J. Walton, Daft, Breyer, Burns, Williams, and Wolf would have had contemporaneous knowledge of the fraudulent and criminal conduct occurring at Wal-Mex and the resultant effort to cover-up the wrongdoing from being exposed and the wrongdoers from being held accountable.   Director Defendants Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, if sufficiently informed of material matters at the Company, would have had after-acquired knowledge of the fraudulent and criminal conduct that occurred at Wal-Mex and the resultant effort to cover-up the wrongdoing from being exposed and the wrongdoers from being held accountable. Therefore, there is a substantial likelihood that all of these Director Defendants will be held liable for breach of fiduciary duty, and are therefore self-interested and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

Accordingly, demand is excused.

107.   Additionally, there is a substantial likelihood that the members of the Audit Committee (Alvarez, Cash, Sorenson and Williams) will be held liable for breaches of their duty to review and monitor the Company's compliance with all legal and regulatory requirements, as alleged herein, and therefore are not disinterested in this action. These defendants are directly responsible for overseeing Wal-Mart's compliance with the FCPA. In this capacity, Director Defendant Williams breached his fiduciary duties by both (1) knowingly and/or recklessly undermining the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme; and (2) recklessly failing to install internal controls sufficient to avoid violations of the FCPA.   All Audit Committee members, including Alvarez, Cash, Sorenson, who serve along side Williams, due to the corporate governance and reporting system in place at the Company and their reporting relationship with the CEO and others with knowledge of the corruption scheme at Wal-Mex, are charged with knowledge of and responsibility for the Company's non-compliance with FCPA and thus have acquiesced in the cover-up of the Wal-Mex scandal forgoing steps to remedy the Company's internal controls in this area.   These breaches of duty by the Director Defendants on the Audit Committee render them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

108.   Defendants Scott is interested due to the fact that he reaped millions of dollars in opportunistic sales of his Wal-Mart shares in the months preceding *The New York Times* exposé but after the Company learned that the newspaper was investigating possible FCPA infractions. As the table below demonstrates, the trading records of Defendant Scott demonstrates that he began divesting his shares in Wal-Mart in apparent anticipation of the publication of *The New York Times* article and the corresponding stock drop that would undoubtedly occur, and did occur.

During the three trading days after *The New York Times'* April 21, 2012 exposé, Wal-Mart stock dropped eight percent, wiping out all of its gains in 2012.  In the months preceding this precipitous drop, Scott sold/executed 1,458,385 shares/options on December 20, 2012 for gains of $3,950,401, 635,220 shares/options on March 2, 2012 for gains of $3,295,043, and 100,000 shares/options on March 27, 2012 for gains of $6,122,490.  These uncharacteristically large stock sales were executed by Defendant Scott while he possessed the materially adverse nonpublic information that the Company was exposed to undisclosed liability for massive FCPA penalties and other contingences relating to the bribes and cover-up.  Due to the fact that Scott benefited from undisclosed adverse inside knowledge of the corruption at Wal-Mex, demand on him is futile.

109.  Furthermore, there are other facts which cast a reasonable doubt that certain Director Defendants can independently and/or disinterestedly consider a demand to sue in this matter, for the following reasons:

    a. Defendants Rob Walton and Jim Walton are brothers. Because of entangling professional, business and familial relationships with the Walton family, none of them will take the action requested by plaintiff herein against one another;

    b. Defendant Penner is the son-in-law of Defendant Rob Walton.  He owes his career and status to Rob Walton, as from 2002 to 2005, he served as Wal-Mart's Senior Vice President and CFO–Japan. Because of entangling professional, business and familial relationships with the Walton family, none of them will take the action requested by plaintiff herein against one another.

    c. Defendants Duke and Scott lack disinterest and independence given their long term relationship on the Wal-Mart Board and their mutual service on the advisory board of the Tsinghua University School of Economics and Management in Beijing, China;

    d. Defendants Duke, Rob Walton and Jim Walton lack disinterest and independence because Duke sits on the Board of Arvest Bank, a Walton family-owned bank of which Jim Walton is Chairman of the Board and CEO. As such, Duke serves at the pleasure of Rob Walton, Jim Walton, and the Walton family. The Walton family, which exerts considerable control over the Board, will not wish to oust Duke in connection with the bribery probe;

e.  Defendant Duke's principal professional occupation is his employment with Wal-Mart, pursuant to which he has received and continues to receive substantial monetary compensations and other benefits.  In 2011, defendant Duke, who is a high-ranking officer of the Company, received more than $18 million in compensation from Wal-Mart and expects to receive more than $18 million in compensation again in 2012.  Wal-Mart is controlled by Chairman of the Board Rob Walton, Jim Walton and the Walton family, which collectively owns nearly 50% of the Company and controls two Board seats.  There is reasonable doubt that Duke would jeopardize his lucrative compensation package by bringing suit against these members of the Walton family or other Board members who control his compensation. Thus demand is futile as to defendant Duke.

f.  Defendant Sorenson's primary employment is the President, CEO and director of Marriott International, Inc., which during fiscal 2012 received payments from Wal-Mart of approximately $19 million.  Marriott, on the other hand, made over $1 million in purchases from Wal-Mart stores.  Due to these entangling business relationships which benefit the Marriott company lead by Sorenson which would be placed in substantial jeopardy, there is reasonable doubt that he will take the action requested by the plaintiff against his fellow Wal-Mart directors.

## COUNT I

### On Behalf of Wal-Mart Against Individual
### Defendants for Breach of Fiduciary Duties

110.  Plaintiff repeats and re-alleges each allegation set forth herein.

111.  The Individual Defendants owed and have violated fiduciary duties of care, loyalty, candor, good faith, and reasonable inquiry owed under Delaware law to the public shareholders of Wal-Mart by acting in defiance of those duties and placing their personal interests ahead of the interests of the Company and its shareholders.

112.  The Individual Defendants have violated their fiduciary duties by authorizing, benefitting, acquiescing in, and/or failing to prevent or remedy the wrongful acts complained of herein, to wit, having actual and/or constructive knowledge of a massive bribery and corruption scheme perpetrated by officials at its single largest global subsidiary, Wal-Mex, during the Relevant Period, and taking affirmative steps to undermine any investigation, reporting, remedying or punishment  that may have emerged as a result of this scheme; to cover-up this

wrongdoing and mask the Company's and their own violations of any applicable federal or state laws, rules, or regulatory scheme, including the FCPA; to cause the Company to fail in its obligations to establish internal controls sufficient to comply with federal and state laws, rules, or regulatory schemes, including the FCPA; to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate, did not mislead investors and conformed to federal and state securities laws;

113. By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to advance their interests at the expense of Wal-Mart and its shareholders.

114. Because the Individual Defendants dominate and control the business and corporate affairs of Wal-Mart, and are in possession of private corporate information concerning Wal-Mart business transactions, they were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the federal and state laws as alleged herein. Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings. These actions by Individual Defendants exposed the Company to liability for violations of federal and state law, and therefore could not be the product of a valid exercise of business judgment. Instead, this was a complete abdication of their duties as officers and/or directors of the Company.

115. Each of the Individual Defendants' acts in causing or permitting the Company to disseminate to the investing public material misrepresentations and omissions and abdicating their oversight responsibilities to the Company has subjected the Company to liability for violations of federal and state law, and therefore could not be the product of a valid exercise of business judgment. Instead, this was a complete abdication of their duties as officers and/or directors of the

Company. As a result of the Individual Defendants' breaches, Wal-Mart has lost market capitalization and has had its reputation in the business community and financial markets irreparably tarnished.

116. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Wal-Mart has sustained significant damages and is subjected to unreasonable risks of loss and expenses, and therefore Individual Defendants are liable to the Company

117. Plaintiff, on behalf of Wal-Mart, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A. Against all of the Individual Defendants jointly and severally and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, together with interest thereon;

B. Granting any appropriate extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including a declaration that that plaintiff has adequately plead demand futility and may maintain this action on behalf of Wal-Mart; an order attaching, impounding, imposing a constructive trust on the excessive compensation, wrongfully gained benefits, or their other assets so as to assure that plaintiff on behalf of Wal-Mart has an effective remedy; and an order directing Wal-Mart to take all necessary actions to reform its corporate governance practices to comply with Company policies and all applicable laws, rules, and regulations;

C. Awarding to Wal-Mart restitution from Individual Defendants, together with pre- and post-judgment interest, and ordering disgorgement of all profits, benefits and other compensation obtained by these defendants;

43

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.    Granting such other and further relief as the Court deems just and proper.


DATED: May 17, 2012                     Respectfully Submitted,


                                        James A. Streett (2007092)
                                        Alex G. Streett (65038)
                                        STREETT LAW FIRM, P.A.
                                        107 West Main
                                        Russellville, AR 72801
                                        (479) 968-2030
                                        james@streettlaw.com
                                        alex@streettlaw.com


                                        Joe P. Leniski, Jr. (TN Bar No. 22891) (pro hac vice)
                                        BRANSTETTER, STRANCH &
                                            JENNINGS, PLLC
                                        227 2nd Avenue North, 4th Floor
                                        Nashville, TN 37201
                                        (615) 254-8801
                                        jleniski@branstetterlaw.com

## VERIFICATION

NATHAN F. AUSTIN, certifies under penalty of perjury that: (1) he is a resident of in the State of Arkansas residing in Pope County; (2) he is a shareholder of Wal-Mart, Inc.; (3) he has reviewed the factual allegations Complaint against the current Board of Directors and certain other directors and officers of Wal-Mart Inc. and believes them to be true to the best of its knowledge, information, and belief and (4) he authorizes his attorneys to file the Complaint on his behalf.



Dated: May 17, 2012.

_____
NATHAN F. AUSTIN

STATE OF ARKANSAS)
COUNTY OF POPE   )

Subscribed and sworn to before me this 17th day of May, 2012.

_____
Notary Public

My Commission Expires:
  2-15-2013

PATSY D. BROWN
Pope County
My Commission Expires
February 15, 2013

## IN THE CIRCUIT COURT OF POPE COUNTY, ARKANSAS

NATHAN F. AUSTIN, DERIVATIVELY ON )
BEHALF OF WAL-MART STORES, INC., )

PLAINTIFF, )

VS. )

S. ROBSON WALTON, MICHAEL T. )
DUKE, H. LEE SCOTT, JR., JIM C. )
WALTON, DOUGLAS N. DAFT, ROGER C. )
CORBETT, AIDA M. ALVAREZ, JAMES W. )
BREYER, M. MICHELE BURNS, JAMES I. )
CASH, JR., GREGORY B. PENNER, )
STEVEN S. REINEMUND, ARNE M. )
SORENSON, CHRISTOPHER J. WILLIAMS, )
LINDA S. WOLF, EDUARDO CASTRO- )
WRIGHT, EDUARDO SOLORZANO )
MORALES, and JOSE LUIS )
RODRIGUEZMACEDO RIVERA, )

DEFENDANTS, )
)

——————————————————— )
)
AND )
)
WAL-MART STORES, INC., )
)
NOMINAL DEFENDANT. )

Case No.  CV-2012-201

FILED
CIRCUIT CLERK ...
2012 JUN 27  AM 8 34

### AGREED ORDER ACCEPTING SERVICE

Plaintiff and Defendants S. Robson Walton, Michael T. Duke, H. Lee Scott, Jr., Jim C.

Walton, Douglas N. Daft, Roger C. Corbett, Aida M. Alvarez, James W. Breyer, M. Michele

Burns, James I. Cash, Jr., Gregory B. Penner, Steven S. Reinemund, Arne M. Sorenson,

Christopher J. Williams, Linda S. Wolf, Eduardo Castro-Wright, and the nominal Defendant

0612.1497

Wal-Mart Stores, Inc. ("Walmart"), hereby agree as follows:

Gibson, Dunn & Crutcher LLP has obtained consent from Walmart and all the individual Defendants, with the exception of Eduardo Solórzano Morales and José Luis Rodríguezmacedo Rivera, to accept service of the complaint filed in this Action on their behalf, without waiver of any defense, including but not limited to improper or inconvenient venue, lack of personal jurisdiction, and pendency of another action between the parties arising from the same transaction or occurrence. Walmart and the Defendants for whom service of process is accepted agree that such service of process is effective as of the date this Agreed Order is entered on the docket of the Court.

Stipulated and Agreed by Counsel this 25th day of June, 2012.

**IT IS SO ORDERED.**

_____
The Honorable Bill Pearson,
Circuit Judge

**STIPULATED AND AGREED BY:**

James A. Streett (2007092)
Alex G. Streett (65038)
STREETT LAW FIRM, P.A.
107 West Main
Russellville, AR 72801

and

2

0612·1498

Joe P. Leniski, Jr. (TN Bar No. 22891)(pro hac vice)
BRANSTETTER, STRANCH & JENNINGS, PLLC
227 Second Avenue North, 4th Floor
Nashville, TN 37201

By: _____
        Joe P. Leniski, Jr.
        James A. Streett
        Alex G. Streett

        *Attorneys for Plaintiff*


Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: (213)-229-7000
Fax: (213) 229-7520

Jonathan C. Dickey
Brian M. Lutz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000
Fax: (212) 351-4035

and

WILLIAMS & ANDERSON PLC
111 Center Street, 22nd Floor
Little Rock, Arkansas 72201

By: _____
        Jess Askew III

        *Attorneys for Nominal Defendant Walmart*
        *and Defendants S. Robson Walton,*
        *Michael T. Duke, H. Lee Scott, Jr.,*
        *Jim C. Walton, Douglas N. Daft, Roger C.*
        *Corbett, Aida M. Alvarez, James W. Breyer,*
        *M. Michele Burns, James I. Cash, Jr.,*
        *Gregory B. Penner, Steven S. Reinemund,*

3

0612.1499

*Arne M. Sorenson, Christopher J. Williams,*
*Linda S. Wolf, and Eduardo Castro-Wright*

0612.1500

**IN THE CIRCUIT COURT OF POPE COUNTY, ARKANSAS**
**DIVISION 1**

NATHAN F. AUSTIN, derivatively on behalf
of WAL-MART STORES, INC.,

     Plaintiff,

v.

S. ROBSON WALTON, et al.,

     Defendants,

     -and-

WAL-MART STORES, INC.,

     Nominal Defendant.

Case No. CV-2012-201

FILED
CIRCUIT & CHANCERY CLERK
2012 JUL 9 AM 10 12

## MOTION TO STAY THE ENTIRE ACTION AND FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT

Nominal defendant Wal-Mart Stores, Inc. and the individual defendants (collectively,

"Defendants"), for their motion to stay the entire action and for extension of time to respond to

complaint, state:

1.      Defendants move for an order staying this action in its entirety pending resolution of the parallel actions in Delaware.

2.      Defendants also request that their time to Answer or otherwise respond to the operative complaint be enlarged until after the Court has decided this motion.

3.      As set forth in the accompanying Memorandum, this is one of more than a dozen shareholder derivative actions based on the same *New York Times* story concerning alleged bribery by employees of Wal-Mart de Mexico, and asserts the same claims against the same defendants.  If these derivative claims were to proceed both here and in Delaware, it would create an undue risk of inconsistent, conflicting, or duplicative rulings; impose unwarranted litigation and monitoring burdens on Defendants and the plaintiffs; and unnecessarily task separate judicial systems with applying the substantive corporate laws of Delaware.

4.      This Motion is based on the accompanying Memorandum; Exhibits A-I attached and incorporated herein by reference; all pleadings, papers, and records on file in this case and related actions; argument of counsel; and such other matters as the Court may consider.

WHEREFORE, and for the reasons set forth in the accompanying Memorandum Brief, Defendants respectfully request that this Court stay this action in its entirety pending resolution of the parallel proceedings in Delaware, extend their time to Answer or otherwise respond to the operative complaint until after the Court has decided this motion, and grant all other just and proper relief.

Dated: July 6, 2012

*Teresa Wineland*

THEODORE J. BOUTROUS JR.
JONATHAN C. DICKEY
MARK A. PERRY
GEORGE H. BROWN
BRIAN M. LUTZ
ALEXANDER K. MIRCHEFF
GIBSON DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE
LOS ANGELES, CA 90071-3197
TELEPHONE: (213) 229-7000
FAX: (213) 229-7520

JESS ASKEW III (Ark. Bar No. 86005)
TERESA WINELAND (Ark. Bar No. 81168)
WILLIAMS & ANDERSON PLC
111 CENTER STREET, SUITE 2200
LITTLE ROCK, AR 72201
TELEPHONE: (501) 372-0800
FAX: (501) 372-6453

*Attorneys for Defendants Wal-Mart Stores, Inc., S. Robson Walton, Aida M. Alvarez, James W. Breyer, M. Michele Burns, James I. Cash, Jr., Roger C. Corbett, Douglas N. Daft, Michael T. Duke, Gregory B. Penner, Steven S. Reinemund, H. Lee Scott, Jr., Arne M. Sorenson, Jim C. Walton, Christopher J. Williams, Linda S. Wolf, Eduardo Castro-Wright.*

## CERTIFICATE OF SERVICE

I certify that on this 6th day of July, 2012, I served a copy of the foregoing upon the plaintiff by email and by First Class U.S. Mail to his attorneys at the following addresses:

James A. Streett
james@streettlaw.com
Alex G. Streett
alex@streetlaw.com
Streett Law Firm, P.A.
107 West Main
Russellville, AR 72801

Joe P. Leniski, Jr.
jleniski@branstetterlaw.com
Branstetter, Stranch & Jennings, PLLC
227 2nd Avenue North, 4th Floor
Nashville, TN 37201

*Attorneys for Plaintiff*

*Teresa Wineland*
Teresa Wineland

**EXHIBIT A**

8-K 1 d354306d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549

## FORM 8-K

### CURRENT REPORT

**PURSUANT TO SECTION 13 or 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported):
May 17, 2012**

# Wal-Mart Stores, Inc.
### (Exact Name of Registrant as Specified in Charter)

| Delaware | 001-06991 | 71-0415188 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**702 Southwest 8th Street
Bentonville, Arkansas 72716-0215**
(Address of Principal Executive Offices) (Zip code)

**Registrant's telephone number, including area code:
(479) 273-4000**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

## Item 2.02. Results of Operations and Financial Condition.

In accordance with Item 2.02 of Form 8-K of the Securities and Exchange Commission (the "SEC"), Wal-Mart Stores, Inc., a Delaware corporation (the "Company"), is furnishing to the SEC a press release that the Company will issue on May 17, 2012 (the "Press Release"). The Press Release will disclose information regarding the Company's results of operations for the three months ended April 30, 2012 and the Company's financial condition as of April 30, 2012.

The Press Release provides information regarding certain financial measures that may be considered non-GAAP financial measures (each, a "Non-GAAP Measure") under the rules of the SEC. Those Non-GAAP Measures are:

- The Company's free cash flow, calculated as set forth in the Press Release, for the three-month periods ended April 30, 2012 and 2011 ("Free Cash Flow").

- The Company's return on investment ("ROI"), calculated as set forth in the Press Release, for the trailing twelve-month periods ended April 30, 2012 and 2011.

- Financial measures stated to be presented on a constant currency basis (each, an "Adjusted Constant Currency Measure"). The Adjusted Constant Currency Measures are calculated by translating the results of the Company's Walmart International operating segment ("Walmart International") for a current fiscal period in the local currencies in which Walmart International operates into U.S. dollars using the currency exchange rates used to translate the similar results of Walmart International for the prior year comparable period into U.S. dollars to report those prior year comparable period results in the Company's consolidated financial statements for that prior year comparable period and excluding the effect of acquisitions on such current fiscal period results until the effect of such acquisitions are included in both the current fiscal period results and the prior year comparable period results. The Adjusted Constant Currency Measures included in the Press Release exclude the effect of the results attributable to the Netto stores in the United Kingdom and of the Company's majority-owned subsidiary, Massmart Holdings Limited, the acquisitions of which the Company completed during the three months ended July 31, 2011 (the "Acquisitions").

- The Company's total U.S. comparable store sales for the thirteen-week periods ended April 27, 2012 and April 29, 2011 (the "Total U.S. Comparable Store Sales"), the comparable club sales of the Company's Sam's Club operating segment ("Sam's Club") for the thirteen-week periods ended April 27, 2012, April 29, 2011 and July 29, 2011 and the projected comparable club sales of Sam's Club for the thirteen-week period ending July 27, 2012, in each case calculated by excluding the fuel sales of Sam's Club for such periods.

- The net sales of Sam's Club for the three months ended April 30, 2012, excluding the fuel sales of Sam's Club for that three-month period, and the percentage increase in the net sales of Sam's Club for the three months ended April 30, 2012, excluding the fuel sales of Sam's Club for that three-month period, over the net sales of Sam's Club for the three months ended April 30, 2011, excluding the fuel sales of Sam's Club for that three-month period.

- The increase in the Company's consolidated membership and other income for the three months ended April 30, 2012 over the Company's consolidated membership and other income for the three months ended April 30, 2011, excluding from the Company's consolidated membership and other income for the three months ended April 30, 2011, a gain of $51 million on the sale of an investment by the Company's Chilean subsidiary that was recorded in the three months ended April 30, 2011.

- The increase in the Company's consolidated operating income for the three months ended April 30 2012 over the Company's consolidated operating income for the three months ended April 30, 2011 excluding the effect of $50 million of net pre-tax items realized by the Company in the three months ended April 30, 2011.

The Press Release provides information that reconciles Free Cash Flow, ROI and Total U.S. Comparable Store Sales and the Sam's Club comparable club sales for the thirteen-week periods ended April 27, 2012 and April 29, 2011 to the most directly comparable financial measures calculated and presented in accordance with generally accepted accounting principles ("GAAP"). Exhibit 99.2 to this Current Report on Form 8-K, the information in which is incorporated into this Item 2.02 by reference, sets forth reconciliations of each other Non-GAAP Measure that appears in the Press Release and the most directly comparable financial measures calculated and presented in accordance with GAAP to the extent such reconciliations are reasonably practicable.

-1-

The Company's management believes that the presentation of the Non-GAAP Measures discussed above (other than Free Cash Flow and ROI, which are discussed in the Press Release) provides useful information to investors regarding the Company's financial condition and results of operations as to the periods for which they are presented for the following reasons:

- The Company is required to translate Walmart International's operating results as stated in local currencies into U.S. dollars to report the Company's consolidated results of operations in accordance with generally accepted accounting principles as in effect in the United States. Period-over-period comparisons of the Company's consolidated results of operations can be affected by the differences between currency exchange rates in the prior fiscal period to which the comparison is made and the currency exchange rates in the current fiscal period as reflected in the Company's consolidated results of operations reported in U.S. dollars, making an investor's assessment of the underlying performance of Walmart International and its effect on total company underlying performance for the current fiscal period more difficult. Moreover, the inclusion of the results of acquisitions in the Company's consolidated results of operations and the results of operations of Walmart International for current periods when such acquisitions had not been consummated during the prior year comparable periods makes it more difficult for investors to assess the comparative period-over-period underlying performance of Walmart International and total company underlying performance without the effect on such underlying performance of such acquisitions on the current periods' results. The presentation of the Adjusted Constant Currency Measures permits investors to understand the combined effects of currency exchange rate translations and acquisitions on the Company's consolidated net sales and consolidated operating income and Walmart International's net sales and operating income and on the period-over-period increases in the Company's consolidated net sales and consolidated operating income and Walmart International's net sales, in each case for the periods as to which the Adjusted Financial Measures are presented, and what the Company's financial performance as reflected by those measures would have been for the periods for which the Adjusted Financial Measures are presented without the combined effects of currency exchange rate translations and such acquisitions.

- The presentation of the Company's total U.S. comparable store sales, Sam's Club's comparable club sales, the net sales of Sam's Club and the period-over-period percentage increase in the net sales of Sam's Club, calculated, in each case, excluding the fuel sales of Sam's Club, permits investors to understand the effect of such fuel sales, which are affected by the volatility of fuel prices, on the Company's total U.S. comparable store sales, on Sam's Club's comparable club sales and on Sam's Club's net sales for the periods presented.

- The presentation of the period-over-period increase in the Company's consolidated membership and other income, calculated excluding the gain from the sale of an investment recorded in the three months ended April 30, 2011, permits investors to assess the Company's period-over-period underlying performance with respect to the consolidated membership and other income of the Company without the effect of a gain of a type that is not frequently included in the Company's consolidated membership and other income.

- The presentation of the increase in the Company's consolidated operating income for the three months ended April 30, 2012 over the Company's consolidated operating income for the three months ended April 30, 2011 excluding the effect of $50 million of net pre-tax items realized in the three months ended April 30, 2011 permits investors to assess the Company's period-over-period underlying performance with respect to the Company's consolidated operating income without the effect of those items, which were an aggregation of items of types that do not occur frequently in the Company's operations.

## Item 8.01. Other Information.

The Audit Committee of the Company's Board of Directors (the "Audit Committee"), which is composed solely of independent directors, is conducting an internal investigation into, among other things, alleged violations of the U.S. Foreign Corrupt Practices Act (the "FCPA") and other alleged crimes or misconduct in connection with foreign subsidiaries including Wal-Mart de México, S.A.B. de C.V. ("Walmex") and whether prior allegations of such violations and/or misconduct were appropriately handled by the Company. The Audit Committee and the Company have engaged outside counsel from a number of law firms and other advisors who are assisting in the on-going investigation of these matters. The Company is also conducting a voluntary global review of its policies, practices and internal controls for FCPA compliance. The Company is engaged in strengthening its global anti-corruption compliance programs through appropriate remedial anti-corruption measures. In November 2011, the Company voluntarily disclosed that investigative activity to the U.S. Department of Justice (the "DOJ") and the SEC.

The Company has been informed by the DOJ and the SEC that it is also the subject of their respective investigations into possible violations of the FCPA. The Company is cooperating with the investigations by the DOJ and the SEC. A number of federal and local government agencies in Mexico have also recently initiated investigations of these matters. Walmex is cooperating with the Mexican governmental agencies conducting these investigations. Furthermore, lawsuits relating to the matters under investigation have recently been filed by several of the Company's shareholders against it, its current directors, certain of its former directors, certain of its current and former officers and certain of Walmex's current and former officers.

The Company could be exposed to a variety of negative consequences as a result of the matters noted above. There could be one or more enforcement actions in respect of the matters that are the subject of some or all of the ongoing government investigations, and such actions, if brought, may result in judgments, settlements, fines, penalties, injunctions, cease and desist orders or other relief, criminal convictions and/or penalties. The shareholder lawsuits may result in judgments against the Company and its current and former directors and officers named in those proceedings. The Company cannot predict accurately at this time the outcome or impact of the government investigations, the shareholder lawsuits, or its own internal investigation and review. In addition, the Company expects to incur costs in responding to requests for information or subpoenas seeking documents, testimony and other information in connection with the government investigations, in defending the shareholder lawsuits, and in conducting its internal investigation and review, and it cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of the Company's senior management that could impinge on the time they have available to devote to other matters relating to the business. The Company may also see ongoing media and governmental interest in these matters that could impact the perception among certain audiences of its role as a corporate citizen.

The Company is in the early stages of assessing and responding to the governmental investigations, the shareholder lawsuits, and its internal investigation and review are on-going. Although the Company does not presently believe that these matters will have a material adverse effect on its business, given the inherent uncertainties in such situations, the Company can provide no assurance that these matters will not be material to its business in the future.

### Item 9.01. Financial Statements and Exhibits.

Exhibit 99.1—A copy of the Press Release being furnished pursuant to the foregoing Item 2.02 is included herewith as Exhibit 99.1.

Exhibit 99.2—Reconciliations of Certain Non-GAAP Measures to Most Directly Comparable GAAP Measures being furnished pursuant to the foregoing Item 2.02 are included herewith as Exhibit 99.2.

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: May 17, 2012

WAL-MART STORES, INC.

By:   /s/ Gordon Y. Allison
Name: Gordon Y. Allison
Title:  Vice President and
             General Counsel, Corporate

-4-

**EXHIBIT B**

## IN THE CIRCUIT COURT OF POPE COUNTY, ARKANSAS

NATHAN F. AUSTIN,  )
Derivatively On Behalf of  )
WAL-MART STORES, INC.  )
　　　　　　　　　　　　 )
　　Plaintiff,  )
　　　　　　　　　　　　 )　　　　Case No. CV-2012- 201
　　　　vs.  )
　　　　　　　　　　　　 )
　　　　　　　　　　　　 )　　　　JURY DEMAND
S. ROBSON WALTON, MICHAEL T. DUKE,  )
H. LEE SCOTT, JR., JIM C. WALTON,  )
DOUGLAS N. DAFT, ROGER C. CORBETT, )
AIDA M. ALVAREZ, JAMES W. BREYER,  )
M. MICHELE BURNS, JAMES L CASH, JR.,  )
GREGORY B. PENNER, STEVEN S.  )
REINEMUND, ARNE M. SORENSON,  )
CHRISTOPHER J. WILLIAMS, LINDA S.  )
WOLF, EDUARDO CASTRO-WRIGHT,  )
EDUARDO SOLORZANO MORALES and  )
JOSE LUIS RODRIGUEZMACEDO RIVERA,  )
　　　　　　　　　　　　 )
　　Defendants.  )
　　　　　　　　　　　　 )
　　　　-and-  )
　　　　　　　　　　　　 )
WAL-MART STORES, INC.,  )
　　　　　　　　　　　　 )
　　Nominal Defendant.  )
_____ )

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
### FOR BREACH OF FIDUCIARY DUTIES

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.　　This is a shareholders' derivative action brought pursuant to Arkansas Annotated Code §4-26-714, §4-27-740 and Arkansas Rule of Civil Procedure 23.1 by shareholders of and for the benefit of nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") against

its entire Board of Directors and certain top officers of Wal-Mart's to remedy defendants' violations of law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that occurred between January 1, 2005 and the present (the "Relevant Period").

2.      Specifically, this shareholders derivative action asserts claims for breach of fiduciary duty against defendants S. Robson Walton, Michael T. Duke, H. Lee Scott, Jr., Jim C. Walton, Douglas N. Daft, Roger C. Corbett, Aida M. Alvarez, James W. Breyer, M. Michele Burns, James I. Cash, Jr, Gregory B. Penner, Steven S. Reinemund, Arne M. Sorenson, Christopher J. Williams, and Linda S. Wolf (the "Director Defendants" or the "Board"), as well as Company officer defendants Eduardo Castro-Wright, Eduardo Solorzano Morales and Jose Luis Rodriguezmacedo Rivera (the "Officer Defendants"). Collectively, the Director Defendants and the Individual Defendants are referred to as the "Individual Defendants".

3.      The Complaint sets forth allegations of fact that since at least 2005, the Company's largest foreign subsidiary, Wal-Mart de Mexico ("Wal-Mex") engaged in widespread and illegal bribery of Mexican officials to gain the permits necessary to further Wal-Mex's business interests in that country, while high-level officers and directors of Wal-Mart in the United States attempted to and did cover-up this illicit scheme. Wal-Mart holds a nearly 70% stake in Wal-Mex, which by the end of 2005 was one of Mexico's largest retailers and a jewel of Wal-Mart's $56 billion international arm.

4.      For nearly six years, top executives and directors of Wal-Mart were able to conceal the corrupt business practices being orchestrated all across Mexico by Wal-Mex. However, in a filing with the Securities and Exchange Commission ("SEC") on December 8, 2011, Wal-Mart was forced to disclose that during fiscal year 2012, the Company had begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in

2

compliance with the U.S. Foreign Corrupt Practices Act ("FCPA").  Although Wal-Mart indicated that it had notified the Justice Department of the commencement of its investigation, it informed the investing public that it did "not believe that these matters will have a material adverse effect on [Wal-Mart's] business."  At the time of this SEC filing, however, the Company was well-aware of the illegal conduct that was being perpetuated by its Mexican subsidiary and its efforts to bury the truth about this conduct from the public.

5.      The truth about the Company's actions would not stay buried for long.  As reported by *The New York Times* ("NYT") in an article by David Barstow titled, *At Wal-Mart in Mexico, a Bribe Inquiry Silenced,* N.Y. TIMES (Apr. 21, 2012)(available at http://www.nytimes.com/2012/04/22/business/at-walmart-in-mexico-a-bribe-inquiry-silenced.html (last visited May 8, 2012)), it had been conducting an investigation which revealed that from 2005 to present, Wal-Mex had paid approximately $24 million in bribes to officials and bureaucrats throughout Mexico in order to obtain new-store building permits and expand its market presence.  The NYT investigation described how in September 2005, a former Wal-Mex executive emailed a senior Wal-Mart attorney detailing how Wal-Mex, with the knowledge and consent of  former Wal-Mex Chief Executive Officer ("CEO") defendant Eduardo Castro-Wright, designed and executed the corrupt bribery operation.   Upon receiving the email, Wal-Mart executives deemed it credible and sent an internal investigation team to Mexico City.  Shortly after arriving, the investigators found evidence confirming the bribery allegations in the email, and concluded that "There is reasonable suspicion to believe that Mexican and USA laws have been violated." The lead investigator, himself a former-FBI agent, recommended that Wal-Mart enhance their investigation efforts by questioning defendant Castro-Wright and other top Wal-Mex officials about their awareness and roles regarding the bribes.

6.     Rather than expose the full scope of this criminal wrongdoing and fulfill their fiduciary duties of good faith and loyalty to the Company, Individual Defendants and the other officers and directors of Wal-Mart at that time halted any further investigation into the bribery scandal involving Wal-Mex and defendant Castro-Wright.  The investigation was shut down in order to prevent damaging the business reputation of Wal-Mex and in particular defendant Castro-Wright, the recently-appointed CEO of Wal-Mart Stores USA, who was widely-considered a "rising star" in the Company and a possible candidate to replace then-Wal-Mart CEO defendant H. Lee Scott Jr. ("Scott").

7.     By shutting down the investigation, Individual Defendants successfully covered-up the illegal activities orchestrated by Wal-Mex and defendant Castro-Wright, and thus no Wal-Mex executives were ever punished.  In fact, Individual Defendants rewarded defendant Castro-Wright by promoting him to the Company's vice chairman position in 2008.

8.     The self-serving and disloyal conduct exhibited by the Individual Defendants not only placed the Defendants' interests squarely in conflict with the best interests of the Company, itself and utter abdication of their fiduciary duties, but also exposed Wal-Mart to significant liability and expenses due to its alleged violations of the FCPA, not to mention significant damage to its reputation and goodwill.  The faithless behavior of the Individual Defendants has and will constitute a waste of corporate assets, gross mismanagement, and abuse of their power as directors and officers of the Company.

9.     Any demand upon the Director Defendants to remedy these damages would be a futile gesture, as they themselves are responsible for inflicting these harms upon the Company, and could not be reasonably expected to sue themselves or other directors to whom they are beholden, through business connections, or otherwise.  This derivative lawsuit is necessary to help recover the damages suffered by Wal-Mart, and to protect the Company from the Board of

Directors' continuing breaches of fiduciary duty, conflicts of interest and violations of statutory law.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Ark. Code Ann. §16-4-101 *et seq.* This Court has jurisdiction over each of the defendants because at all relevant times, they conducted business in, resided in and/or were citizens of Arkansas. Wal-Mart is incorporated in the State of Delaware and its principal place of business was, at all relevant times, in the State of Arkansas.

11.     Venue is proper in this County pursuant to Ark. Code Ann. §16-55-213, *et seq.*, in that the plaintiff, a Wal-Mart shareholder, is a resident of this County.

12.     This action arises solely under State laws of Arkansas and Delaware. No Federal Question is presented by this complaint. This action is a shareholder derivative action on behalf of Wal-Mart seeking both damages and injunctive relief, and solely involves the internal affairs or governance of a corporation.

## PARTIES

13.     Plaintiff Nathan F. Austin is a resident of Pope County, Arkansas, and at all times relevant hereto, is and was an owner and holder of Wal-Mart stock at the time of the transactions complained of in this Action under in accordance with Ark. Code Ann. §4-26-714(a) and §4-27-740(a).

14.     Nominal defendant Wal-Mart is a Delaware corporation whose headquarters are located at 702 Southwest 8th Street, Bentonville, Arkansas. The Company is the world's 18th largest public corporation, according to the Forbes Global 2000 list and the largest public corporation ranked according to revenue. The Company was founded by Sam Walton in 1962 and the Walton family still controls a majority of the shares. Wal-Mart operates discount retail stores,

supercenters and markets world-wide, selling a variety of merchandise including clothing, housewares, electronic, music and DVD's and hardware.

15.    Defendant S. Robson Walton ("R. Walton") is the eldest son of Wal-Mart's founder, Sam Walton, has worked for Wal-Mart since 1969, and has served as the Chairman of the Board since 1992. Defendant R. Walton has previously served as senior vice president, secretary and general counsel and vice chairman of the Company. Prior to joining Wal-Mart, defendant R. Walton was a law partner with the law firm of Conner & Winters in Tulsa, Oklahoma.

16.    Defendant Michael T. Duke ("Duke") is the current President and CEO of Wal-Mart and a Director of the Company since 2008. Duke joined Wal-Mart in 1995 and served as vice chairman of the Company in charge of Wal-Mart International from 2005 to 2009, and in that capacity he was responsible for responding to the bribery charges regarding Wal-Mex, thus making him directly responsible for the resulting cover-up that has inflicted significant damages upon the Company. Prior to joining the Company, Mr. Duke had 23 years of experience in retailing with Federated Department Stores and May Department Stores. Mr. Duke is a director of Arvest Bank and serves on the board of directors of the Consumer Goods Forum, the executive committee of Business Roundtable and is on the executive board of Conservation International's Center for Environment Leadership in Business. He also serves on the board of advisors for the University of Arkansas and the advisory board of the Tsinghua University School of Economics and Management in Beijing, China.

17.    Defendant H. Lee Scott, Jr. ("Scott") served as CEO of Wal-Mart from 2000 through 2009, and is a Director of the Company. Scott joined Wal-Mart in 1979. Mr. Scott served as a director of the Goldman Sachs Group, Inc. from May 2010 to May 2011. He currently serves on the advisory board of the Tsinghua University School of Economics and Management in

6

Beijing, China. Along with defendant Duke, Scott was responsible for responding to the bribery charges regarding Wal-Mex, thus making him directly responsible for the resulting cover-up that has inflicted significant damages upon the Company.

18.     Defendant Jim C. Walton ("J. Walton") has been a Director of Wal-Mart since 2005. J. Walton is the youngest son of Wal-Mart founder Sam Walton and the brother of R. Walton. He is the CEO and Chairman of the Board of Arvest Bank, a Walton family owned bank which has branches in Arkansas, Kansas, Oklahoma and Missouri. J. Walton is also Chairman of the Board of Community Publishers, Inc.

19.     Defendant Douglas N. Daft ("Daft") has been a Director of Wal-Mart since 2005. Mr. Daft served as the CEO and Chairman of the Board of the Coca-Cola Company from 2000 to 2004. Currently, Mr. Daft serves as a director of McGraw-Hill Companies, Inc. and Green Mountain Coffee Roasters, Inc.

20.     Defendant Roger C. Corbett ("Corbett") has been a Director of Wal-Mart since 2006. Mr. Corbett is the retired CEO and Group Managing Director of Woolworths Limited, an Australian retail company. He is a director of the Reserve Bank of Australia, Fairfax Media Limited and Chairman of the Board of Directors of ALH Group Pty Limited. He also serves on the board of Outback Stores.

21.     Defendant Aida M. Alvarez ("Alvarez") has been a Director of Wal-Mart since 2006, and currently serves on the Company's Audit Committee. She is the former Administrator of the United States Small Business Administration and served as the Founding Director of the US Office of Federal Housing Enterprise Oversight, the financial regulator of Fannie Mae and Freddie Mac, from 1993 to 1997. Ms. Alvarez is a director of UnionBanCal Corp. and Progreso Financiero.

22.    Defendant James W. Breyer ("Breyer") has been a Director of Wal-Mart since 2001. He is the Managing Partner of Accel Partners and a director of RealNetworks, Inc., Marvel Entertainment, Inc., and several private companies. Currently, he serves as the Company's Presiding Director.

23.    Defendant M. Michele Burns ("Burns") has been a Director of Wal-Mart since 2003. She is the Chairman and CEO of Mercer Human Resources Consulting, a subsidiary of Marsh and McLennan Companies, Inc. Ms. Burns is also a director of Cisco Systems, Inc.

24.    Defendant James I. Cash, Jr. ("Cash") has been a Director of Wal-Mart since 2006, and currently serves on the Company's Audit Committee. Mr. Cash is a retired Professor of Business Administration at Harvard Business School and a Former Senior Associate Dean and Chairman of HBS Publishing. Mr. Cash is a director of the Chubb Corporation, General Electric Company and other private companies and a former director of Microsoft Corporation.

25.    Defendant Gregory B. Penner ("Penner") has been a director of Wal-Mart since 2008. From 2002 to 2005, he served as Wal-Mart's Senior Vice president and Chief Financial Officer-Japan. Mr. Penner is a former General Partner at Peninsula Capital and a former financial analyst for Goldman, Sachs & Co. He is a member of the board of directors of Baidu.com, Inc., 99Bill Corporation, Cuil Inc., and Global Hyatt Corp.

26.    Defendant Steven S. Reinemund ("Reinemund") has been a Director of Wal-Mart since 2010.  Mr. Reinemund worked for PepsiCo for 22 years and served as PepsiCo's CEO and Chairman of the Board from 2001 to 2006. Currently, he is the Dean of the Calloway School of Business and Accountancy and Babcock Graduate School of Management at Wake Forest University. He is a director of Exxon Mobil Corporation, American Express Company and Marriott International, Inc.

27.     Defendant Arne M. Sorenson ("Sorenson") has been a Director of Wal-Mart since 2008, and currently serves on the Company's Audit Committee. Mr. Sorenson is the Executive Vice president and Chief Financial Officer of Marriott International, Inc., a position he has held since 1998. He was a former partner in the law firm of Latham & Watkins in Washington, D.C.

28.     Defendant Christopher J. Williams ("Williams") has been a Director of Wal-Mart since 2004, and currently serves on the Company's Audit Committee. Mr. Williams is the Chairman and CEO of The Williams Capital Group, L.P., Chairman and CEO of Williams Capital Management, LLC and a director of Harrah's Entertainment, Inc.

29.     Defendant Linda S. Wolf ("Wolf") has been a Director of Wal-Mart since 2005. She is the former chairman of the board and CEO of Leo Burnett Worldwide, Inc., a division of Publicis Groupe, S.A. She is a trustee for investment funds advised by the Janus Capital Group, Inc.

30.     Defendant Eduardo Castro-Wright ("Castro-Wright") was the CEO of Wal-Mex and headed the Company's Mexican operation from 2002 to 2005. Defendant Castro-Wright was promoted to CEO of Wal-Mart Stores USA in 2005, and named a Vice-Chairman of the Company in 2008. Former executives quoted in the New York Times on April 21, 2012, called defendant Castro-Wright the "driving force behind years of bribery" in Mexico.

31.     Defendant Eduardo F. Solorzano Morales ("Morales") replaced defendant Castro-Wright as CEO of Wal-Mex in 2005, and presently serves as Chief Executive of Wal-Mart Latin America. Defendant Morales vehemently opposed Wal-Mart's internal investigation into Wal-Mex's corrupt business practices in 2005 in an effort to conceal his and other executive's roles in the illegal bribery and record falsification scheme.

32.     Defendant Jose Luis Rodriguezmacedo Rivera ("Rodriguezmacedo") was the General Counsel of Wal-Mex in 2005. Defendant Rodriguezmacedo was one of the targets in

Wal-Mart's bribery investigation in 2005, but eventually defendants Scott and Duke turned control of the investigation over to his supervision. He was senior vice president for legal, ethics and compliance at Wal-Mart Mexico until he was reassigned on April 20, 2012, shortly after the NYT ran its story.

## ALLEGATIONS OF WRONGFUL CONDUCT

33.     This shareholder derivative action results from the uncovering of a widespread bribery scheme being perpetrated by executive officers at Wal-Mex, the Company's largest subsidiary located in Mexico, a resultant effort by Individual Defendants to hide the truth about the wrongdoing occurring at Wal-Mex, and the Wal-Mart Board's failure to implement and execute an effective system of internal controls that would prevent the Company and/or its employees from paying or offering to pay a foreign official anything of value to obtain business, thus violating the FCPA. The factual allegations herein are the result of pervasive malfeasance committed by Wal-Mart and Wal-Mex executives who are under the direct monitor and control of the Board and senior management. Perpetrated at the highest levels of the Company and covered-up by these same individuals, the wrongdoing being challenged by this shareholder action demonstrates that the Individual Defendants cannot impartially consider a demand to remedy the grievous harm inflicted upon the Company and its reputation.

### A.     The Foreign Corrupt Practices Act

34.     Under the FCPA's anti-bribery provisions, U.S. companies and citizens, foreign companies listed on a U.S. stock exchange, or any person acting while in the United States are generally prohibited from corruptly paying or offering to pay, directly or indirectly, money or anything of value to a foreign official a foreign political party or official, or a candidate for foreign political office for purposes of influencing any act or decision (including a decision not to act) of such official in his or her official capacity, inducing the official to do any act in violation

10

of his or her lawful duty, or to secure any improper advantage in order to assist the payor in obtaining or retaining business for or with any person, or in directing business to any person. In addition, the FCPA established accounting control requirements for issuers subject to either the registration or reporting provisions of the Exchange Act.

35.    The FCPA also requires every issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements; and (iii) to maintain accountability for assets. Proof of a U.S. territorial nexus is not required for FCPA implication against U.S. companies and citizens, and FCPA violations can, and often do, occur even if the prohibited activity takes place entirely outside of the United States.

36.    Significantly, a key 'best practices' FCPA compliance program component is to utilize internal audit to monitor for FCPA compliance issues on a regular basis to not only assess compliance but to also identify anything which warrants further investigation. Taken a step further, a continuous controls monitoring program can assist a company to identify unusual expenses, budgeted items, or any other event which is outside an established norm and "red flag" such expense, item or event for further investigation.

37.    The Department of Justice ("DOJ") and the SEC jointly enforce the FCPA. The DOJ is responsible for all criminal enforcement and for civil enforcement of the anti-bribery provisions with respect to domestic concerns and foreign companies and nationals. The SEC is responsible for civil enforcement of the anti-bribery provisions with respect to issuers.

38.    The following criminal penalties may be imposed for violations of the FCPA's anti-bribery provisions: corporations and other business entities are subject to a fine of up to

11

$2,000,000; officers, directors, stockholders, employees, and agents are subject to a fine of up to $100,000 and imprisonment for up to five years. Moreover, under the Alternative Fines Act, these fines may be quite higher -- the actual fine may be up to twice the benefit that the defendant sought to obtain by making the corrupt payment. Importantly, fines imposed on individuals may not be paid by their employer or principal.

39.     In addition to the criminal penalties, the Attorney General or the SEC, as appropriate, may bring a civil action for a fine of up to $10,000 against any firm as well as any officer, director, employee, or agent of a firm, or stockholder acting on behalf of the firm, who violates the anti-bribery provisions. In addition, in an SEC enforcement action, the court may impose an additional fine not to exceed the greater of (i) the gross amount of the pecuniary gain to the defendant as a result of the violation, or (ii) a specified dollar limitation. The specified dollar limitations are based on the egregiousness of the violation, ranging from $5,000 to $100,000 for a natural person and $50,000 to $500,000 for any other person.

40.     The Attorney General or the SEC, as appropriate, may also bring a civil action to enjoin any act or practice of a firm whenever it appears that the firm (or an officer, director, employee, agent, or stockholder acting on behalf of the firm) is in violation (or about to be) of the anti-bribery provisions.

41.     In addition to the criminal and civil penalties and fines, under guidelines issued by the Office of Management and Budget, a person or firm found in violation of the FCPA may be barred from doing business with the Federal government. Indictment alone can lead to suspension of the right to do business with the government. The President has directed that no executive agency shall allow any party to participate in any procurement or non-procurement activity if any agency has debarred, suspended, or otherwise excluded that party from participation in a procurement or non-procurement activity.

42.     Furthermore, a person or firm found guilty of violating the FCPA may be ruled ineligible to receive export licenses; the SEC may suspend or bar persons from the securities business and impose civil penalties on persons in the securities business for violations of the FCPA; the Commodity Futures Trading Commission and the Overseas Private Investment Corporation both provide for possible suspension or debarment from agency programs for violation of the FCPA; and a payment made to a foreign government official that is unlawful under the FCPA cannot be deducted under the tax laws as a business expense.

43.     As of March, 2009, there emerged three distinct trends in the enforcement of FCPA which legal analysts identified and publicly reported. First, the number of FCPA matters pursued by the DOJ (including deferred prosecutions and non-prosecution agreements) and the SEC steadily increased between 2002 and 2008, including a sharp increase in enforcement actions against both corporation and individuals. Secondly, there was a strong trend of actions against individuals being brought separately—often in advance—of charges against their employers and then, in all likelihood, following classic prosecutorial strategy of working up the chain of command, using the individuals to build the government's case against their superiors and eventually the company. Third, penalties assessed against corporations have increased over the same period, both in the aggregate (including all fines, penalties, restitution, and disgorgement) and in individual cases.

44.     Because the Individual Defendants have authorized Wal-Mart to operate in over 100 countries, some of which involve a higher than normal risk of violations of the anticorruption laws, including the FCPA, the Wal-Mart Board had a fiduciary duty to install and maintain internal controls and an accounting system for compliance with the FCPA.

**B.** **Whistleblower in 2005 Revealed Systemic Bribery and Corruption**
**Scheme at Wal-Mex Spearheaded By Defendant Castro-Wright**

45.     In 2004, Ms. Maritza I. Munich ("Munich"), a senior attorney at Wal-Mart,
implored the board to adopt a strict anticorruption policy that prohibited all employees from
"offering anything of value to a government official on behalf of Wal-Mart." Under the proposed
policy, every employee would be required to report the first sign of corruption, and it would bind
Wal-Mart's agents to the same exacting standards. The board, however, resisted this proposal,
which would eventually have significant ramifications for the Company.

46.     As reported in the recently-published The New York Times article, on September
21, 2005, former Wal-Mex in-house attorney Sergio Cicero Zapata ("Cicero") e-mailed Munich
stating that he was in possession of information about "irregularities" authorized "by the highest
levels" at Wal-Mex, and concluding that "I hope to meet you soon." A few days later, Wal-Mart
hired a local Mexico attorney to question Cicero. In that interview, he told how Wal-Mex's
leaders had engaged in a systematic campaign of bribery throughout Mexico in order to ensure
quick and easy approval of building permits for Wal-Mex's new stores.

47.     According to Cicero, the person most responsible for this conduct was defendant
Castro-Wright, but several Wal-Mex leaders, including its board chairman, its general counsel, its
chief auditor and its top real estate executive, were also implicated in the scheme. Cicero stated
that while he had knowledge of the occasional bribe being paid before defendant Castro-Wright's
arrival, the illegal practice exploded once defendant Castro-Wright took over as Wal-Mex's top
executive in 2002. Setting the tone at the top, defendant Castro-Wright set "very aggressive
growth goals," which required opening new stores "in record times," thus applying pressure to
Wal-Mex executives to do "whatever was necessary" to obtain permits.

48.     As quoted in the *The New York Times* article, Cicero recounted how defendant Castro-Wright had encouraged the payments for a specific strategic purpose: build hundreds of new stores so fast that competitors would not have time to react. Specifically, Cicero explained how the bribes were funneled to government officials through Mexican intermediaries called "gestores" (loosely translated as "managers"), and how Wal-Mex prepared false invoices to make it seem as if the payments made to the *gestores* were legitimate business expenses. Wal-Mex used

bribes to accelerate growth by, amongst other things, changing zoning maps, overcoming environmental objections, and drastically shortening the time for processing permits. "What we were buying was time," he said.

49.     Wal-Mart investigators were able to substantiate Cicero's revelations through both his documentation as well as materials they uncovered in the course of their investigations in Mexico City. According to the Wal-Mart investigators, each month, Mr. Castro-Wright and other top Wal-Mex executives received a detailed schedule of all of the payments performed. Wal-Mex then falsified the payments in accounting records as simple legal fees. These false records were then passed on to the Company's headquarters in Bentonville.  The investigators concluded that Cicero's account of the criminality at the top of Wal-Mex was extremely credible, as he had clearly been in a position to witness the events he described.

### C.     The Company Concealed Earlier Known Corruption By Wal-Mex and Defendant Castro-Wright

50.     Wal-Mart's investigation into Cicero's allegations was not the Company's first indication of corruption at Wal-Mex by defendant Castro-Wright. A confidential investigation, conducted for Wal-Mart in 2003 by Kroll Inc., a leading investigation firm, discovered that Wal-Mex had systematically increased its sales by helping favored high-volume customers evade sales taxes.  A draft of Kroll's report, obtained by The New York Times, concluded that top Wal-Mex

executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Wal-Mex was "carrying out a tax fraud. (The company ultimately paid $34.3 million in back taxes.) Wal-Mart then asked Kroll to evaluate Wal-Mex internal audit and antifraud units. Kroll wrote another report that branded the units "ineffective." Many employees accused of wrongdoing were not even questioned; some received a promotion shortly after the suspicions of fraudulent activities had surfaced.

**D.     Despite His Role In Wal-Mex Corruption, Defendant Castro-Wright Is Placed In Charge of All Wal-Mart Stores in the United States**

51.     The stunning growth at Wal-Mex made defendant Castro-Wright a rising star in the eyes of the Company's senior leaders, despite the already clear warnings that something was amiss at Wal-Mex under his leadership. Just days before Wal-Mart investigators first interviewed Mr. Cicero, Mr. Castro-Wright was promoted and put in charge of all Wal-Mart stores in the United States, one of the most prominent and powerful jobs in the Company. In early 2005, when he was promoted to a senior position in the United States, Mr. Duke would cite his "outstanding results" in Mexico.

**E.     Individual Defendants Reject An Independent and Thorough Investigation of Defendant Castro-Wright and Wal-Mex**

52.     Defendant Duke, who is presently Wal-Mart's CEO, received an email with a note stating "You'll want to read this" on October 15, 2005 which detailed Cicero's allegations. Duke received this email in his capacity as then-Vice Chairman of the Company in charge of Wal-Mart's foreign subsidiaries.

53.     Following the Company's initial investigation of Cicero's claims, Wal-Mart senior attorney Munich sent memos detailing the corruption scheme to Wal-Mart's senior management, including Thomas A. Mars, Wal-Mart's general counsel and a former director of the Arkansas

State Police; Thomas D. Hyde, Wal-Mart's executive vice president and corporate secretary; Michael Fung, Wal-Mart's top internal auditor; Craig Herkert, the chief executive for Wal-Mart's operations in Latin America; and Lee Stucky, a confidant of Lee Scott's and chief administrative officer of Wal-Mart International.

54.     As a result of Munich's memos, Wal-Mart contacted the law firm of Willkie Farr & Gallagher ("Willkie Farr") and asked them to outline the course of a possible investigation into whether any employees of the Company had engaged in violations of the Foreign Corrupt Practices Act. Willkie Farr submitted a plan calling for tracing all payments to anyone who had helped Wal-Mex obtain permits for the previous five years, stating that it would scrutinize "any and all payments" to government officials and interview every person who might know about payoffs, including "implicated members" of Wal-Mex's board. Willkie Farr recommended that the investigation be allowed to proceed for approximately four months and argued that it should be independent and thorough, as fitting an investigation in which top executives such as defendant Castro-Wright may be implicated.

55.     Despite this call for a robust investigation into Wal-Mex, the Company rejected the firm's proposal.  Instead, records show, they decided Wal-Mart's lawyers would supervise a far more limited "preliminary inquiry" by Wal-Mart's internal Corporate Investigations Unit. However, as the Company knew full well, this in-house investigation team was ill-equipped to take on a major investigation of this type, particularly one involving a foreign country such as Mexico. It had fewer than 70 employees, and most were assigned to chasing shoplifting rings and corrupt vendors. Just four people were specifically dedicated to investigating corporate fraud, a number Joseph R. Lewis ("Lewis"), Wal-Mart's director of corporate investigations, described in a confidential memo as "wholly inadequate for an organization the size of Wal-Mart." As a confidential memo explained, this team's inquiry would take two weeks, not the four months

proposed by Willkie Farr; analyze the permits of just a few specific stores; and conduct interviews "only when absolutely essential to establishing the bona fides" of Cicero.  Only if the Corporate Investigations Unit discovered a "likelihood" that laws had been violated would the Company consider conducting a "full investigation."

56.    The decision to conduct a much more limited investigation into Wal-Mex and defendant Castro-Wright allowed Wal-Mart's senior management to directly oversee and control the scope of the inquiry, thus continuing the Company's disturbing trend of tightly restricting investigations of its own leaders and calling into question their effectiveness.  For example, in October, Wal-Mart's vice chairman, John B. Menzer ("Menzer"), intervened in an internal investigation into a senior vice president who reported to him. According to internal records, Menzer told Kenneth H. Senser ("Senser"), Walmart's vice president of global security, that he did not want Corporate Investigations to handle the case "due to concerns about the impact such an investigation would have." One of the senior vice president's subordinates, he concluded, "would be better suited to conduct this inquiry." Soon after, records show, the subordinate cleared his boss. The other case involved the president of Wal-Mart Puerto Rico. A whistle-blower had accused the president and other executives of mistreating employees. Although Corporate Investigations was supposed to investigate all allegations against senior executives, the president had instead assigned an underling to look into the complaints -- but to steer clear of those against him.

**F.    Wal-Mart's Limited Inquiry Yielded Overwhelming
       Evidence of Wrongdoing Committed by Wal-Mex and Wal-Mex Officials**

57.    Even though the Company authorized only a limited inquiry, into Wal-Mex, the results were overwhelming and confirmed the allegations made by Cicero. The investigation confirmed almost all of Cicero's findings, including the fact that approximately $24 million in

suspect payments had been made to Mexican officials and specific records showing payments of $8.5 million to two of the *gestores* named by Cicero in his interviews. The investigators also found documents showing that Wal-Mex's top executives knew about the payments, and instead of halting the practice, ramped up the scheme ("implement this plan as soon as possible") and took steps to conceal them. These executives included defendants Castro-Wright and Rodriguezmacedo, who was then Wal-Mex General Counsel. Defendant Rodriguezmacedo claimed the company had stopped using *gestores* after Cicero departed the company, yet even as Cicero was being debriefed in October 2005, records show Wal-Mex real estate executives made a request to pay a gestore $14,000 to get a construction permit.

58.     The investigative team wrote confidential reports to Wal-Mart's top executives in December 2005 laying out all the evidence that corroborated Cicero's allegations: hundreds of gestore payments, the mystery codes, the rewritten audits, the evasive responses from Wal-Mart Mexico executives and the evidence *gestores* were still being used. "There is reasonable suspicion," the report concluded, "to believe that Mexican and USA laws have been violated." There was simply "no defendable explanation" for the millions of dollars in payments to *gestores*.

59.     The leader of the Corporate Investigations team, Ronald Halter ("Halter"), submitted an "action plan" for a deeper investigation that would more fully-vet the extent of the corruption at Wal-Mex and reveal those who were responsible. Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history." Halter also proposed a thorough investigation of the two primary *gestores* mentioned by Cicero. He had forgone such interviews in Mexico for fear of his safety. ("I do not want to expose myself on what I consider to be an unrealistic attempt to get Mexican lawyers to admit to criminal activity," he had explained to his bosses.) Now Halter wanted Wal-Mart to hire private investigators to interview and monitor both of the primary *gestores*. He also proposed a round of adversarial

19

interviews with Wal-Mex senior executives, including the sensitive step of questioning defendant Castro-Wright about his role in the gestore payments.

60.     Around January 2006, Munich wrote a memo in which she agreed with Halter's assessments and recommendation that the Company enlarged the scope of the bribery investigation, noting that "[t]he bribery of government officials is a criminal offense in Mexico."

**G.     Individual Defendants Chose To Cover-Up The Bribery Scheme At Wal-Mex and Exonerate Those Responsible For The Wrongdoing**

61.     There can be no doubt that the Individual Defendants with the Company in 2005 were on notice of the rampant corruption in Wal-Mart's global business sector and the need to redress it. In addition to the proposal from Halter, others involved in the investigation argued that it was time to take a stand against signs of rising corruption in Wal-Mart's global operations, which was becoming a significant dilemma facing the Company. Each year the Company received hundreds of internal reports of bribery and fraud. In Asia alone, there had been 90 reports of bribery just in the previous 18 months.  So dire was this problem that in 2005, Wal-Mart summoned its top procurement executives to its corporate headquarters where Company Vice Chairman Menzer scolded them over the corruption, stating in succinct fashion that "Times have changed" and such wrongdoing was creating an unacceptable risk given the government's stepped-up enforcement of the FCPA.  Moreover, even as they pondered Halter's action plan, the Company received new disturbing evidence of additional wrongdoing at Wal-Mex. In January 2006, Scott, Duke and Wal-Mart's chairman, S. Robson Walton, received an anonymous e-mail accusing Wal-Mex's top real estate executives of receiving kickbacks from construction companies, and pleading with these defendants "Please you must do something."

62.     Wal-Mart's leaders had agreed to consider a full investigation if the preliminary inquiry found Cicero's allegations credible.  They were now confronted with clear and compelling

evidence that one of the Company's rising stars, already being publicly discussed as a potential successor to CEO Scott, was implicated in serious criminal wrongdoing and had taken steps to cover it up. On this point, Wal-Mart's ethics policy offered clear direction: "Never cover up or ignore an ethics problem..." Yet this is exactly what the Individual Defendants did.

63.     Throughout the scaled-down investigation process and beyond, the Company's board received considerable push-back against casting any spotlight on the wrongdoing at Wal-Mex. Senior Executives at Wal-Mex complained bitterly to top Company management including defendants Scott and Duke, who himself traveled to Mexico in October 2005 to meet with enraged Wal-Mex officials, that the internal investigation was too heavy-handed and intrusive. Defendant Morales, then the CEO of Wal-Mex, criticized the investigators for being too secretive and accusatory. Senior Wal-Mart executives accused Lewis and the Corporate Investigation team of being overbearing, disruptive and naïve about the ambiguities of doing business abroad. They argued that Corporate Investigations should focus more on quietly "neutralizing" problems than on turning corrupt employees over to law enforcement. Unfortunately, the Company yielded to these voices.

64.     On February 3, 2006, defendant Scott called a meeting to discuss revisions to Wal-Mart's internal investigation process, and to resolve the issue of how to deal with Cicero's allegations. During that meeting, Lewis and his team were criticized for being "overly aggressive" and having too much of a "law enforcement approach".

65.     At the end of the meeting on February 3, defendant Scott ordered Mr. Sensor to produce a new protocol for corporate investigations within 24 hours, which he did. The new protocol that resulted was a highly bureaucratic process that gave senior Wal-Mart executives—including executives at the business units being investigated—more control over internal investigations. The policy included multiple "case reviews." It also required senior executives to

conduct a "cost-benefit analysis" before signing off on a full-blown investigation. Most critically, the new policy mandated that Mr. Lewis and his team would only investigate "significant" allegations, including those involving potential crimes or senior executives. Lesser allegations would be left to the affected business unit to investigate. Wal-Mart's senior leaders now had the ability to hamper any internal investigation and cover up the misconduct of what they deemed to be valuable assets to the Company, irrespective of the severity or illegality of the conduct at issue.

66.    Just four days after the February 3, 2006 meeting, pursuant to the new protocol that they authorized, Wal-Mart's leaders transferred control of the investigation of Wal-Mex to one of the individual's at the heart of the inquiry into the wrongdoing, Mr. Rodriguezmacedo. By taking such action, they appeared to violate even the modified weak protocol for investigations as it involved potential crimes and senior executives. Wal-Mart attorney Munich, who had strenuously objected when the Company instructed her to substantially narrow the scope of the Wal-Mex investigation, resigned from Wal-Mart in February, 2006. In an e-mail to Wal-Mart executives, she emphasized the need for "professional, independent investigative resources," and complained that the investigation was "at the direction of the same company officer who is the target of several of the allegations."

67.    Although Wal-Mart's senior investigators uniformly believed that that a proper, full-blown investigation of defendant Castro-Wright would take months to complete given that he had never been questioned or asked to produce documents, defendant Rodriguzemacedo, the Wal-Mex official now in charge, saw it differently. He wrapped up the case in a few weeks, with little additional investigation, and detailed his conclusions in a report to Wal-Mart leaders (the "Rodriguezmacedo report"). "There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits." That conclusion, the Rodriguezmacedo report explained, was largely based

22

on the denials of his fellow executives. According to his report, not one "mentioned having ordered or given bribes to government authorities."

68. The Rodriguezmacedo report, just six pages long in total, neglected to note that he had been implicated in the same criminal conduct. While the report conceded that Wal-Mart Mexico executives had authorized years of payments to *gestores*, it never bothered to try to explain what these executives expected the payments would be used for if not to bribe officials to facilitate permits. Nor did the report address the improper and fraudulent audits prepared by Wal-Mex. The Rodriguezmacedo report promised a series of corrective steps including a ban on the use of *gestores* but did not recommend any disciplinary action against any of his colleagues.

69. A plain reading of the Rodriguezmacedo report shows that he devoted most of it to unsubstantiated attacks on Cicero. In building his case against Cicero, the Rodriguezmacedo report included several false statements, for example, stating that Cicero was subject to "dismissal" when records showed he had resigned, and stating falsely that Kroll's investigation of Mr. Cicero concluded that he "had a considerable increase in his standard of living during the time in which payments were made to the *gestores*." The Rodriguezmacedo report further suggested scouring Cicero's records and determining if any legal action could be taken against him.

70. The Rodriguezmacedo report was given to senior executives at Wal-Mart's corporate headquarters, including defendant Scott. By way of an e-mail, Lewis told his superiors the report was clearly "lacking" and had no basis to support its claim that no further action was needed regarding Wal-Mex. Rodriguezmacedo responded by adding a paragraph to the end of his report which stated that "criminal actions" were not brought against Cicero because "[Wal-Mex] did not have a strong case." This paragraph did not answer any of the questions as to why Wal-

Mex did not wish to pursue an investigation of defendant Castro-Wright and other top executives implicated in the wrongdoing.

71.    Despite the fact that the Rodriguezmacedo report was hastily put together, lacked support for its conclusions, and was criticized by members of the Company's own investigatory team, on May 10, 2006, Wal-Mart executives told Rodriguezmacedo to put his report "into final form, thus concluding this investigation." The Company did not publicly disclose anything regarding the allegations of bribery and corruption at Wal-Mex, nor did it discipline anyone for their involvement in the alleged scheme. From the Company's perspective, the Wal-Mex affair was officially closed.

### INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND/OR MISLEADING STATEMENTS REGARDING THEIR PRIOR KNOWLEDGE OF CORRUPTION AT WAL-MEX

72.    In approximately December 2011—five-and-a-half years after the Wal-Mart board shut down and quietly shelved its Wal-Mex investigation, Wal-Mart officials first learned that *The New York Times* was investigating its operations in Mexico in connection with possible violations of the FCPA by defendant Castro-Wright and other Wal-Mex executives. On December 8, 2011, in a Form 10Q filed with the SEC, Individual Defendants made the following disclosure:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anticorruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters.

> However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

73.   This statement found in the Company's Form 10Q was extremely misleading.  As written, it strongly suggests that the Company first learned of the Wal-Mex FCPA violations in 2012, then and only as the result of a voluntary internal review. In truth, as detailed above, the Company had known about the corrupt practices in Mexico concerning Wal-Mex's permits for several years and had taken the extraordinary steps detailed above to cover it up. Furthermore, the investigation that was launched in 2012 to review wrongdoing the Company had long known about in Mexico was not purely a "voluntary" effort, but was undoubtedly driven by the impending New York Times article.

74.   At this time, Individual Defendants knew full well that they had caused the Company to engage in serious wrongdoing by failing to implement any proper controls to combat corruption and by engaging in a six year campaign to cover up evidence of serious and unlawful corruption committed by senior executives at Wal-Mex, the Company's most important foreign subsidiary. Their willingness to issue false and misleading statements about their knowledge of such wrongdoing is indicative of their unwillingness to acknowledge their role and remedy the damages that have or will befall the Company, thus justifying the need for this shareholder derivative action.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

75.   By reason of their positions as officers and/or directors and fiduciaries of Wal-Mart and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Wal-Mart, Plaintiff and other common public shareholders fiduciary obligations of trust, loyalty, good faith fair dealing, due care, and candor, and were and are required to use their utmost ability to control and manage Wal-Mart in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Wal-Mart and its shareholders so as to benefit all shareholders equally and not in

furtherance of their personal interest or benefit. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wal-Mart, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

76.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wal-Mart's, and was at all times acting within the course and scope of such agency.

77.   To discharge their duties, the officers and directors of Wal-Mart were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. In accordance with these fiduciary duties as officers and directors of Wal-Mart, the Individual Defendants as were required to, among other things:

a.   Manage, conduct, supervise and direct the business affairs of Wal-Mart in accordance with all applicable laws, including federal and states laws, regulations and policies of the Company;

b.   Neither violate, nor permit any officer, director or employee of Wal-Mart to violate applicable laws, rules and regulations, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA");

c.   Remain informed as to the status of Wal-Mart's operations, including its compliance with the FCPA and the financial reporting requirements under the FCPA and the federal securities laws, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

d.   Conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, to avoid conflicts of interest between their own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Wal-Mart's public stockholders, and to maximize the value of the Company's stock.

78.   Pursuant to the Company's Corporate Governance Guidelines, the Board is tasked with responsibility for, among other things, "[r]eviewing compliance with applicable laws and regulations and adopting policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls."

79.   Under the Corporate Governance Guidelines, Directors are also expected "to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders, and to perform their duties of care and loyalty."

80.   Additionally, all directors are also required to participate in an orientation plan upon his or her election to the Board.  This plan includes "familiarizing new directors with the Company's strategic plans, *its significant financial, accounting and risk management issues, its compliance programs*, its Statement of Ethics, its principal officers, and its internal and independent auditors." (emphasis added).

81.   As stated in Wal-Mart's Code of Business Conduct and Ethics, Individual Defendants are directed to "[n]ever cover up or ignore an ethics problem. The anti-bribery laws of many countries, including the U.S. Foreign Corrupt Practices Act ("FCPA"), prohibit Wal-Mart from offering or giving any money or other thing of value, directly or indirectly through a third party, to any foreign government official for the purpose of improperly obtaining or maintaining business or securing an improper advantage. A "thing of value" could include gifts or gratuities of any kind, travel and entertainment, offers of employment or contributions to charity.

27

82.   Wal-Mart also has a Code of Ethics for the CEO and all Senior Financial Officials that was in effect from November 20, 2003 through the present.  In particular, the CEO and all Senior Financial Officers (including the CFO and Corporate Controller) are bound by these provisions.  This Code of Ethics assigns certain reporting obligations to the CEO, CFO and Corporate Controller, who fulfill those obligations by reporting specified matters, such as information about conflicts of interest or "evidence of a material violation of securities of other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof" *to the Audit Committee of the Board* and the Company's Internal Audit Services.  Other Senior Financial Officers may report such matters to their superior or the Audit Committee.

83.   Defendants Alvarez, Cash, Sorenson and Williams are members of the Board's Audit Committee, and therefore have enhanced duties as detailed in the Company's Audit Committee Charter.   Generally these defendants have a duty to review and monitor the Company's compliance with all legal and regulatory requirements. Specifically, the Charter requires the Audit Committee to "[d]iscuss with management and the Outside Auditor, and advise the Board with respect to, the Company's policies, processes and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics, and instances of non-compliance therewith." As such, they are directly responsible for overseeing Wal-Mart's compliance with the FCPA. In this capacity, Defendants Alvarez, Cash, Sorenson and Williams breached their fiduciary duties by both (1) knowingly and/or recklessly undermining the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme; and (2) failing to install internal controls sufficient to avoid violations of the FCPA, rendering them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

84.     As directors and officers of Wal-Mart, Individual Defendants owed a duty to be reasonably informed about the business and operations of the Company.  Moreover, the Individual Defendants who are also officers of Wal-Mart also assumed important managerial responsibilities at the Company which required them to be well informed about the day-to-day operations of the Company, and to only conduct the business affairs of Wal-Mart in the best interests of the Company and its shareholders.  The Company's governance and reporting system presumably worked to inform Director Defendants of all important aspects of the Company's business, including the business activities of its single-largest global subsidiary, Wal-Mex.

85.     Rather than fulfill these important fiduciary duties, upon information and belief, Individual Defendants actively participated in or knowingly encouraged, sponsored or approved the conduct complained of herein, and/or breached their fiduciary duties to Wal-Mart by purposefully, recklessly and/or negligently disregarding this conduct.

86.     The Individual Defendants, in derogation of their responsibilities to Wal-Mart, failed to properly manage the affairs of the Company and failed to protect the interests of Wal-Mart and its shareholders.  The Individual Defendants consciously acted in blatant disregard for their fiduciary duties by directly sabotaging the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme. Additionally, Individual Defendants failed to adequately exercise control as required by law and by their own Code of Business Conduct and Ethics by failing to: (a) prevent the payment of illegal bribes and kickbacks; (b) fully inform themselves of the scheme and/or the attempt to cover-up this wrongdoing involving its own directors and officers, (c) take direct responsibility in decision-making regarding these issues, and (d) establish and maintain adequate internal controls over management and the affairs of Wal-Mart designed to prevent these issues from occurring.

87.    Individual Defendants, because of their positions of control and authority as directors, members of the Audit Committee and/or officers of Wal-Mart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive, managerial and/or directorial positions with Wal-Mart, each of the defendants had access to adverse, non-public information concerning the lack of a system of accounting controls that permitted them to know of and prevent the payment of illegal bribes and kickbacks. The Individual Defendants breached their fiduciary duties by: (1) knowingly and/or recklessly electing to weaken internal controls for complying with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Wal-Mart; and (2) knowingly and/or recklessly failing to require Wal-Mart to implement such internal controls.

88.    The Individual Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at Wal-Mart, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with Wal-Mart and the financial benefits that flow therefrom.

89.    As direct and proximate result of the Individual Defendants' breaches of fiduciary duties and their failures described herein, Wal-Mart has expended, and will continue to expend, significant sums of its capital, both reputational and economic, addressing the illegal and reprehensible payments that were paid in its name. Likewise, the illegal payments have and will continue to irreparably damage Wal-Mart's corporate image and goodwill and jeopardize its ability to do business in foreign countries.

## WAL-MART HAS AND SHALL SUFFER DAMAGES
## RESULTING FROM INDIVIDUAL DEFENDANTS' CONDUCT

90.     On May 17, 2012, the Company filed an SEC Form 8-K addressing the scope of

the investigations into the alleged wrongdoing at Wal-Mex and discussing the financial impact

and other damages to the Company that may result, which could be material: (emphasis added)

> The Audit Committee of the Company's Board of Directors (the "Audit
> Committee"), which is composed solely of independent directors, is conducting
> an internal investigation into, among other things, alleged violations of the U.S.
> Foreign Corrupt Practices Act (the "FCPA") and other alleged crimes or
> misconduct in connection with foreign subsidiaries including Wal-Mart de
> México, S.A.B. de C.V. ("Walmex") and whether prior allegations of such
> violations and/or misconduct were appropriately handled by the Company. The
> Audit Committee and the Company have engaged outside counsel from a number
> of law firms and other advisors who are assisting in the on-going investigation of
> these matters. The Company is also conducting a voluntary global review of its
> policies, practices and internal controls for FCPA compliance. The Company is
> engaged in strengthening its global anti-corruption compliance programs through
> appropriate remedial anti-corruption measures. In November 2011, the Company
> voluntarily disclosed that investigative activity to the U.S. Department of Justice
> (the "DOJ") and the SEC.
>
> The Company has been informed by the DOJ and the SEC that it is also the
> subject of their respective investigations into possible violations of the FCPA. The
> Company is cooperating with the investigations by the DOJ and the SEC. A
> number of federal and local government agencies in Mexico have also recently
> initiated investigations of these matters. Walmex is cooperating with the Mexican
> governmental agencies conducting these investigations. Furthermore, lawsuits
> relating to the matters under investigation have recently been filed by several of
> the Company's shareholders against it, its current directors, certain of its former
> directors, certain of its current and former officers and certain of Walmex's
> current and former officers.
>
> *The Company could be exposed to a variety of negative consequences as a*
> *result of the matters noted above.* There could be one or more enforcement
> actions in respect of the matters that are the subject of some or all of the ongoing
> government investigations, and such actions, if brought, may result in judgments,
> settlements, fines, penalties, injunctions, cease and desist orders or other relief,
> criminal convictions and/or penalties. The shareholder lawsuits may result in
> judgments against the Company and its current and former directors and officers
> named in those proceedings. The Company cannot predict accurately at this time
> the outcome or impact of the government investigations, the shareholder lawsuits,
> or its own internal investigation and review. In addition, the Company expects to
> incur costs in responding to requests for information or subpoenas seeking

31

documents, testimony and other information in connection with the government investigations, in defending the shareholder lawsuits, and in conducting its internal investigation and review, and it cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of the Company's senior management that could impinge on the time they have available to devote to other matters relating to the business. The Company may also see ongoing media and governmental interest in these matters that could impact the perception among certain audiences of its role as a corporate citizen.

The Company is in the early stages of assessing and responding to the governmental investigations, the shareholder lawsuits, and its internal investigation and review are on-going. Although the Company does not presently believe that these matters will have a material adverse effect on its business, given the inherent uncertainties in such situations, *the Company can provide no assurance that these matters will not be material to its business in the future.*

91.    As a result of the faithless, disloyal actions of the Individual Defendants, Wal-Mart has and will sustain varying, significant damages. As the Form 8-K filed by the Company on May 17, 2012 confirmed, Wal-Mart will undoubtedly have to defend against lengthy probes by the DOJ and the SEC into Wal-Mart's foreign operations, not only in Mexico but worldwide. Wal-Mart's defense against these regulatory actions, which have already commenced, will be time-consuming, distracting and expensive.

92.    Wal-Mart executives, including many of the Individual Defendants, face the possibility of criminal prosecutions and civil liability which will undoubtedly distract and deter them from the performance of their duties. The DOJ has placed a high premium on investigating and prosecuting violations of the FCPA and bribery laws and will undoubtedly pursue any case against the Company vigorously. As stated above, Wal-Mart also faces charges under the FCPA which can lead to very substantial fines and penalties totaling in the hundreds of millions. The scale of the bribery in Mexico and the subsequent cover-up by senior Wal-Mart executives and directors make it even more likely that Wal-Mart will have to pay the stiffest of penalties to resolve the matter.

93.    The improper actions of the Individual Defendants will also cost Wal-Mart n terms of its future growth and loss of goodwill. Already, activists and competitors have signaled that they will use the improprieties committed by the Individual Defendants against the Company when it attempts to opens stores in the U.S. and abroad. Much of Wal-Mart's recent growth has come from opening stores overseas, and so any increased regulatory activity against it will undoubtedly hinder the Company's overall growth.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.    Plaintiff brings this action derivatively in the right and for the benefit of Wal-Mart to redress injuries suffered, and to be suffered, by Wal-Mart as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Wal-Mart is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiffs will adequately and fairly represent the interests of Wal-Mart in enforcing and prosecuting its rights. Plaintiff is and was owner of the stock of Wal-Mart during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

95.    The Board of Directors of Wal-Mart at the time of this filing consisted of the following fourteen (14) individuals: S. Walton, Scott, J. Walton, Daft, Corbett, Alvarez, Breyer, Burns, Cash, Penner, Reinemund, Sorenson, Williams, and Wolf. Plaintiff did not make a pre-suit demand on the Board of Directors of Wal-Mart to institute this action because by reason of their own personal interest in the outcome of such a decision or the effect their decision would have on

another Wal-Mart Board member who dominated and controlled them, a majority the members of the Wal-Mart Board could not independently and disinterestedly consider whether to bring the allegations alleged herein, rendering such a demand a futile, wasteful and useless act.

96.    Pre-suit demand would have been futile because a majority of the Wal-Mart Board members personally participated in the misconduct described herein for his own personal gain or by improperly abrogating his oversight duties to other defendants. As a result of the Wal-Mart Board members' direct access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management, Board and Board Committee meetings, a majority of the Individual Defendants knew of the corruption scheme at Wal-Mex and yet consciously acted to cover it up and allow the Company to maintain insufficient internal controls required by the FCPA.

97.    Demand would have been futile because in order to bring this suit, a majority of the directors of Wal-Mart would have been forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand. Specifically, a majority of the Director Defendants are prevented from independently and disinterestedly considering a demand to commence and vigorously pursue the allegations contained herein for the following reasons:

98.    There is a reasonable doubt that the actions alleged herein, including the following, by the Director Defendants' were the product of a valid exercise of business judgment, for the following reasons:

a.  All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson (all of whom were appointed to Board after June, 2006) were fully aware by December, 2005 of the allegations by Cicero and the subsequent documentation and findings produced by the Company's investigation team which substantiated those allegations, including the fact that approximately *$24 million* in suspect payments had been made to Mexican officials; that Wal-Mex's top executives including Castro-Wright and Rodriguezmacedo knew about the

34

payments and had taken steps to conceal them; that Rodriguezmacedo falsely claimed the company had stopped using *gestores* after Cicero departed the company, yet records show that in October 2005, Wal-Mex real estate executives made a request to pay a *gestore* $14,000 to get a construction permit; that hundreds of *gestore* payments were still being used; and that the investigation team concluded that "There is reasonable suspicion to believe that Mexican and USA laws have been violated.";

b. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, acted against the recommendations of senior attorney Menzer and outside legal counsel Willkie Farr to conduct a thorough, effective investigation into Wal-Mex and its senior executives which would have complied with the FCPA, choosing instead to have the Company's internal investigation team, which lacked adequate resources to fully vet such substantial allegations of wrongdoing, to conduct a "preliminary" investigation into Wal-Mex;

c. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, rejected the plan by lead investigator Halter to follow-up on the Company's "preliminary" investigation, which uncovered overwhelming evidence of criminal bribery and other wrongdoing at Wal-Mex, with a more thorough investigation which would include hiring private investigators to interview and monitor both of the primary *gestores*, and a round of adversarial interviews with Wal-Mex senior executives, including defendant Castro-Wright;

d. All current Board members in January, 2006 except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, criticized the "overly aggressive" tactics of their internal investigation team and substantially revised the Company's internal investigation protocol away from a "law enforcement approach" that gave senior Wal-Mart executives—including executives at the business units being investigated—more control over internal investigations;

e. All current Board members in February, 2006 except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, yielded control and supervision over the investigation into Wal-Mex to defendant Rodriguezmacedo, the Wal-Mex official originally implicated in the wrongdoing, thus violating even the new weakened investigation protocol established by the Company;

f. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, allowed Rodriguezmacedo to conduct a minimal inquiry which conducted little additional investigation, and which resulted in report which concluded that there was no evidence of bribes, exonerated Wal-Mex senior officials including defendant Castro-Wright, and spent most of its six-pages baselessly attacking whistleblower Cicero;

g. All current Board members in May, 2006, except Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, accepted the Rodriguezmacedo report as the final word on the Wal-Mex bribery scandal and closed the matter, despite the fact that the

report was hastily put together, lacked support for its conclusions, and was criticized by members of the Company's own investigatory team;

h.  All current Board members have either explicitly or implicitly endorsed the Company's inexplicable exoneration and continued promotion of defendant Castro-Wright, who they knew or should have known to have been directly implicated by both Cicero and their own internal investigation as orchestrating the illegal bribery scheme at Wal-Mex;

i.  All current Board members in December, 2011 caused the Company to issue a false and misleading Form 10Q which strongly suggests that the Company first learned of the Wal-Mex FCPA violations in 2012, then and only as the result of a voluntary internal review. This conceals the fact that they Company had known about the corrupt practices in Mexico concerning Wal-Mex's bribery scheme.

99.  The Company has a governance and reporting system by which all the Director Defendants are presumably informed of all important and/or material aspects of Wal-Mart's business, including the activities of its largest global subsidiary, Wal-Mex.  For example, the Company's Corporate Governance Guidelines requires directors to participate in an orientation plan upon his or her election to the Board, which includes "familiarizing new directors with the Company's strategic plans, *its significant financial, accounting and risk management issues, its compliance programs*, its Statement of Ethics, its principal officers, and its internal and independent auditors." (emphasis added.)

100.  Because the Company has a corporate governance structure in place, there is a presumption that the corporate governance and reporting procedures were followed and that all of the Director Defendants knew of the bribery scheme at Wal-Mex and subsequent cover-up and yet decided against further investigating, reporting, or rectifying this wrongdoing, or punishing any official implicated in the scheme.

101.  As alleged above, all current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson received a large number of reports of the bribery scheme at Wal-Mex.  Moreover, because the Company's Corporate Governance Guidelines, it may

reasonably be inferred that all Director Defendants knew of Wal-Mex's continued misconduct and chose to disregard it. Given the extensive paper trail generated by both a Wal-Mex whistleblower and the Company's own investigation team concerning the violations, the Board's direct and/or inferred awareness of the problems, and the ensuring effort to cover-up the wrongdoing from public discovery, there was a sustained and systematic failure of the board to exercise oversight which can only be considered intentional, in that the directors knew of the violations of law and yet took no steps in an effort to prevent or remedy the situation. The Board's failure to take any action regarding illegal activity of such substantial magnitude and duration until threatened with exposure by the media indicates that the directors' decision to not act was not made in good faith and was contrary to the best interests of the company, and has and will result in substantial losses to the Company.

102.   Director Defendants, as a result of their control over the internal controls relating to Wal-Mart's investigation and subsequent cover-up of the Wal-Mex bribery scheme and their knowledge of the deficiencies in internal controls associated therewith, caused the Company to illegally sanction what they knew or should have known were violations of the FCPA, and thus there is reasonable doubt that their actions resulted from the exercise of valid business judgment.

103.   Director Defendants, as a result of their control over the internal controls relating to Wal-Mart's investigation and subsequent cover-up of the Wal-Mex bribery scheme and their knowledge of the deficiencies in internal controls associated therewith, elected not to maintain adequate internal controls over the business practices by Wal-Mex and/or ensure that all such practices were legally performed, and thus there is reasonable doubt that their actions resulted from the exercise of valid business judgment.

104.   Director Defendants, despite having direct evidence of substantial wrongdoing by and amongst the Individual Defendants, has chosen not to hold any of these individuals

accountable for causing harm to Wal-Mart and exposing the Company to serious reputational and pecuniary damages. This inaction by the Board is not surprising given that Director Defendants themselves are directly implicated in the wrongdoing by their cover-up of the Company's violations of the FCPA and their own deliberate neglect in failing to plan or maintain internal controls to ensure Wal-Mart's compliance with the FCPA.

105. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on intentional, reckless and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the current Board, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

106. There is a substantial likelihood that a majority of the Director Defendants will be held liable for their breaches of fiduciary duties, as alleged herein, and therefore are not disinterested in this action. Director Defendants S. Walton, Scott, J. Walton, Daft, Breyer, Burns, Williams, and Wolf would have had contemporaneous knowledge of the fraudulent and criminal conduct occurring at Wal-Mex and the resultant effort to cover-up the wrongdoing from being exposed and the wrongdoers from being held accountable. Director Defendants Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, if sufficiently informed of material matters at the Company, would have had after-acquired knowledge of the fraudulent and criminal conduct that occurred at Wal-Mex and the resultant effort to cover-up the wrongdoing from being exposed and the wrongdoers from being held accountable. Therefore, there is a substantial likelihood that all of these Director Defendants will be held liable for breach of fiduciary duty, and are therefore self-interested and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

Accordingly, demand is excused.

107. Additionally, there is a substantial likelihood that the members of the Audit Committee (Alvarez, Cash, Sorenson and Williams) will be held liable for breaches of their duty to review and monitor the Company's compliance with all legal and regulatory requirements, as alleged herein, and therefore are not disinterested in this action. These defendants are directly responsible for overseeing Wal-Mart's compliance with the FCPA. In this capacity, Director Defendant Williams breached his fiduciary duties by both (1) knowingly and/or recklessly undermining the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme; and (2) recklessly failing to install internal controls sufficient to avoid violations of the FCPA. All Audit Committee members, including Alvarez, Cash, Sorenson, who serve along side Williams, due to the corporate governance and reporting system in place at the Company and their reporting relationship with the CEO and others with knowledge of the corruption scheme at Wal-Mex, are charged with knowledge of and responsibility for the Company's non-compliance with FCPA and thus have acquiesced in the cover-up of the Wal-Mex scandal forgoing steps to remedy the Company's internal controls in this area. These breaches of duty by the Director Defendants on the Audit Committee render them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

108. Defendants Scott is interested due to the fact that he reaped millions of dollars in opportunistic sales of his Wal-Mart shares in the months preceding *The New York Times* exposé but after the Company learned that the newspaper was investigating possible FCPA infractions. As the table below demonstrates, the trading records of Defendant Scott demonstrates that he began divesting his shares in Wal-Mart in apparent anticipation of the publication of *The New York Times* article and the corresponding stock drop that would undoubtedly occur, and did occur.

During the three trading days after *The New York Times'* April 21, 2012 exposé, Wal-Mart stock dropped eight percent, wiping out all of its gains in 2012. In the months preceding this precipitous drop, Scott sold/executed 1,458,385 shares/options on December 20, 2012 for gains of $3,950,401, 635,220 shares/options on March 2, 2012 for gains of $3,295,043, and 100,000 shares/options on March 27, 2012 for gains of $6,122,490. These uncharacteristically large stock sales were executed by Defendant Scott while he possessed the materially adverse nonpublic information that the Company was exposed to undisclosed liability for massive FCPA penalties and other contingences relating to the bribes and cover-up. Due to the fact that Scott benefited from undisclosed adverse inside knowledge of the corruption at Wal-Mex, demand on him is futile.

109. Furthermore, there are other facts which cast a reasonable doubt that certain Director Defendants can independently and/or disinterestedly consider a demand to sue in this matter, for the following reasons:

  a. Defendants Rob Walton and Jim Walton are brothers. Because of entangling professional, business and familial relationships with the Walton family, none of them will take the action requested by plaintiff herein against one another;

  b. Defendant Penner is the son-in-law of Defendant Rob Walton. He owes his career and status to Rob Walton, as from 2002 to 2005, he served as Wal-Mart's Senior Vice President and CFO–Japan. Because of entangling professional, business and familial relationships with the Walton family, none of them will take the action requested by plaintiff herein against one another.

  c. Defendants Duke and Scott lack disinterest and independence given their long term relationship on the Wal-Mart Board and their mutual service on the advisory board of the Tsinghua University School of Economics and Management in Beijing, China;

  d. Defendants Duke, Rob Walton and Jim Walton lack disinterest and independence because Duke sits on the Board of Arvest Bank, a Walton family-owned bank of which Jim Walton is Chairman of the Board and CEO. As such, Duke serves at the pleasure of Rob Walton, Jim Walton, and the Walton family. The Walton family, which exerts considerable control over the Board, will not wish to oust Duke in connection with the bribery probe;

e. Defendant Duke's principal professional occupation is his employment with Wal-Mart, pursuant to which he has received and continues to receive substantial monetary compensations and other benefits.  In 2011, defendant Duke, who is a high-ranking officer of the Company, received more than $18 million in compensation from Wal-Mart and expects to receive more than $18 million in compensation again in 2012.  Wal-Mart is controlled by Chairman of the Board Rob Walton, Jim Walton and the Walton family, which collectively owns nearly 50% of the Company and controls two Board seats.  There is reasonable doubt that Duke would jeopardize his lucrative compensation package by bringing suit against these members of the Walton family or other Board members who control his compensation.  Thus demand is futile as to defendant Duke.

f. Defendant Sorenson's primary employment is the President, CEO and director of Marriott International, Inc., which during fiscal 2012 received payments from Wal-Mart of approximately $19 million.  Marriott, on the other hand, made over $1 million in purchases from Wal-Mart stores.  Due to these entangling business relationships which benefit the Marriott company lead by Sorenson which would be placed in substantial jeopardy, there is reasonable doubt that he will take the action requested by the plaintiff against his fellow Wal-Mart directors.

## COUNT I

### On Behalf of Wal-Mart Against Individual
### Defendants for Breach of Fiduciary Duties

110.   Plaintiff repeats and re-alleges each allegation set forth herein.

111.   The Individual Defendants owed and have violated fiduciary duties of care, loyalty, candor, good faith, and reasonable inquiry owed under Delaware law to the public shareholders of Wal-Mart by acting in defiance of those duties and placing their personal interests ahead of the interests of the Company and its shareholders.

112.   The Individual Defendants have violated their fiduciary duties by authorizing, benefitting, acquiescing in, and/or failing to prevent or remedy the wrongful acts complained of herein, to wit, having actual and/or constructive knowledge of a massive bribery and corruption scheme perpetrated by officials at its single largest global subsidiary, Wal-Mex, during the Relevant Period, and taking affirmative steps to undermine any investigation, reporting, remedying or punishment  that may have emerged as a result of this scheme; to cover-up this

wrongdoing and mask the Company's and their own violations of any applicable federal or state laws, rules, or regulatory scheme, including the FCPA; to cause the Company to fail in its obligations to establish internal controls sufficient to comply with federal and state laws, rules, or regulatory schemes, including the FCPA; to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate, did not mislead investors and conformed to federal and state securities laws;

113.   By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to advance their interests at the expense of Wal-Mart and its shareholders.

114.   Because the Individual Defendants dominate and control the business and corporate affairs of Wal-Mart, and are in possession of private corporate information concerning Wal-Mart business transactions, they were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the federal and state laws as alleged herein. Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings.   These actions by Individual Defendants exposed the Company to liability for violations of federal and state law, and therefore could not be the product of a valid exercise of business judgment. Instead, this was a complete abdication of their duties as officers and/or directors of the Company.

115.   Each of the Individual Defendants' acts in causing or permitting the Company to disseminate to the investing public material misrepresentations and omissions and abdicating their oversight responsibilities to the Company has subjected the Company to liability for violations of federal and state law, and therefore could not be the product of a valid exercise of business judgment. Instead, this was a complete abdication of their duties as officers and/or directors of the

Company. As a result of the Individual Defendants' breaches, Wal-Mart has lost market capitalization and has had its reputation in the business community and financial markets irreparably tarnished.

116. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Wal-Mart has sustained significant damages and is subjected to unreasonable risks of loss and expenses, and therefore Individual Defendants are liable to the Company

117. Plaintiff, on behalf of Wal-Mart, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants jointly and severally and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, together with interest thereon;

B.    Granting any appropriate extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including a declaration that that plaintiff has adequately plead demand futility and may maintain this action on behalf of Wal-Mart; an order attaching, impounding, imposing a constructive trust on the excessive compensation, wrongfully gained benefits, or their other assets so as to assure that plaintiff on behalf of Wal-Mart has an effective remedy; and an order directing Wal-Mart to take all necessary actions to reform its corporate governance practices to comply with Company policies and all applicable laws, rules, and regulations;

C.    Awarding to Wal-Mart restitution from Individual Defendants, together with pre- and post-judgment interest, and ordering disgorgement of all profits, benefits and other compensation obtained by these defendants;

D.   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.   Granting such other and further relief as the Court deems just and proper.

DATED: May 17, 2012                    Respectfully Submitted,

James A. Streett (2007092)
Alex G. Streett (65038)
STREETT LAW FIRM, P.A.
107 West Main
Russellville, AR 72801
(479) 968-2030
james@streettlaw.com
alex@streettlaw.com


Joe P. Leniski, Jr. (TN Bar No. 22891) (pro hac vice)
BRANSTETTER, STRANCH &
     JENNINGS, PLLC
227 2nd Avenue North, 4th Floor
Nashville, TN 37201
(615) 254-8801
jleniski@branstetterlaw.com

## VERIFICATION

NATHAN F. AUSTIN, certifies under penalty of perjury that: (1) he is a resident of in the State of Arkansas residing in Pope County; (2) he is a shareholder of Wal-Mart, Inc.; (3) he has reviewed the factual allegations Complaint against the current Board of Directors and certain other directors and officers of Wal-Mart Inc. and believes them to be true to the best of its knowledge, information, and belief and (4) he authorizes his attorneys to file the Complaint on his behalf.

Dated: May 17, 2012.

_____
NATHAN F. AUSTIN

STATE OF ARKANSAS )
COUNTY OF POPE    )

Subscribed and sworn to before me this 17th day of May, 2012.



_____
Notary Public

My Commission Expires:
_____2-15-2013_____

PATSY D. BROWN
Pope County
My Commission Expires
February 15, 2013

**EXHIBIT C**

EFiled: May  3 2012  9:46AM EDT
Transaction ID 44020326
Case No. 7489-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LEON BRAZIN and MITCHELL PINSLY,

     Plaintiffs,

  v.

S. ROBSON WALTON, MICHAEL T. DUKE, H. LEE SCOTT, JR., JIM C. WALTON, DOUGLAS N. DAFT, ROGER C. CORBETT, AIDA M. ALVERAZ, JAMES W. BREYER, M. MICHELLE BURNS, JAMES I. CASH, JR., GREGORY B. PENNER, STEVEN S. REINEMUND, ARNE M. SORESON, CHRISTOPHER J. WILLIAMS, LINDA S. WOLF, EDUARDO CASTRO-WRIGHT, EDUARDO SOLORZANO MORALES and JOSE LUIS RODRIGUEZMACEDO RIVERA,

     Defendants,

  and

WAL-MART STORES, INC., a Delaware Corporation,

     Nominal Defendant.

C.A. No.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

   Plaintiffs Leon Brazin and Mitchell Pinsly ("Plaintiffs"), by their attorneys, allege for their Verified Shareholder Derivative Complaint against defendants upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through their attorneys, as follows:

## SUMMARY OF THE ACTION

   1. This is a shareholder's derivative action brought on behalf of nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company"), against certain of the Company's

1

officers and members of its Board of Directors (the "Board") asserting claims for breach of fiduciary duty against defendants S. Robson Walton, Michael T. Duke, H. Lee Scott, Jr., Jim C. Walton, Douglas N. Daft, Roger C. Corbett, Aida M. Alveraz, James W, Breyer, M. Michelle Burns, James I. Cash, Jr, Gregory B. Penner, Steven S. Reinemund, Arne M. Sorenson, Christopher J. Williams, and Linda S. Wolf (the "Current Director Defendants" or the "Board"). This Complaint also asserts claims against three high-level Wal-Mart officers, defendants Eduardo-Castro Wright, Eduardo Solorzano and Jose Luis Rodriguezmacedo Rivera (the "Officer Defendants" and together with the Current Director Defendants, the "Individual Defendants").

2.      This derivative action arises from a massive bribery scheme at the Company's largest foreign subsidiary – Wal-Mart de Mexico ("Wal-Mart Mexico") – and a *six-year-long* effort to cover up that scheme by top executives and directors of the Company who sacrificed Wal-Mart's purported commitment to high moral and ethical standards in order to win market dominance in Mexico.

3.      On December 8, 2011, the Company disclosed in a filing with the Securities and Exchange Commission ("SEC") that during fiscal year 2012, the Company had begun an internal investigation into whether certain matters, including permitting, licensing  and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act ("FCPA") Wal-Mart said it had notified the Justice Department that it had begun the investigation and stated that 'We do not believe that these matters will have a material adverse effect on our business".

4.      An investigation conducted by *The New York Times* and reported on April 22, 2012, reveals that beginning in 2005, Wal-Mart Mexico paid bribes to obtain permits in virtually every corner of the country, leaving a paper trail of hundreds of suspect payments totaling more

than $24 million.  Then, when confronted with evidence of corruption in its Mexican subsidiary after the Company dispatched investigators, *the Individual Defendants shut the investigation down*.

5.      Specifically, in September 2005, a senior Wal-Mart attorney received an email from a former executive of Wal-Mart Mexico.  The e-mail detailed how Wal-Mart Mexico had conceived of and orchestrated a campaign of bribery and corruption designed to ensure that Wal-Mart Mexico could obtain the permits needed to build new stores in Mexico and facilitate market dominance in the region.  This bribery campaign reached the highest level of Wal-Mart Mexico and was carried out with the full knowledge and acquiescence of defendant Eduardo Castro-Wright, the chief executive of Wal-Mart Mexico and a rising star within the Company.

6.      The former executive's e-mail was immediately deemed credible by Wal-Mart executives and a Company investigative team was dispatched to Mexico City.  Within a matter of days, the investigators uncovered evidence of widespread illegal bribes paid to numerous Mexican officials and bureaucrats.  Indeed, Wal-Mart's lead investigator, a former FBI special agent, summed up the team's findings by stating "There is reasonable suspicion to believe that Mexican and USA laws have been violated."  The lead investigator recommended that Wal-Mart expand the investigation and vigorously question Mr. Castro-Wright and other top Wal-Mart Mexico officials about their knowledge of the improper payments.

7.      The investigation was not expanded.  Instead, in a shocking and unconscionable display of disloyalty and abdication of duty to the Company, top officers and directors of the Company, including its then Chief Executive Officer ("CEO") defendant H. Lee Scott Jr., ("Scott") and its then vice-president and current CEO, defendant Michael T. Duke ("Duke"), ordered that the investigation be shut down.  They did so in order to protect Mr. Castro-Wright

who they viewed as too valuable to take the fall for what was clearly already known to them to be a massive criminal bribery and corruption scheme. The Individual Defendants further feared what would likely be devastating consequences of having the Company's brightest international "success story" – its Mexican operations – seriously undermined.

8.     The cover-up succeeded in preventing a thorough investigation of the charges made by the former executive. None of Wal-Mart Mexico's leaders were fired or disciplined in any manner. Instead, its CEO, Mr. Castro-Wright, the driving force behind years of bribery and corruption, was rewarded for his criminal misdeeds and promoted to vice chairman of the Company in 2008.

9.     As a result of the misconduct described herein, the Current Director Defendants are antagonistic to this lawsuit such that making a demand on the Board would have been futile. Each of the Current Director Defendants faces a substantial likelihood of non-exculpated liability for their breaches of fiduciary duty disabling them from impartially considering the subject matter of this lawsuit.

## JURISDICTION

10.     This Court has jurisdiction over this action pursuant to 10 Del. C. § 341.

11.     As directors of a Delaware corporation, the Director Defendants have consented to the jurisdiction of this Court pursuant to 10 Del. C. § 3114.

12.     This court has jurisdiction over Wal-Mart pursuant to 10 Del. C. § 3111.

## PARTIES

13.     Plaintiffs Leon Brazin and Mitchell Pinsly are currently shareholders of Wal-Mart and have continuously been shareholders of the Company at all times relevant hereto.

14.     Nominal defendant Wal-Mart is a Delaware corporation that operates discount stores, supercenters and markets throughout the world.   The Company's stores and supermarkets offer a vast range of merchandise including clothing, housewares, electronic, music and DVD's and hardware. The Company is the world's 18th largest public corporation, according to the Forbes Global 2000 list and the largest public corporation when ranked by revenue.   The Company was founded by Sam Walton in 1962 and the Walton family still controls a majority of the shares.   The Company's operating headquarters are located at 702 Southwest 8th Street, Bentonville, Arkansas ("Bentonville").

15.     Defendant S. Robson Walton ("Rob Walton") is Wal-Mart's Chairman of the Board, a position he has held since 1992.   Since joining Wal-Mart in 1969, Rob Walton has served as senior vice president, secretary and general counsel and vice chairman.   Before joining Wal-Mart he was a partner with the law firm of Conner & Winters in Tulsa, Oklahoma.   Rob Walton is the eldest son of Sam Walton, the founder of the Company.   He was named Chairman of the Board of the Company on April 7, 1992, two days after his father's death.

16.     Defendant Michael T. Duke ("Duke") is the president and CEO of Wal-Mart and serves on the Company's Board.   Duke joined Wal-Mart in 1995 and served as vice chairman of the Company in charge of Wal-Mart International from 2005 to 2009.   He joined the Board in 2008.   Prior to joining the Company, Mr. Duke had 23 years of experience in retailing with Federated Department Stores and May Department Stores.   Mr. Duke is a director of Arvest Bank and serves on the board of directors of the Consumer Goods Forum, the executive committee of Business Roundtable and is on the executive board of Conservation International's Center for Environment Leadership in Business.   He also serves on the board of advisors for the

University of Arkansas and the advisory board of the Tsinghua University School of Economics and Management in Beijing, China.

17.     Defendant H. Lee Scott, Jr. ("Scott") has been a Director of Wal-Mart since 1999 and served as CEO of the Company from January 2000 to January 2009.  Scott joined Wal-Mart in 1979.  Mr. Scott served as a director of the Goldman Sachs Group, Inc. from May 2010 to May 2011.  He currently serves on the advisory board of the Tsinghua University School of Economics and Management in Beijing, China.  Along with defendant Duke, Scott was in charge of Wal-Mart's response to the Company's growing bribery problem afflicting Wal-Mart Mexico during the relevant time period and is directly responsible for the resulting cover-up that has inflicted such great harm upon the Company.

18.     Defendant Jim C. Walton ("Jim Walton") has been a Director of Wal-Mart since 2005.  Jim Walton is the youngest son of Wal-Mart founder Sam Walton and the brother of Rob Walton.  He is the CEO and Chairman of the Board of Arvest Bank, a Walton family owned bank which has branches in Arkansas, Kansas, Oklahoma and Missouri.  Jim Walton is also Chairman of the Board of Community Publishers, Inc.

19.     Defendant Douglas N. Daft ("Daft") has been a Director of Wal-Mart since 2005.  Mr. Daft served as the CEO and Chairman of the Board of the Coca-Cola Company from 2000 to 2004.  Currently, Mr. Daft serves as a director of McGraw-Hill Companies, Inc. and Green Mountain Coffee Roasters, Inc.

20.     Defendant Roger C. Corbett ("Corbett") has been a Director of Wal-Mart since 2006.  Mr. Corbett is the retired CEO and Group Managing Director of Woolworths Limited, an Australian retail company.  He is a director of the Reserve Bank of Australia, Fairfax Media

Limited and Chairman of the Board of Directors of ALH Group Pty Limited. He also serves on the board of Outback Stores.

21.     Defendant Aida M. Alveraz ("Alveraz") has been a Director of Wal-Mart since 2006. Currently, she serves on the Company's Audit Committee. She is the former Administrator of the United States Small Business Administration and served as the Founding Director of the US Office of Federal Housing Enterprise Oversight, the financial regulator of Fannie Mae and Freddie Mac, from 1993 to 1997. Ms. Alveraz is a director of Unionbancal Corp. and Progresso Financiero.

22.     Defendant James W. Breyer ("Breyer") has been a Director of Wal-Mart since 2001. He is the Managing Partner of Accel Partners and a director of RealNetworks, Inc., Marvel Entertainment, Inc., and several private companies. Currently, he serves as the Company's Presiding Director.

23.     Defendant M. Michelle Burns ("Burns") has been a Director of Wal-Mart since 2003. She is the Chairman and CEO of Mercer Human Resources Consulting, a subsidiary of Marsh and McLennan Companies, Inc. Ms. Burns is also a director of Cisco Systems, Inc.

24.     Defendant James I. Cash, Jr. ("Cash") has been a Director of Wal-Mart since 2006. Currently, he serves on the Company's Audit Committee. Mr. Cash is a retired Professor of Business Administration at Harvard Business School and a Former Senior Associate Dean and Chairman of HBS Publishing. Mr. Cash is a director of the Chubb Corporation, General Electric Company and other private companies and a former director of Microsoft Corporation.

25.     Defendant Gregory B. Penner ("Penner") has been a director of Wal-Mart since 2008. From 2002 to 2005, he served as Wal-Mart's Senior Vice president and Chief Financial Officer-Japan. Mr. Penner is a former General Partner at Peninsula Capital and a former

financial analyst for Goldman, Sachs & Co.  He is a member of the board of directors of Baidu.com, Inc., 99Bill Corporation, Cuill Inc., and Global Hyatt Corp.  Mr. Penner is the son-in-law of Rob Walton.

26.     Defendant Steven S. Reinemund ("Reinemund") has been a Director of Wal-Mart since 2010.  Mr. Reinemund worked for PepsiCo for 22 years and served as PepsiCo's CEO and Chairman of the Board from 2001 to 2006.  Currently, he is the Dean of the Calloway School of Business and Accountancy and Babcock Graduate School of Management at Wake Forest University.  He is a director of Exxon Mobil Corporation, American Express Company and Marriott International, Inc.

27.     Defendant Arne M. Soreson ("Soreson") has been a Director of Wal-Mart since 2008.  Currently, he serves on the Company's Audit Committee.  Mr. Sorenson is the Executive Vice president and Chief Financial Officer of Marriott International, Inc., a position he has held since 1998.  He was a former partner in the law firm of Latham & Watkins in Washington, D.C.

28.     Defendant Christopher J. Williams ("Williams") has been a Director of Wal-Mart since 2004.  Currently, he serves on the Company's Audit Committee.  Mr. Williams is the Chairman and CEO of The Williams Capital Group, L.P., Chairman and CEO of Williams Capital Management, LLC and a director of Harrah's Entertainment, Inc.

29.     Defendant Linda S. Wolf ("Wolf") has been a Director of Wal-Mart since 2005.  She is the former chairman of the board and CEO of Leo Burnett Worldwide, Inc., a division of Publicis Groupe, S.A.  She is a trustee for investment funds advised by the Janus Capital Group, Inc.

30.     Defendant Eduardo Castro-Wright ("Castro-Wright") was the CEO of Wal-Mart Mexico and headed the Company's Mexican operation from 2002 to 2005.  In 2005, he was

named CEO of Wal-Mart Stores USA, one of the most important executive positions in the Company and was considered to be a likely successor to defendant Scott. He was named a Vice-Chairman of the Company in 2008. According to former executives, quoted in the *New York Times* on April 21, 2012, Mr. Castro-Wright was the "driving force behind years of bribery" in Mexico.

31.    Defendant Eduardo F. Solorzano Morales ("Morales") was the CEO of Wal-Mart Mexico in 2005. He is now Chief Executive of Wal-Mart Latin America. In 2005, he complained bitterly about Wal-Mart's internal investigation into bribery and falsification of records at Wal-Mart Mexico in an attempt to shut down the investigation before it could implicate him and other top Wal-Mart executives.

32.    Defendant Jose Luis Rodriguezmacedo Rivera ("Rodriguezmacedo") was the General Counsel of Wal-Mart Mexico in 2005. A target of Wal-Mart's bribery investigation, he was later given control of the investigation by defendants Scott and Duke. He was senior vice president for legal, ethics and compliance at Wal-Mart Mexico until he was reassigned on April 20, 2012.

### DEFENDANTS' FIDUCIARY DUTIES

33.    By reason of their positions as officers and/or directors and fiduciaries of Wal-Mart and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Wal-Mart and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Wal-Mart in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wal-Mart and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or

benefit.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wal-Mart, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.    To discharge their fiduciary duties, the officers and directors of Wal-Mart were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Wal-Mart were required to, among other things:

a.    Manage, conduct, supervise and direct the business affairs of Wal-Mart in accordance with all applicable laws, including federal and states laws, regulations and policies of the Company;

b.    Neither violate, nor permit any officer, director or employee of Wal-Mart to violate applicable laws, rules and regulations, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA");

c.    Remain informed as to the status of Wal-Mart's  operations, including its compliance with the FCPA and the financial reporting requirements under the FCPA and the federal securities laws, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

d.    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

35.     Wal-Mart – a company that conducts business across the globe – and its shareholders depend and rely on Board members to carry out their fiduciary duties.  As stated in Wal-Mart's Code of Business Conduct and Ethics, "Never cover up or ignore an ethics problem. The anti-bribery laws of many nations, including the U.S. Foreign Corrupt Practices Act ("FCPA"), prohibit Wal-Mart from offering or giving any money or other thing of value, directly or indirectly through a third party, to any foreign government official for the purpose of improperly obtaining or maintaining business or securing an improper advantage.  A "thing of value" could include gifts or gratuities of any kind, travel and entertainment, offers of employment or contributions to charity.

36.     Defendants Alvarez, Cash, Sorenson and Williams are members of the Board's Audit Committee.  As members of the Audit Committee, defendants Alvarez, Cash, Sorenson and Williams have enhanced duties as outlined in the Company's Audit Committee Charter, to review and monitor the Company's compliance with all legal and regulatory requirements.  As such, they are directly responsible for overseeing Wal-Mart's compliance with the FCPA and have failed to prevent violations thereof, rendering them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

37.     Defendants, because of their positions of control and authority as directors, members of the Audit Committee and/or officers of Wal-Mart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their executive, managerial and/or directorial positions with Wal-Mart, each of the defendants had access to adverse, non-public information concerning the lack of a system of accounting controls that would have permitted them to know of and prevent the payment of illegal bribes and

kickbacks. The Individual Defendants breached their fiduciary duties by failing to require Wal-Mart to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Wal-Mart.

38.    At times relevant hereto, defendants were the agents of each of the other defendants and were at all times acting within the course and scope of such agency.

39.    Defendants breached their fiduciary duties by failing to require Wal-Mart to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of illegal payments that were made at Wal-Mart. These payments were facilitated by defendants' knowing and/or reckless failure to establish a system of internal controls at Wal-Mart, in direct violation of the books, records and internal accounting requirements of the FCPA. As a result, Wal-Mart has expended, and will continue to expend, significant sums of its capital, both reputational and economic, addressing the illegal and reprehensible payments that were paid in its name. Likewise, the illegal payments have and will continue to irreparably damage Wal-Mart's corporate image and goodwill and jeopardize its ability to do business in foreign countries.

## FACTUAL ALLEGATIONS

40.    This derivative action arises from a massive bribery scheme at the Company's largest subsidiary, its subsequent cover-up by the Individual Defendants and the Board's failure to institute and maintain internal controls necessary to prevent systematic violations of the FCPA, which prohibits companies from paying or offering to pay a foreign official anything of value to obtain business.

41.     The conduct alleged herein is not the work of a rogue employee or business division outside the direct purview of the Board and senior management. Rather, the conduct emanated from the highest levels of senior management and was deeply embedded in the Company's regular practices and corporate culture. In a disloyal attempt to protect a few, the Company's senior management and directors have caused grievous harm to the Company and its reputation which cannot be remedied absent shareholder action.

42.     At Wal-Mart in 2004, Ms. Maritza I. Munich ("Munich"), a senior lawyer at Wal-Mart, pushed the board to adopt a strict anticorruption policy that prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart." The policy would have required every employee to report the first sign of corruption, and it would bind Wal-Mart's agents to the same exacting standards. Unfortunately, Ms. Munich's concerns fell on deaf ears. As first reported by *The New York Times*, on September 21, 2005, a former Wal-Mart Mexico executive named Sergio Cicero Zapata ("Cicero") sent an e-mail to Munich telling her he had information about "irregularities" authorized "by the highest levels" at Wal-Mart Mexico. "I hope to meet you soon," he wrote.

43.     Within days of that email, an investigative team was dispatched to interview Mr. Cicero. During hours of questioning, Mr. Cicero described how Wal-Mart Mexico's leaders had engaged in a systematic campaign of bribery in order to ensure that the permits for Wal-Mart Mexico's new stores would be obtained quickly and easily. Mr. Cicero implicated many of Wal-Mart Mexico's leaders, including its board chairman, its general counsel, its chief auditor and its top real estate executive. The person most responsible, according to Mr. Cicero, was defendant Castro-Wright.

44.     Mr. Cicero said that while bribes were occasionally paid before Mr. Castro-Wright's arrival, their use soared after Mr. Castro-Wright ascended to the top job in 2002.  Mr. Cicero described how Wal-Mart Mexico's leaders had set "very aggressive growth goals," which required opening new stores "in record times."  Wal-Mart Mexico's executives, he said, were under pressure to do "whatever was necessary" to obtain permits.

45.     In an interview with *The New York Times*, Mr. Cicero said Mr. Castro-Wright had encouraged the payments for a specific strategic purpose.  The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react. Bribes, he explained, accelerated growth.  They got zoning maps changed.  They made environmental objections vanish. Permits that typically took months to process magically materialized in days. "What we were buying was time," he said.

46.     Wal-Mart Mexico's stunning growth made Mr. Castro-Wright a rising star at the Company's headquarters.  In early 2005, when he was promoted to a senior position in the United States, Mr. Duke would cite his "outstanding results" in Mexico.

47.     Mr. Cicero explained how the bribes were funneled to government officials through Mexican intermediaries, known as "gestores" and how false invoices were prepared to make it seem as if the payments made to the gestores were legitimate business expenses.  His explanations were detailed and supported by documents that he produced and that Wal-Mart investigators found in the course of their investigations in Mexico City.  According to the Wal-Mart investigators, each month, Mr. Castro-Wright and other top Wal-Mart Mexico executives received a detailed schedule of all of the payments performed.  Wal-Mart Mexico then falsified the payments in accounting records as simple legal fees.  These false records were then passed on to the Company's headquarters in Bentonville.

14

48.     According to people involved in Wal-Mart's investigation, Mr. Cicero's account

of criminality at the top of Wal-Mart's most important foreign subsidiary was impossible to

dismiss.  He had clearly been in a position to witness the events he described.  Nor was this the

first indication of corruption at Wal-Mart de Mexico under Mr. Castro-Wright.  A confidential

investigation, conducted for Wal-Mart in 2003 by Kroll Inc., a leading investigation firm,

discovered that Wal-Mart Mexico had systematically increased its sales by helping favored high-

volume customers evade sales taxes.

49.     A draft of Kroll's report, obtained by *The New York Times*, concluded that top

Wal-Mart Mexico executives had failed to enforce their own anticorruption policies, ignored

internal audits that raised red flags and even disregarded local press accounts asserting that Wal-

Mart Mexico was "carrying out a tax fraud."  (The company ultimately paid $34.3 million in

back taxes.)  Wal-Mart then asked Kroll to evaluate Wal-Mart Mexico's internal audit and

antifraud units.  Kroll wrote another report that branded the units "ineffective."  Many employees

accused of wrongdoing were not even questioned; some "received a promotion shortly after the

suspicions of fraudulent activities had surfaced."

50.     But Mr. Castro-Wright was considered a rising star in the Company despite the

already clear warnings that something was amiss at Wal-Mart Mexico.  Just days before Wal-

Mart investigators first interviewed Mr. Cicero, Mr. Castro-Wright was promoted and put in

charge of all Wal-Mart stores in the United States, one of the most prominent and powerful jobs

in the Company.

51.     Ms. Munich sent detailed memos describing Mr. Cicero's debriefings to Wal-

Mart's senior management.  These executives, records show, included Thomas A. Mars, Wal-

Mart's general counsel and a former director of the Arkansas State Police; Thomas D. Hyde,

Wal-Mart's executive vice president and corporate secretary; Michael Fung, Wal-Mart's top internal auditor; Craig Herkert, the chief executive for Wal-Mart's operations in Latin America; and Lee Stucky, a confidant of Lee Scott's and chief administrative officer of Wal-Mart International.

52.     As a result of Ms. Munich's memos, Wal-Mart contacted the law firm of Willkie Farr & Gallagher ("Willkie Farr") and asked them to outline the course of a possible investigation into whether any employees of the Company had engaged in violations of the Foreign Corrupt Practices Act.  The firm submitted a plan calling for tracing all payments to anyone who had helped Wal-Mart Mexico obtain permits for the previous five years.  The firm said it would scrutinize "any and all payments" to government officials and interview every person who might know about payoffs, including "implicated members" of Wal-Mart Mexico's board.  Willkie Farr recommended that the investigation be allowed to proceed for approximately four months and argued that it should be independent and thorough, as fitting an investigation in which top executives such as Mr. Castro-Wright may be implicated.

53.     But that was exactly the type of investigation Wal-Mart did not want and the Company immediately rejected the firm's proposal.  Instead, records show, they decided Wal-Mart's lawyers would supervise a far more limited "preliminary inquiry" by in-house investigators.

54.     The inquiry, a confidential memo explained, would take two weeks, not the four months proposed by Willkie Farr.  Rather than examining years of permits, the team would look at a few specific stores. Interviews would be done "only when absolutely essential to establishing the bona fides" of Mr. Cicero.  Only if the inquiry found a "likelihood" that laws had been violated would the Company consider conducting a "full investigation."

55.     Significantly, the plan called for the internal investigators to keep Bentonville management apprised of their progress and to file a report with management and the Chairman of the Audit Committee.  Thus the Board was apprised of the internal investigation at Wal-Mart Mexico during its early stages.

56.     The decision gave Wal-Mart's senior management direct control over the investigation.  This was not surprising given that it was well known throughout the Company that Wal-Mart's internal Corporate Investigations Unit was ill-equipped to take on a major investigation of this type, particularly one involving a foreign country such as Mexico.  It had fewer than 70 employees, and most were assigned to chasing shoplifting rings and corrupt vendors.  Just four people were specifically dedicated to investigating corporate fraud, a number Joseph R. Lewis, Wal-Mart's director of corporate investigations, described in a confidential memo as "wholly inadequate for an organization the size of Wal-Mart."

57.     Several prominent cases had already called into question the effectiveness and independence of investigations into corporate wrongdoing at Wal-Mart.  In October, Wal-Mart's vice chairman, John B. Menzer, intervened in an internal investigation into a senior vice president who reported to him.  According to internal records, Mr. Menzer told Kenneth H. Senser, Walmart's vice president of global security, that he did not want Corporate Investigations to handle the case "due to concerns about the impact such an investigation would have."  One of the senior vice president's subordinates, he said, "would be better suited to conduct this inquiry."  Soon after, records show, the subordinate cleared his boss.  The other case involved the president of Wal-Mart Puerto Rico.  A whistle-blower had accused the president and other executives of mistreating employees.  Although Corporate Investigations was supposed

to investigate all allegations against senior executives, the president had instead assigned an underling to look into the complaints -- but to steer clear of those against him.

58.     Ms. Munich objected. In an e-mail to Wal-Mart executives, she complained that the investigation was "at the direction of the same company officer who is the target of several of the allegations." "We are in need of clear guidelines about how to handle these issues going forward," she warned. That warning would prove all too prophetic.

59.     The investigation confirmed almost all of Mr. Cicero's findings including the fact that approximately $24 million in suspect payments had been made to Mexican officials. The investigators also found documents showing that Wal-Mart Mexico's top executives knew about the payments and had taken steps to conceal them. These executives included Mr. Castro-Wright and defendant Rodriguezmacedo, Wal-Mart Mexico's General Counsel. Mr. Rodriguezmacedo said the company had stopped using gestores after Mr. Cicero's departure. Yet even as Mr. Cicero was being debriefed in October 2005, records show Wal-Mart Mexico real estate executives made a request to pay a gestore of $14,000 to get a construction permit.

60.     Numerous records detailed how Mr. Castro-Wright had been kept informed of the gestor payments and subsequent audits. Investigators were struck by Mr. Castro-Wright's response to the gestor audit. Rather than expressing alarm about potential corruption, he appeared worried about becoming dependent on too few gestores. In an e-mail, Mr. Rodriguezmacedo told Mr. Cicero to write up a plan to "diversify the gestores used to "facilitate" the granting of permits. "Eduardo Castro wants us to implement this plan as soon as possible," he wrote.

61.     Investigators made other disturbing findings which suggested that the corruption at Wal-Mart Mexico was far more extensive than previously believed. In going through Wal-

Mart Mexico's database of payments, investigators noticed the Company was making hefty "contributions" and "donations" directly to governments all over Mexico – nearly $16 million since 2003. Some of the donations were openly described as having been made to ensure the quick issuance of licenses and permits. The investigators quickly zeroed in on Mr. Rodriguezmacedo as a major participant in the bribery scheme.

62.     Senior Executives at Wal-Mart Mexico complained bitterly to top Company management including defendants Scott and Duke that the internal investigation was too heavy-handed and intrusive. Mr. Rodriguezmacedo responded to the investigator's questions with evasions, hostility and/or baseless attacks on the credibility of Cicero. Mr. Morales, then the CEO of Wal-Mart Mexico, chastised the investigators for being too secretive and accusatory. These complaints had their desired effect. Three days after Mr. Morales lodged his complaints, Mr. Duke along with other top Wal-Mart executives flew to Mexico to reassure Wal-Mart Mexico's top executives.

63.     Wal-Mart's leaders had agreed to consider a full investigation if the preliminary inquiry found Mr. Cicero's allegations credible.

64.     The investigative team wrote confidential reports to Wal-Mart's top executives in December 2005 laying out all the evidence that corroborated Mr. Cicero -- the hundreds of gestore payments, the mystery codes, the rewritten audits, the evasive responses from Wal-Mart Mexico executives and the evidence gestores were still being used.

65.     "There is reasonable suspicion," the report concluded, "to believe that Mexican and USA laws have been violated." There was simply "no defendable explanation" for the millions of dollars in payments to gestores.

66.     A leader of the team, Mr. Ronald Halter submitted an "action plan" for a deeper investigation that would plumb the depths of corruption and culpability at Wal-Mart de Mexico. Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history." Mr. Halter also proposed a thorough investigation of the two main gestores. He had not tried to interview them in Mexico for fear of his safety. ("I do not want to expose myself on what I consider to be an unrealistic attempt to get Mexican lawyers to admit to criminal activity," he had explained to his bosses.)  Now Mr. Halter wanted Wal-Mart to hire private investigators to interview and monitor both gestores.  He also envisioned a round of adversarial interviews with Wal-Mart Mexico's senior executives.  He and his investigators argued that it was time to take the sensitive step of questioning Mr. Castro-Wright about his role in the gestore payments.

67.     Wal-Mart's leaders were now confronted with clear and compelling evidence that one of the Company's rising stars, already being publicly discussed as a potential successor to Mr. Scott, was implicated in serious criminal wrongdoing and had taken steps to cover it up.

68.     Wal-Mart's ethics policy offered clear direction.  "Never cover up or ignore an ethics problem," the policy states.  And some who were involved in the investigation argued that it was time to take a stand against signs of rising corruption in Wal-Mart's global operations. Each year the Company received hundreds of internal reports of bribery and fraud.  In Asia alone, there had been 90 reports of bribery just in the previous 18 months.  The situation was bad enough that Wal-Mart's top procurement executives were summoned to Bentonville that winter for a dressing down.  Mr. Menzer, Wal-Mart's vice chairman, warned them that corruption was creating an unacceptable risk, particularly given the government's stepped-up enforcement of the Foreign Corrupt Practices Act.  "Times have changed," he said.

69.     Even as they pondered Mr. Halter's action plan, the Company received new disturbing evidence of how widespread the corruption at Wal-Mart Mexico was.  In January 2006, Mr. Scott, Mr. Duke and Wal-Mart's chairman, S. Robson Walton, received an anonymous e-mail saying Wal-Mart Mexico's top real estate executives were receiving kickbacks from construction companies.  "Please you must do something," the e-mail implored.

70.     Mr. Lewis and the Corporate Investigation team at Wal-Mart continued to face pushback from senior Wal-Mart executives.  They accused him and his investigators of being overbearing, disruptive and naïve about the ambiguities of doing business abroad.  They argued that Corporate Investigations should focus more on quietly "neutralizing" problems than on turning corrupt employees over to law enforcement.

71.     Mr. Scott called a meeting for February 3, 2006 to discuss revamping Wal-Mart's internal investigations and to resolve the issue of how to deal with Cicero's allegations.  The meeting brought the grievances against Mr. Lewis and his team out in the open.  Mr. Lewis was accused of being "overly aggressive" and having too much of a "law enforcement approach".  At the end of the meeting, Mr. Scott ordered Mr. Sensor to produce a new protocol for corporate investigations within 24 hours.

72.     Mr. Sensor did what he was told and produced a new protocol, a highly bureaucratic process that gave senior Wal-Mart executives -- including executives at the business units being investigated -- more control over internal investigations.  The policy included multiple "case reviews."  It also required senior executives to conduct a "cost-benefit analysis" before signing off on a full-blown investigation.  Most critically, the new policy mandated that Mr. Lewis and his team would only investigate "significant" allegations, including those

involving potential crimes or senior executives.  Lesser allegations would be left to the affected business unit to investigate.

73.     The cover-up was now in place.  Four days after the February 3, 2006 meeting, Wal-Mart's leaders transferred control of the investigation of Wal-Mart Mexico to one of its main initial targets, Mr. Rodriguezmacedo.  The transfer appeared to violate even the modified weak protocol for investigations as it involved potential crimes and senior executives.

74.     It was universally believed among Wal-Mart's senior investigators that a proper, full-blown investigation of Castro-Wright would take months to complete given that he had never been questioned or asked to produce documents.  Mr. Rodriguzmacedo, the man now in charge, saw it differently.  He wrapped up the case in a few weeks, with little additional investigation.

75.     "There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits."

76.     That conclusion, his report explained, was largely based on the denials of his fellow executives.  Not one "mentioned having ordered or given bribes to government authorities," he wrote.

77.     His report, six pages long, neglected to note that he had been implicated in the same criminal conduct.  While the report conceded that Wal-Mart Mexico executives had authorized years of payments to gestores, it never bothered to try to explain what these executives expected the payments would be used for if not to bribe officials to facilitate permits.  Nor did the report address the improper and fraudulent audits prepared by Wal-Mart Mexico.  Most of the report was devoted to unsubstantiated attacks on Cicero.

78.   In building a case against Mr. Cicero, Mr. Rodriguezmacedo's report included several false statements.  He described Mr. Cicero's "'dismissal'" when records showed he had resigned.  He also wrote that Kroll's investigation of Mr. Cicero concluded that he "had a considerable increase in his standard of living during the time in which payments were made to the gestores."  Kroll's report made no such assertion, people involved in the investigation said.

79.   His report promised a series of corrective steps including a ban on the use of gestores but did not recommend any disciplinary action against any of his colleagues. Rodriguezmacedo did suggest scouring Mr. Cicero's records and determining if any legal action could be taken against him.

80.   Mr. Rodriguezmacedo submitted a draft of his report to senior executives at Bentonville including Mr. Scott.  In an e-mail, Mr. Lewis told his superiors the report was clearly "lacking" and did not contain any evidence to support its claims that no further action was needed.  Mr. Rodriguezmacedo responded by adding a paragraph to the end of his report:  They had decided not to pursue "criminal actions" against Mr. Cicero because "we did not have a strong case."  This paragraph did not answer any of the questions as to why Wal-Mart Mexico did not wish to pursue an investigation of Castro-Wright and other top executives.  But it was more than enough for Wal-Mart.  On May 10, 2006, Mr. Rodriguezmacedo was told by executives in Bentonville to put his report "into final form, thus concluding this investigation." The matter was officially closed.

81.   The FCPA's anti-bribery provisions generally prohibit U.S. companies and citizens, foreign companies listed on a U.S. stock exchange, or any person acting while in the United States from corruptly paying or offering to pay, directly or indirectly, money or anything of value to a foreign official a foreign political party or official, or a candidate for foreign

23

political office for purposes of influencing any act or decision (including a decision not to act) of such official in his or her official capacity, inducing the official to do any act in violation of his or her lawful duty, or to secure any improper advantage in order to assist the payor in obtaining or retaining business for or with any person, or in directing business to any person. In addition, the FCPA established accounting control requirements for issuers subject to either the registration or reporting provisions of the Exchange Act.

82.     The FCPA also requires every issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements; and (iii) to maintain accountability for assets. Proof of a U.S. territorial nexus is not required for FCPA implication against U.S. companies and citizens, and FCPA violations can, and often do, occur even if the prohibited activity takes place entirely outside of the United States.

83.     Notably, a key 'best practices' FCPA compliance program component is to utilize internal audit to monitor for FCPA compliance issues on a regular basis to not only assess compliance but to also identify anything which warrants further investigation. Taken a step further, a continuous controls monitoring program can assist a company to identify unusual expenses, budgeted items, or any other event which is outside an established norm and "red flag" such expense, item or event for further investigation.

84.     The FCPA is jointly enforced by the Department of Justice ("DOJ") and the SEC. The DOJ is responsible for all criminal enforcement and for civil enforcement of the anti-bribery

provisions with respect to domestic concerns and foreign companies and nationals. The SEC is responsible for civil enforcement of the anti-bribery provisions with respect to issuers.

85.     The following criminal penalties may be imposed for violations of the FCPA's anti-bribery provisions: corporations and other business entities are subject to a fine of up to $2,000,000; officers, directors, stockholders, employees, and agents are subject to a fine of up to $100,000 and imprisonment for up to five years.   Moreover, under the Alternative Fines Act, these fines may be quite higher -- the actual fine may be up to twice the benefit that the defendant sought to obtain by making the corrupt payment.   Importantly, fines imposed on individuals may not be paid by their employer or principal.

86.     In addition to the criminal penalties, the Attorney General or the SEC, as appropriate, may bring a civil action for a fine of up to $10,000 against any firm as well as any officer, director, employee, or agent of a firm, or stockholder acting on behalf of the firm, who violates the anti-bribery provisions.   In addition, in an SEC enforcement action, the court may impose an additional fine not to exceed the greater of (i) the gross amount of the pecuniary gain to the defendant as a result of the violation, or (ii) a specified dollar limitation.   The specified dollar limitations are based on the egregiousness of the violation, ranging from $5,000 to $100,000 for a natural person and $50,000 to $500,000 for any other person.

87.     The Attorney General or the SEC, as appropriate, may also bring a civil action to enjoin any act or practice of a firm whenever it appears that the firm (or an officer, director, employee, agent, or stockholder acting on behalf of the firm) is in violation (or about to be) of the antibribery provisions.

88.     In addition to the criminal and civil penalties and fines, under guidelines issued by the Office of Management and Budget, a person or firm found in violation of the FCPA may be

barred from doing business with the Federal government. Indictment alone can lead to suspension of the right to do business with the government. The President has directed that no executive agency shall allow any party to participate in any procurement or non-procurement activity if any agency has debarred, suspended, or otherwise excluded that party from participation in a procurement or non-procurement activity.

89.    Furthermore, a person or firm found guilty of violating the FCPA may be ruled ineligible to receive export licenses; the SEC may suspend or bar persons from the securities business and impose civil penalties on persons in the securities business for violations of the FCPA; the Commodity Futures Trading Commission and the Overseas Private Investment Corporation both provide for possible suspension or debarment from agency programs for violation of the FCPA; and a payment made to a foreign government official that is unlawful under the FCPA cannot be deducted under the tax laws as a business expense.

90.    In March of 2009 three distinct trends in the enforcement of FCPA enforcement were identified and publicly reported by legal analysts. First, the number of FCPA matters pursued by the DOJ (including deferred prosecutions and nonprosecution agreements) and the SEC steadily increased between 2002 and 2008, including a sharp increase in enforcement actions against both corporation and individuals. Secondly, there was a strong trend of actions against individuals being brought separately – often in advance – of charges against their employers and then, in all likelihood, following classic prosecutorial strategy of working up the chain of command, using the individuals to build the government's case against their superiors and eventually the company. Third, penalties assessed against corporations have increased over the same period, both in the aggregate (including all fines, penalties, restitution, and disgorgement) and in individual cases.

91.     Because the Individual Defendants have authorized Wal-Mart to operate in over 100 countries, some of which involve a higher than normal risk of violations of the anti-corruption laws, including the FCPA, the Wal-Mart Board had a fiduciary duty to install and maintain internal controls and an accounting system for compliance with the FCPA.

92.     Wal-Mart's lack of internal controls was well-known to the Company's directors and epidemic throughout the Company's operations.  For, example in 2005, after reports that Wal-Mart had hired undocumented immigrants and violated child labor laws in three states, a group of institutional investors, including the New York City comptroller, asked the Board to hire an independent firm to review its regulatory controls and report findings to shareholders. Although Wal-Mart's directors met with the investor group, the request for an independent review was rebuffed.

93.     After the meeting with the Wal-Mart directors, the shareholder group continued to press for greater outside policing of the Company's policies and controls.  In November 2005, the investors requested more material from the Board, asking for, among other things, information about what the Company was doing to ensure that "individual and regional store performance targets and aggressive growth targets are not driving noncompliance through the system" The Board did not comply with the request.

**DEFENDANTS ISSUE A FALSE AND/OR
MISLEADING STATEMENT CONCERNING THEIR
PRIOR KNOWLEDGE OF CORRUPTION AT WAL-MART MEXICO**

94.     Sometime around early December 2011, the Company learned that the *New York Times* was investigating its operations in Mexico in connection with possible violations of the FCPA by Castro-Wright and other Wal-Mart Mexico executives.  On December 8, 2011, the Company filed a Form 10Q with the SEC in which it made the following disclosure:

During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters. However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

95.     This disclosure was, at best, highly misleading because it strongly suggested that the Company found out about the FCPA violations in Mexico only in 2012 and only as the result of a voluntary internal review.  In fact, the Company had known about the corrupt practices in Mexico concerning Wal-Mart's permits **for six years** and had taken the extraordinary steps detailed above to cover it up.  Furthermore, it is clear that the investigation was anything but voluntary but rather was undoubtedly the product of panic and fear resulting from the knowledge that the *New York Times* was about to expose the cover-up.

## DAMAGES INCURRED BY WAL-MART

96.     As a result of the Individual Defendants' improprieties, Wal-Mart has and will sustain a wide range of damages.  Wal-Mart will undoubtedly have to defend against lengthy probes by the DOJ and the SEC into Wal-Mart's foreign operations, not only in Mexico but worldwide.   Wal-Mart's defense against these regulatory actions, which have already commenced, will be time-consuming, distracting and expensive.

97.     Wal-Mart executives, including many of the Individual Defendants, face the possibility of criminal prosecutions and civil liability which will undoubtedly distract and deter them from the performance of their duties.  The DOJ has placed a high premium on investigating

and prosecuting violations of the FCPA and bribery laws and will undoubtedly pursue any case against the Company vigorously.  As stated above, Wal-Mart also faces charges under the FCPA which can lead to very substantial fines and penalties totaling in the hundreds of millions.  The scale of the bribery in Mexico and the subsequent cover-up by senior Wal-Mart executives and directors make it even more likely that Wal-Mart will have to pay the stiffest of penalties to resolve the matter.

98.    The improper actions of the Individual Defendants will also cost Wal-Mart on terms of its future growth and loss of goodwill.  Already, activists and competitors have signaled that they will use the improprieties committed by the Individual Defendants against the Company when it attempts to opens stores in the U.S. and abroad.   Much of Wal-Mart's recent growth has come from opening stores overseas, and so any increased regulatory activity against it will undoubtedly hinder the Company's overall growth.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99.    Plaintiffs incorporate by reference and realleges each and every allegation stated above as if fully set forth herein.  Plaintiffs did not make a demand on the Current Director Defendants to bring this action because such demand would be futile given the facts as alleged herein and, therefore, such a demand is excused.

100.    As specified herein, demand is excused because this Complaint alleges with particularity that a majority of the members of the current Board failed to institute proper safeguards against corruption and consciously disregarded the fact that the Company lacked the internal controls required by the FCPA.  Moreover, none of the Current Director Defendants took any steps to prevent the unlawful conduct engaged in by certain Company executives as alleged herein.  Instead they ratified it and then engaged in a *six year effort* to cover it up causing great

harm to the Company, its reputation and its shareholders. Likewise, the Board has not held any of the Individual Defendants accountable for causing harm to Wal-Mart and exposing the Company to serious reputational and pecuniary damages. This inaction by the Board is not surprising given that Current Director Defendants themselves are directly implicated in the wrongdoing by their cover-up of the Company's violations of the FCPA and their own deliberate neglect in failing to plan or maintain internal controls to ensure Wal-Mart's compliance with the FCPA.

101. The Current Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on intentional, reckless and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the current Board, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). A majority of the Individual Defendants face a substantial likelihood of liability, and are therefore self-interested and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused

102. Demand is also futile for the following additional reasons:

(a) Defendants Rob Walton and Jim Walton are brothers. Their familial relationship prevents either defendant from making a disinterested and independent evaluation of the claims herein. Defendant Penner is the son-in-law of Rob Walton.

(b) Defendants Duke and Scott lack disinterest and independence given their long term relationship on the Wal-Mart Board and their mutual service on

the advisory board of the Tsinghua University School of Economics and Management in Beijing, China.

(c)     Defendants Duke, Rob Walton and Jim Walton lack disinterest and independence because Duke sits on the Board of Arvest Bank, a Walton family-owned bank of which Jim Walton is Chairman of the Board and CEO. The Walton family, which exerts considerable control over the Board, will not wish to oust Duke in connection with the bribery probe.

(d)     Duke is a high-ranking officer and his principal employment is with Wal-Mart. He has received and continues to receive substantial monetary compensation and other benefits through his employment with Wal-Mart. In 2011, defendant Duke received more than $18 million in compensation from Wal-Mart and expects to receive more than $18 million in compensation again in 2012. Thus demand is futile as to defendant Duke.

## COUNT I
### Against All Individual Defendants for Breach of Fiduciary Duty

103.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    The Individual Defendants owed and owe Wal-Mart fiduciary obligations. By reason of their fiduciary relationships, these defendants owed and owe Wal-Mart the highest obligation of good faith, fair dealing, loyalty and due care.

105.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

106.    Each of the Individual Defendants had actual or constructive knowledge of the misconduct alleged herein, including that they utterly failed to institute a system of internal

31

controls to monitor the Company's compliance with the FCPA and other anti-bribery laws and permitted the Company and its employees to violate the FCPA and other anti-bribery laws by making corrupt payments to officials of foreign governments. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

107.   The Individual Defendants owed a fiduciary duty to Wal-Mart to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate, did not mislead investors and conformed to federal and state securities laws. The Individual Defendants breached their fiduciary duties by allowing the Company to issue false and misleading filings.

108.   The Individual Defendants have engaged, knowingly or recklessly, in a sustained and systematic failure to exercise their oversight responsibilities to ensure that Wal-Mart complied with federal and state laws, rules and regulations.

109.   As members of the Board and/or officers of the Company, the Individual Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the federal and state laws as alleged herein. Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings. The alleged acts of wrongdoing have subjected Wal-Mart to unreasonable risks of loss and expenses.

110.   Each of the Individual Defendants' acts in causing or permitting the Company to disseminate to the investing public material misrepresentations and omissions and abdicating their oversight responsibilities to the Company has subjected the Company to liability for

violations of federal and state law, and therefore could not be the product of a valid exercise of business judgment. Instead, this was a complete abdication of their duties as officers and/or directors of the Company. As a result of the Individual Defendants' breaches, Wal-Mart has lost market capitalization and has had its reputation in the business community and financial markets irreparably tarnished.

111. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Wal-Mart has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

112. Plaintiffs, on behalf of Wal-Mart, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Awarding to Wal-Mart restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

C. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D. Granting such other and further relief as the Court deems just and proper.

Dated: May 2, 2012

Respectfully submitted,

FARUQI & FARUQI, LLP

33

By: /s/ James P. McEvilly, III
James P. McEvilly, III (#4807)
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Telephone: 302-482-3182
Facsimile: 302-482-3612
Email: jmcevilly@faruqilaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

Michael J. Hynes
**FARUQI & FARUQI, LLP**
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email: mhynes@faruqilaw.com

-and-

Beth A. Keller
Nicholas W. Moyne
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: bkeller@faruqilaw.com
       nmoyne@faruqilaw.com

Debra S. Goodman
**THE LAW OFFICE OF DEBRA S. GOODMAN**
1301 Skippack Pike Ste 7A #133
Blue Bell, PA 19422
Telephone: 610- 277-6057
Facsimile: 484-231-1922

**EXHIBIT D**

EFiled: May 3 2012 4:33PM EDT
Transaction ID 44017988
Case No. 7490-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, derivatively on behalf of WAL-MART STORES, INC., | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| AIDA M. ALVAREZ, JAMES W. BREYER, M. MICHELLE BURNS, JAMES I. CASH, JR., ROGER C. CORBETT, DOUGLAS N. DAFT, MICHAEL T. DUKE, GREGORY B. PENNER, STEVEN S. REINEMUND, H. LEE SCOTT, JR., ARNE M. SORENSON, JIM C. WALTON, S. ROBSON WALTON, CHRISTOPHER J. WILLIAMS, LINDA S. WOLF, DAVID D. GLASS, ROLAND A. HERNANDEZ, JOHN D. OPIE, J. PAUL REASON, JOSE H. VILLARREAL, EDUARDO CASTRO-WRIGHT, THOMAS A. MARS, JOSÉ LUIS RODRÍGUEZMACEDO RIVERA, EDUARDO F. SOLÓRZANO MORALES, THOMAS A. HYDE, JOHN B. MENZER, and LEE STUCKEY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____ |
| Defendants, | ) ) |  |
| -and- | ) |  |
| WAL-MART STORES, INC., | ) ) |  |
| Nominal Defendant. | ) ) |  |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff California State Teachers' Retirement System ("CalSTRS"), by and through its undersigned counsel, brings this action derivatively on behalf of Nominal Defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") against Wal-Mart's current board of directors, certain of Wal-Mart's current officers, certain of Wal-Mart's former board of directors, and certain of Wal-Mart's former officers (collectively the "Individual Defendants"), and alleges

upon personal knowledge as to its own acts, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.     This case arises from highly credible allegations of rampant corruption at the Company's largest foreign subsidiary, as a result of which the Company now faces the combined scrutiny of the Department of Justice and the Securities and Exchange Commission, as well as potentially hundreds of millions of dollars of liability for violations of the Foreign Corrupt Practices Act of 1977 (the "FCPA").

2.     From September 2005 to May 2006, Wal-Mart's top management and directors—including the Company's then-CEO, current CEO, and its Chairman of the Board—received evidence from a whistleblower that executives of Wal-Mart's thriving subsidiary Wal-Mart de Mexico ("Wal-Mex") had paid hundreds of illegal bribes to foreign government officials in order to procure competitive advantages for the Company.   The significance of the Wal-Mex expansion to Wal-Mart cannot be understated: currently, approximately 20 percent of Wal-Mart's stores (out of more than 10,000 worldwide) are located in Mexico.

3.     Rather than order an independent outside investigation, Wal-Mart's management instead instructed the Company's anemic Corporate Investigations unit to fly to Mexico and conduct a "preliminary inquiry."   Although the unit's four corporate fraud investigators were greeted with evasion and open hostility, even this "preliminary inquiry" managed to swiftly corroborate the whistleblower's account.

4.     The investigators tracked some $24 million in bribes paid to secure permits and clear away red tape, permitting the rapid expansion of Wal-Mart stores in Mexico. Even worse, they confirmed that the CEO of Wal-Mex, Eduardo Castro-Wright, had approved of the payment

of bribes as a business practice, to speed Wal-Mart's entry into the Mexican market and choke out the competition before it had time to establish a foothold.

5.      When Corporate Investigations delivered its final report to top Wal-Mart management in December 2005, the executive summary read that "There is reasonable suspicion to believe that Mexican and USA laws have been violated."

6.      Although Wal-Mart's executives had previously agreed to consider a full investigation if the preliminary investigation found the bribery allegations to be credible, they then switched course in response to the report delivered by Corporate Investigations.   On February 3, 2006, top Wal-Mart executives, including Wal-Mart's then-CEO and director H. Lee Scott, Jr., convened a meeting at which the internal investigative team was upbraided for being "overly aggressive."   Scott and the other executives then directed that Wal-Mart's Corporate Investigations unit draw up a "revised protocol" for internal investigations, which added several layers of bureaucratic obstacles to the investigative process and put control of the investigations into the hands of Wal-Mart executives, including executives at the very business units being investigated.

7.      Four days later, management sent an even clearer message.   Wal-Mart's General Counsel ordered the investigative team to transfer control of the investigation, along with all of their files, to the general counsel of Wal-Mex. The Wal-Mex general counsel, who had been one of the principal targets of the preliminary inquiry, then prepared a six-page report exonerating his fellow Wal-Mex executives and accusing the whistleblower of theft and fabrication.  Wal-Mart's U.S. leaders were apparently more satisfied with this report than they had been with the findings of the preliminary inquiry.  On May 10, 2006, the Wal-Mex general counsel was told by Wal-

Mart executives in Arkansas to put his report "into final form, thus concluding this investigation."

8.      Over the ensuing five-and-a-half year period, the Wal-Mart Board and management made no public disclosure of the bribery allegations at Wal-Mex, although nine members of the current Board were also on the Board or members of management during 2005-2006. It was not until December 2011, when, upon learning that *The New York Times* was investigating these events, the Company announced in an SEC filing that it had launched an internal investigation into whether "certain matters" were in compliance with the FCPA. Nevertheless, the Company filing advised investors, "We do not believe that these matters will have a material adverse effect on our business."

9.      When, on April 21, 2012, *The New York Times* published an article detailing the massive scale of the alleged bribery (the "NYT Article"), the adverse findings of Wal-Mart's preliminary internal investigation and how management orchestrated the subsequent cover-up, the Company shifted into damage-control mode. Wal-Mart has since announced the creation of a global compliance officer position. At the same time, the Company is assiduously minimizing the magnitude of the financial implications to Wal-Mart and its shareholders, stressing the importance of putting everything "in context" because "the allegations… about the decisions made in Bentonville are more than six years old."

10.      The Board's prolonged failure to address detailed and credible allegations of criminal activity undertaken with the tacit or express consent of current and former senior corporate officials, and the complicity of the Company's highest level executives in shutting down any investigation into those allegations, is causing and will continue to cause the Company substantial harm. Even beyond the reputational damage and loss in market capitalization—Wal-

Mart's stock lost eight percent of its value in the first three days after the publication of The New York Times article—the total cost to the Company and shareholders of the possible FCPA penalties or other government fines, the potential civil litigation, and the now-inevitable scorched-earth investigations may well stretch into the billions of dollars.

11.    Through this Action, Plaintiffs seek redress for Wal-Mart and its public shareholders for the harm caused to them by the Board and certain executives of the Company, and to ensure that Wal-Mart going forward becomes a corporation that pays more than lip service to its purported commitment to ethics and integrity.

## PARTIES

### A.    Plaintiff

12.    Plaintiff California State Teachers' Retirement System ("CalSTRS") is the largest U.S. teachers' retirement fund, with over 856,000 members.  As of March 31, 2012, CalSTRS had $152.9 billion of assets under management.  CalSTRS is a current shareholder of the Company, was a shareholder at the time of the misconduct complained of herein, and has been a shareholder of Wal-Mart continuously since that time.

### B.    The Nominal Corporate Defendant

13.    Defendant Wal-Mart is a Delaware corporation headquartered at 702 Southwest 8th Street, Bentonville, Arkansas.  The Company was founded by Sam Walton in 1962.  Today, members of the Walton family, including Defendants Jim C. Walton and S. Robson Walton, individually and/or collectively control over 49.5% of its voting shares.  As a group, the current Board, director nominee and the Company's Executive Officers collectively control 50.12% of the voting shares of the company.  Wal-Mart operates retail stores in various formats around the world, and its operations comprise three reportable business segments: the Wal-Mart U.S. segment; the Wal-Mart International segment; and the Sam's Club segment.  Wal-Mart has a

market capitalization of $201 billion, and its stock trades on the New York Stock Exchange under the ticker symbol "WMT."

## C.   Director Defendants

14.    Defendant Aida M. Alvarez ("Alvarez") has been a director of the Company since 2006.  Alvarez has been a member of the Board's Audit Committee since 2007.

15.    Defendant James W. Breyer ("Breyer") has been a director of the Company since 2001.  Breyer is the presiding director of executive sessions of the "non-management directors" and "independent directors," which are defined terms in Wal-Mart's Annual Proxy Statement for fiscal year 2012, filed with the SEC on April 16, 2012.

16.    Defendant M. Michelle Burns ("Burns") has been a director of the Company since 2003.  Burns served as a member of the Board's Audit Committee from 2003 through 2006.

17.    Defendant James I. Cash, Jr. ("Cash") has been a director of the Company since 2006.  Cash has been a member of the Board's Audit Committee since 2006.

18.    Defendant Roger C. Corbett ("Corbett") has been a director of the Company since 2006.

19.    Defendant Douglas N. Daft ("Daft") has been a director of the Company since 2005.  Daft is a member of the Board's Compensation, Nominating and Governance Committee.

20.    Defendant Michael T. Duke ("Duke") is Wal-Mart's President and Chief Executive Officer ("CEO"), positions that he has held since 2009.  Duke has been a director of the Company since 2008.  Duke has held other high-ranking positions with Wal-Mart since joining the Company in July 1995, including Vice Chairman with responsibility for Wal-Mart International beginning in September 2005 and Executive Vice President and President and CEO of Wal-Mart U.S. beginning in April 2003.  Duke serves as Chairperson of the Board's Executive Committee.

21.     Defendant Gregory B. Penner ("Penner") has been a director of the Company since 2008.  Penner is Rob Walton's son-in-law.

22.     Defendant Steven S. Reinemund ("Reinemund") has been a director of the Company since 2010.  Reinemund is a member of the Board's Compensation, Nominating and Governance Committee.

23.     Defendant H. Lee Scott, Jr. ("Scott") has been a director of the Company since 1999.  Scott was Wal-Mart's President and CEO from January 2000 through January 2009.  Prior to serving as the Company's President and CEO, Scott held other positions with Wal-Mart since joining the Company in September 1979, including Vice Chairman and Chief Operating Officer from January 1999 to January 2000, and Executive Vice President and President and CEO of Wal-Mart U.S. from January 1998 to January 1999.

24.     Defendant Arne M. Sorenson ("Sorenson") has been a director of the Company since 2008.  Sorenson has been a member of the Board's Audit Committee since 2008.

25.     Defendant Jim C. Walton ("Jim Walton") has been a director of Wal-Mart since September 28, 2005.  Jim Walton is the youngest son of Sam Walton and the brother of Rob Walton.  Jim Walton individually and through Walton Enterprises LLC controls 49.81% of the voting shares of the Company.

26.     Defendant S. Robson Walton ("Rob Walton") is Wal-Mart's Chairman of the Board, and has served in that capacity since 1992.  Rob Walton has been a director of the Company since 1978.  Rob Walton is the eldest son of Sam Walton, the founder of the Company.  Rob Walton is a member of the Board's Executive Committee.  Rob Walton individually and through Walton Enterprises LLC controls 49.51% of the voting shares of the Company.

27.     Defendant Christopher J. Williams ("Williams") has been a director of the Company since 2004.  Williams has been the Chairperson of the Board's Audit Committee since 2008, and has been a member of the Audit Committee since 2005.  Williams is also a member of the Board's Executive Committee.

28.     Defendant Linda S. Wolf ("Wolf") has been a director of the Company since 2005.   Wolf serves as the Chairperson of the Board's Compensation, Nominating and Governance Committee.

29.     Defendants Alvarez, Breyer, Burns, Cash, Corbett, Daft, Duke, Penner, Reinemund, Scott, Sorenson, Jim Walton, Rob Walton, Williams, and Wolf are collectively referred to herein as the "Director Defendants."

**D.      Former Director Defendants**

30.     Defendant David D. Glass ("Glass") served as a director of the Company from 1977 through 2009.  Glass served as Wal-Mart's President and CEO from January 1988 to January 2000.

31.     Defendant Roland A. Hernandez ("Hernandez") served as a director of the Company from 1998 through 2008.  Hernandez was Chairperson of the Board's Audit Committee prior to 2002, and served in that capacity until 2008.

32.     Defendant John D. Opie ("Opie") served as a director of the Company from 2003 through 2006.

33.     Defendant J. Paul Reason ("Reason") served as a director of the Company from 2000 through 2006.  Reason served as a member of the Board's Audit Committee prior to 2002, and remained a member until 2006.

34.     Defendant José H. Villarreal ("Villarreal") served as a director of the Company from 1998 through 2006.

35.     Defendants Glass, Hernandez, Opie, Reason and Villarreal are collectively referred to as the "Former Director Defendants."

**E.     Executive Defendants**

36.     Defendant Eduardo Castro-Wright ("Castro-Wright") has served as Vice Chairman of the Company since 2008.  Castro-Wright served as President and CEO of Wal-Mart Stores Division U.S. from September 2005 through November 2008.  From February 2005 to September 2005, Castro-Wright served as Executive Vice President and Chief Operating Officer of Wal-Mart U.S.  Castro-Wright was the CEO of Wal-Mex from 2002 through 2005.

37.     Defendant Thomas A. Mars ("Mars") is the current executive vice president and chief administrative officer for Wal-Mart U.S.  From 2002 to 2009, Mars managed the legal department and served as Wal-Mart's general counsel.

38.     José Luis Rodríguezmacedo Rivera ("Rodríguezmacedo") was General Counsel of Wal-Mex and Wal-Mex's Senior Vice President in Charge of Legal, Compliance and Corporate Quality from January 2004 through April 20, 2012.  On April 20, 2012, Rodríguezmacedo was reassigned to a Senior Vice President position within Wal-Mex.

39.     Eduardo F. Solórzano Morales ("Solórzano") has served as CEO, President and Executive Vice President of Wal-Mart Latin America since January 2010.  Solórzano served as President and CEO of Wal-Mex from 2004 through 2010.

40.     Defendants Castro-Wright, Mars, Rodríguezmacedo and Solórzano are collectively referred to herein as the "Executive Defendants."

**F.     Former Executive Defendants**

41.     Thomas A. Hyde ("Hyde") was the Executive Vice President and Corporate Secretary of Wal-Mart from June 2005 to 2010.  From June 2003 to June 2005, he served as

Executive Vice President, Legal and Corporate Affairs and Corporate Secretary. From July 2001 to June 2003, he served as Executive Vice President, Senior General Counsel.

42. John B. Menzer ("Menzer") was the Vice Chairman of Wal-Mart from 2005 through 2007.

43. Lee Stuckey ("Stuckey") was the Chief Administrative Officer of Wal-Mart International from 2005 through 2010.

44. Defendants Hyde, Menzer and Stuckey are collectively referred to herein as the "Former Executive Defendants."

45. The Director Defendants, Former Director Defendants, Executive Defendants, and Former Executive Defendants are collectively referred to herein as "Defendants."

### JURISDICTION

46. This Court has jurisdiction over this action pursuant to 10 *Del. C.* § 341.

47. This Court has jurisdiction over the Director Defendants, Former Director Defendants, Executive Defendants, and Former Executive Defendants as the directors and officers of a Delaware corporation under 10 *Del. C.* § 3114 and/or under 10 *Del. C.* § 3104.

48. This Court has jurisdiction over Wal-Mart pursuant to 10 *Del. C.* § 3111.

### SUBSTANTIVE ALLEGATIONS

**A. Fiduciary Duties of Wal-Mart's Management and Board**

49. Defendants have fiduciary duties to the Company and its shareholders, including the duties of loyalty, good faith, and candor. In addition, Wal-Mart's foundational corporate documents detail the requirements of the Board's duties, requiring, *inter alia*, that the Board actively identify and report any illegal and/or unethical business practices within the Company.

### 1.    Corporate Governance Guidelines

50.    Pursuant to the Company's Corporate Governance Guidelines, the Board is tasked with responsibility for, among other things, "[r]eviewing compliance with applicable laws and regulations and adopting policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls."

51.    Under the Corporate Governance Guidelines, Directors are also expected "to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders, and to perform their duties of care and loyalty."

52.    Additionally, all directors are also required to participate in an orientation plan upon his or her election to the Board.  This plan includes "familiarizing new directors with the Company's strategic plans, its significant financial, accounting and risk management issues, its compliance programs, its Statement of Ethics, its principal officers, and its internal and independent auditors."

### 2.    Statement of Ethics (effective January 1, 2005 through September 2008)

53.    On January 1, 2005, the Company revised its Statement of Ethics "to take into account recent changes in laws and regulations."  The revised Statement of Ethics applies to all of the Company's employees worldwide as well as the members of the Board and all employees and directors of controlled subsidiaries, such as Wal-Mex.  According to the letter accompanying the Statement of Ethics, signed by Defendants Rob Walton and Scott, "[w]here ethics are concerned, our Company goes a step further.  You are expected to raise any questions or concerns regarding business ethics."

54.    Two sections of the Statement of Ethics address improper payments.  The section titled "Improper Payments" provides:

> You should not offer anything of value, directly or through third persons, to anyone (including governmental authorities) to obtain an improper advantage in selling goods and services, conducting financial transactions, or presenting the Company's interests. All countries prohibit bribery of their own public officials, and many also prohibit the bribery of officials of other countries. Wal-Mart's policy goes beyond these legal requirements and prohibits improper payments in all activities, both with governments and in the private sector.

55.     The Statement of Ethics also contains a section titled "Responsibilities Regarding International Business Practices," which provides that "Wal-Mart is subject to several international anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act, which seek to curb dishonesty in international dealings." The Statement of Ethics further provides that "Wal-Mart has adopted a comprehensive International Anti-Corruption Policy, CR-02" With respect to bribes, kickbacks, or payoff, the Statement of Ethics provides:

> The U.S. Foreign Corrupt Practices Act, other U.S. laws, and similar laws of other countries, prohibit you, on behalf of Wal-Mart, from directly or indirectly making, promising, authorizing or offering anything of value to a government official or employee, political party, or any candidate for political office. A governmental official includes any person acting in an official capacity on behalf of a government, agency, department or instrumentality, such as a business with government ownership (e.g., a national oil company).

**3.     Statement of Ethics (effective September 2008 to present)**

56.     Effective September 2008, Wal-Mart revised its Statement of Ethics, which remains in effect today. According to the Company, "The Statement of Ethics was revised to make it more user-friendly, to reflect Wal-Mart's tone and voice, and to align with Wal-Mart's brand. As with the prior version, the revised Statement of Ethics continues to apply to all members of Wal-Mart's Board of Directors and all Wal-Mart associates worldwide. In relevant part, the revisions include "the addition of sections specifically addressing financial conflicts of interest, retaliation, and intentional dishonesty; and revisions that align the Statement of Ethics

with other Wal-Mart policies, including Wal-Mart's anti-corruption and expatriate work authorization policies."

57.     As part of its anti-corruption policy, the Revised Statement of Ethics provides: "Bribery of public officials in the U.S. and abroad is illegal under both U.S. law and the local law of the countries in which we operate." Nevertheless, "Wal-Mart's policy goes beyond these legal requirements and prohibits corrupt payments in all circumstances, whether in dealings with public officials or individuals in the private sector."

58.     The anti-corruption policy also states:

> Specifically, the Global Anti-Corruption Policy prohibits us from paying, promising, offering, or authorizing a payment, directly, indirectly, or through a third party, money or anything of value to a government official or political party for the purpose of influencing an official act or decision in order to obtain or retain business or secure an improper advantage. The term "government official" includes any person acting in an official capacity for or on behalf of a government or governmental agency or department, including a business with government ownership (for example, a national oil company); a public international organization (for example, the U.N. or World Bank); or a political party or candidate for political office. Even when local practices or customs allow behavior that violates our Anti-Corruption Policy, it is not acceptable for us to do so.

**4.     CEO/Senior Financial Officials Code of Ethics (effective November 20, 2003)**

59.     Wal-Mart also has a Code of Ethics for the CEO and all Senior Financial Officials.[1] This policy has been in effect from November 20, 2003 through the present. In particular, the CEO and all Senior Financial Officers (including the CFO and Corporate Controller) are bound by these provisions. This Code of Ethics assigns certain reporting obligations to the CEO, CFO and Corporate Controller, who fulfill those obligations by reporting

---

[1] Senior Financial Officials are defined to be the CFO, Corporate Controller, officers in the Accounting, Finance and Tax departments, Chief Executive Officers who are responsible for an operating division, and officers in operating divisions who are responsible for accounting.

specified matters to the Audit Committee of the Board and the Company's Internal Audit Services. Other Senior Financial Officers may report such matters to their superior or the Audit Committee.

60.     Two provisions of this Code are pertinent to the conduct alleged in *The New York Times* article. First, the CEO and each Senior Financial Officer is required under the Code to "report any information he or she may have concerning any violation of this Code of Ethics, including any actual or apparent conflicts of interest between personal and professional relationships involving any associate who has a significant role in his or her area's financial reporting, disclosures or internal controls." Second, the CEO and each Senior Financial Officer are required to "report any information he or she may have concerning evidence of a material violation of securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof."

61.     Pursuant to this Code, the Audit Committee is tasked with responsibility for determining appropriate actions to take in response to any such reported violations.

## 5.     Audit Committee Charter

62.     The Audit Committee is tasked with several responsibilities, including overseeing the work of the Company's management.

63.     As part of this oversight function, the Audit Committee is required to review and discuss the following with management: management's compliance with the Company's processes, procedures, and internal controls; the Company's risk assessment and risk management process and policies; and the Company's major financial and other risk exposures, as well as the steps management has taken to monitor and control such exposures.

64.     In addition to its oversight of the CEO and Senior Financial Officers, the Audit Committee's charter requires it to oversee the CEO's and CFO's certification of the Company's

Form 10-Ks and Form 10-Qs for "(a) any significant deficiencies in the design or operation of internal controls or material weakness therein, (b) any fraud involving management or other associates who have a significant role in the Company's internal control, and (c) any significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation."

65.     As part of its compliance oversight responsibilities, the Audit Committee is also required to "[d]iscuss with management and the Outside Auditor, and advise the Board with respect to, the Company's policies, processes and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics, and instances of non-compliance therewith."

66.    The Audit Committee is also tasked with discussing with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance policies.

**B.     The Mexican Bribery Scheme**

67.     On April 21, 2012, *The New York Times* reported that top executives of Wal-Mart had engaged in and concealed evidence of pervasive corruption at Wal-Mex, the Company's largest foreign subsidiary.  David Barstow, *At Wal-Mart in Mexico, a Bribe Inquiry Silenced*, N.Y. TIMES (Apr. 21, 2012), *available at* http://www.nytimes.com/2012/04/22/business/at-wal-mart-in-mexico-a-bribe-inquiry-silenced.html (last visited May 3, 2012).

68.     According to the exposé, Wal-Mex executives had, for years, bribed government officials in order to procure special treatment and competitive advantages for the Company in

violation of the FCPA.[2]  As a result, as many as five new Wal-Mart stores were built a week in Mexico.

69.     Between 2002 and 2005, bribery became especially unrestrained at the specific request of Wal-Mex's then-CEO, Eduardo Castro-Wright.  Castro-Wright, who has since been promoted to Vice Chairman of Wal-Mart, authorized hundreds of bribes in order to speed the Company's expansion into the desirable Mexico retail merchandising market.  As a result, zoning maps changed, environmental objections vanished, and permits that typically took months to process materialized in days.

70.     Under Castro-Wright's leadership, Wal-Mex executives were pressured to do "whatever was necessary" to obtain permits.  The goal was for Wal-Mex to outpace the competition, to build new stores so fast that competitors would not have time to react.  Not surprisingly, in 2005, when Castro-Wright was elevated to CEO of Wal-Mart Stores USA, the number of bribes reported at Wal-Mex dropped dramatically.

71.     As a matter of fact, this was not the first indication of corruption at Wal-Mex under Castro-Wright.  A 2003 investigation by Kroll Inc. ("Kroll") on behalf of Wal-Mart discovered that Wal-Mex "had systematically increased its sales by helping favored high-volume customers evade sales taxes." *See* NYT Article.  Kroll concluded that top Wal-Mex executives "had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Wal-Mart de Mexico was 'carrying out a tax fraud.'"  Kroll also determined that Wal-Mex's internal audit and antifraud units were "ineffective" and observed that many of the employees implicated in the tax evasion scheme

---

[2] 15 U.S.C. § 78dd-1, *et seq*.  The FCPA prohibits companies from making or offering to make improper payments to foreign governments in order to secure business.

were never questioned by the Company and some even received promotions.  The Company ultimately paid $34.3 million in back taxes.  *Id.*

72.     Two years later, in September 2005, former Wal-Mex in-house attorney Sergio Cicero Zapata ("Cicero") contacted Maritza Munich ("Munich"), general counsel of Wal-Mart International.  In emails and subsequent interviews, Cicero described in detail how Wal-Mex had bribed government officials throughout Mexico in order to secure construction permits, zoning approvals, reductions in environmental impact fees and the allegiance of neighborhood leaders.  Wal-Mex targeted mayors and city council members, obscure urban planners, and low-level bureaucrats who issued permits—anyone with the power to thwart or facilitate Wal-Mart's growth.  *Id.*

73.     In response, Munich hired a prominent Mexico City attorney, Mr. Torres-Landa ("Torres-Landa"), to debrief Cicero.  Cicero and the attorney met three times in October 2005, and Munich traveled from Wal-Mart's Bentonville, Arkansas headquarters to attend the third meeting.  *Id.*

74.     During these debriefings, Cicero implicated numerous Wal-Mex executives in the bribery scheme, including its board chairman, general counsel, chief auditor and top real estate executive.  Cicero also described how the bribes were hidden through fraudulent accounting.  *Id.*

75.     Cicero explained that it was his job to recruit and funnel bribes through bag-men referred to as *gestores*, which, loosely translated, means "managers."  Cicero planned whom to bribe with the *gestores*, who in turn would make the payments, and skim a percentage off the top.  *Id.*

76.     The scheme was carefully monitored through a system of secret codes known only to a few Wal-Mex executives.  While the invoices submitted by the *gestores* seemed vague,

each was marked with a code that, when translated, revealed the service that was actually being provided. Torres-Landa's notes from an interview with Cicero record that the scheme used codes indicating that bribes were paid for at least the following purposes:

- Speed of applications
- Elimination of a requirement
- Reduction of mitigation work or conditions
- Donations in cash without receipt
- Street vendors, invaders and holders of properties
- Street markets and public markets
- Government agency discretional authority
- Verbal authorizations
- Influence, control or confidential information of government agencies
- Cross-subsidies between projects
- Follow-up expenses to eliminate fines
- Presidency instructions to speed-up projects in Mexico City

77.     Torres-Landa's list demonstrates the systematic and deliberate nature of the bribery scheme.

78.     According to Torres-Landa's notes, each month Castro-Wright and other top Wal-Mex executives also "received a detailed schedule of all of the payments performed." Wal-Mex then "purified" the bribes in accounting records as simple legal fees. *Id.*

## C.     The "Preliminary Inquiry"

79.     At the time of Cicero's debriefings, defendant Michael T. Duke, Wal-Mart's current CEO and a member of the Board, was Vice Chairman of the Company and in charge of Wal-Mart International, giving him responsibility for Wal-Mart's foreign subsidiaries. Duke was kept informed of the investigation. On October 15, 2005, he received an email with a note saying "You'll want to read this" followed by a detailed description of Cicero's allegations.

80.     After Cicero's debriefing, Munich sent detailed memos to senior management at Wal-Mart, including Defendant Mars, then general counsel of Wal-Mart; Defendant Thomas D. Hyde ("Hyde"), then Wal-Mart Executive Vice President and Corporate Secretary; Michael Fung, then Wal-Mart's top Internal Auditor; Craig Herkert ("Herkert"), then Wal-Mart's Latin America chief; and Defendant Lee Stucky, then Chief Administrative Officer of Wal-Mart International.

81.     In response to Cicero's allegations, Wal-Mart contacted Willkie Farr & Gallagher LLP ("Willkie Farr"), a law firm with extensive experience in FCPA cases, to assist in an investigation. Willkie Farr submitted an "investigation work plan" that called for tracing all payments to anyone who had helped Wal-Mex obtain permits for the previous five years.

82.     This plan, however, was rejected. Instead, Wal-Mart's executives ordered a far more limited "preliminary inquiry," to be run by its small Corporate Investigations unit.

83.     Wal-Mart's Corporate Investigations unit had less than 70 employees, only four of whom were assigned to investigate corporate fraud (a number which Joseph R. Lewis ("Lewis"), Wal-Mart's director of corporate investigations, described as "wholly inadequate for an organization the size of Wal-Mart"); the rest of the unit mainly concerned themselves with shoplifting rings.

84.     Nevertheless, the investigative team, which was led by Ronald Halter ("Halter"), a new investigator at Wal-Mart, with the help of Bob Ainley ("Ainley"), a senior auditor, swiftly corroborated Cicero's reports. Wal-Mart investigators collected receipts showing that Wal-Mex agents had doled out more than $24 million in payments to government officials across Mexico in order to clear bureaucratic hurdles and "facilitate" the rapid construction of new Wal-Mart stores.

85.     Halter's team started their investigation on November 12, 2005, at Wal-Mex headquarters in Mexico City. By the end of that day, they found evidence of 441 *gestor* payments, even though they had only searched back to 2003. Significantly, the records showed payments of $8.5 million to the two *gestores* named by Cicero in his debriefings.

86.     Halter passed his team's findings on to Joseph R. Lewis, Wal-Mart's director of corporate investigations. Lewis in turn alerted his boss, Kenneth H. Senser ("Senser"), Wal-Mart's vice president for global security, aviation and travel, that it was "not looking good."

87.     Halter's team also quickly confirmed that Castro-Wright and other top Wal-Mex executives were well aware of the *gestor* payments. A March 2004 Wal-Mex audit that Halter's team unearthed documented millions of dollars of *gestor* payments intended to facilitate new store permits. Halter noted that not long after the audit was completed, the auditor was fired.

88.     The investigation also found that, instead of shutting down the bribery scheme, Defendant Castro-Wright became concerned that Wal-Mex had become dependent on too few *gestores*. Consequently, Wal-Mex General Counsel, Defendant Rodríguezmacedo, told Cicero to come up with a plan to diversify the *gestores* used, noting that Castro-Wright wanted to "implement this plan as soon as possible."

89.     However, bribery at Wal-Mex went beyond payments made through *gestores*. As Halter's team discovered, between 2003 and 2005, Wal-Mex had made payments totaling nearly $16 million to government officials all over Mexico.

90.     The investigators' document requests and questions were poorly received by executives at Wal-Mex. For example, Defendant Eduardo F. Solórzano Morales ("Solórzano"), then chief executive of Wal-Mex, had angrily chastised Halter and the investigators for being too secretive and accusatory. Solórzano also attempted to divert the investigation by casting blame

on whistleblower Cicero.  In a video conference with Mars, Senser and Stucky, Solórzano described a "hypothesis" that Cicero had in fact stolen the payments to *gestores*.

91.     When Herkert, Wal-Mart's chief executive for Latin America, was notified about the complaints in October, he and Defendant Duke flew to Mexico City. While the trip had been originally planned for Duke to tour several stores, Herkert and Duke now took the opportunity to soothe Wal-Mex's unhappy executives.

92.     In December 2005, Halter and Ainley concluded their investigation and submitted confidential reports to Wal-Mart's top executives.  They laid out all the evidence corroborating Cicero's account: hundreds of *gestor* payments, mystery accounting codes, rewritten audits, evasive responses from Wal-Mex executives, donations for permits, and evidence that *gestores* were still being used by Wal-Mex.

93.     The report of the preliminary internal investigation concluded that, "[t]here is reasonable suspicion to believe that Mexican and USA laws have been violated," and that there was "no defendable explanation" for the millions of dollars in *gestor* payments.

94.     Halter also submitted an "action plan," in which he recommended a deeper investigation, including a reconstruction of Cicero's computer history, a thorough investigation of the two main *gestores*, and interviews of senior Wal-Mex executives.

**D.     The Cover-Up in the United States**

95.     Rather than expand and intensify the probe, Wal-Mart executives in the United States took steps to shut the investigation down.

96.     Around January 2006, Munich wrote a memo concurring with Halter's recommendation that the bribery investigation be expanded, noting that "[t]he bribery of government officials is a criminal offense in Mexico." That same month, as Wal-Mart's leaders in Bentonville were considering whether to order a full investigation, Rob Walton, Duke and

Scott received an anonymous email asserting that Wal-Mex's top real estate executives were taking kickbacks from construction companies.

97.    Soon thereafter, the decision was made. On February 3, 2006, Scott called a meeting to discuss the investigative team's recommendations. Mars, Stucky and Senser were present. Senser later wrote that Wal-Mart's leaders had chastised the investigative team for being "overly aggressive." At the conclusion of the meeting, Senser was ordered to work with Mars to quickly develop a "modified protocol" for internal investigations. Within twenty-four hours they drafted a new protocol that gave senior Wal-Mart executives more control over internal investigations. The shift in control extended to the executives at the business units being investigated. When Senser sent the new protocol to Hyde, Wal-Mart's Executive Vice President and Corporate Secretary, Hyde responded, "This captures it, I think."

98.    On the same day that Senser was finishing the new protocol, Wal-Mart's ethics office sent him a booklet of "best practices" for internal investigations. It was compiled by lawyers and executives who supervised investigations at Fortune 500 companies. "Investigations should be conducted by individuals who do not have any vested interest in the potential outcomes of the investigation," it said, according to *The New York Times* article.

99.    Within days, Scott and other senior Wal-Mart executives turned the investigation over to Rodríguezmacedo, who was one of the executives directly implicated in authorizing bribes. Indeed, Wal-Mart's preliminary inquiry had developed evidence that Rodríguezmacedo had previously taken "significant information out" of an audit of Wal-Mex's compliance with the FCPA. Before it was altered, the audit had stated that Wal-Mex executives gave gift cards to government officials in towns where Wal-Mart was building stores. Once the stores had been built, those payments stopped. The investigation had also identified an email in which

Rodríguezmacedo, at Castro-Wright's request, ordered Cicero to draft a plan to "diversify" the *gestores* Wal-Mex used to "facilitate" permits. The plan authorized paying a *gestore* as much as $280,000 per permit facilitated – though, upon reviewing the plan, Rodríguezmacedo ordered it reworded to refer to "*gestores*" as "external service providers."

100.    Despite these findings, Rodríguezmacedo was now entrusted with the Wal-Mex investigation. Mars sent Halter's report to Rodríguezmacedo, along with the investigator's files. At the same time, Stucky scheduled a trip to Mexico for himself and other Wal-Mart executives who had participated in the bribery inquiry. Stucky wrote that they were going "for the purpose of re-establishing activities related to the certain compliance matters we've been discussing."

101.    Munich, who had meanwhile concluded that Wal-Mart management had no interest in addressing corruption at Wal-Mex, resigned from Wal-Mart effective February 1, 2006. In an e-mail to top Wal-Mart executives, she observed that "[t]he wisdom of assigning any investigative role to management of the business unit being investigated escapes me." She also stated that the investigation into Wal-Mex should be pursued by "professional, independent investigative resources."

102.    In Rodríguezmacedo's hands, the investigation was resolved in a few weeks, and focused on covering Wal-Mex's tracks. Despite the extensive evidence previously collected by Wal-Mart's Corporate Investigations unit, Rodríguezmacedo's report concluded that there was "no evidence or clear indication of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits."

103.    Rodríguezmacedo's conclusion was largely based on the denials of his fellow executives. He wrote that not one implicated executive "mentioned having ordered or given

bribes to government authorities." The report omitted that Rodríguezmacedo himself was one of those implicated.

104.    Rodríguezmacedo submitted a draft of his report to Wal-Mart's headquarters in Bentonville. Upon reading the report, investigator Lewis told his superiors that he found it "truly lacking."

105.    Nevertheless, Wal-Mart accepted the report as the last word on the matter. On May 10, 2006, Rodríguezmacedo was told to put his report "into final form, thus concluding this investigation."

106.    Wal-Mart made no contemporaneous public disclosure of the allegations of bribery at Wal-Mex or the conflicting reports generated by Corporate Investigations and Rodríguezmacedo. Instead, Wal-Mart's directors and executives swept everything under the rug, where it remained for nearly six years, and only began to surface again when Wal-Mart learned of *The New York Times* investigation in late 2011.

**E.    The Foreign Bribery Scheme and Subsequent Cover-Up in Mexico is the Result of the Defendants' Conscious Breach of Their Duties**

107.    Defendants' conscious failure to implement an internal controls system to detect and prevent the illegal payment of bribes in Mexico, their conscious failure to act once the bribery scheme was exposed, and certain Defendants' (as set forth herein) affirmative acts to cover-up the scheme, have severely damaged and will likely in the future damage Wal-Mart and its business, goodwill and reputation. The Company has and is likely to suffer substantial damages while investigating the cover-up, remediating the compliance violations, as well as paying any fines imposed and addressing potential civil liabilities.

108. · Defendants thereby knowingly violated their fiduciary duties of loyalty and care, by permitting and covering-up the illegal behavior. Defendants' breaches of fiduciary duty

placed the Company and its shareholders at serious risk, and have and will harm the Company financially.

## DEFENDANTS CONCEALED THEIR
## WRONGDOING FROM WAL-MART SHAREHOLDERS

109.   Defendants concealed the facts pertaining to Wal-Mart's FCPA violations in Mexico, along with the fact that an internal investigation discovered the bribery scheme only to be covered-up.   Misleading investors and the public at large, Wal-Mart's annual reports and proxy statements have never mentioned any of the specific facts at issue here.

110.   In fact, it was not until December 2011—five-and-a-half years after sanctioning the cover-up of the bribery investigation—that Wal-Mart executives and directors, after being alerted to *The New York Times'* on-going investigation, informed the DOJ and SEC that Wal-Mart had begun an internal investigation into possible violations of the FCPA.

111.   On December 8, 2011, Wal-Mart filed its 10-Q with the SEC.   In the filing, Wal-Mart included the following statement:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anticorruption compliance program.   As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act.   The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures.   The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission.   We cannot reasonably estimate the potential liability, if any, related to these matters.   However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

## SCOTT AND CASTRO-WRIGHT SELL MILLIONS
## IN STOCK BASED ON ADVERSE NON-PUBLIC INFORMATION

112.   As the table below demonstrates, the trading records of defendants Scott and Castro-Wright show that both of these defendants began selling millions of dollars worth of Wal-Mart shares in the months after *The New York Times* first contacted the Company regarding possible FCPA infractions by Wal-Mex in December 2011.  Scott and Castro-Wright were divesting their shares in Wal-Mart in apparent anticipation of the publication of *The New York Times* exposé and the corresponding stock drop that would undoubtedly occur, and did occur. On the three trading days after *The New York Times'* April 21, 2012 exposé, Wal-Mart stock dropped eight percent, wiping out all of its gains in 2012.  Scott and Castro-Wright sold uncharacteristically large amounts of stock while in possession of the materially adverse non-public information that the Company was exposed to undisclosed liability for massive FCPA penalties and other contingences relating to the bribes and cover-up (as described in greater detail below).

### SCOTT'S AND CASTRO-WRIGHT'S SALES OF WAL-MART STOCK

| INDIVIDUAL | DATE | SHARES SOLD OR OPTIONS EXERCISED | GAIN |
|---|---|---|---|
| Scott | 03/27/2012 | 100,000 | $6,122,490 |
| | 03/02/2012 | 635,220 | $3,295,043 |
| | 12/20/2011 | 1,458,385 | $3,950,401 |
| Castro-Wright | 03/20/2012 | 143,206 | $1,716,037 |

## DERIVATIVE ALLEGATIONS

113.   Plaintiffs bring this action derivatively to redress injuries suffered by the Company as a result of the breaches of fiduciary duties of the Defendants.

114.   Plaintiff owned Wal-Mart stock during the time of the wrongful course of conduct constituting the basis for the claims asserted herein and continues to hold such stock.

115.   Plaintiff will adequately and fairly represent the interests of Wal-Mart and its shareholders in prosecuting and enforcing its rights and has retained counsel competent and experienced in shareholder derivative litigation.

### DEMAND ON THE WAL-MART BOARD IS EXCUSED AS FUTILE

116.   Plaintiffs have not made a demand on the Board to bring suit asserting the claims set forth herein because pre-suit demand was excused as a matter of law.

117.   As of the time of the filing of this complaint, the Wal-Mart Board comprised the following fifteen directors: Aida M. Alvarez, James W. Breyer, M. Michele Burns, James I. Cash, Jr., Roger C. Corbett, Douglas N. Daft, Michael T. Duke, Gregory B. Penner, Steven S Reinemund, H. Lee Scott, Jr., Arne M. Sorenson, Jim C. Walton, Rob Walton, Christopher J. Williams, Linda S. Wolf.

118.   As described below, eleven (11) of these directors—Breyer, Burns, Daft, Duke, Penner, Scott, Sorenson, Jim Walton, Rob Walton, Williams and Wolf—affirmatively refused to investigate the corruption at Wal-Mex and/or lack independence such that any pre-suit demand on them would be useless.

**A.     Demand on Breyer, Burns, Daft, Duke, Scott, Jim Walton, Rob Walton, Williams and Wolf Is Excused Because They Served On the Board During the Relevant Period, Had Actual or Constructive Knowledge of Wrongdoing, Yet Failed to Insist on an Adequate, Independent Investigation**

119.   A majority of the current Board—nine (9) out of fifteen directors—were Board members (Breyer, Burns, Daft, Scott, Jim Walton, Rob Walton, Williams and Wolf) and/or senior executives (Duke and Scott) of Wal-Mart during the relevant period spanning September

2005 to May 2006, when allegations of bribery in Mexico were raised to the attention of top

Wal-Mart management and subsequently covered up (the "Cover-up").

120.    *The New York Times* exposé contains detailed, credible information establishing

that three of these nine Board members (Duke, Scott and Rob Walton) had direct

contemporaneous knowledge of the bribery allegations, the findings of the preliminary internal

investigation, and/or the Cover-up:

- Scott was a director and the CEO of Wal-Mart during the relevant September 2005 to May 2006 time period and remains a member of the Board. As detailed in *The New York Times*, on February 3, 2006, Scott convened a meeting at which Wal-Mart internal investigators were upbraided for being "overly aggressive" in performing their duties and ordered to devise a new, less stringent protocol for internal investigations. Four days later, Wal-Mart's General Counsel turned the internal investigation and related files over to José Luis Rodríguezmacedo Rivera, the General Counsel of Wal-Mex. Rodríguezmacedo, who was implicated in the bribery and was one of the principal targets of the internal investigation, proceeded to torpedo it.

- Duke, who is now President and CEO of Wal-Mart and a member of the Board, was in 2005-2006 head of Wal-Mart International. In this role he had responsibility for all of Wal-Mart's foreign subsidiaries. Duke was identified by name in *The New York Times* exposé as having been informed of the allegations of bribery at Wal-Mex. Specifically, on October 15, 2005, Duke received an email from a top Wal-Mart lawyer with the message "You'll want to read this" followed by a detailed description of the bribery allegations made by former Wal-Mex executive Cicero. Also, in October 2005, Duke and Craig Herkert, then the chief executive for Wal-Mart's operations in Latin America, traveled to Mexico; while there, Duke and Herkert met with and attempted to appease Wal-Mex executives who had been angered by the Company's preliminary internal investigation into the bribery allegations.

- Rob Walton was the Chairman of the Board of Wal-Mart during the relevant September 2005 to May 2006 time period and still holds that position. As detailed in *The New York Times*, he had direct knowledge of allegations of bribery at Wal-Mex. In January 2006, he, along with Scott and Duke, received an anonymous email stating that Wal-Mex's top real estate executives were receiving kickbacks from construction companies. The email said "Please you must do something."

121.    Accordingly, demand is excused at least as to Duke, Scott and Rob Walton, because they exhibited hostility toward the investigation (Scott) and/or they knew of the bribery allegations but failed to order a neutral, third-party investigation (Duke and Rob Walton).   In addition, Duke, Scott and Rob Walton were complicit in the cover-up.

122.    Additionally, documentary evidence confirms that the full Board from September 2005 to May 2006—including the eight Board members who also served on the Board at that time, Breyer, Burns, Daft, Scott, Jim Walton, Rob Walton, Williams and Wolf—was apprised of the findings of the preliminary internal investigation.   For example, a document titled "Investigation and Audit Plan" that was prepared by Wal-Mart investigator Ronald Halter in connection with the preliminary internal investigation states that: "On November 16, 2005, a progress report will be given to Bentonville management and *the Chairman of the Audit Committee*.  Additional progress reports will be given as appropriate."  (emphasis added).

123.    The preliminary internal investigation report subsequently found that "There is reasonable suspicion to believe that Mexican and USA laws have been violated."

124.    Wal-Mart's corporate governance guidelines require that Chairpersons of Board Committees report all matters of interest to the full Board ("the chairperson of each committee will report to the full Board regarding matters that should be brought to the attention of the Board").   As such, the full Board in 2005-2006—including Breyer, Burns, Daft, Scott, Jim Walton, Rob Walton, Williams and Wolf—would have been informed of the adverse findings of the preliminary internal investigation and failed to take appropriate action, rendering them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

125.   The Director Defendants, who were on the Board or top executives at the Company in late 2005 to mid-2006 would have been informed of the bribery allegations, the adverse findings of the preliminary internal investigation and the subsequent cover-up because of their positions of control and authority at the Company.   Systemic, sustained corruption over a period of years at the Company's largest foreign subsidiary and what course of action the Company should take in response are unquestionably Board-level matters.

126.   Accordingly, as detailed above, nine members of the current Board had actual or constructive knowledge of the bribery allegations, the adverse findings of the preliminary internal investigation and the Cover-up.   Despite this, in 2005-2006, these Board members failed to order a thorough, independent review, such as that proposed by Willkie Farr in the "investigation work plan" it submitted to Wal-Mart's leaders.   These directors have demonstrated unwillingness to take reasonable corrective action in 2005-2006 or, indeed, over the subsequent six-and-a-half years.   Further, some or all of these nine directors now face the threat of criminal and civil liability under at least the FCPA and the federal conspiracy statute as well as for breaches of their duties as directors.   For all these reasons, pre-suit demand on them is excused as a matter of law.

**B.   Demand on Breyer, Burns, Daft, Duke, Scott, Jim Walton,**
**Rob Walton, Williams and Wolf is Also Futile Because They**
**Ignored A Red Flag Warning of Corruption at Wal-Mex**

127.   Demand is also futile as to Breyer, Burns, Daft, Duke, Scott, Jim Walton, Rob Walton, Williams and Wolf because they were on notice of corruption at Wal-Mex yet failed to conduct an adequate investigation or terminate those responsible.   In 2003, Kroll conducted an internal investigation on behalf of Wal-Mart into allegations of tax fraud at Wal-Mex.   Kroll's investigation found that Wal-Mex executives, in order to boost sales, had assisted preferred customers in committing tax fraud.   As a consequence, Wal-Mex paid $34.3 million in back

taxes. In its report to Wal-Mart, Kroll concluded that Wal-Mex's internal audit and antifraud units were "ineffective," and, further, observed that employees accused in connection with the tax fraud had not been questioned, while some employees were even promoted soon after the tax fraud was discovered. Indeed, Castro-Wright, who was implicated by the preliminary investigation into the bribery scheme, was CEO of Wal-Mex at the time of the 2003 tax fraud scheme. He retained his position however, and in October 2005, was elevated to CEO of Wal-Mart Stores USA and member of Wal-Mart's executive committee. Later, Castro-Wright was promoted again, to Vice Chairman of Wal-Mart.

**C.     Demand on Breyer, Burns, Daft, Duke, Scott, Jim Walton, Rob Walton, Williams and Wolf is Also Futile Because They Failed to Ensure The Propriety Of Wal-Mart's Business Practices By Implementing And Maintaining An Adequate System For Investigating Allegations Of Fraud**

128.   Demand is also futile as to Breyer, Burns, Daft, Duke, Scott, Jim Walton, Rob Walton, Williams and Wolf because they presided over a system of corporate investigations which permitted executives to control investigations into allegations of misconduct by them or their subordinates.

129.   For example, in October 2005 John B. Menzer ("Menzer"), Wal-Mart's vice chairman, undermined an internal investigation into a senior vice president ("SVP") subordinate to him. Menzer told the head of Corporate Investigations that he had "concerns about the impact such an investigation would have" and directed that one of the SVP's subordinates should investigate the allegations against his boss. Unsurprisingly, the subordinate cleared the SVP.

130.   Additionally, the president of Wal-Mart Puerto Rico was accused of mistreating employees but was allowed to assign a subordinate to conduct the investigation. Again, the subordinate cleared his boss. Maritza Munich, the general counsel of Wal-Mart International who debriefed Cicero, subsequently wrote an email to Company executives in which she

lamented that the investigation was "at the direction of the same company officer who is the target of several of the allegations." Munich also warned the executives that Wal-Mart was "in need of clear guidelines about how to handle these issues going forward."

131.   Demand is also futile as to these nine directors because they permitted the Company to maintain a wholly inadequate corporate investigations unit. Specifically, during the relevant period from September 2005 to May 2006, Wal-Mart maintained a Corporate Investigations unit that numbered less than 70 employees, only four of whom were assigned to investigate corporate fraud. Nevertheless, Director and then-CEO Scott agreed that Corporate Investigations would field all allegations of misconduct by senior executives, despite the fact that it was wholly understaffed and notwithstanding that as of January 31, 2006, Wal-Mart employed over 1.8 million people worldwide, including approximately 500,000 people in foreign countries.

**D.     Demand on Breyer, Burns, Daft, Duke, Scott, Jim Walton,
        Rob Walton, Williams and Wolf is Also Futile Because They
        Failed to Heed the Company's Own Statement of Ethics**

132.   Demand is also futile as to Breyer, Burns, Daft, Duke, Scott, Jim Walton, Rob Walton, Williams and Wolf because, by condoning or participating in the Cover-up, these nine directors not only failed to insist on compliance with the FCPA, they failed to comply with the Company's own Statement of Ethics.

133.   In the relevant period from September 2005 to May 2006, Wal-Mart's operative "Statement of Ethics," which was accompanied by a letter signed by Director Defendants Rob Walton and Scott, contained a section titled "Responsibilities Regarding International Business Practices." This section stated that "Wal-Mart is subject to several international anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act, which seek to curb dishonesty in international dealings."

134.    The Statement of Ethics further set forth that "Wal-Mart has adopted a comprehensive International Anti-Corruption Policy, CR-02." With respect to bribes, kickbacks, or payoff, the Statement of Ethics provided:

> The U.S. Foreign Corrupt Practices Act, other U.S. laws, and similar laws of other countries, prohibit you, on behalf of Wal-Mart, from directly or indirectly making, promising, authorizing or offering anything of value to a government official or employee, political party, or any candidate for political office.   A governmental official includes any person acting in an official capacity on behalf of a government, agency, department or instrumentality, such as a business with government ownership (e.g., a national oil company).

135.    Accordingly, because the above-named directors not only ignored credible allegations that U.S. law had been violated, but also ignored that these acts would have contravened the Company's own Statement of Ethics, it would be useless to make demand on them to pursue the instant litigation.

## E.    Demand on Scott Is Additionally Excused Due to His Opportunistic Selling

136.    In December 2011, the Company publicly announced that it was reviewing its FCPA compliance on a global basis. *The New York Times* reported that this announcement followed shortly after the Company learned that the newspaper was conducting research for a story about corruption at Wal-Mex. In the subsequent months, while in the possession of the materially adverse non-public information that *The New York Times* was planning to write an exposé that posed a risk to the price of Wal-Mart shares, Scott sold 2,193,605 shares of Wal-Mart stock and options, on which he realized a gain of $13,367,934. Because Scott profited opportunistically from inside knowledge of impending revelations about the corruption at Wal-Mex, demand on him is futile.

**F.    Demand on Breyer, Burns, Duke and Sorenson Is Excused Because
        Their Business Relationships with the Company Render Them
        Incapable of Acting Independently of Rob Walton and the Walton Family**

137.    Demand is also futile as to Breyer, Burns, Duke and Sorenson because they perennially reap tens of millions of dollars from related-party transactions with Wal-Mart. As set forth above, Wal-Mart is controlled by Chairman of the Board Rob Walton, Jim Walton and the Walton family, which collectively owns nearly 50% of the Company and controls two Board seats. As discussed in *The New York Times* exposé, Rob Walton had direct contemporaneous knowledge of allegations of bribery at Wal-Mex, yet failed to act to protect the Company and shareholders. It is therefore useless to make demand on Breyer, Burns, Duke and Sorenson, because to do so would force them to oppose the will of Rob Walton and the Walton family, to whom they are financially beholden through the following related-party transactions:

- Breyer is a partner of Accel, which was a primary investor in Kosmix, a privately held social media technology firm. On April 18, 2011, Wal-Mart reported that it agreed to acquire Kosmix, which will form the basis of a new Wal-Mart operation called @Wal-Martlabs. Further, Breyer may be deemed to beneficially own indirectly more than ten percent of the equity of Centrify Corporation ("Centrify") and LetsTalk.com, Inc. ("LetsTalk"). During fiscal 2009, Wal-Mart paid Centrify approximately $2.11 million for computer software and received payments from LetsTalk of approximately $2.21 million for commissions for sales of wireless products and services to Wal-Mart's customers.

- Burns is the former Chairman and CEO of Mercer Inc. ("Mercer"), a subsidiary of Marsh & McLennan Companies, Inc. During fiscal year 2012, Wal-Mart paid Mercer and its subsidiaries approximately $3.64 million for consulting services. Further, in fiscal year 2011, Mercer and its subsidiaries received approximately $2.8 million; in fiscal year 2010, Mercer and its subsidiaries received approximately $2.0 million from Wal-Mart; in fiscal year 2009, Mercer and its subsidiaries received approximately $3.65 million from Wal-Mart; and in fiscal year 2008, Mercer and its subsidiaries received approximately $1.734 million from Wal-Mart.

- Duke serves on the Board of Directors of Arvest Bank of Bentonville ("Arvest"), Arkansas. According to sources including Forbes magazine, Arvest is majority-owned and controlled by the Walton family. Arvest

Bank's Chairman and CEO is Wal-Mart director Jim Walton, son of Sam Walton, founder of Wal-Mart. Duke accordingly serves on the Arvest board and is compensated for such service at the pleasure of Jim Walton and the Walton family. Additionally, Stephen P. Weber, a senior manager in Wal-Mart's Information Systems Division, is Duke's son-in-law. For fiscal 2012, Wal-Mart paid Weber a salary of $119,692, a bonus of $32,024, and other benefits totaling approximately $16,153 (including Wal-Mart's matching contributions to Weber's 401(k) Plan account and health insurance premiums). For Weber's performance in fiscal 2012, he also received a grant of 571 restricted stock rights. Weber received similar sums in fiscal year 2011.

- Sorenson is the President and CEO and a director of Marriott International, Inc. ("Marriott"). During fiscal 2012, Wal-Mart paid or reimbursed payments made to Marriott and its subsidiaries in the amount of approximately $19 million for hotel, lodging, and related services, and Wal-Mart received payments of approximately $1.07 million from Marriott for purchases of merchandise from Wal-Mart. In fiscal year 2011, Marriott and its subsidiaries received approximately $9.0 million from Wal-Mart; in fiscal year 2010, Marriott and its subsidiaries received approximately $5.9 million from Wal-Mart; in fiscal year 2009, Marriott and its subsidiaries received approximately $5.8 million from Wal-Mart; and in fiscal year 2008, Marriott and its subsidiaries received approximately $5.5 million from Wal-Mart.

## G.    Demand on Jim Walton Is Additionally Excused Because of His Familial Relationship With Rob Walton

138.    Jim Walton Is Rob Walton's younger brother and the son of Wal-Mart founder Sam Walton. Jim Walton joined the Board on September 28, 2005. Rob Walton has served on the Board since 1978, and has been its Chairman since 1992. Accordingly, it is futile to make demand on Jim Walton, due to his familial relationship with and allegiance to Rob Walton and the Walton family.

## H.    Demand on Penner Is Excused Because of His Familial Relationship With Rob Walton

139.    Penner is Rob Walton's son-in-law. He owes his career and status to Rob Walton, as from 2002 to 2005, he served as Wal-Mart's Senior Vice President and CFO–Japan.

Accordingly, Penner is not sufficiently independent of Rob Walton and the Walton family to impartially decide whether to pursue suit, and demand on him is futile.

## LIABILITY UNDER THE FOREIGN CORRUPT PRACTICES ACT

140.     The FCPA prohibits the payment of bribes to foreign officials for the purpose of obtaining or retaining business.  The U.S. Department of Justice (the "DOJ") is responsible for all criminal enforcement and for civil enforcement of the anti-bribery provisions with respect to domestic concerns and foreign companies and nationals.  The U.S. Securities and Exchange Commission (the "SEC") is responsible for civil enforcement of the anti-bribery provisions with respect to publicly-traded companies.

141.     While in criminal cases the DOJ has statutory guidelines for imposing penalties for violations of the FCPA's anti-bribery provisions, penalties for large scale commissions of bribery typically fall under the Alternative Fines Act.[3]  Under that statute, the actual fine may be up to twice the benefit that the defendant gained by making the illegal payment.  Fines to an individual may not be paid by their employer.  Further, a person or company found in violation of the FCPA may be barred from doing business with the federal government.

142.     In civil cases, such as an SEC enforcement action, a court may impose, in addition to statutory fines, a fine equaling the gross amount of the pecuniary gain to the defendant as a result of the violation.

143.     Over the past three years, the penalties imposed against companies for FCPA violations have ranged widely.  One academic monitoring these actions has compiled a "top 10" list of corporate sanctions under the FCPA, as follows:

---

[3] 18 U.S.C.A. § 3571.

**FCPA FINES FOR SELECTED COMPANIES: DECEMBER 2008 TO DECEMBER 2011**

| DATE | COMPANY NAME | BRIBES | DOJ FINES | SEC FINES | TOTAL FINES |
|---|---|---|---|---|---|
| Dec-08 | Siemens AG | $1.4 billion | $450 million | $350 million | $800 million |
| Feb-09 | Kellogg Brown & Root LLC (KBR) & Halliburton | $182 million | $402 million | $177 million | $579 million |
| Mar-10 | BAE Systems plc | $200 million | $400 million | | $400 million |
| Apr-10 | Daimler AG | $56 million | $93.6 million | $91.4 million | $185 million |
| Jun-10 | Technip | $182 million | $240 million | $98 million | $338 million |
| Jul-10 | Snamprogetti Netherlands B.V. & ENI S.p.A | $182 million | $240 million | $125 million | $365 million |
| Nov-10 | Panalpina | $49 million | $70.5 million | $11.3 million | $81.8 million |
| Dec-10 | Alcatel-Lucent S.A. | $9.8 million | $92 million | $45 million | $137 million |
| Apr-11 | JGC Corporation | $182 million | $218.8 million | | $218.8 million |
| Dec-11 | Magyar Telekom plc & Deutsche Telekom AG | $15 million | $63.9 million | $31.2 million | $95 million |

144.   This chart suggests that the amount of the bribes has little bearing on the overall fines and penalties.   Instead, the calculus looks primarily to the amount of gain or profit produced by the bribes (less the amount paid through disgorgement).   Aggravating factors may be considered, such as the culpability of senior management, the size of the company and its number of employees.   Mitigating factors may also be weighed, including voluntary disclosure, cooperation and acceptance of responsibility.

145.   In Wal-Mart's case, the Company's internal investigators found evidence indicating that over $24 million in bribes had been paid to Mexican officials.   However, the pecuniary gain attributable to those bribes is likely substantially higher.   From 2002 to 2011, Wal-Mex generated approximately $200 billion (USD) in revenue, a significant portion of which

arguably flowed from stores whose construction was facilitated by bribes. Accordingly, some commentators believe the resulting fine could exceed $1 billion.

**WAL-MEX ESTIMATED REVENUE 2005-2011 (USD)**

| FISCAL YEAR | REVENUE |
|---|---|
| 2002 | $11.0 billion |
| 2003 | $11.2 billion |
| 2004 | $12.4 billion |
| 2005 | $15.1 billion |
| 2006 | $18.2 billion |
| 2007 | $20.6 billion |
| 2008 | $21.2 billion |
| 2009 | $20.0 billion |
| 2010 | $32.9 billion |
| 2011 | $37.7 billion |
| TOTAL | $200.3 billion |

**CLAIMS FOR RELIEF**

**COUNT I**

**(Breach of Fiduciary Duty Against the Defendants)**

146.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

147.    Defendants, as current or former Wal-Mart directors or officers, owe the Company's shareholders the utmost fiduciary duties of due care, good faith, candor and loyalty. By virtue of their positions as directors and/or officers of Wal-Mart and their exercise of control over the business and corporate affairs of the Company, the Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein. Each Defendant was required to:

(a) use his or her ability to control and manage Wal-Mart in a fair, just and equitable manner; and (b) act in furtherance of the best interests of Wal-Mart and its shareholders and not his or her own. Defendants also have the duty to oversee its CEO and ensure that he is not breaching his fiduciary duties to the Company.

148.   Additionally, the Defendants have a duty to implement a reasonable system of controls to ensure that Wal-Mart is operated in conformity with applicable laws. Once that system is in place, the Directors have a duty to respond in good faith to reports or indications that Wal-Mart or its employees are engaging in unlawful or other improper behavior. The Defendants have acted in violation of Wal-Mart's internal policies, including, *inter alia*, its Corporate Governance Guidelines, its anti-corruption policy, its Statement of Ethics, and its Code of Ethics for the CEO and all Senior Financial Officials.

149.   The Code of Ethics for the CEO and all Senior Financial Officials requires them to "report any information he or she may have concerning any violation of this Code of Ethics, including any actual or apparent conflicts of interest between personal and professional relationships involving any associate who has a significant role in his or her area's financial reporting, disclosures or internal controls." The CEO and each Senior Financial Officer are also required to "report any information he or she may have concerning evidence of a material violation of securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof." Through their actions and inactions, Defendants have systematically ignored these principles.

150.   The Company's Corporate Governance Guidelines also require Defendants to review compliance with applicable laws and regulations and adopting policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of

necessary accounting, financial, and other controls. Attached to the Company's Statement of Ethics, which applies to all Defendants, is a letter by Defendant Duke committing each Wal-Mart employee to be "be a champion for integrity by engaging fellow associates in conversation and setting an example through your words and actions." Additionally, Defendant Duke's letter states, "Silence can condone questionable behavior—and the actions or inactions of just one associate who makes a poor choice can impact our entire company." The decisions and actions of Wal-Mart's leaders in response to the Wal-Mex corruption allegations underscore that silence in the face of wrongdoing poses a risk of devastating consequences for the Company.

151. The Defendants breached their fiduciary duties by acting to subvert and/or failing to take any action to investigate and/or stop the improper and illegal conduct at Wal-Mex involving bribery.

152. Based on the foregoing conduct, Defendants were not acting in good faith toward the Company and breached their fiduciary duties.

153. As a direct and proximate result of Defendants' conscious failure to perform their fiduciary obligations, Wal-Mart has been and will be damaged.

154. As a result of the misconduct alleged herein, Defendants are liable to the Company.

155. Plaintiff, on behalf of Wal-Mart, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment against all defendants as follows:

      a)     Declaring that Defendants have breached their fiduciary duties to Wal-Mart;

b)      Declaring that Plaintiff may maintain this action on behalf of Wal-Mart and that Plaintiff is an adequate representative of the Company;

c)      Determining that this action is a proper derivative action maintainable under law and demand is excused;

d)      Determining and awarding to Wal-Mart the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

e)      Directing Wal-Mart to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

f)      Awarding Wal-Mart damages, together with pre- and post-judgment interest to the Company;

g)      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and;

h)      Granting such other and further relief as this Court deems just and equitable.

Dated: May 3, 2012

Of Counsel:

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Eric J. Belfi
Michael W. Stocker
Matthew C. Moehlman
Philip C. Smith
140 Broadway
New York, NY  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**GIRARD GIBBS LLP**
Daniel Girard
Jonathan K. Levine
Amanda Steiner
Dena Sharp
Ian P. Samson
601 California Street, Suite 1400
San Francisco, CA  94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

**LABATON SUCHAROW LLP**

By  */s/ Christine S. Azar*
    Christine S. Azar (#4170)
    Charles B. Vincent (#5078)
    Peter C. Wood, Jr. (#5249)
    300 Delaware Avenue, Suite 1225
    Wilmington, DE  19801
    Telephone: (302) 573-2530
    Facsimile: (302) 573-2529

*Attorneys for Plaintiff*

**EXHIBIT E**

EFiled: Apr 27 2012 6:09PM EDT
Transaction ID 43951555
Case No. 7470-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ELSIE COHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| AIDA M. ALVAREZ, JAMES W. BREYER, | ) | |
| M. MICHELE BURNS, JAMES I. CASH, JR., | ) | |
| ROGER C. CORBETT, DOUGLAS N. DAFT, | ) | |
| MICHAEL T. DUKE, GREGORY B. PENNER, | ) | |
| STEVEN S. REINEMUND, H. LEE SCOTT, JR., | ) | |
| ARNE M. SORENSON, JIM C. WALTON, | ) | |
| S. ROBSON WALTON, CHRISTOPHER J. | ) | |
| WILLIAMS, LINDA S. WOLF, THOMAS M. | ) | |
| COUGHLIN, DAVID D. GLASS, ROLAND A. | ) | |
| HERNANDEZ, JOHN D. OPIE, J. PAUL | ) | |
| REASON, JACK C. SHEWMAKER, JOSE H. | ) | |
| VILLARREAL, EDUARDO CASTRO-WRIGHT, | ) | |
| THOMAS A. MARS, JOSE LUIS | ) | |
| RODRIGUEZMACEDO RIVERA, and | ) | |
| EDUARDO F. SOLORZANO MORALES, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WAL-MART STORES, INC., a Delaware | ) | |
| Corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

This is a verified shareholder derivative action brought by plaintiff Elsie Cohen ("Plaintiff") for the benefit of nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") against certain current or former members of Wal-Mart's board of directors (the "Board") and certain Wal-Mart executives (collectively "Defendants") for breaches of their fiduciary duties owed to Wal-Mart and its shareholders. Defendants breached their fiduciary

duties by causing and/or allowing Wal-Mart and its employees to engage in the systematic practice of bribing foreign officials in Mexico to obtain construction permits in violation of the Foreign Corrupt Practices Act ("FCPA"), and by curtailing and covering up an investigation into the bribery practices.  The allegations in this shareholder derivative complaint ("Complaint") are made upon Plaintiff's personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, among other things, the investigation by counsel retained by Plaintiff, including a review of publicly available information, Securities and Exchange Commission ("SEC") filings by Wal-Mart, media reports about Wal-Mart, and Company reports.

## I.   **INTRODUCTION**

1.   Wal-Mart, which had mainly operated retail stores in the United States, began operations in Mexico in 1991, with the opening of a Sam's Club.  During the two decades since, Walmart de México ("WalMex") has experienced tremendous growth.  As of February 29, 2012, Wal-Mart owned 2,099 stores in Mexico and employed approximately 200,000 people in the country.  One in five Wal-Mart stores today is in Mexico, making WalMex a significant success story.

2.   Wal-Mart's rapid expansion in Mexico was the product of illegal actions.  For years, Wal-Mart engaged in a wide-ranging practice of bribing foreign officials in Mexico in order to secure zoning approvals, reductions in environmental impact fees and the allegiance of neighborhood leaders, in an effort to build so fast that competitors could not keep up.[1]

3.   Though an initial internal investigation unearthed evidence of widespread bribery, with a paper trail of more than $24 million in suspect payments, about which WalMex's top executives

---

[1]   *See* David Barstow, "Vast Mexico Bribery Case Hushed Up by Wal-Mart After Top-Level Struggle," The New York Times (April 21, 2012), *available at*: http://www.nytimes.com/2012/04/22/business/at-wal-mart-in-mexico-a-bribe-inquiry-silenced.html (last visited April 23, 2012) ("*New York Times Report*").

had extensive knowledge, when it was recommended that Wal-Mart expand the investigation the Defendants instead halted the investigation and held no one accountable.

4. Shockingly, WalMex's chief executive at the peak of the bribery scheme was promoted to President and CEO of Wal-Mart Stores USA and is now vice chairman of Wal-Mart.

5. Defendants' conduct represents a breach of Defendants' fiduciary duties that caused significant harm to the Company and for which they must be held accountable.

6. As explained herein and will be shown at trial, the criminal bribery conduct was affirmatively adopted as Wal-Mart's business strategy, and there is the suggestion in press reports that Wal-Mart is using the same conduct in China.

7. As a result of the Defendants' actions, the Company has already suffered, and will continue to suffer, substantial financial damage. The Company's goodwill and reputation has also been damaged by the Defendants' actions. The Company will now likely have to spend hundreds of millions of dollars on investigations into the bribery scheme and cover-up, and may have to pay substantial government fines. Investigations by the United States Department of Justice ("DOJ") and the SEC could result in criminal indictments and/or civil enforcement actions, either of which could impair the Company. In addition, Mexican authorities have initiated their own investigation into the bribery scheme. Media reports suggest that fines could be as high as $4.5 billion.

8. Since the Company remains under the control and/or influence of many of the primary wrongdoers who: (1) have substantial conflicts, and/or (2) may be implicated in the commission of the wrongful conduct alleged herein, Wal-Mart is unable to protect itself or remedy the wrongs inflicted upon it. Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of Wal-Mart, as any demand would be futile.

9. This action seeks restitution to Wal-Mart for the bribery of foreign officials in Mexico in contravention to the FCPA, and for the costs and expenses that will be paid by the Company as a result of Defendants' wrongdoing. This action also seeks to enjoin Defendants from future violations of their fiduciary duties.

## II.  THE PARTIES

### A. Plaintiff

10. Plaintiff, Elsie Cohen, is a current shareholder of the Company, was a shareholder at the time of the misconduct complained of herein, and intends to continue to hold Wal-Mart shares at least through the resolution of this action.

### B. The Nominal Corporate Defendant

11. Nominal defendant Wal-Mart Stores, Inc., a Delaware corporation with headquarters located in Bentonville, Arkansas, is a multinational retailer. Wal-Mart securities are registered with the SEC under Section 12(b) of the Exchange Act and its common stock trades on the New York Stock Exchange under the symbol "WMT." Wal-Mart serves customers and members more than 200 million times per week at over 10,000 retail outlets under 69 different banners in 27 countries. Wal-Mart has more than 2 million employees worldwide and had fiscal year 2012 sales of approximately $444 billion. Wal-Mart's website professes that the Company is "known for [its] unique corporate culture. Sam Walton built [Wal-Mart's] business on values and morals. Those rules and customs have helped [Wal-Mart] become one of the world's most admired companies."

12. Wal-Mart conducts its operations in Mexico through Walmart de México and Central America. WalMex started as a joint venture with Cifra in 1991, making Mexico the first country in Wal-Mart's International division. In 1997, Wal-Mart acquired a majority of Cifra, and in February 2000, the Cifra name officially changed to Walmart de México. WalMex's

headquarters are located in Mexico City.   Its current president and CEO is Scot Rank.   As of February 29, 2012, Wal-Mart had 2,099 outlets employing approximately 200,000 associates in Mexico.

### C. The Board of Directors

13. Wal-Mart's Board maintains several standing committees on which its directors serve. These standing committees include the Audit Committee; the Compensation, Nominating and Governance Committee; the Executive Committee; the Global Compensation Committee; the Strategic Planning and Finance Committee; and the Technology and eCommerce Committee.

14. Defendant Aida M. Alvarez ("Alvarez") has served as a director of the Company since 2006.   She currently serves as a member of the Audit Committee.   Her total director compensation for fiscal 2012 was $234,985.

15. Defendant James W. Breyer ("Breyer") has served as a director of the Company since 2001.  He currently serves as a member of the Strategic Planning and Finance Committee and the Technology and eCommerce Committee.   His total director compensation for fiscal 2012 was $261,523.

16. Defendant M. Michele Burns ("Burns") has served as a director of the Company since 2003.  She currently serves as the chairperson of the Strategic Planning and Finance Committee. Her total director compensation for fiscal 2012 was $256,256.

17. Defendant James I. Cash, Jr. ("Cash") has served as a director of the Company since 2006.   He currently serves as a member of the Audit Committee and the Technology and eCommerce Committee. His total director compensation for fiscal 2012 was $244,825.

18. Defendant Roger C. Corbett ("Corbett") has served as a director of the Company since 2006.  He currently serves as a member of the Strategic Planning and Finance Committee.  His total director compensation for fiscal 2012 was $288,251.

19. Defendant Douglas N. Daft ("Daft") has served as a director of the Company since 2005. He currently serves as a member of the Compensation, Nominating and Governance Committee. His total director compensation for fiscal 2012 was $241,575.

20. Defendant Michael T. Duke ("Duke") has served as a director of the Company since 2008. Duke is the President and CEO of Wal-Mart and has served in that position since February 1, 2009. Since joining the Company in July 1995, he held other positions, including Vice Chairman with responsibility for Walmart International beginning in September 2005 and Executive Vice President and President and CEO of Walmart US beginning in April 2003. He currently serves as the chairperson of the Executive Committee and the Global Compensation Committee. His total compensation for fiscal 2012 was $18,131,738.

21. Defendant Gregory B. Penner ("Penner") has served as a director of the Company since 2008. From 2002 to 2005, he served as Wal-Mart's Senior Vice President and CFO – Japan. Before serving in that role, Penner held the position of Senior Vice President of Finance and Strategy for Walmart.com. He currently serves as a member of the Global Compensation Committee and as the chairperson of the Technology and eCommerce Committee. His total director compensation for fiscal 2012 was $255,177. Penner is the son-in-law of defendant S. Robson Walton.

22. Defendant Steven S. Reinemund ("Reinemund") has served as a director of the Company since 2010. He currently serves as a member of the Compensation, Nominating and Governance Committee. His total director compensation for fiscal 2012 was $234,985.

23. Defendant H. Lee Scott, Jr. ("Scott") has served as a director of the Company since 1999. Scott was Wal-Mart's President and CEO from January 2000 through January 31, 2009. Scott served as an Executive Officer of Wal-Mart and as the Chairman of the Executive Committee until January 31, 2011. Since joining the Company in September 1979, he held other positions

6

with Wal-Mart, including Vice Chairman and Chief Operating Officer from January 1999 to January 2000, and Executive Vice President and President and CEO, Walmart US from January 1998 to January 1999. He currently serves as a member of the Strategic Planning and Finance Committee. His total director compensation for fiscal 2012 was $229,819.

24. Defendant Arne M. Sorenson ("Sorenson") has served as a director of the Company since 2008. He currently serves as a member of the Audit Committee. His total director compensation for fiscal 2012 was $234,985.

25. Defendant Jim C. Walton ("Jim Walton") has served as a director of the Company since 2005. He currently serves as a member of the Strategic Planning and Finance Committee. His total director compensation for fiscal 2012 was $235,424. Jim Walton is the brother of defendant S. Robson Walton.

26. Defendant S. Robson Walton ("Rob Walton") has served as a director of the Company since 1978. Rob Walton has been the Chairman of Wal-Mart since 1992. He joined the Company in 1969 and, prior to becoming Chairman, held a variety of positions with the Company, including Senior Vice President, Corporate Secretary, General Counsel and Vice Chairman. He currently serves as a member of the Executive Committee and the Global Compensation Committee. Rob Walton is the brother of defendant Jim Walton.

27. Defendant Christopher J. Williams ("Williams") has served as a director of the Company since 2004. He currently serves as the chairperson of the Audit Committee and as a member of the Executive Committee. His total director compensation for fiscal 2012 was $276,433.

28. Defendant Linda S. Wolf ("Wolf") has served as a director of the Company since 2005. She currently serves as the chairperson of the Compensation, Nominating and Governance Committee and as a member of the Technology and eCommerce Committee. Her total director compensation for fiscal 2012 was $269,616.

29. Defendants Alvarez, Breyer, Burns, Cash, Corbett, Daft, Duke, Penner, Reinemund, Scott, Sorenson, Jim Walton, Rob Walton, Williams and Wolf comprise the current directors on the Board, and are collectively referred to as the "Director Defendants."

### D. Former Directors

30. Defendant Thomas M. Coughlin ("Coughlin") served as a director of the Company from 2001 to 2005. Coughlin was Vice Chairman of the Board from 2003 to 2005. He held various positions with Wal-Mart beginning in 1978, including Executive Vice President and Vice Chairman of Wal-Mart Stores, Inc. (USA) from April 2003 to June 2003, Executive Vice President and President and Chief Executive Officer of Wal-Mart Stores Division and SAM'S CLUB USA from 2002 to 2003, Executive Vice President and President and Chief Executive Officer, Wal-Mart Stores Division, from 1999 to 2002, and Executive Vice President and Chief Operating Officer, Wal-Mart Stores Division, from 1998 to 1999. In fiscal 2005, he served as a member of the Executive Committee and the Strategic Planning and Finance Committee.

31. Defendant David D. Glass ("Glass") served as a director of the Company from 1977 to 2009. Glass was Wal-Mart's President and CEO from January 1988 to January 2000. In fiscal 2006, he served as the chairperson of the Executive Committee, a position he had held since 2000. In fiscal 2006, he also served as a member of the Stock Option Committee.

32. Defendant Roland A. Hernandez ("Hernandez") served as a director of the Company from 1998 to 2008. In fiscal 2006, he served as the chairperson of the Audit Committee. His total director compensation for fiscal 2006 was $231,788.

33. Defendant John D. Opie ("Opie") served as a director of the Company from 2003 to 2006. In fiscal 2006, he served as a member of the Compensation, Nominating and Governance Committee. His total director compensation for fiscal 2006 was $200,013.

34. Defendant J. Paul Reason ("Reason") served as a director of the Company from 2001 to 2006. In fiscal 2006, he served as a member of the Audit Committee. His total director compensation for fiscal 2006 was $205,752.

35. Defendant Jack C. Shewmaker ("Shewmaker") served as a director of the Company from 1977 to 2008. He was a Wal-Mart executive until 1988. In fiscal 2006, he served as a member of the Strategic Planning and Finance Committee. His total director compensation for fiscal 2006 was $201,578.

36. Defendant José H. Villarreal ("Villarreal") served as a director of the Company from 1998 to 2006. In fiscal 2006, he served as the chairperson of the Compensation, Nominating and Governance Committee. His total director compensation for fiscal 2006 was $218,812.

37. Defendants Coughlin, Glass, Hernandez, Opie, Reason, Shewmaker and Villarreal are collectively referred to as the "Former Director Defendants."

### E. Senior Executives

38. As detailed below, some of Wal-Mart's senior management were directly involved with the bribery in Mexico or notified of the bribery in Mexico and failed to act. Additionally, several top executives at WalMex were complicit in the bribery scheme.

39. Defendant Eduardo Castro-Wright ("Castro") is a former Chief Executive of WalMex. Castro was identified by a former executive as the driving force behind years of bribery. He was promoted to Executive Vice President of the Company and President and CEO of Wal-Mart Stores USA in September 2005 and is now vice chairman of Wal-Mart.

40. Defendant Michael T. Duke ("Duke"), Wal-Mart's current Chief Executive, was vice chairman of the Company, with responsibility for Walmart International from 2005 to February 2009. On October 15, 2006, a top Wal-Mart lawyer wrote to Duke giving a detailed description

9

of a former executive's WalMex allegations, noting that Duke would "want to read this." Duke visited Mexico City during the investigation. Duke is also named as a Director Defendant.

41. Defendant Thomas A. Mars ("Mars") was Wal-Mart's general counsel from 2002 to 2009, as such, he served as the company's chief legal officer. He is currently executive vice president and chief administrative officer for Walmart U.S. Mars received detailed memos from the general counsel of Wal-Mart International regarding the bribery of foreign officials. Mars was present at the February 3, 2006, meeting where Wal-Mart management decided whether the investigation should go forward and worked on the "modified protocol" for internal investigations.

42. Defendant José Luis Rodríguezmacedo Rivera ("Rodríguezmacedo") was the general counsel of WalMex. He was senior vice president for legal, ethics and compliance at WalMex until he was reassigned on April 20, 2012.

43. Defendant H. Lee Scott Jr. ("Scott") was Wal-Mart's President and CEO from January 2000 through January 31, 2009. Scott rebuked internal investigators for being overly aggressive. Scott called for the February 3, 2006, meeting where Wal-Mart management decided whether the investigation should go forward and ordered the "modified protocol" for internal investigations. Scott is also named as a Director Defendant.

44. Defendant Eduardo F. Solórzano Morales ("Solórzano") was the chief executive of WalMex after Castro's promotion. Solórzano attempted to impede the bribery investigation.

45. Defendants Castro, Duke, Mars, Rodríguezmacedo, Scott, and Solórzano are collectively referred to as the "Executive Defendants."

46. The Director Defendants, the Former Director Defendants and the Executive Defendants are collectively referred to as "Defendants."

### III.   FACTUAL BACKGROUND

#### A. The Specific Fiduciary Duties of Wal-Mart's Management and Board

47. Under Delaware law, Wal-Mart's senior management and directors on the Board have fiduciary duties to the Company and its shareholders, including the duties of loyalty and care.  In addition, Wal-Mart's corporate documents (such as the "Walmart Statement of Ethics") expressly detail the requirements of the Board's duties, requiring, among other things, that the Board must "[n]ever cover up or ignore any ethical conduct problem.  Address the matter in a timely manner and seek guidance if necessary."

48. To implement this philosophy, the Company maintains, and directors are obligated to follow, formal "Corporate Governance Guidelines," which are articulated by the Compensation, Nominating and Governance Committee of the Board.  The Corporate Governance Guidelines place ultimate decision-making authority for the Company with the Board and explicitly require and establish mechanisms for the Board to be continuously informed with respect to the Company's important business affairs. As stated in the Corporate Governance Guidelines:

> The specific duties and responsibilities of the Board will include, among other things, overseeing the management of the business and affairs of the Company; ... reviewing and, where appropriate, approving the business plans, major strategies and financial objectives of the Company; evaluating Board processes and performance and the overall effectiveness of the Board; evaluating the performance of the Company and of senior management; ... **reviewing compliance with applicable laws and regulations and adopting policies of corporate conduct to assure compliance with applicable laws and regulations** and to assure maintenance of necessary accounting, financial, and other controls; and showing, through its actions, its awareness that the Company's long-term success depends upon its strong relationship with its customers, associates, suppliers and the communities, including the global community, in which it operates.

(Emphasis added.)

49. According to the Audit Committee's Charter, a core responsibility of the Audit Committee is to "assist the Board in monitoring...the compliance by the Company with legal and regulatory requirements."

50. The Compensation, Nominating and Governance Committee is also specifically charged with "assist[ing] the Board in the implementation of sound corporate governance principles and practices."

51. Defendants' misconduct related to bribing foreign officials in violation of the Foreign Corrupt Practices Act, the subsequent cover-up, and consciously failing to monitor for such conduct is completely inconsistent with the fiduciary duties that all Wal-Mart directors and senior management undertake as a condition to accepting their positions with the Company.

### B. Wal-Mart's Practice of Bribing Foreign Officials In Violation of the Foreign Corrupt Practices Act

52. The anti-bribery provisions of the FCPA make it unlawful to make a payment to a foreign official for purposes "influencing any act or decision of such foreign official in his official capacity...." The statute defines foreign official as: "any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization." 15 U.S.C. § 78dd-1.

53. The FCPA, including its anti-bribery provisions, applied to Wal-Mart's overseas business.

54. In 2004, at the urging of Maritza I. Munich ("Munich"), then general counsel of Wal-Mart International, the Wal-Mart Board adopted an anti-corruption policy that prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart."

The policy required every employee to report the first sign of corruption, and it bound Wal-Mart's agents to the same exacting standards.

55. Additionally, the vigorous enforcement of the FCPA has been a well-publicized, top priority for the U.S. Government since its enactment into law by Congress in 1977. Since the terrorist attacks of September 11, 2001, the SEC and DOJ's enforcement of the FCPA has only intensified. SEC and DOJ enforcement actions, large FCPA settlements and countless media reports in the financial press regarding the FCPA, all alerted Defendants to the importance of, and need to secure, Wal-Mart's full compliance with the FCPA.

56. Section 307 of the Sarbanes-Oxley Act of 2002 required the SEC to adopt minimum standards of professional conduct for attorneys at companies that issue securities. Under the standards prescribed, an attorney that has evidence of a material violation of law must report that evidence "up-the-ladder" to the chief legal counsel or chief executive officer at the company. If those individuals do not respond appropriately to the evidence, the attorney must report the evidence to the audit committee, another committee of independent directors, or the full board of directors.

### C. Wal-Mart's Payment of Bribes to Foreign Officials In Mexico Comes to Light

57. On April 21, 2012, *The New York Times* published an article exposing WalMex's campaign of bribery that was orchestrated to win market dominance in Mexico, as well as to procure confidential information and eliminate fines. As described by Sergio Cicero Zapata ("Cicero"), a former WalMex executive in the real estate department, and as corroborated by others and by documents, WalMex paid bribes to obtain permits in virtually every corner of Mexico in order to secure zoning approvals, reductions in environmental impact fees and the allegiance of neighborhood leaders. WalMex targeted mayors and city council members,

13

obscure urban planners, and low-level bureaucrats who issued permits – anyone with the power to thwart Wal-Mart's growth.

58. On September 21, 2005, Cicero emailed Munich, then general counsel of Wal-Mart International, to come forward about irregularities at the highest levels of WalMex.  In response, Munich hired a prominent Mexico City attorney to debrief Cicero.  Cicero and the attorney met three times in October 2005, with Munich travelling from Bentonville to attend the third debriefing.

59. During these debriefings, Cicero implicated many WalMex executives – including its board chairman, general counsel, chief auditor and top real estate executive – in the bribery scheme, and described how it was also hidden in fraudulent accounting.

60. Cicero pointed to defendant Castro, WalMex's CEO, as the person most responsible for the bribes.  This was not the first indication of corruption at WalMex under Castro.  A 2003, Kroll Inc. investigation discovered that WalMex "had systematically increased its sales by helping favored high-volume customers evade sales taxes."  The investigation concluded that top WalMex executives "had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Wal-Mart de Mexico was 'carrying out a tax fraud.'  (The Company ultimately paid $34.3 million in back taxes.)," according to *The New York Times*.  Kroll determined that WalMex's internal audit and antifraud units were "ineffective."  Yet, many of the employees implicated were not even questioned and some even received promotions.

61. Under Castro's leadership, WalMex executives were under pressure to do "whatever was necessary" to obtain permits.  The strategy was for WalMex to build hundreds of new stores so fast that competitors would be left in the dust.  The bribes accelerated growth by getting zoning

14

maps changed and disposing of environmental objections.  Permits that normally would have taken months, took only days to obtain.

62. WalMex funneled its bribes through "*gestores*" who took a fee to put the bribes in the right hands.  These *gestores* submitted invoices with codes known by top WalMex executives. The codes included the items that went beyond facilitation of permits.

63. According to Cicero, Castro and other top WalMex executives "received a detailed schedule of all of the payments performed," each month.  WalMex then "purified" the bribes in accounting records as simple legal fees.

64. At the time of Cicero's debriefings, Wal-Mart's current CEO, defendant Michael T. Duke, was vice chairman of the Company, in charge of Wal-Mart International.  Duke was kept abreast of the interviews, receiving an email on October 15, 2005, with a detailed description of Cicero's allegations.

### D. Wal-Mart Opts Against a Thorough Investigation by an Independent Party

65. Following Cicero's debriefing, Munich sent detailed memos to senior management at Wal-Mart, including defendant Mars, then general counsel of Wal-Mart; Thomas D. Hyde, then Wal-Mart EVP and corporate secretary; Michael Fung, then Wal-Mart's top internal auditor; Craig Herkert, then Wal-Mart's Latin America chief; and Lee Stucky, then chief administrative officer of Wal-Mart International.  As general counsel of Wal-Mart International, under the Sarbanes-Oxley Act, Munich was also responsible for reporting to the Board's Audit Committee, another committee of independent directors, or the full Board, if defendant Mars did not respond appropriately to the evidence.  Accordingly, the Board must (or at least should) have known of these issues.  If the Board did not, such lack of information reflects a failure of the Company's reporting systems for which the Board bears responsibility.

66. In response, Wal-Mart initially turned to Willkie Farr & Gallagher, a law firm with extensive experience in Foreign Corrupt Practices Act cases ("Willkie Farr"). Willkie Farr, according to the *New York Times Report*, "recommended the kind of independent, spare-no-expense investigation major corporations routinely undertake when confronted with allegations of serious wrongdoing by top executives." Given the seriousness of the allegations and the magnitude of the proposed investigation, the Board must (or at least should) have known of the recommendation and the wrongdoing. If the Board did not, their failure to be involved reflects another failure of the Company's reporting systems.

67. Yet, the idea of allowing Willkie Farr, a neutral party, to thoroughly investigate was rejected and instead there was a decision to conduct a far more limited investigation in-house, giving Wal-Mart's senior management direct control over the investigation. This decision to allow the proverbial fox to guard the hen house reflects an utter failure to attend to fiduciary obligations and another sustained failure of Wal-Mart's reporting systems for which the Board bears responsibility.

68. The internal investigation was led by Ronald Halter ("Halter"), a new investigator at Wal-Mart, with the help of Bob Ainley ("Ainley"), a senior auditor.

69. Halter's team started their investigation on November 12, 2005, at WalMex headquarters in Mexico City. By the end of the day, they found evidence of 441 *gestor* payments, even though they had only searched back to 2003. Significantly, the records showed payments of $8.5 million to the two *gestores* named by Cicero in his debriefings.

70. Halter passed his team's findings on to Joseph R. Lewis ("Lewis"), Wal-Mart's director of corporate investigations. Lewis alerted his boss, Kenneth H. Senser ("Senser"), Wal-Mart's vice president for global security, aviation and travel, that it was "not looking good."

71. Halter's team quickly confirmed that Castro and other top WalMex executives were well aware of the *gestor* payments. A March 2004 WalMex audit that Halter's team came across documented millions of dollars of *gestor* payments intended to facilitate new store permits. Halter noted that not long after the audit was completed, the auditor was fired, again reflecting a serious flaw in Wal-Mart's monitoring systems.

72. Instead of shutting down the bribery scheme defendant Rodríguezmacedo, the general counsel of WalMex, worried about becoming too dependent on too few *gestores*. He told Cicero to come up with a plan to diversify the *gestores* used, noting that Castro wanted to "implement this plan as soon as possible."[2]

73. The bribery did not stop with *gestores*, in fact it went much further. As Halter's team discovered, WalMex was making large payments directly to governments all over Mexico, to the tune of nearly $16 million in all between 2003 and 2005.

74. Upon the conclusion of their investigation, in December 2005, Halter and Ainley wrote confidential reports to Wal-Mart's top executives. They laid out all the evidence that corroborated Cicero – hundreds of *gestor* payments, mystery accounting codes, rewritten audits, evasive responses from WalMex executives, donations for permits, and evidence *gestores* were still being used.

75. Halter concluded that, "[t]here is **reasonable suspicion to believe that Mexican and USA laws have been violated**," and that there was "no defendable explanation" for the millions of dollars in *gestor* payments. (Emphasis added.) This is the sort of report that would have, or at least should have, been sent to the Board under the requirements of the Sarbanes-Oxley Act and

---

[2]     Rodríguezmacedo declined to comment for the *New York Times Report*. On April 20, 2012, Wal-Mart disclosed that Rodríguezmacedo had been reassigned and is no longer WalMex's general counsel.

Wal-Mart's corporate governance documents.  To the extent it was not, the Board is once again to be faulted for utterly failing to ensure that appropriate reporting systems were in place.

76. Halter recommended a deeper investigation, including a reconstruction of Cicero's computer history, a thorough investigation of the two main *gestores*, and interviews of senior WalMex executives.

### E. Instead of Expanding the Investigation as Recommended, Defendants' Shut it Down and Covered it Up

77. Despite the fact that Wal-Mart's own investigator recommended that Wal-Mart expand the bribery investigation, just the opposite was done – yet again reflecting a sustained breakdown in the reporting systems for which Defendants were responsible.

78. In January 2006, the Company weighed whether to accept Halter's recommendations and approve a full investigation.

79. Around this time, Munich wrote a memo arguing for expanding the bribery investigation, noting that "[t]he bribery of government officials is a criminal offense in Mexico."  Munich was aware that Wal-Mart management was not responding appropriately to the evidence of the material violations of law and that the Sarbanes-Oxley Act required her to report to the Board's Audit Committee, another committee of independent directors, or the full Board.

80. Munich resigned from Wal-Mart.  Sarbanes-Oxley allows (and in some cases requires) lawyers to make a "noisy" withdrawal when the lawyer has not received an appropriate response to a report of wrongdoing.

81. Defendant Scott called a meeting for February 3, 2006, in order to discuss the options for the Mexico investigation.  Defendant Mars, among others, attended the meeting.  At the conclusion of the meeting, Senser and Mars were ordered to quickly develop a "modified protocol" for internal investigations.  Within 24 hours they came up with a new protocol that

gave senior Wal-Mart executives more control over internal investigations.   This included executives at the business units being investigated.  The new protocol enabled the investigation to be halted and covered-up, further evidencing the Board's sustained failure to ensureadequate reporting at the Company.

82. On the same day Senser was putting the finishing touches on the new investigations protocol, Wal-Mart's ethics office sent him a booklet of "best practices" for internal investigations.  It had been put together by lawyers and executives who supervised investigations at Fortune 500 companies.  "Investigations should be conducted by individuals who do not have any vested interest in the potential outcomes of the investigation," it said, according to the *New York Times Report.*

83. Within days, control of the bribery investigation was given to one of its earliest targets – defendant Rodríguezmacedo, the general counsel of WalMex who was alleged to have taken part in the bribery himself.  Once again, Defendants' allowance of the proverbial fox to guard the hen house reflects an utter failure to exercise oversight over issues of great magnitude.

84. As Munich put it in an e-mail, "[t]he wisdom of assigning any investigative role to management of the business unit being investigated escapes me."

85. On Rodríguezmacedo's watch, the case was wrapped up in a few weeks, with little additional investigation.   Despite the large amount of information discovered earlier, Rodríguezmacedo's report concluded that there was "no evidence or clear indication of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits."  His report explained that his conclusion was largely based on the denials of his fellow executives.  He wrote that not one executive "mentioned having ordered or given bribes to government authorities."

86. Rodríguezmacedo submitted a draft of his report to Wal-Mart headquarters. Despite the fact that Lewis told his superiors that he found the report "lacking," it was good enough for Wal-Mart, which accepted the report as the last word on the matter. Rodríguezmacedo was told on May 10, 2006, to put his report "into final form, thus concluding this investigation."

87. As a result of the Defendants' sustained inattention to remedying the problem, none of WalMex's leaders were disciplined. In fact, Castro, was promoted to President and CEO of Wal-Mart Stores USA and is now vice chairman of Wal-Mart.

88. The system of bribery in Mexico and Wal-Mart's investigation were not publicly disclosed by Wal-Mart. Rather, Wal-Mart directors and executives swept the issue under the rug, where it remained for nearly six years until *The New York Times* started investigating the matter in late-2011.

**F.   The Foreign Bribery Scheme and Subsequent Cover-Up in Mexico is the Result of the Defendants' Conscious Breach of Their Duties**

89. Defendants' conscious failure to implement an internal controls system to detect and prevent the illegal payment of bribes in Mexico, along with Defendants' conscious failure to act once the bribery scheme was exposed, has severely damaged and will likely in the future damage Wal-Mart and its business, goodwill and reputation. The Company has and is likely to suffer substantial damages while investigating the cover-up, remediating the compliance violations, as well as paying any fines imposed.

90. Defendants thereby knowingly violated their fiduciary duties of loyalty and care, and permitted and covered-up the illegal behavior. Defendants' breaches of fiduciary duty placed the Company and its shareholders at serious risk, and has and will harm the Company financially.

## IV.   DEFENDANTS CONCEALED THEIR WRONGDOING FROM WAL-MART SHAREHOLDERS

91. Defendants concealed the facts pertaining to Wal-Mart's FCPA violations in Mexico, along with the fact that an internal investigation discovered the bribery scheme only to be covered-up. Misleading investors and the public at large, Wal-Mart's annual reports and proxy statements have never mentioned any of the specific facts at issue here.

92. In fact, it was not until December 2011 – five-and-a-half years after sanctioning the cover-up of the bribery investigation – that Wal-Mart executives and directors, after being alerted to *The New York Times*' on-going investigation, informed the DOJ and SEC that Wal-Mart had begun an internal investigation into possible violations of the FCPA.

93. On December 8, 2011, Wal-Mart filed its 10-Q with the SEC. In the filing, Wal-Mart included the following statement:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act.
> The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters. However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

## V.   DEMAND ON THE BOARD OF DIRECTORS WOULD BE FUTILE

94. Plaintiff brings this action derivatively in the right and for the benefit of Wal-Mart to redress the breaches of fiduciary duty and other violations of law by Defendants as alleged herein.

95. Plaintiff will adequately and fairly represent the interests of Wal-Mart and its shareholders in enforcing and prosecuting their rights, and she has retained counsel experienced in prosecuting this type of action.

96. Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

97. At the time this action was initiated, the Board was comprised of fifteen (15) directors: defendants Alvarez, Breyer, Burns, Cash, Corbett, Daft, Duke, Penner, Reinemund, Scott, Sorenson, Jim Walton, Rob Walton, Williams and Wolf (defined earlier as the "Director Defendants"). Plaintiff did not issue a demand upon the Director Defendants prior to instituting this action because a majority of the Director Defendants either: (a) engaged in conduct that is not a legitimate exercise of judgment and/or is *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (b) would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in Wal-Mart's improper conduct.

### A. Demand is Excused Because the Director Defendants' Conduct is Not a Valid Exercise of Business Judgment

98. The Director Defendants' challenged misconduct at the heart of this case constitutes the direct concealment of criminal activity. As a result of the internal investigation, and the requirements placed on Wal-Mart's attorneys by the Sarbanes-Oxley Act, the Defendants knew, or should have known, that WalMex's system of bribery and subsequent cover-up could damage the Company and its reputation as well as its shareholders. In essence, as the "ultimate decision making body" of the Company, the Board affirmatively condoned by consciously refusing to remediate a business strategy based on deliberate, widespread, and often criminal violations of

law.  Such conduct may be on-going in other parts of the world.  Accordingly, demand on the

Board is excused.

99. A derivative claim to recoup damages for harm caused to the Company by unlawful

activity represents a challenge to conduct that is outside the scope of the Board's business

judgment – conduct for which the Board should face potential personal liability.  Simply put,

committing crimes, approving the commission of crimes by others, or looking the other way

while refusing to prevent others under the Board's control from committing crimes are all forms

of misconduct that cannot under any circumstances be examples of legitimate business conduct.

The protections of the "business judgment rule" do not extend to such malfeasance or

misfeasance.  Nor can such malfeasance or misfeasance ever constitute the "good faith" required

of corporate fiduciaries.

100.    A majority of the current members of the Board served as directors while the

violations were occurring and/or being covered-up (which persisted until very recently).  As

such, they had an obligation to remediate (including requiring further investigation).  Their

decision not to do so cannot be regarded as a valid exercise of business judgment.

101.    There is no legitimate "business judgment" involved in devising or carrying out

the unlawful bribery policy, or in continuing to conceal such acts.  Accordingly, demand on the

Board is futile and excused.

   **B. Demand is Excused Because a Majority of the Current Board Members are
       Conflicted by a Substantial Likelihood of Liability Arising from Their
       Misconduct**

102.    Even if knowingly refusing to remediate criminal misconduct could somehow fall

within the ambit of the business judgment rule, demand is also futile and excused because a majority

of the members of the current Board are not disinterested or independent and cannot, therefore,

properly consider or investigate any demand to prosecute this action.

103.     Specifically, eight (8) of the current members of the Board face a substantial likelihood of liability because they each began their service on the Board by 2005 and, thus, were directors at the time of the investigation into the bribery scheme and the subsequent cover-up.

104.     As alleged herein, the Board must have (or at least should have) known of the FCPA violations Wal-Mart was committing in Mexico and the related cover-up.

105.     These Defendants were required to act upon this information to protect the Company from continued legal violations being committed in its name.  Rather than acting, these Defendants, in violation of their fiduciary duties, willfully ignored and covered-up the information presented to them.  To the extent that some of the defendants did not know of the wrongdoing, it is as a result of their own fiduciary failures.  Defendants had an obligation to monitor and oversee the Company's compliance with applicable law; their sustained and conscious failure to attend to these duties, as described herein, is to blame for any lack of information about problems requiring their attention.  As a result, these Defendants face a substantial likelihood of liability for their conduct and demand is, therefore, excused.[3]

106.     The Director Defendants are conflicted from and unable to pursue the Company's claims against the Executive Defendants.  Any effort by the Director Defendants to hold the Executive Defendants liable would likely lead the Executive Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established and by and known to the Board.

---

[3]     Executives of several companies – including but not limited to Ports Engineering Consultants Corporation (87 months), Latin Node Inc. (46 months), KBR Inc. (30 months), and Willbros International Inc. (15 and 12 months) – have recently been sentenced to lengthy prison terms for bribery schemes in violation of the FCPA.

## COUNT I

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY FOR DISREGARDING AND COVERING-UP WIDESPREAD VIOLATIONS OF LAW

### (Against all Defendants)

107.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.     The Defendants all owed and owe fiduciary duties to Wal-Mart and its shareholders.  By reason of their fiduciary relationships, Defendants specifically owed and owe Wal-Mart the highest obligation of loyalty and due care in the administration of the affairs of Wal-Mart, including the oversight of Wal-Mart's compliance with federal laws.  Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company alleged herein.

109.     The Defendants consciously breached their corporate duties and responsibilities as stated herein.

110.     As a direct and proximate result of the Defendants' conscious failure to perform their fiduciary obligations, Wal-Mart has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

111.     Plaintiff, on behalf of Wal-Mart, has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

a.  Determining that this action is a proper derivative action maintainable under law and demand is excused;

b.  Awarding, against all Defendants and in favor of Wal-Mart, the damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

c.  Enjoining Defendants from further violating their fiduciary duties as described herein;

d.  Awarding to Wal-Mart restitution from Defendants, and from each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

e.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f.  Granting such other and further relief as the Court deems just and proper.

ROSENTHAL, MONHAIT & GODDESS, P.A.

Jessica Zeldin (Del. Bar No. 3558)
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433

*Counsel for Plaintiff*

OF COUNSEL:

BERGER & MONTAGUE, P.C
Lawrence Deutsch
Robin Switzenbaum
Jacob M. Polakoff
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

BRAGAR WEXLER EAGEL & SQUIRE, P.C.
Lawrence P. Eagel
Jeffrey H. Squire
Justin Kuehn
885 Third Avenue, Suite 3040
New York, NY 10022
(212) 308-5858

April 27, 2012

**EXHIBIT F**

EFiled: May 1 2012 9:41AM EDT
Transaction ID 43985227
Case No. 7477-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PAULA GERBER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. _____ |
| ) | |
| AIDA M. ALVAREZ, JAMES W. BREYER, ) | |
| M. MICHELE BURNS, JAMES I. CASH, JR., ) | |
| ROGER C. CORBETT, DOUGLAS N. DAFT, ) | |
| MICHAEL T. DUKE, GREGORY B. PENNER, ) | |
| STEVEN S. REINEMUND, H. LEE SCOTT, JR., ) | |
| ARNE M. SORENSON, JIM C. WALTON, ) | |
| S. ROBSON WALTON, CHRISTOPHER J. ) | |
| WILLIAMS, LINDA S. WOLF, THOMAS M. ) | |
| COUGHLIN, DAVID D. GLASS, ROLAND A. ) | |
| HERNANDEZ, JOHN D. OPIE, J. PAUL ) | |
| REASON, JACK C. SHEWMAKER, JOSE H. ) | |
| VILLARREAL, EDUARDO CASTRO-WRIGHT, ) | |
| THOMAS A. MARS, JOSE LUIS ) | |
| RODRIGUEZMACEDO RIVERA, and ) | |
| EDUARDO F. SOLORZANO MORALES, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| WAL-MART STORES, INC., a Delaware ) | |
| Corporation, ) | |
| ) | |
| Nominal Defendant. ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

This is a verified shareholder derivative action brought by plaintiff Paula Gerber ("Plaintiff") for the benefit of nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") against certain current or former members of Wal-Mart's board of directors (the "Board") and certain Wal-Mart executives (collectively "Defendants") for breaches of their fiduciary duties owed to Wal-Mart and its shareholders. Defendants breached their fiduciary

duties by causing and/or allowing Wal-Mart and its employees to engage in the systematic practice of bribing foreign officials in Mexico to obtain construction permits in violation of the Foreign Corrupt Practices Act ("FCPA"), and by curtailing and covering up an investigation into the bribery practices. The allegations in this shareholder derivative complaint ("Complaint") are made upon Plaintiff's personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, among other things, the investigation by counsel retained by Plaintiff, including a review of publicly available information, Securities and Exchange Commission ("SEC") filings by Wal-Mart, media reports about Wal-Mart, and Company reports.

## I.    INTRODUCTION

1.  Wal-Mart, which had mainly operated retail stores in the United States, began operations in Mexico in 1991, with the opening of a Sam's Club. During the two decades since, Walmart de México ("WalMex") has experienced tremendous growth. As of February 29, 2012, Wal-Mart owned 2,099 stores in Mexico and employed approximately 200,000 people in the country. One in five Wal-Mart stores today is in Mexico, making WalMex a significant success story.

2.  Wal-Mart's rapid expansion in Mexico was the product of illegal actions. For years, Wal-Mart engaged in a wide-ranging practice of bribing foreign officials in Mexico in order to secure zoning approvals, reductions in environmental impact fees and the allegiance of neighborhood leaders, in an effort to build so fast that competitors could not keep up.[1]

3.  Though an initial internal investigation unearthed evidence of widespread bribery, with a paper trail of more than $24 million in suspect payments, about which WalMex's top executives

---

[1]    *See* David Barstow, "Vast Mexico Bribery Case Hushed Up by Wal-Mart After Top-Level Struggle," The New York Times (April 21, 2012), *available at*: http://www.nytimes.com/2012/04/22/business/at-wal-mart-in-mexico-a-bribe-inquiry-silenced.html (last visited April 23, 2012) ("*New York Times Report*").

had extensive knowledge, when it was recommended that Wal-Mart expand the investigation, the Defendants instead halted it and held no one accountable.

4. Shockingly, WalMex's chief executive at the peak of the bribery scheme was promoted to President and CEO of Wal-Mart Stores USA and is now vice chairman of Wal-Mart.

5. Defendants' conduct represents a breach of Defendants' fiduciary duties that caused significant harm to the Company and for which they must be held accountable.

6. As explained herein and will be shown at trial, the criminal bribery conduct was affirmatively adopted as Wal-Mart's business strategy, and there is the suggestion in press reports that Wal-Mart is using the same conduct in China.

7. As a result of the Defendants' actions, the Company has already suffered, and will continue to suffer, substantial financial damage. The Company's goodwill and reputation has also been damaged by the Defendants' actions. The Company will now likely have to spend hundreds of millions of dollars on investigations into the bribery scheme and cover-up, and may have to pay substantial government fines. Investigations by the United States Department of Justice ("DOJ") and the SEC could result in criminal indictments and/or civil enforcement actions, either of which could impair the Company. In addition, Mexican authorities have initiated their own investigation into the bribery scheme. Media reports suggest that fines could be as high as $4.5 billion.

8. Since the Company remains under the control and/or influence of many of the primary wrongdoers who: (1) have substantial conflicts, and/or (2) may be implicated in the commission of the wrongful conduct alleged herein, Wal-Mart is unable to protect itself or remedy the wrongs inflicted upon it. Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of Wal-Mart, as any demand would be futile.

9.  This action seeks restitution to Wal-Mart for the bribery of foreign officials in Mexico in contravention to the FCPA, and for the costs and expenses that will be paid by the Company as a result of Defendants' wrongdoing.  This action also seeks to enjoin Defendants from future violations of their fiduciary duties.

## II.  THE PARTIES

### A. Plaintiff

10. Plaintiff, Paula Gerber, is a current shareholder of the Company, was a shareholder at the time of the misconduct complained of herein, and intends to continue to hold Wal-Mart shares at least through the resolution of this action.

### B. The Nominal Corporate Defendant

11. Nominal defendant Wal-Mart Stores, Inc., a Delaware corporation with headquarters located in Bentonville, Arkansas, is a multinational retailer.  Wal-Mart securities are registered with the SEC under Section 12(b) of the Exchange Act and its common stock trades on the New York Stock Exchange under the symbol "WMT."  Wal-Mart serves customers and members more than 200 million times per week at over 10,000 retail outlets under 69 different banners in 27 countries.  Wal-Mart has more than 2 million employees worldwide and had fiscal year 2012 sales of approximately $444 billion.  Wal-Mart's website professes that the Company is "known for [its] unique corporate culture.  Sam Walton built [Wal-Mart's] business on values and morals.  Those rules and customs have helped [Wal-Mart] become one of the world's most admired companies."

12. Wal-Mart conducts its operations in Mexico through Walmart de México and Central America. WalMex started as a joint venture with Cifra in 1991, making Mexico the first country in Wal-Mart's International division.  In 1997, Wal-Mart acquired a majority of Cifra, and in February 2000, the Cifra name officially changed to Walmart de México.  WalMex's

4

headquarters are located in Mexico City.  Its current president and CEO is Scot Rank.  As of February 29, 2012, Wal-Mart had 2,099 outlets employing approximately 200,000 associates in Mexico.

### C. The Board of Directors

13. Wal-Mart's Board maintains several standing committees on which its directors serve. These standing committees include the Audit Committee; the Compensation, Nominating and Governance Committee; the Executive Committee; the Global Compensation Committee; the Strategic Planning and Finance Committee; and the Technology and eCommerce Committee.

14. Defendant Aida M. Alvarez ("Alvarez") has served as a director of the Company since 2006.  She currently serves as a member of the Audit Committee.  Her total director compensation for fiscal 2012 was $234,985.

15. Defendant James W. Breyer ("Breyer") has served as a director of the Company since 2001.  He currently serves as a member of the Strategic Planning and Finance Committee and the Technology and eCommerce Committee.  His total director compensation for fiscal 2012 was $261,523.

16. Defendant M. Michele Burns ("Burns") has served as a director of the Company since 2003.  She currently serves as the chairperson of the Strategic Planning and Finance Committee. Her total director compensation for fiscal 2012 was $256,256.

17. Defendant James I. Cash, Jr. ("Cash") has served as a director of the Company since 2006.  He currently serves as a member of the Audit Committee and the Technology and eCommerce Committee.  His total director compensation for fiscal 2012 was $244,825.

18. Defendant Roger C. Corbett ("Corbett") has served as a director of the Company since 2006.  He currently serves as a member of the Strategic Planning and Finance Committee.  His total director compensation for fiscal 2012 was $288,251.

19. Defendant Douglas N. Daft ("Daft") has served as a director of the Company since 2005. He currently serves as a member of the Compensation, Nominating and Governance Committee. His total director compensation for fiscal 2012 was $241,575.

20. Defendant Michael T. Duke ("Duke") has served as a director of the Company since 2008. Duke is the President and CEO of Wal-Mart and has served in that position since February 1, 2009. Since joining the Company in July 1995, he held other positions, including Vice Chairman with responsibility for Walmart International beginning in September 2005 and Executive Vice President and President and CEO of Walmart US beginning in April 2003. He currently serves as the chairperson of the Executive Committee and the Global Compensation Committee. His total compensation for fiscal 2012 was $18,131,738.

21. Defendant Gregory B. Penner ("Penner") has served as a director of the Company since 2008. From 2002 to 2005, he served as Wal-Mart's Senior Vice President and CFO – Japan. Before serving in that role, Penner held the position of Senior Vice President of Finance and Strategy for Walmart.com. He currently serves as a member of the Global Compensation Committee and as the chairperson of the Technology and eCommerce Committee. His total director compensation for fiscal 2012 was $255,177. Penner is the son-in-law of defendant S. Robson Walton.

22. Defendant Steven S. Reinemund ("Reinemund") has served as a director of the Company since 2010. He currently serves as a member of the Compensation, Nominating and Governance Committee. His total director compensation for fiscal 2012 was $234,985.

23. Defendant H. Lee Scott, Jr. ("Scott") has served as a director of the Company since 1999. Scott was Wal-Mart's President and CEO from January 2000 through January 31, 2009. Scott served as an Executive Officer of Wal-Mart and as the Chairman of the Executive Committee until January 31, 2011. Since joining the Company in September 1979, he held other positions

with Wal-Mart, including Vice Chairman and Chief Operating Officer from January 1999 to January 2000, and Executive Vice President and President and CEO, Walmart US from January 1998 to January 1999. He currently serves as a member of the Strategic Planning and Finance Committee. His total director compensation for fiscal 2012 was $229,819.

24. Defendant Arne M. Sorenson ("Sorenson") has served as a director of the Company since 2008. He currently serves as a member of the Audit Committee. His total director compensation for fiscal 2012 was $234,985.

25. Defendant Jim C. Walton ("Jim Walton") has served as a director of the Company since 2005. He currently serves as a member of the Strategic Planning and Finance Committee. His total director compensation for fiscal 2012 was $235,424. Jim Walton is the brother of defendant S. Robson Walton.

26. Defendant S. Robson Walton ("Rob Walton") has served as a director of the Company since 1978. Rob Walton has been the Chairman of Wal-Mart since 1992. He joined the Company in 1969 and, prior to becoming Chairman, held a variety of positions with the Company, including Senior Vice President, Corporate Secretary, General Counsel and Vice Chairman. He currently serves as a member of the Executive Committee and the Global Compensation Committee. Rob Walton is the brother of defendant Jim Walton.

27. Defendant Christopher J. Williams ("Williams") has served as a director of the Company since 2004. He currently serves as the chairperson of the Audit Committee and as a member of the Executive Committee. His total director compensation for fiscal 2012 was $276,433.

28. Defendant Linda S. Wolf ("Wolf") has served as a director of the Company since 2005. She currently serves as the chairperson of the Compensation, Nominating and Governance Committee and as a member of the Technology and eCommerce Committee. Her total director compensation for fiscal 2012 was $269,616.

29. Defendants Alvarez, Breyer, Burns, Cash, Corbett, Daft, Duke, Penner, Reinemund, Scott, Sorenson, Jim Walton, Rob Walton, Williams and Wolf comprise the current directors on the Board, and are collectively referred to as the "Director Defendants."

### D. Former Directors

30. Defendant Thomas M. Coughlin ("Coughlin") served as a director of the Company from 2001 to 2005. Coughlin was Vice Chairman of the Board from 2003 to 2005. He held various positions with Wal-Mart beginning in 1978, including Executive Vice President and Vice Chairman of Wal-Mart Stores, Inc. (USA) from April 2003 to June 2003, Executive Vice President and President and Chief Executive Officer of Wal-Mart Stores Division and SAM'S CLUB USA from 2002 to 2003, Executive Vice President and President and Chief Executive Officer, Wal-Mart Stores Division, from 1999 to 2002, and Executive Vice President and Chief Operating Officer, Wal-Mart Stores Division, from 1998 to 1999. In fiscal 2005, he served as a member of the Executive Committee and the Strategic Planning and Finance Committee.

31. Defendant David D. Glass ("Glass") served as a director of the Company from 1977 to 2009. Glass was Wal-Mart's President and CEO from January 1988 to January 2000. In fiscal 2006, he served as the chairperson of the Executive Committee, a position he had held since 2000. In fiscal 2006, he also served as a member of the Stock Option Committee.

32. Defendant Roland A. Hernandez ("Hernandez") served as a director of the Company from 1998 to 2008. In fiscal 2006, he served as the chairperson of the Audit Committee. His total director compensation for fiscal 2006 was $231,788.

33. Defendant John D. Opie ("Opie") served as a director of the Company from 2003 to 2006. In fiscal 2006, he served as a member of the Compensation, Nominating and Governance Committee. His total director compensation for fiscal 2006 was $200,013.

8

34. Defendant J. Paul Reason ("Reason") served as a director of the Company from 2001 to 2006. In fiscal 2006, he served as a member of the Audit Committee. His total director compensation for fiscal 2006 was $205,752.

35. Defendant Jack C. Shewmaker ("Shewmaker") served as a director of the Company from 1977 to 2008. He was a Wal-Mart executive until 1988. In fiscal 2006, he served as a member of the Strategic Planning and Finance Committee. His total director compensation for fiscal 2006 was $201,578.

36. Defendant José H. Villarreal ("Villarreal") served as a director of the Company from 1998 to 2006. In fiscal 2006, he served as the chairperson of the Compensation, Nominating and Governance Committee. His total director compensation for fiscal 2006 was $218,812.

37. Defendants Coughlin, Glass, Hernandez, Opie, Reason, Shewmaker and Villarreal are collectively referred to as the "Former Director Defendants."

### E. Senior Executives

38. As detailed below, some of Wal-Mart's senior management were directly involved with the bribery in Mexico or notified of the bribery in Mexico and failed to act. Additionally, several top executives at WalMex were complicit in the bribery scheme.

39. Defendant Eduardo Castro-Wright ("Castro") is a former Chief Executive of WalMex. Castro was identified by a former executive as the driving force behind years of bribery. He was promoted to Executive Vice President of the Company and President and CEO of Wal-Mart Stores USA in September 2005 and is now vice chairman of Wal-Mart.

40. Defendant Michael T. Duke ("Duke"), Wal-Mart's current Chief Executive, was vice chairman of the Company, with responsibility for Walmart International from 2005 to February 2009. On October 15, 2006, a top Wal-Mart lawyer wrote to Duke giving a detailed description

of a former executive's WalMex allegations, noting that Duke would "want to read this."  Duke visited Mexico City during the investigation.  Duke is also named as a Director Defendant.

41. Defendant Thomas A. Mars ("Mars") was Wal-Mart's general counsel from 2002 to 2009, as such, he served as the company's chief legal officer.  He is currently executive vice president and chief administrative officer for Walmart U.S.  Mars received detailed memos from the general counsel of Wal-Mart International regarding the bribery of foreign officials.  Mars was present at the February 3, 2006, meeting where Wal-Mart management decided whether the investigation should go forward and worked on the "modified protocol" for internal investigations.

42. Defendant José Luis Rodríguezmacedo Rivera ("Rodríguezmacedo") was the general counsel of WalMex.  He was senior vice president for legal, ethics and compliance at WalMex until he was reassigned on April 20, 2012.

43. Defendant H. Lee Scott Jr. ("Scott") was Wal-Mart's President and CEO from January 2000 through January 31, 2009.  Scott rebuked internal investigators for being overly aggressive.  Scott called for the February 3, 2006, meeting where Wal-Mart management decided whether the investigation should go forward and ordered the "modified protocol" for internal investigations.  Scott is also named as a Director Defendant.

44. Defendant Eduardo F. Solórzano Morales ("Solórzano") was the chief executive of WalMex after Castro's promotion.  Solórzano attempted to impede the bribery investigation.

45. Defendants Castro, Duke, Mars, Rodríguezmacedo, Scott, and Solórzano are collectively referred to as the "Executive Defendants."

46. The Director Defendants, the Former Director Defendants and the Executive Defendants are collectively referred to as "Defendants."

III.   **FACTUAL BACKGROUND**

### A.   The Specific Fiduciary Duties of Wal-Mart's Management and Board

47. Under Delaware law, Wal-Mart's senior management and directors on the Board have fiduciary duties to the Company and its shareholders, including the duties of loyalty and care. In addition, Wal-Mart's corporate documents (such as the "Walmart Statement of Ethics") expressly detail the requirements of the Board's duties, requiring, among other things, that the Board must "[n]ever cover up or ignore any ethical conduct problem. Address the matter in a timely manner and seek guidance if necessary."

48. To implement this philosophy, the Company maintains, and directors are obligated to follow, formal "Corporate Governance Guidelines," which are articulated by the Compensation, Nominating and Governance Committee of the Board. The Corporate Governance Guidelines place ultimate decision-making authority for the Company with the Board and explicitly require and establish mechanisms for the Board to be continuously informed with respect to the Company's important business affairs. As stated in the Corporate Governance Guidelines:

> The specific duties and responsibilities of the Board will include, among other things, overseeing the management of the business and affairs of the Company; ... reviewing and, where appropriate, approving the business plans, major strategies and financial objectives of the Company; evaluating Board processes and performance and the overall effectiveness of the Board; evaluating the performance of the Company and of senior management; ... **reviewing compliance with applicable laws and regulations and adopting policies of corporate conduct to assure compliance with applicable laws and regulations** and to assure maintenance of necessary accounting, financial, and other controls; and showing, through its actions, its awareness that the Company's long-term success depends upon its strong relationship with its customers, associates, suppliers and the communities, including the global community, in which it operates.

(Emphasis added.)

49. According to the Audit Committee's Charter, a core responsibility of the Audit Committee is to "assist the Board in monitoring…the compliance by the Company with legal and regulatory requirements."

50. The Compensation, Nominating and Governance Committee is also specifically charged with "assist[ing] the Board in the implementation of sound corporate governance principles and practices."

51. Defendants' misconduct related to bribing foreign officials in violation of the Foreign Corrupt Practices Act, the subsequent cover-up, and consciously failing to monitor for such conduct is completely inconsistent with the fiduciary duties that all Wal-Mart directors and senior management undertake as a condition to accepting their positions with the Company.

**B. Wal-Mart's Practice of Bribing Foreign Officials In Violation of the Foreign Corrupt Practices Act**

52. The anti-bribery provisions of the FCPA make it unlawful to make a payment to a foreign official for purposes "influencing any act or decision of such foreign official in his official capacity…." The statute defines foreign official as: "any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization." 15 U.S.C. § 78dd-1.

53. The FCPA, including its anti-bribery provisions, applied to Wal-Mart's overseas business.

54. In 2004, at the urging of Maritza I. Munich ("Munich"), then general counsel of Wal-Mart International, the Wal-Mart Board adopted an anti-corruption policy that prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart."

The policy required every employee to report the first sign of corruption, and it bound Wal-Mart's agents to the same exacting standards.

55. Additionally, the vigorous enforcement of the FCPA has been a well-publicized, top priority for the U.S. Government since its enactment into law by Congress in 1977. Since the terrorist attacks of September 11, 2001, the SEC and DOJ's enforcement of the FCPA has only intensified. SEC and DOJ enforcement actions, large FCPA settlements and countless media reports in the financial press regarding the FCPA, all alerted Defendants to the importance of, and need to secure, Wal-Mart's full compliance with the FCPA.

56. Section 307 of the Sarbanes-Oxley Act of 2002 required the SEC to adopt minimum standards of professional conduct for attorneys at companies that issue securities. Under the standards prescribed, an attorney that has evidence of a material violation of law must report that evidence "up-the-ladder" to the chief legal counsel or chief executive officer at the company. If those individuals do not respond appropriately to the evidence, the attorney must report the evidence to the audit committee, another committee of independent directors, or the full board of directors.

### C. Wal-Mart's Payment of Bribes to Foreign Officials In Mexico Comes to Light

57. On April 21, 2012, *The New York Times* published an article exposing WalMex's campaign of bribery that was orchestrated to win market dominance in Mexico, as well as to procure confidential information and eliminate fines. As described by Sergio Cicero Zapata ("Cicero"), a former WalMex executive in the real estate department, and as corroborated by others and by documents, WalMex paid bribes to obtain permits in virtually every corner of Mexico in order to secure zoning approvals, reductions in environmental impact fees and the allegiance of neighborhood leaders. WalMex targeted mayors and city council members,

13

obscure urban planners, and low-level bureaucrats who issued permits – anyone with the power to thwart Wal-Mart's growth.

58. On September 21, 2005, Cicero emailed Munich, then general counsel of Wal-Mart International, to come forward about irregularities at the highest levels of WalMex. In response, Munich hired a prominent Mexico City attorney to debrief Cicero. Cicero and the attorney met three times in October 2005, with Munich travelling from Bentonville to attend the third debriefing.

59. During these debriefings, Cicero implicated many WalMex executives – including its board chairman, general counsel, chief auditor and top real estate executive – in the bribery scheme, and described how it was also hidden in fraudulent accounting.

60. Cicero pointed to defendant Castro, WalMex's CEO, as the person most responsible for the bribes. This was not the first indication of corruption at WalMex under Castro. A 2003, Kroll Inc. investigation discovered that WalMex "had systematically increased its sales by helping favored high-volume customers evade sales taxes." The investigation concluded that top WalMex executives "had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Wal-Mart de Mexico was 'carrying out a tax fraud.' (The Company ultimately paid $34.3 million in back taxes.)," according to *The New York Times*. Kroll determined that WalMex's internal audit and antifraud units were "ineffective." Yet, many of the employees implicated were not even questioned and some even received promotions.

61. Under Castro's leadership, WalMex executives were under pressure to do "whatever was necessary" to obtain permits. The strategy was for WalMex to build hundreds of new stores so fast that competitors would be left in the dust. The bribes accelerated growth by getting zoning

maps changed and disposing of environmental objections. Permits that normally would have taken months, took only days to obtain.

62. WalMex funneled its bribes through "*gestores*" who took a fee to put the bribes in the right hands. These *gestores* submitted invoices with codes known by top WalMex executives. The codes included the items that went beyond facilitation of permits.

63. According to Cicero, Castro and other top WalMex executives "received a detailed schedule of all of the payments performed," each month. WalMex then "purified" the bribes in accounting records as simple legal fees.

64. At the time of Cicero's debriefings, Wal-Mart's current CEO, defendant Michael T. Duke, was vice chairman of the Company, in charge of Wal-Mart International. Duke was kept abreast of the interviews, receiving an email on October 15, 2005, with a detailed description of Cicero's allegations.

### D. Wal-Mart Opts Against a Thorough Investigation by an Independent Party

65. Following Cicero's debriefing, Munich sent detailed memos to senior management at Wal-Mart, including defendant Mars, then general counsel of Wal-Mart; Thomas D. Hyde, then Wal-Mart EVP and corporate secretary; Michael Fung, then Wal-Mart's top internal auditor; Craig Herkert, then Wal-Mart's Latin America chief; and Lee Stucky, then chief administrative officer of Wal-Mart International. As general counsel of Wal-Mart International, under the Sarbanes-Oxley Act, Munich was also responsible for reporting to the Board's Audit Committee, another committee of independent directors, or the full Board, if defendant Mars did not respond appropriately to the evidence. Accordingly, the Board must (or at least should) have known of these issues. If the Board did not, such lack of information reflects a failure of the Company's reporting systems for which the Board bears responsibility.

66. In response, Wal-Mart initially turned to Willkie Farr & Gallagher, a law firm with extensive experience in Foreign Corrupt Practices Act cases ("Willkie Farr"). Willkie Farr, according to the *New York Times Report*, "recommended the kind of independent, spare-no-expense investigation major corporations routinely undertake when confronted with allegations of serious wrongdoing by top executives." Given the seriousness of the allegations and the magnitude of the proposed investigation, the Board must (or at least should) have known of the recommendation and the wrongdoing. If the Board did not, their failure to be involved reflects another failure of the Company's reporting systems.

67. Yet, the idea of allowing Willkie Farr, a neutral party, to thoroughly investigate was rejected and instead there was a decision to conduct a far more limited investigation in-house, giving Wal-Mart's senior management direct control over the investigation. This decision to allow the proverbial fox to guard the hen house reflects an utter failure to attend to fiduciary obligations and another sustained failure of Wal-Mart's reporting systems for which the Board bears responsibility.

68. The internal investigation was led by Ronald Halter ("Halter"), a new investigator at Wal-Mart, with the help of Bob Ainley ("Ainley"), a senior auditor.

69. Halter's team started their investigation on November 12, 2005, at WalMex headquarters in Mexico City. By the end of the day, they found evidence of 441 *gestor* payments, even though they had only searched back to 2003. Significantly, the records showed payments of $8.5 million to the two *gestores* named by Cicero in his debriefings.

70. Halter passed his team's findings on to Joseph R. Lewis ("Lewis"), Wal-Mart's director of corporate investigations. Lewis alerted his boss, Kenneth H. Senser ("Senser"), Wal-Mart's vice president for global security, aviation and travel, that it was "not looking good."

71. Halter's team quickly confirmed that Castro and other top WalMex executives were well aware of the *gestor* payments. A March 2004 WalMex audit that Halter's team came across documented millions of dollars of *gestor* payments intended to facilitate new store permits. Halter noted that not long after the audit was completed, the auditor was fired, again reflecting a serious flaw in Wal-Mart's monitoring systems.

72. Instead of shutting down the bribery scheme defendant Rodríguezmacedo, the general counsel of WalMex, worried about becoming too dependent on too few *gestores*. He told Cicero to come up with a plan to diversify the *gestores* used, noting that Castro wanted to "implement this plan as soon as possible."[2]

73. The bribery did not stop with *gestores*, in fact it went much further. As Halter's team discovered, WalMex was making large payments directly to governments all over Mexico, to the tune of nearly $16 million in all between 2003 and 2005.

74. Upon the conclusion of their investigation, in December 2005, Halter and Ainley wrote confidential reports to Wal-Mart's top executives. They laid out all the evidence that corroborated Cicero – hundreds of *gestor* payments, mystery accounting codes, rewritten audits, evasive responses from WalMex executives, donations for permits, and evidence *gestores* were still being used.

75. Halter concluded that, "[t]here is **reasonable suspicion to believe that Mexican and USA laws have been violated**," and that there was "no defendable explanation" for the millions of dollars in *gestor* payments. (Emphasis added.) This is the sort of report that would have, or at least should have, been sent to the Board under the requirements of the Sarbanes-Oxley Act and

---

[2]      Rodríguezmacedo declined to comment for the *New York Times Report*. On April 20, 2012, Wal-Mart disclosed that Rodríguezmacedo had been reassigned and is no longer WalMex's general counsel.

Wal-Mart's corporate governance documents.  To the extent it was not, the Board is once again to be faulted for utterly failing to ensure that appropriate reporting systems were in place.

76. Halter recommended a deeper investigation, including a reconstruction of Cicero's computer history, a thorough investigation of the two main *gestores*, and interviews of senior WalMex executives.

### E.  Instead of Expanding the Investigation as Recommended, Defendants' Shut it Down and Covered it Up

77. Despite the fact that Wal-Mart's own investigator recommended in 2005 that Wal-Mart expand the bribery investigation, just the opposite was done – yet again reflecting a sustained breakdown in the reporting systems for which Defendants were responsible.

78. In January 2006, the Company weighed whether to accept Halter's recommendations and approve a full investigation.

79. Around this time, Munich wrote a memo arguing for expanding the bribery investigation, noting that "[t]he bribery of government officials is a criminal offense in Mexico."  Munich was aware that Wal-Mart management was not responding appropriately to the evidence of the material violations of law and that the Sarbanes-Oxley Act required her to report to the Board's Audit Committee, another committee of independent directors, or the full Board.

80. Munich resigned from Wal-Mart.  Sarbanes-Oxley allows (and in some cases requires) lawyers to make a "noisy" withdrawal when the lawyer has not received an appropriate response to a report of wrongdoing.

81. Defendant Scott called a meeting for February 3, 2006, in order to discuss the options for the Mexico investigation.  Defendant Mars, among others, attended the meeting.  At the conclusion of the meeting, Senser and Mars were ordered to quickly develop a "modified protocol" for internal investigations.  Within 24 hours they came up with a new protocol that

18

gave senior Wal-Mart executives more control over internal investigations. This included executives at the business units being investigated. The new protocol enabled the investigation to be halted and covered-up, further evidencing the Board's sustained failure to ensure adequate reporting at the Company.

82. On the same day Senser was putting the finishing touches on the new investigations protocol, Wal-Mart's ethics office sent him a booklet of "best practices" for internal investigations. It had been put together by lawyers and executives who supervised investigations at Fortune 500 companies. "Investigations should be conducted by individuals who do not have any vested interest in the potential outcomes of the investigation," it said, according to the *New York Times Report*.

83. Within days, control of the bribery investigation was given to one of its earliest targets – defendant Rodríguezmacedo, the general counsel of WalMex who was alleged to have taken part in the bribery himself. Once again, Defendants' allowance of the proverbial fox to guard the hen house reflects an utter failure to exercise oversight over issues of great magnitude.

84. As Munich put it in an e-mail, "[t]he wisdom of assigning any investigative role to management of the business unit being investigated escapes me."

85. On Rodríguezmacedo's watch, the case was wrapped up in a few weeks, with little additional investigation. Despite the large amount of information discovered earlier, Rodríguezmacedo's report concluded that there was "no evidence or clear indication of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits." His report explained that his conclusion was largely based on the denials of his fellow executives. He wrote that not one executive "mentioned having ordered or given bribes to government authorities."

86. Rodríguezmacedo submitted a draft of his report to Wal-Mart headquarters. Despite the fact that Lewis told his superiors that he found the report "lacking," it was good enough for Wal-Mart, which accepted the report as the last word on the matter. Rodríguezmacedo was told on May 10, 2006, to put his report "into final form, thus concluding this investigation."

87. As a result of the Defendants' sustained inattention to remedying the problem, none of WalMex's leaders were disciplined. In fact, Castro, was promoted to President and CEO of Wal-Mart Stores USA and is now vice chairman of Wal-Mart.

88. The system of bribery in Mexico and Wal-Mart's investigation were not publicly disclosed by Wal-Mart. Rather, Wal-Mart directors and executives swept the issue under the rug, where it remained for nearly six years until *The New York Times* started investigating the matter in late-2011.

**F. The Foreign Bribery Scheme and Subsequent Cover-Up in Mexico is the Result of the Defendants' Conscious Breach of Their Duties**

89. Defendants' conscious failure to implement an internal controls system to detect and prevent the illegal payment of bribes in Mexico, along with Defendants' conscious failure to act once the bribery scheme was exposed, has severely damaged and will likely in the future damage Wal-Mart and its business, goodwill and reputation. The Company has and is likely to suffer substantial damages while investigating the cover-up, remediating the compliance violations, as well as paying any fines imposed.

90. Defendants thereby knowingly violated their fiduciary duties of loyalty and care, and permitted and covered-up the illegal behavior. Defendants' breaches of fiduciary duty placed the Company and its shareholders at serious risk, and has and will harm the Company financially.

## IV.    DEFENDANTS CONCEALED THEIR WRONGDOING FROM WAL-MART SHAREHOLDERS

91. Defendants concealed the facts pertaining to Wal-Mart's FCPA violations in Mexico, along with the fact that an internal investigation discovered the bribery scheme only to be covered-up. Misleading investors and the public at large, Wal-Mart's annual reports and proxy statements have never mentioned any of the specific facts at issue here.

92. In fact, it was not until December 2011 – five-and-a-half years after sanctioning the cover-up of the bribery investigation – that Wal-Mart executives and directors, after being alerted to *The New York Times'* on-going investigation, informed the DOJ and SEC that Wal-Mart had begun an internal investigation into possible violations of the FCPA.

93. On December 8, 2011, Wal-Mart filed its 10-Q with the SEC. In the filing, Wal-Mart included the following statement:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act.
> The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters. However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

## V.    DEMAND ON THE BOARD OF DIRECTORS WOULD BE FUTILE

94. Plaintiff brings this action derivatively in the right and for the benefit of Wal-Mart to redress the breaches of fiduciary duty and other violations of law by Defendants as alleged herein.

95. Plaintiff will adequately and fairly represent the interests of Wal-Mart and its shareholders in enforcing and prosecuting their rights, and she has retained counsel experienced in prosecuting this type of action.

96. Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

97. At the time this action was initiated, the Board was comprised of fifteen (15) directors: defendants Alvarez, Breyer, Burns, Cash, Corbett, Daft, Duke, Penner, Reinemund, Scott, Sorenson, Jim Walton, Rob Walton, Williams and Wolf (defined earlier as the "Director Defendants"). Plaintiff did not issue a demand upon the Director Defendants prior to instituting this action because a majority of the Director Defendants either: (a) engaged in conduct that is not a legitimate exercise of judgment and/or is *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (b) would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in Wal-Mart's improper conduct.

### A. Demand is Excused Because the Director Defendants' Conduct is Not a Valid Exercise of Business Judgment

98. The Director Defendants' challenged misconduct at the heart of this case constitutes the direct concealment of criminal activity. As a result of the internal investigation, and the requirements placed on Wal-Mart's attorneys by the Sarbanes-Oxley Act, the Defendants knew, or should have known, that WalMex's system of bribery and subsequent cover-up could damage the Company and its reputation as well as its shareholders. In essence, as the "ultimate decision making body" of the Company, the Board affirmatively condoned by consciously refusing to remediate a business strategy based on deliberate, widespread, and often criminal violations of

law.  Such conduct may be on-going in other parts of the world.  Accordingly, demand on the Board is excused.

99. A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which the Board should face potential personal liability.  Simply put, committing crimes, approving the commission of crimes by others, or looking the other way while refusing to prevent others under the Board's control from committing crimes are all forms of misconduct that cannot under any circumstances be examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance or misfeasance.  Nor can such malfeasance or misfeasance ever constitute the "good faith" required of corporate fiduciaries.

100.    A majority of the current members of the Board served as directors while the violations were occurring and/or being covered-up (which persisted until very recently).   As such, they had an obligation to remediate (including requiring further investigation).   Their decision not to do so cannot be regarded as a valid exercise of business judgment.

101.    There is no legitimate "business judgment" involved in devising or carrying out the unlawful bribery policy, or in continuing to conceal such acts.  Accordingly, demand on the Board is futile and excused.

**B. Demand is Excused Because a Majority of the Current Board Members are Conflicted by a Substantial Likelihood of Liability Arising from Their Misconduct**

102.    Even if knowingly refusing to remediate criminal misconduct could somehow fall within the ambit of the business judgment rule, demand is also futile and excused because a majority of the members of the current Board are not disinterested or independent and cannot, therefore, properly consider or investigate any demand to prosecute this action.

23

103.     Specifically, eight (8) of the current members of the Board face a substantial likelihood of liability because they each began their service on the Board by 2005 and, thus, were directors at the time of the investigation into the bribery scheme and the subsequent cover-up.

104.     As alleged herein, the Board must have (or at least should have) known of the FCPA violations Wal-Mart was committing in Mexico and the related cover-up.

105.     These Defendants were required to act upon this information to protect the Company from continued legal violations being committed in its name. Rather than acting, these Defendants, in violation of their fiduciary duties, willfully ignored and covered-up the information presented to them. To the extent that some of the defendants did not know of the wrongdoing, it is as a result of their own fiduciary failures. Defendants had an obligation to monitor and oversee the Company's compliance with applicable law; their sustained and conscious failure to attend to these duties, as described herein, is to blame for any lack of information about problems requiring their attention. As a result, these Defendants face a substantial likelihood of liability for their conduct and demand is, therefore, excused.[3]

106.     The Director Defendants are conflicted from and unable to pursue the Company's claims against the Executive Defendants. Any effort by the Director Defendants to hold the Executive Defendants liable would likely lead the Executive Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established and by and known to the Board.

---

[3]     Executives of several companies – including but not limited to Ports Engineering Consultants Corporation (87 months), Latin Node Inc. (46 months), KBR Inc. (30 months), and Willbros International Inc. (15 and 12 months) – have recently been sentenced to lengthy prison terms for bribery schemes in violation of the FCPA.

24

## COUNT I

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY FOR DISREGARDING AND COVERING-UP WIDESPREAD VIOLATIONS OF LAW

#### (Against all Defendants)

107.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.     The Defendants all owed and owe fiduciary duties to Wal-Mart and its shareholders.  By reason of their fiduciary relationships, Defendants specifically owed and owe Wal-Mart the highest obligation of loyalty and due care in the administration of the affairs of Wal-Mart, including the oversight of Wal-Mart's compliance with federal laws.  Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company alleged herein.

109.     The Defendants consciously breached their corporate duties and responsibilities as stated herein.

110.     As a direct and proximate result of the Defendants' conscious failure to perform their fiduciary obligations, Wal-Mart has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

111.     Plaintiff, on behalf of Wal-Mart, has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

a. Determining that this action is a proper derivative action maintainable under law and demand is excused;

b. Awarding, against all Defendants and in favor of Wal-Mart, the damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

c. Enjoining Defendants from further violating their fiduciary duties as described herein;

d. Awarding to Wal-Mart restitution from Defendants, and from each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

e. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f. Granting such other and further relief as the Court deems just and proper.

ROSENTHAL, MONHAIT & GODDESS, P.A.

Jessica Zeldin (Del. Bar No. 3558)
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433

*Counsel for Plaintiff*

OF COUNSEL:

BERGER & MONTAGUE, P.C
Lawrence Deutsch
Robin Switzenbaum
Jacob M. Polakoff
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

BRAGAR WEXLER EAGEL & SQUIRE, P.C.
Lawrence P. Eagel
Jeffrey H. Squire
Justin Kuehn
885 Third Avenue, Suite 3040
New York, NY 10022
(212) 308-5858

May 1, 2012