## IN THE CIRCUIT COURT OF POPE COUNTY, ARKANSAS

NATHAN F. AUSTIN,                                    )
Derivatively On Behalf of                            )
WAL-MART STORES, INC.                                )
                                                     )
    Plaintiff,                    )
                                                     )       Case No. CV-2012-201
      vs.              )
                                                     )
                                                     )       JURY DEMAND
S. ROBSON WALTON, MICHAEL T. DUKE,                   )
H. LEE SCOTT, JR., JIM C. WALTON,                    )
DOUGLAS N. DAFT, ROGER C. CORBETT,                   )
AIDA M. ALVAREZ, JAMES W. BREYER,                    )
M. MICHELE BURNS, JAMES I. CASH, JR.,                )
GREGORY B. PENNER, STEVEN S.                         )
REINEMUND, ARNE M. SORENSON,                         )
CHRISTOPHER J. WILLIAMS, LINDA S.                    )
WOLF, EDUARDO CASTRO-WRIGHT,                         )
EDUARDO SOLORZANO MORALES and                        )
JOSE LUIS RODRIGUEZMACEDO RIVERA,                    )
                                                     )
    Defendants.                   )
                                                     )
      -and-            )
                                                     )
WAL-MART STORES, INC.,                               )
                                                     )
    Nominal Defendant.            )
_____             )

**FILED 2012 MAY 17 PM 3 59 CIRCUIT & CHANCERY CLERK**

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
### FOR BREACH OF FIDUCIARY DUTIES

    Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint for

Breach of Fiduciary Duty (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

    1.    This is a shareholders' derivative action brought pursuant to Arkansas Annotated

Code §4-26-714, §4-27-740 and Arkansas Rule of Civil Procedure 23.1 by shareholders of and for

the benefit of nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") against

its entire Board of Directors and certain top officers of Wal-Mart's to remedy defendants' violations of law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that occurred between January 1, 2005 and the present (the "Relevant Period").

2.      Specifically, this shareholders derivative action asserts claims for breach of fiduciary duty against defendants S. Robson Walton, Michael T. Duke, H. Lee Scott, Jr., Jim C. Walton, Douglas N. Daft, Roger C. Corbett, Aida M. Alvarez, James W. Breyer, M. Michele Burns, James I. Cash, Jr, Gregory B. Penner, Steven S. Reinemund, Arne M. Sorenson, Christopher J. Williams, and Linda S. Wolf (the "Director Defendants" or the "Board"), as well as Company officer defendants Eduardo Castro-Wright, Eduardo Solorzano Morales and Jose Luis Rodriguezmacedo Rivera (the "Officer Defendants"). Collectively, the Director Defendants and the Individual Defendants are referred to as the "Individual Defendants".

3.      The Complaint sets forth allegations of fact that since at least 2005, the Company's largest foreign subsidiary, Wal-Mart de Mexico ("Wal-Mex") engaged in widespread and illegal bribery of Mexican officials to gain the permits necessary to further Wal-Mex's business interests in that country, while high-level officers and directors of Wal-Mart in the United States attempted to and did cover-up this illicit scheme. Wal-Mart holds a nearly 70% stake in Wal-Mex, which by the end of 2005 was one of Mexico's largest retailers and a jewel of Wal-Mart's $56 billion international arm.

4.      For nearly six years, top executives and directors of Wal-Mart were able to conceal the corrupt business practices being orchestrated all across Mexico by Wal-Mex. However, in a filing with the Securities and Exchange Commission ("SEC") on December 8, 2011, Wal-Mart was forced to disclose that during fiscal year 2012, the Company had begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in

compliance with the U.S. Foreign Corrupt Practices Act ("FCPA").  Although Wal-Mart indicated that it had notified the Justice Department of the commencement of its investigation, it informed the investing public that it did "not believe that these matters will have a material adverse effect on [Wal-Mart's] business."  At the time of this SEC filing, however, the Company was well-aware of the illegal conduct that was being perpetuated by its Mexican subsidiary and its efforts to bury the truth about this conduct from the public.

5.      The truth about the Company's actions would not stay buried for long.  As reported by *The New York Times* ("NYT") in an article by David Barstow titled, *At Wal-Mart in Mexico, a Bribe Inquiry Silenced,* N.Y. TIMES (Apr. 21, 2012)(available at http://www.nytimes.com/2012/04/22/business/at-walmart-in-mexico-a-bribe-inquiry-silenced.html (last visited May 8, 2012)), it had been conducting an investigation which revealed that from 2005 to present, Wal-Mex had paid approximately $24 million in bribes to officials and bureaucrats throughout Mexico in order to obtain new-store building permits and expand its market presence.  The NYT investigation described how in September 2005, a former Wal-Mex executive emailed a senior Wal-Mart attorney detailing how Wal-Mex, with the knowledge and consent of former Wal-Mex Chief Executive Officer ("CEO") defendant Eduardo Castro-Wright, designed and executed the corrupt bribery operation.  Upon receiving the email, Wal-Mart executives deemed it credible and sent an internal investigation team to Mexico City.  Shortly after arriving, the investigators found evidence confirming the bribery allegations in the email, and concluded that "There is reasonable suspicion to believe that Mexican and USA laws have been violated." The lead investigator, himself a former-FBI agent, recommended that Wal-Mart enhance their investigation efforts by questioning defendant Castro-Wright and other top Wal-Mex officials about their awareness and roles regarding the bribes.

6.      Rather than expose the full scope of this criminal wrongdoing and fulfill their fiduciary duties of good faith and loyalty to the Company, Individual Defendants and the other officers and directors of Wal-Mart at that time halted any further investigation into the bribery scandal involving Wal-Mex and defendant Castro-Wright.  The investigation was shut down in order to prevent damaging the business reputation of Wal-Mex and in particular defendant Castro-Wright, the recently-appointed CEO of Wal-Mart Stores USA, who was widely-considered a "rising star" in the Company and a possible candidate to replace then-Wal-Mart CEO defendant H. Lee Scott Jr. ("Scott").

7.      By shutting down the investigation, Individual Defendants successfully covered-up the illegal activities orchestrated by Wal-Mex and defendant Castro-Wright, and thus no Wal-Mex executives were ever punished. In fact, Individual Defendants rewarded defendant Castro-Wright by promoting him to the Company's vice chairman position in 2008.

8.      The self-serving and disloyal conduct exhibited by the Individual Defendants not only placed the Defendants' interests squarely in conflict with the best interests of the Company, itself and utter abdication of their fiduciary duties, but also exposed Wal-Mart to significant liability and expenses due to its alleged violations of the FCPA, not to mention significant damage to its reputation and goodwill.  The faithless behavior of the Individual Defendants has and will constitute a waste of corporate assets, gross mismanagement, and abuse of their power as directors and officers of the Company.

9.      Any demand upon the Director Defendants to remedy these damages would be a futile gesture, as they themselves are responsible for inflicting these harms upon the Company, and could not be reasonably expected to sue themselves or other directors to whom they are beholden, through business connections, or otherwise. This derivative lawsuit is necessary to help recover the damages suffered by Wal-Mart, and to protect the Company from the Board of

Directors' continuing breaches of fiduciary duty, conflicts of interest and violations of statutory law.

<u>**JURISDICTION AND VENUE**</u>

10.     This Court has jurisdiction over this action pursuant to Ark. Code Ann. §16-4-101 *et seq.* This Court has jurisdiction over each of the defendants because at all relevant times, they conducted business in, resided in and/or were citizens of Arkansas.  Wal-Mart is incorporated in the State of Delaware and its principal place of business was, at all relevant times, in the State of Arkansas.

11.     Venue is proper in this County pursuant to Ark. Code Ann. §16-55-213, *et seq.*, in that the plaintiff, a Wal-Mart shareholder, is a resident of this County.

12.     This action arises solely under State laws of Arkansas and Delaware.  No Federal Question is presented by this complaint. This action is a shareholder derivative action on behalf of Wal-Mart seeking both damages and injunctive relief, and solely involves the internal affairs or governance of a corporation.

<u>**PARTIES**</u>

13.     Plaintiff Nathan F. Austin is a resident of Pope County, Arkansas, and at all times relevant hereto, is and was an owner and holder of Wal-Mart stock at the time of the transactions complained of in this Action under in accordance with Ark. Code Ann. §4-26-714(a) and §4-27-740(a).

14.     Nominal defendant Wal-Mart is a Delaware corporation whose headquarters are located at 702 Southwest 8th Street, Bentonville, Arkansas.  The Company is the world's 18th largest public corporation, according to the Forbes Global 2000 list and the largest public corporation ranked according to revenue. The Company was founded by Sam Walton in 1962 and the Walton family still controls a majority of the shares. Wal-Mart operates discount retail stores,

supercenters and markets world-wide, selling a variety of merchandise including clothing, housewares, electronic, music and DVD's and hardware.

15.     Defendant S. Robson Walton ("R. Walton") is the eldest son of Wal-Mart's founder, Sam Walton, has worked for Wal-Mart since 1969, and has served as the Chairman of the Board since 1992.  Defendant R. Walton has previously served as senior vice president, secretary and general counsel and vice chairman of the Company.  Prior to joining Wal-Mart, defendant R. Walton was a law partner with the law firm of Conner & Winters in Tulsa, Oklahoma.

16.     Defendant Michael T. Duke ("Duke") is the current President and CEO of Wal-Mart and a Director of the Company since 2008.  Duke joined Wal-Mart in 1995 and served as vice chairman of the Company in charge of Wal-Mart International from 2005 to 2009, and in that capacity he was responsible for responding to the bribery charges regarding Wal-Mex, thus making him directly responsible for the resulting cover-up that has inflicted significant damages upon the Company.  Prior to joining the Company, Mr. Duke had 23 years of experience in retailing with Federated Department Stores and May Department Stores. Mr. Duke is a director of Arvest Bank and serves on the board of directors of the Consumer Goods Forum, the executive committee of Business Roundtable and is on the executive board of Conservation International's Center for Environment Leadership in Business. He also serves on the board of advisors for the University of Arkansas and the advisory board of the Tsinghua University School of Economics and Management in Beijing, China.

17.     Defendant H. Lee Scott, Jr. ("Scott") served as CEO of Wal-Mart from 2000 through 2009, and is a Director of the Company. Scott joined Wal-Mart in 1979. Mr. Scott served as a director of the Goldman Sachs Group, Inc. from May 2010 to May 2011. He currently serves on the advisory board of the Tsinghua University School of Economics and Management in

Beijing, China. Along with defendant Duke, Scott was responsible for responding to the bribery charges regarding Wal-Mex, thus making him directly responsible for the resulting cover-up that has inflicted significant damages upon the Company.

18.     Defendant Jim C. Walton ("J. Walton") has been a Director of Wal-Mart since 2005. J. Walton is the youngest son of Wal-Mart founder Sam Walton and the brother of R. Walton. He is the CEO and Chairman of the Board of Arvest Bank, a Walton family owned bank which has branches in Arkansas, Kansas, Oklahoma and Missouri. J. Walton is also Chairman of the Board of Community Publishers, Inc.

19.     Defendant Douglas N. Daft ("Daft") has been a Director of Wal-Mart since 2005. Mr. Daft served as the CEO and Chairman of the Board of the Coca-Cola Company from 2000 to 2004. Currently, Mr. Daft serves as a director of McGraw-Hill Companies, Inc. and Green Mountain Coffee Roasters, Inc.

20.     Defendant Roger C. Corbett ("Corbett") has been a Director of Wal-Mart since 2006. Mr. Corbett is the retired CEO and Group Managing Director of Woolworths Limited, an Australian retail company. He is a director of the Reserve Bank of Australia, Fairfax Media Limited and Chairman of the Board of Directors of ALH Group Pty Limited. He also serves on the board of Outback Stores.

21.     Defendant Aida M. Alvarez ("Alvarez") has been a Director of Wal-Mart since 2006, and currently serves on the Company's Audit Committee. She is the former Administrator of the United States Small Business Administration and served as the Founding Director of the US Office of Federal Housing Enterprise Oversight, the financial regulator of Fannie Mae and Freddie Mac, from 1993 to 1997. Ms. Alvarez is a director of UnionBanCal Corp. and Progreso Financiero.

22.     Defendant James W. Breyer ("Breyer") has been a Director of Wal-Mart since 2001. He is the Managing Partner of Accel Partners and a director of RealNetworks, Inc., Marvel Entertainment, Inc., and several private companies. Currently, he serves as the Company's Presiding Director.

23.     Defendant M. Michele Burns ("Burns") has been a Director of Wal-Mart since 2003. She is the Chairman and CEO of Mercer Human Resources Consulting, a subsidiary of Marsh and McLennan Companies, Inc. Ms. Burns is also a director of Cisco Systems, Inc.

24.     Defendant James I. Cash, Jr. ("Cash") has been a Director of Wal-Mart since 2006, and currently serves on the Company's Audit Committee. Mr. Cash is a retired Professor of Business Administration at Harvard Business School and a Former Senior Associate Dean and Chairman of HBS Publishing. Mr. Cash is a director of the Chubb Corporation, General Electric Company and other private companies and a former director of Microsoft Corporation.

25.     Defendant Gregory B. Penner ("Penner") has been a director of Wal-Mart since 2008. From 2002 to 2005, he served as Wal-Mart's Senior Vice president and Chief Financial Officer-Japan. Mr. Penner is a former General Partner at Peninsula Capital and a former financial analyst for Goldman, Sachs & Co. He is a member of the board of directors of Baidu.com, Inc., 99Bill Corporation, Cuil Inc., and Global Hyatt Corp.

26.     Defendant Steven S. Reinemund ("Reinemund") has been a Director of Wal-Mart since 2010. Mr. Reinemund worked for PepsiCo for 22 years and served as PepsiCo's CEO and Chairman of the Board from 2001 to 2006. Currently, he is the Dean of the Calloway School of Business and Accountancy and Babcock Graduate School of Management at Wake Forest University. He is a director of Exxon Mobil Corporation, American Express Company and Marriott International, Inc.

27.     Defendant Arne M. Sorenson ("Sorenson") has been a Director of Wal-Mart since 2008, and currently serves on the Company's Audit Committee. Mr. Sorenson is the Executive Vice president and Chief Financial Officer of Marriott International, Inc., a position he has held since 1998. He was a former partner in the law firm of Latham & Watkins in Washington, D.C.

28.     Defendant Christopher J. Williams ("Williams") has been a Director of Wal-Mart since 2004, and currently serves on the Company's Audit Committee. Mr. Williams is the Chairman and CEO of The Williams Capital Group, L.P., Chairman and CEO of Williams Capital Management, LLC and a director of Harrah's Entertainment, Inc.

29.     Defendant Linda S. Wolf ("Wolf") has been a Director of Wal-Mart since 2005. She is the former chairman of the board and CEO of Leo Burnett Worldwide, Inc., a division of Publicis Groupe, S.A. She is a trustee for investment funds advised by the Janus Capital Group, Inc.

30.     Defendant Eduardo Castro-Wright ("Castro-Wright") was the CEO of Wal-Mex and headed the Company's Mexican operation from 2002 to 2005.  Defendant Castro-Wright was promoted to CEO of Wal-Mart Stores USA in 2005, and named a Vice-Chairman of the Company in 2008. Former executives quoted in the New York Times on April 21, 2012, called defendant Castro-Wright the "driving force behind years of bribery" in Mexico.

31.     Defendant Eduardo F. Solorzano Morales ("Morales") replaced defendant Castro-Wright as CEO of Wal-Mex in 2005, and presently serves as Chief Executive of Wal-Mart Latin America. Defendant Morales vehemently opposed Wal-Mart's internal investigation into Wal-Mex's corrupt business practices in 2005 in an effort to conceal his and other executive's roles in the illegal bribery and record falsification scheme.

32.     Defendant Jose Luis Rodriguezmacedo Rivera ("Rodriguezmacedo") was the General Counsel of Wal-Mex in 2005.  Defendant Rodriguezmacedo was one of the targets in

Wal-Mart's bribery investigation in 2005, but eventually defendants Scott and Duke turned control of the investigation over to his supervision.  He was senior vice president for legal, ethics and compliance at Wal-Mart Mexico until he was reassigned on April 20, 2012, shortly after the NYT ran its story.

**ALLEGATIONS OF WRONGFUL CONDUCT**

33.   This shareholder derivative action results from the uncovering of a widespread bribery scheme being perpetrated by executive officers at Wal-Mex, the Company's largest subsidiary located in Mexico, a resultant effort by Individual Defendants to hide the truth about the wrongdoing occurring at Wal-Mex, and the Wal-Mart Board's failure to implement and execute an effective system of internal controls that would prevent the Company and/or its employees from paying or offering to pay a foreign official anything of value to obtain business, thus violating the FCPA. The factual allegations herein are the result of pervasive malfeasance committed by Wal-Mart and Wal-Mex executives who are under the direct monitor and control of the Board and senior management. Perpetrated at the highest levels of the Company and covered-up by these same individuals, the wrongdoing being challenged by this shareholder action demonstrates that the Individual Defendants cannot impartially consider a demand to remedy the grievous harm inflicted upon the Company and its reputation.

A.   **The Foreign Corrupt Practices Act**

34.   Under the FCPA's anti-bribery provisions, U.S. companies and citizens, foreign companies listed on a U.S. stock exchange, or any person acting while in the United States are generally prohibited from corruptly paying or offering to pay, directly or indirectly, money or anything of value to a foreign official a foreign political party or official, or a candidate for foreign political office for purposes of influencing any act or decision (including a decision not to act) of such official in his or her official capacity, inducing the official to do any act in violation

of his or her lawful duty, or to secure any improper advantage in order to assist the payor in obtaining or retaining business for or with any person, or in directing business to any person. In addition, the FCPA established accounting control requirements for issuers subject to either the registration or reporting provisions of the Exchange Act.

35.     The FCPA also requires every issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements; and (iii) to maintain accountability for assets. Proof of a U.S. territorial nexus is not required for FCPA implication against U.S. companies and citizens, and FCPA violations can, and often do, occur even if the prohibited activity takes place entirely outside of the United States.

36.     Significantly, a key 'best practices' FCPA compliance program component is to utilize internal audit to monitor for FCPA compliance issues on a regular basis to not only assess compliance but to also identify anything which warrants further investigation. Taken a step further, a continuous controls monitoring program can assist a company to identify unusual expenses, budgeted items, or any other event which is outside an established norm and "red flag" such expense, item or event for further investigation.

37.     The Department of Justice ("DOJ") and the SEC jointly enforce the FCPA. The DOJ is responsible for all criminal enforcement and for civil enforcement of the anti-bribery provisions with respect to domestic concerns and foreign companies and nationals. The SEC is responsible for civil enforcement of the anti-bribery provisions with respect to issuers.

38.     The following criminal penalties may be imposed for violations of the FCPA's anti-bribery provisions: corporations and other business entities are subject to a fine of up to

$2,000,000; officers, directors, stockholders, employees, and agents are subject to a fine of up to $100,000 and imprisonment for up to five years. Moreover, under the Alternative Fines Act, these fines may be quite higher -- the actual fine may be up to twice the benefit that the defendant sought to obtain by making the corrupt payment. Importantly, fines imposed on individuals may not be paid by their employer or principal.

39.    In addition to the criminal penalties, the Attorney General or the SEC, as appropriate, may bring a civil action for a fine of up to $10,000 against any firm as well as any officer, director, employee, or agent of a firm, or stockholder acting on behalf of the firm, who violates the anti-bribery provisions. In addition, in an SEC enforcement action, the court may impose an additional fine not to exceed the greater of (i) the gross amount of the pecuniary gain to the defendant as a result of the violation, or (ii) a specified dollar limitation. The specified dollar limitations are based on the egregiousness of the violation, ranging from $5,000 to $100,000 for a natural person and $50,000 to $500,000 for any other person.

40.    The Attorney General or the SEC, as appropriate, may also bring a civil action to enjoin any act or practice of a firm whenever it appears that the firm (or an officer, director, employee, agent, or stockholder acting on behalf of the firm) is in violation (or about to be) of the anti-bribery provisions.

41.    In addition to the criminal and civil penalties and fines, under guidelines issued by the Office of Management and Budget, a person or firm found in violation of the FCPA may be barred from doing business with the Federal government. Indictment alone can lead to suspension of the right to do business with the government. The President has directed that no executive agency shall allow any party to participate in any procurement or non-procurement activity if any agency has debarred, suspended, or otherwise excluded that party from participation in a procurement or non-procurement activity.

42.   Furthermore, a person or firm found guilty of violating the FCPA may be ruled ineligible to receive export licenses; the SEC may suspend or bar persons from the securities business and impose civil penalties on persons in the securities business for violations of the FCPA; the Commodity Futures Trading Commission and the Overseas Private Investment Corporation both provide for possible suspension or debarment from agency programs for violation of the FCPA; and a payment made to a foreign government official that is unlawful under the FCPA cannot be deducted under the tax laws as a business expense.

43.   As of March, 2009, there emerged three distinct trends in the enforcement of FCPA which legal analysts identified and publicly reported. First, the number of FCPA matters pursued by the DOJ (including deferred prosecutions and non-prosecution agreements) and the SEC steadily increased between 2002 and 2008, including a sharp increase in enforcement actions against both corporation and individuals. Secondly, there was a strong trend of actions against individuals being brought separately—often in advance—of charges against their employers and then, in all likelihood, following classic prosecutorial strategy of working up the chain of command, using the individuals to build the government's case against their superiors and eventually the company. Third, penalties assessed against corporations have increased over the same period, both in the aggregate (including all fines, penalties, restitution, and disgorgement) and in individual cases.

44.   Because the Individual Defendants have authorized Wal-Mart to operate in over 100 countries, some of which involve a higher than normal risk of violations of the anticorruption laws, including the FCPA, the Wal-Mart Board had a fiduciary duty to install and maintain internal controls and an accounting system for compliance with the FCPA.

**B.**     **Whistleblower in 2005 Revealed Systemic Bribery and Corruption
Scheme at Wal-Mex Spearheaded By Defendant Castro-Wright**

45.     In 2004, Ms. Maritza I. Munich ("Munich"), a senior attorney at Wal-Mart,
implored the board to adopt a strict anticorruption policy that prohibited all employees from
"offering anything of value to a government official on behalf of Wal-Mart." Under the proposed
policy, every employee would be required to report the first sign of corruption, and it would bind
Wal-Mart's agents to the same exacting standards. The board, however, resisted this proposal,
which would eventually have significant ramifications for the Company.

46.     As reported in the recently-published The New York Times article, on September
21, 2005, former Wal-Mex in-house attorney Sergio Cicero Zapata ("Cicero") e-mailed Munich
stating that he was in possession of information about "irregularities" authorized "by the highest
levels" at Wal-Mex, and concluding that "I hope to meet you soon." A few days later, Wal-Mart
hired a local Mexico attorney to question Cicero. In that interview, he told how Wal-Mex's
leaders had engaged in a systematic campaign of bribery throughout Mexico in order to ensure
quick and easy approval of building permits for Wal-Mex's new stores.

47.     According to Cicero, the person most responsible for this conduct was defendant
Castro-Wright, but several Wal-Mex leaders, including its board chairman, its general counsel, its
chief auditor and its top real estate executive, were also implicated in the scheme. Cicero stated
that while he had knowledge of the occasional bribe being paid before defendant Castro-Wright's
arrival, the illegal practice exploded once defendant Castro-Wright took over as Wal-Mex's top
executive in 2002. Setting the tone at the top, defendant Castro-Wright set "very aggressive
growth goals," which required opening new stores "in record times," thus applying pressure to
Wal-Mex executives to do "whatever was necessary" to obtain permits.

48.     As quoted in the *The New York Times* article, Cicero recounted how defendant Castro-Wright had encouraged the payments for a specific strategic purpose: build hundreds of new stores so fast that competitors would not have time to react. Specifically, Cicero explained how the bribes were funneled to government officials through Mexican intermediaries called "gestores" (loosely translated as "managers"), and how Wal-Mex prepared false invoices to make it seem as if the payments made to the *gestores* were legitimate business expenses. Wal-Mex used bribes to accelerate growth by, amongst other things, changing zoning maps, overcoming environmental objections, and drastically shortening the time for processing permits. "What we were buying was time," he said.

49.     Wal-Mart investigators were able to substantiate Cicero's revelations through both his documentation as well as materials they uncovered in the course of their investigations in Mexico City. According to the Wal-Mart investigators, each month, Mr. Castro-Wright and other top Wal-Mex executives received a detailed schedule of all of the payments performed. Wal-Mex then falsified the payments in accounting records as simple legal fees. These false records were then passed on to the Company's headquarters in Bentonville. The investigators concluded that Cicero's account of the criminality at the top of Wal-Mex was extremely credible, as he had clearly been in a position to witness the events he described.

### C.     The Company Concealed Earlier Known Corruption By Wal-Mex and Defendant Castro-Wright

50.     Wal-Mart's investigation into Cicero's allegations was not the Company's first indication of corruption at Wal-Mex by defendant Castro-Wright. A confidential investigation, conducted for Wal-Mart in 2003 by Kroll Inc., a leading investigation firm, discovered that Wal-Mex had systematically increased its sales by helping favored high-volume customers evade sales taxes. A draft of Kroll's report, obtained by The New York Times, concluded that top Wal-Mex

executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Wal-Mex was "carrying out a tax fraud. (The company ultimately paid $34.3 million in back taxes.) Wal-Mart then asked Kroll to evaluate Wal-Mex internal audit and antifraud units. Kroll wrote another report that branded the units "ineffective." Many employees accused of wrongdoing were not even questioned; some received a promotion shortly after the suspicions of fraudulent activities had surfaced.

### D.  Despite His Role In Wal-Mex Corruption, Defendant Castro-Wright Is Placed In Charge of All Wal-Mart Stores in the United States

51.    The stunning growth at Wal-Mex made defendant Castro-Wright a rising star in the eyes of the Company's senior leaders, despite the already clear warnings that something was amiss at Wal-Mex under his leadership. Just days before Wal-Mart investigators first interviewed Mr. Cicero, Mr. Castro-Wright was promoted and put in charge of all Wal-Mart stores in the United States, one of the most prominent and powerful jobs in the Company. In early 2005, when he was promoted to a senior position in the United States, Mr. Duke would cite his "outstanding results" in Mexico.

### E.  Individual Defendants Reject An Independent and Thorough Investigation of Defendant Castro-Wright and Wal-Mex

52.    Defendant Duke, who is presently Wal-Mart's CEO, received an email with a note stating "You'll want to read this" on October 15, 2005 which detailed Cicero's allegations.  Duke received this email in his capacity as then-Vice Chairman of the Company in charge of Wal-Mart's foreign subsidiaries.

53.    Following the Company's initial investigation of Cicero's claims, Wal-Mart senior attorney Munich sent memos detailing the corruption scheme to Wal-Mart's senior management, including Thomas A. Mars, Wal-Mart's general counsel and a former director of the Arkansas

State Police; Thomas D. Hyde, Wal-Mart's executive vice president and corporate secretary;

Michael Fung, Wal-Mart's top internal auditor; Craig Herkert, the chief executive for Wal-Mart's

operations in Latin America; and Lee Stucky, a confidant of Lee Scott's and chief administrative

officer of Wal-Mart International.

54.     As a result of Munich's memos, Wal-Mart contacted the law firm of Willkie Farr &

Gallagher ("Willkie Farr") and asked them to outline the course of a possible investigation into

whether any employees of the Company had engaged in violations of the Foreign Corrupt

Practices Act. Willkie Farr submitted a plan calling for tracing all payments to anyone who had

helped Wal-Mex obtain permits for the previous five years, stating that it would scrutinize "any

and all payments" to government officials and interview every person who might know about

payoffs, including "implicated members" of Wal-Mex's board. Willkie Farr recommended that

the investigation be allowed to proceed for approximately four months and argued that it should

be independent and thorough, as fitting an investigation in which top executives such as defendant

Castro-Wright may be implicated.

55.     Despite this call for a robust investigation into Wal-Mex, the Company rejected the

firm's proposal.  Instead, records show, they decided Wal-Mart's lawyers would supervise a far

more limited "preliminary inquiry" by Wal-Mart's internal Corporate Investigations Unit.

However, as the Company knew full well, this in-house investigation team was ill-equipped to

take on a major investigation of this type, particularly one involving a foreign country such as

Mexico. It had fewer than 70 employees, and most were assigned to chasing shoplifting rings and

corrupt vendors. Just four people were specifically dedicated to investigating corporate fraud, a

number Joseph R. Lewis ("Lewis"), Wal-Mart's director of corporate investigations, described in

a confidential memo as "wholly inadequate for an organization the size of Wal-Mart." As a

confidential memo explained, this team's inquiry would take two weeks, not the four months

17

proposed by Willkie Farr; analyze the permits of just a few specific stores; and conduct interviews "only when absolutely essential to establishing the bona fides" of Cicero. Only if the Corporate Investigations Unit discovered a "likelihood" that laws had been violated would the Company consider conducting a "full investigation."

56.    The decision to conduct a much more limited investigation into Wal-Mex and defendant Castro-Wright allowed Wal-Mart's senior management to directly oversee and control the scope of the inquiry, thus continuing the Company's disturbing trend of tightly restricting investigations of its own leaders and calling into question their effectiveness. For example, in October, Wal-Mart's vice chairman, John B. Menzer ("Menzer"), intervened in an internal investigation into a senior vice president who reported to him. According to internal records, Menzer told Kenneth H. Senser ("Senser"), Walmart's vice president of global security, that he did not want Corporate Investigations to handle the case "due to concerns about the impact such an investigation would have." One of the senior vice president's subordinates, he concluded, "would be better suited to conduct this inquiry." Soon after, records show, the subordinate cleared his boss. The other case involved the president of Wal-Mart Puerto Rico. A whistle-blower had accused the president and other executives of mistreating employees. Although Corporate Investigations was supposed to investigate all allegations against senior executives, the president had instead assigned an underling to look into the complaints -- but to steer clear of those against him.

F.    **Wal-Mart's Limited Inquiry Yielded Overwhelming Evidence of Wrongdoing Committed by Wal-Mex and Wal-Mex Officials**

57.    Even though the Company authorized only a limited inquiry, into Wal-Mex, the results were overwhelming and confirmed the allegations made by Cicero. The investigation confirmed almost all of Cicero's findings, including the fact that approximately $24 million in

suspect payments had been made to Mexican officials and specific records showing payments of $8.5 million to two of the *gestores* named by Cicero in his interviews.  The investigators also found documents showing that Wal-Mex's top executives knew about the payments, and instead of halting the practice, ramped up the scheme ("implement this plan as soon as possible") and took steps to conceal them.  These executives included defendants Castro-Wright and Rodriguezmacedo, who was then Wal-Mex General Counsel.  Defendant Rodriguezmacedo claimed the company had stopped using *gestores* after Cicero departed the company, yet even as Cicero was being debriefed in October 2005, records show Wal-Mex real estate executives made a request to pay a gestore $14,000 to get a construction permit.

58.    The investigative team wrote confidential reports to Wal-Mart's top executives in December 2005 laying out all the evidence that corroborated Cicero's allegations: hundreds of gestore payments, the mystery codes, the rewritten audits, the evasive responses from Wal-Mart Mexico executives and the evidence *gestores* were still being used.  "There is reasonable suspicion," the report concluded, "to believe that Mexican and USA laws have been violated." There was simply "no defendable explanation" for the millions of dollars in payments to *gestores*.

59.    The leader of the Corporate Investigations team, Ronald Halter ("Halter"), submitted an "action plan" for a deeper investigation that would more fully-vet the extent of the corruption at Wal-Mex and reveal those who were responsible.  Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history."  Halter also proposed a thorough investigation of the two primary *gestores* mentioned by Cicero. He had forgone such interviews in Mexico for fear of his safety. ("I do not want to expose myself on what I consider to be an unrealistic attempt to get Mexican lawyers to admit to criminal activity," he had explained to his bosses.)  Now Halter wanted Wal-Mart to hire private investigators to interview and monitor both of the primary *gestores*. He also proposed a round of adversarial

interviews with Wal-Mex senior executives, including the sensitive step of questioning defendant Castro-Wright about his role in the gestore payments.

60.    Around January 2006, Munich wrote a memo in which she agreed with Halter's assessments and recommendation that the Company enlarged the scope of the bribery investigation, noting that "[t]he bribery of government officials is a criminal offense in Mexico."

### G.    Individual Defendants Chose To Cover-Up The Bribery Scheme At Wal-Mex and Exonerate Those Responsible For The Wrongdoing

61.    There can be no doubt that the Individual Defendants with the Company in 2005 were on notice of the rampant corruption in Wal-Mart's global business sector and the need to redress it.  In addition to the proposal from Halter, others involved in the investigation argued that it was time to take a stand against signs of rising corruption in Wal-Mart's global operations, which was becoming a significant dilemma facing the Company.  Each year the Company received hundreds of internal reports of bribery and fraud.  In Asia alone, there had been 90 reports of bribery just in the previous 18 months.  So dire was this problem that in 2005, Wal-Mart summoned its top procurement executives to its corporate headquarters where Company Vice Chairman Menzer scolded them over the corruption, stating in succinct fashion that "Times have changed" and such wrongdoing was creating an unacceptable risk given the government's stepped-up enforcement of the FCPA.  Moreover, even as they pondered Halter's action plan, the Company received new disturbing evidence of additional wrongdoing at Wal-Mex. In January 2006, Scott, Duke and Wal-Mart's chairman, S. Robson Walton, received an anonymous e-mail accusing Wal-Mex's top real estate executives of receiving kickbacks from construction companies, and pleading with these defendants "Please you must do something."

62.    Wal-Mart's leaders had agreed to consider a full investigation if the preliminary inquiry found Cicero's allegations credible.  They were now confronted with clear and compelling

evidence that one of the Company's rising stars, already being publicly discussed as a potential successor to CEO Scott, was implicated in serious criminal wrongdoing and had taken steps to cover it up. On this point, Wal-Mart's ethics policy offered clear direction: "Never cover up or ignore an ethics problem..." Yet this is exactly what the Individual Defendants did.

63.     Throughout the scaled-down investigation process and beyond, the Company's board received considerable push-back against casting any spotlight on the wrongdoing at Wal-Mex. Senior Executives at Wal-Mex complained bitterly to top Company management including defendants Scott and Duke, who himself traveled to Mexico in October 2005 to meet with enraged Wal-Mex officials, that the internal investigation was too heavy-handed and intrusive. Defendant Morales, then the CEO of Wal-Mex, criticized the investigators for being too secretive and accusatory. Senior Wal-Mart executives accused Lewis and the Corporate Investigation team of being overbearing, disruptive and naïve about the ambiguities of doing business abroad. They argued that Corporate Investigations should focus more on quietly "neutralizing" problems than on turning corrupt employees over to law enforcement. Unfortunately, the Company yielded to these voices.

64.     On February 3, 2006, defendant Scott called a meeting to discuss revisions to Wal-Mart's internal investigation process, and to resolve the issue of how to deal with Cicero's allegations. During that meeting, Lewis and his team were criticized for being "overly aggressive" and having too much of a "law enforcement approach".

65.     At the end of the meeting on February 3, defendant Scott ordered Mr. Sensor to produce a new protocol for corporate investigations within 24 hours, which he did. The new protocol that resulted was a highly bureaucratic process that gave senior Wal-Mart executives— including executives at the business units being investigated—more control over internal investigations. The policy included multiple "case reviews." It also required senior executives to

conduct a "cost-benefit analysis" before signing off on a full-blown investigation. Most critically, the new policy mandated that Mr. Lewis and his team would only investigate "significant" allegations, including those involving potential crimes or senior executives. Lesser allegations would be left to the affected business unit to investigate. Wal-Mart's senior leaders now had the ability to hamper any internal investigation and cover up the misconduct of what they deemed to be valuable assets to the Company, irrespective of the severity or illegality of the conduct at issue.

66.     Just four days after the February 3, 2006 meeting, pursuant to the new protocol that they authorized, Wal-Mart's leaders transferred control of the investigation of Wal-Mex to one of the individual's at the heart of the inquiry into the wrongdoing, Mr. Rodriguezmacedo. By taking such action, they appeared to violate even the modified weak protocol for investigations as it involved potential crimes and senior executives. Wal-Mart attorney Munich, who had strenuously objected when the Company instructed her to substantially narrow the scope of the Wal-Mex investigation, resigned from Wal-Mart in February, 2006. In an e-mail to Wal-Mart executives, she emphasized the need for "professional, independent investigative resources," and complained that the investigation was "at the direction of the same company officer who is the target of several of the allegations."

67.     Although Wal-Mart's senior investigators uniformly believed that that a proper, full-blown investigation of defendant Castro-Wright would take months to complete given that he had never been questioned or asked to produce documents, defendant Rodriguzemacedo, the Wal-Mex official now in charge, saw it differently. He wrapped up the case in a few weeks, with little additional investigation, and detailed his conclusions in a report to Wal-Mart leaders (the "Rodriguezmacedo report"). "There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits." That conclusion, the Rodriguezmacedo report explained, was largely based

on the denials of his fellow executives. According to his report, not one "mentioned having ordered or given bribes to government authorities."

68.     The Rodriguezmacedo report, just six pages long in total, neglected to note that he had been implicated in the same criminal conduct. While the report conceded that Wal-Mart Mexico executives had authorized years of payments to *gestores*, it never bothered to try to explain what these executives expected the payments would be used for if not to bribe officials to facilitate permits. Nor did the report address the improper and fraudulent audits prepared by Wal-Mex. The Rodriguezmacedo report promised a series of corrective steps including a ban on the use of *gestores* but did not recommend any disciplinary action against any of his colleagues.

69.     A plain reading of the Rodriguezmacedo report shows that he devoted most of it to unsubstantiated attacks on Cicero. In building his case against Cicero, the Rodriguezmacedo report included several false statements, for example, stating that Cicero was subject to "dismissal" when records showed he had resigned, and stating falsely that Kroll's investigation of Mr. Cicero concluded that he "had a considerable increase in his standard of living during the time in which payments were made to the *gestores*." The Rodriguezmacedo report further suggested scouring Cicero's records and determining if any legal action could be taken against him.

70.     The Rodriguezmacedo report was given to senior executives at Wal-Mart's corporate headquarters, including defendant Scott. By way of an e-mail, Lewis told his superiors the report was clearly "lacking" and had no basis to support its claim that no further action was needed regarding Wal-Mex. Rodriguezmacedo responded by adding a paragraph to the end of his report which stated that "criminal actions" were not brought against Cicero because "[Wal-Mex] did not have a strong case." This paragraph did not answer any of the questions as to why Wal-

Mex did not wish to pursue an investigation of defendant Castro-Wright and other top executives implicated in the wrongdoing.

71.    Despite the fact that the Rodriguezmacedo report was hastily put together, lacked support for its conclusions, and was criticized by members of the Company's own investigatory team, on May 10, 2006, Wal-Mart executives told Rodriguezmacedo to put his report "into final form, thus concluding this investigation." The Company did not publicly disclose anything regarding the allegations of bribery and corruption at Wal-Mex, nor did it discipline anyone for their involvement in the alleged scheme. From the Company's perspective, the Wal-Mex affair was officially closed.

**INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE
FALSE AND/OR MISLEADING STATEMENTS
REGARDING THEIR PRIOR KNOWLEDGE OF CORRUPTION AT WAL-MEX**

72.    In approximately December 2011—five-and-a-half years after the Wal-Mart board shut down and quietly shelved its Wal-Mex investigation, Wal-Mart officials first learned that *The New York Times* was investigating its operations in Mexico in connection with possible violations of the FCPA by defendant Castro-Wright and other Wal-Mex executives. On December 8, 2011, in a Form 10Q filed with the SEC, Individual Defendants made the following disclosure:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anticorruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters.

> However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

73.     This statement found in the Company's Form 10Q was extremely misleading.  As written, it strongly suggests that the Company first learned of the Wal-Mex FCPA violations in 2012, then and only as the result of a voluntary internal review.  In truth, as detailed above, the Company had known about the corrupt practices in Mexico concerning Wal-Mex's permits for several years and had taken the extraordinary steps detailed above to cover it up.  Furthermore, the investigation that was launched in 2012 to review wrongdoing the Company had long known about in Mexico was not purely a "voluntary" effort, but was undoubtedly driven by the impending New York Times article.

74.     At this time, Individual Defendants knew full well that they had caused the Company to engage in serious wrongdoing by failing to implement any proper controls to combat corruption and by engaging in a six year campaign to cover up evidence of serious and unlawful corruption committed by senior executives at Wal-Mex, the Company's most important foreign subsidiary. Their willingness to issue false and misleading statements about their knowledge of such wrongdoing is indicative of their unwillingness to acknowledge their role and remedy the damages that have or will befall the Company, thus justifying the need for this shareholder derivative action.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

75.     By reason of their positions as officers and/or directors and fiduciaries of Wal-Mart and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Wal-Mart, Plaintiff and other common public shareholders fiduciary obligations of trust, loyalty, good faith fair dealing, due care, and candor, and were and are required to use their utmost ability to control and manage Wal-Mart in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Wal-Mart and its shareholders so as to benefit all shareholders equally and not in

furtherance of their personal interest or benefit. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wal-Mart, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

76.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wal-Mart's, and was at all times acting within the course and scope of such agency.

77.     To discharge their duties, the officers and directors of Wal-Mart were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. In accordance with these fiduciary duties as officers and directors of Wal-Mart, the Individual Defendants as were required to, among other things:

a.     Manage, conduct, supervise and direct the business affairs of Wal-Mart in accordance with all applicable laws, including federal and states laws, regulations and policies of the Company;

b.     Neither violate, nor permit any officer, director or employee of Wal-Mart to violate applicable laws, rules and regulations, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA");

c.     Remain informed as to the status of Wal-Mart's operations, including its compliance with the FCPA and the financial reporting requirements under the FCPA and the federal securities laws, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

d.     Conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, to avoid conflicts of interest between their own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Wal-Mart's public stockholders, and to maximize the value of the Company's stock.

78.     Pursuant to the Company's Corporate Governance Guidelines, the Board is tasked with responsibility for, among other things, "[r]eviewing compliance with applicable laws and regulations and adopting policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls."

79.     Under the Corporate Governance Guidelines, Directors are also expected "to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders, and to perform their duties of care and loyalty."

80.     Additionally, all directors are also required to participate in an orientation plan upon his or her election to the Board.  This plan includes "familiarizing new directors with the Company's strategic plans, *its significant financial, accounting and risk management issues, its compliance programs*, its Statement of Ethics, its principal officers, and its internal and independent auditors." (emphasis added).

81.     As stated in Wal-Mart's Code of Business Conduct and Ethics, Individual Defendants are directed to "[n]ever cover up or ignore an ethics problem. The anti-bribery laws of many countries, including the U.S. Foreign Corrupt Practices Act ("FCPA"), prohibit Wal-Mart from offering or giving any money or other thing of value, directly or indirectly through a third party, to any foreign government official for the purpose of improperly obtaining or maintaining business or securing an improper advantage. A "thing of value" could include gifts or gratuities of any kind, travel and entertainment, offers of employment or contributions to charity.

82.   Wal-Mart also has a Code of Ethics for the CEO and all Senior Financial Officials that was in effect from November 20, 2003 through the present.  In particular, the CEO and all Senior Financial Officers (including the CFO and Corporate Controller) are bound by these provisions.  This Code of Ethics assigns certain reporting obligations to the CEO, CFO and Corporate Controller, who fulfill those obligations by reporting specified matters, such as information about conflicts of interest or "evidence of a material violation of securities of other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof" *to the Audit Committee of the Board* and the Company's Internal Audit Services.  Other Senior Financial Officers may report such matters to their superior or the Audit Committee.

83.   Defendants Alvarez, Cash, Sorenson and Williams are members of the Board's Audit Committee, and therefore have enhanced duties as detailed in the Company's Audit Committee Charter.   Generally these defendants have a duty to review and monitor the Company's compliance with all legal and regulatory requirements. Specifically, the Charter requires the Audit Committee to "[d]iscuss with management and the Outside Auditor, and advise the Board with respect to, the Company's policies, processes and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics, and instances of non-compliance therewith." As such, they are directly responsible for overseeing Wal-Mart's compliance with the FCPA. In this capacity, Defendants Alvarez, Cash, Sorenson and Williams breached their fiduciary duties by both (1) knowingly and/or recklessly undermining the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme; and (2) failing to install internal controls sufficient to avoid violations of the FCPA, rendering them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

84.     As directors and officers of Wal-Mart, Individual Defendants owed a duty to be reasonably informed about the business and operations of the Company.  Moreover, the Individual Defendants who are also officers of Wal-Mart also assumed important managerial responsibilities at the Company which required them to be well informed about the day-to-day operations of the Company, and to only conduct the business affairs of Wal-Mart in the best interests of the Company and its shareholders.  The Company's governance and reporting system presumably worked to inform Director Defendants of all important aspects of the Company's business, including the business activities of its single-largest global subsidiary, Wal-Mex.

85.     Rather than fulfill these important fiduciary duties, upon information and belief, Individual Defendants actively participated in or knowingly encouraged, sponsored or approved the conduct complained of herein, and/or breached their fiduciary duties to Wal-Mart by purposefully, recklessly and/or negligently disregarding this conduct.

86.     The Individual Defendants, in derogation of their responsibilities to Wal-Mart, failed to properly manage the affairs of the Company and failed to protect the interests of Wal-Mart and its shareholders.  The Individual Defendants consciously acted in blatant disregard for their fiduciary duties by directly sabotaging the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme.  Additionally, Individual Defendants failed to adequately exercise control as required by law and by their own Code of Business Conduct and Ethics by failing to: (a) prevent the payment of illegal bribes and kickbacks; (b) fully inform themselves of the scheme and/or the attempt to cover-up this wrongdoing involving its own directors and officers, (c) take direct responsibility in decision-making regarding these issues, and (d) establish and maintain adequate internal controls over management and the affairs of Wal-Mart designed to prevent these issues from occurring.

29

87.   Individual Defendants, because of their positions of control and authority as directors, members of the Audit Committee and/or officers of Wal-Mart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive, managerial and/or directorial positions with Wal-Mart, each of the defendants had access to adverse, non-public information concerning the lack of a system of accounting controls that permitted them to know of and prevent the payment of illegal bribes and kickbacks. The Individual Defendants breached their fiduciary duties by: (1) knowingly and/or recklessly electing to weaken internal controls for complying with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Wal-Mart; and (2) knowingly and/or recklessly failing to require Wal-Mart to implement such internal controls.

88.   The Individual Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at Wal-Mart, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with Wal-Mart and the financial benefits that flow therefrom.

89.   As direct and proximate result of the Individual Defendants' breaches of fiduciary duties and their failures described herein, Wal-Mart has expended, and will continue to expend, significant sums of its capital, both reputational and economic, addressing the illegal and reprehensible payments that were paid in its name. Likewise, the illegal payments have and will continue to irreparably damage Wal-Mart's corporate image and goodwill and jeopardize its ability to do business in foreign countries.

## WAL-MART HAS AND SHALL SUFFER DAMAGES
## RESULTING FROM INDIVIDUAL DEFENDANTS' CONDUCT

90.     On May 17, 2012, the Company filed an SEC Form 8-K addressing the scope of

the investigations into the alleged wrongdoing at Wal-Mex and discussing the financial impact

and other damages to the Company that may result, which could be material: (emphasis added)

> The Audit Committee of the Company's Board of Directors (the "Audit
> Committee"), which is composed solely of independent directors, is conducting
> an internal investigation into, among other things, alleged violations of the U.S.
> Foreign Corrupt Practices Act (the "FCPA") and other alleged crimes or
> misconduct in connection with foreign subsidiaries including Wal-Mart de
> México, S.A.B. de C.V. ("Walmex") and whether prior allegations of such
> violations and/or misconduct were appropriately handled by the Company. The
> Audit Committee and the Company have engaged outside counsel from a number
> of law firms and other advisors who are assisting in the on-going investigation of
> these matters. The Company is also conducting a voluntary global review of its
> policies, practices and internal controls for FCPA compliance. The Company is
> engaged in strengthening its global anti-corruption compliance programs through
> appropriate remedial anti-corruption measures. In November 2011, the Company
> voluntarily disclosed that investigative activity to the U.S. Department of Justice
> (the "DOJ") and the SEC.

> The Company has been informed by the DOJ and the SEC that it is also the
> subject of their respective investigations into possible violations of the FCPA. The
> Company is cooperating with the investigations by the DOJ and the SEC. A
> number of federal and local government agencies in Mexico have also recently
> initiated investigations of these matters. Walmex is cooperating with the Mexican
> governmental agencies conducting these investigations. Furthermore, lawsuits
> relating to the matters under investigation have recently been filed by several of
> the Company's shareholders against it, its current directors, certain of its former
> directors, certain of its current and former officers and certain of Walmex's
> current and former officers.

> ***The Company could be exposed to a variety of negative consequences as a
> result of the matters noted above.*** There could be one or more enforcement
> actions in respect of the matters that are the subject of some or all of the ongoing
> government investigations, and such actions, if brought, may result in judgments,
> settlements, fines, penalties, injunctions, cease and desist orders or other relief,
> criminal convictions and/or penalties. The shareholder lawsuits may result in
> judgments against the Company and its current and former directors and officers
> named in those proceedings. The Company cannot predict accurately at this time
> the outcome or impact of the government investigations, the shareholder lawsuits,
> or its own internal investigation and review. In addition, the Company expects to
> incur costs in responding to requests for information or subpoenas seeking

documents, testimony and other information in connection with the government investigations, in defending the shareholder lawsuits, and in conducting its internal investigation and review, and it cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of the Company's senior management that could impinge on the time they have available to devote to other matters relating to the business. The Company may also see ongoing media and governmental interest in these matters that could impact the perception among certain audiences of its role as a corporate citizen.

The Company is in the early stages of assessing and responding to the governmental investigations, the shareholder lawsuits, and its internal investigation and review are on-going. Although the Company does not presently believe that these matters will have a material adverse effect on its business, given the inherent uncertainties in such situations, *the Company can provide no assurance that these matters will not be material to its business in the future.*

91.     As a result of the faithless, disloyal actions of the Individual Defendants, Wal-Mart has and will sustain varying, significant damages. As the Form 8-K filed by the Company on May 17, 2012 confirmed, Wal-Mart will undoubtedly have to defend against lengthy probes by the DOJ and the SEC into Wal-Mart's foreign operations, not only in Mexico but worldwide. Wal-Mart's defense against these regulatory actions, which have already commenced, will be time-consuming, distracting and expensive.

92.     Wal-Mart executives, including many of the Individual Defendants, face the possibility of criminal prosecutions and civil liability which will undoubtedly distract and deter them from the performance of their duties. The DOJ has placed a high premium on investigating and prosecuting violations of the FCPA and bribery laws and will undoubtedly pursue any case against the Company vigorously. As stated above, Wal-Mart also faces charges under the FCPA which can lead to very substantial fines and penalties totaling in the hundreds of millions. The scale of the bribery in Mexico and the subsequent cover-up by senior Wal-Mart executives and directors make it even more likely that Wal-Mart will have to pay the stiffest of penalties to resolve the matter.

93.   The improper actions of the Individual Defendants will also cost Wal-Mart n terms of its future growth and loss of goodwill. Already, activists and competitors have signaled that they will use the improprieties committed by the Individual Defendants against the Company when it attempts to opens stores in the U.S. and abroad. Much of Wal-Mart's recent growth has come from opening stores overseas, and so any increased regulatory activity against it will undoubtedly hinder the Company's overall growth.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.   Plaintiff brings this action derivatively in the right and for the benefit of Wal-Mart to redress injuries suffered, and to be suffered, by Wal-Mart as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Wal-Mart is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiffs will adequately and fairly represent the interests of Wal-Mart in enforcing and prosecuting its rights.  Plaintiff is and was owner of the stock of Wal-Mart during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

95.   The Board of Directors of Wal-Mart at the time of this filing consisted of the following fourteen (14) individuals: S. Walton, Scott, J. Walton, Daft, Corbett, Alvarez, Breyer, Burns, Cash, Penner, Reinemund, Sorenson, Williams, and Wolf. Plaintiff did not make a pre-suit demand on the Board of Directors of Wal-Mart to institute this action because by reason of their own personal interest in the outcome of such a decision or the effect their decision would have on

another Wal-Mart Board member who dominated and controlled them, a majority the members of the Wal-Mart Board could not independently and disinterestedly consider whether to bring the allegations alleged herein, rendering such a demand a futile, wasteful and useless act.

96.     Pre-suit demand would have been futile because a majority of the Wal-Mart Board members personally participated in the misconduct described herein for his own personal gain or by improperly abrogating his oversight duties to other defendants.  As a result of the Wal-Mart Board members' direct access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management, Board and Board Committee meetings, a majority of the Individual Defendants knew of the corruption scheme at Wal-Mex and yet consciously acted to cover it up and allow the Company to maintain insufficient internal controls required by the FCPA.

97.     Demand would have been futile because in order to bring this suit, a majority of the directors of Wal-Mart would have been forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.  Specifically, a majority of the Director Defendants are prevented from independently and disinterestedly considering a demand to commence and vigorously pursue the allegations contained herein for the following reasons:

98.     There is a reasonable doubt that the actions alleged herein, including the following, by the Director Defendants' were the product of a valid exercise of business judgment, for the following reasons:

    a. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund
       and Sorenson (all of whom were appointed to Board after June, 2006) were fully
       aware by December, 2005 of the allegations by Cicero and the subsequent
       documentation and findings produced by the Company's investigation team which
       substantiated those allegations, including the fact that approximately *$24 million* in
       suspect payments had been made to Mexican officials; that Wal-Mex's top
       executives including Castro-Wright and Rodriguezmacedo knew about the

payments and had taken steps to conceal them; that Rodriguezmacedo falsely claimed the company had stopped using *gestores* after Cicero departed the company, yet records show that in October 2005, Wal-Mex real estate executives made a request to pay a *gestore* $14,000 to get a construction permit; that hundreds of *gestore* payments were still being used; and that the investigation team concluded that "There is reasonable suspicion to believe that Mexican and USA laws have been violated.";

b. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, acted against the recommendations of senior attorney Menzer and outside legal counsel Willkie Farr to conduct a thorough, effective investigation into Wal-Mex and its senior executives which would have complied with the FCPA, choosing instead to have the Company's internal investigation team, which lacked adequate resources to fully vet such substantial allegations of wrongdoing, to conduct a "preliminary" investigation into Wal-Mex;

c. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, rejected the plan by lead investigator Halter to follow-up on the Company's "preliminary" investigation, which uncovered overwhelming evidence of criminal bribery and other wrongdoing at Wal-Mex, with a more thorough investigation which would include hiring private investigators to interview and monitor both of the primary *gestores*, and a round of adversarial interviews with Wal-Mex senior executives, including defendant Castro-Wright;

d. All current Board members in January, 2006 except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, criticized the "overly aggressive" tactics of their internal investigation team and substantially revised the Company's internal investigation protocol away from a "law enforcement approach" that gave senior Wal-Mart executives—including executives at the business units being investigated—more control over internal investigations;

e. All current Board members in February, 2006 except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, yielded control and supervision over the investigation into Wal-Mex to defendant Rodriguezmacedo, the Wal-Mex official originally implicated in the wrongdoing, thus violating even the new weakened investigation protocol established by the Company;

f. All current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, allowed Rodriguezmacedo to conduct a minimal inquiry which conducted little additional investigation, and which resulted in report which concluded that there was no evidence of bribes, exonerated Wal-Mex senior officials including defendant Castro-Wright, and spent most of its six-pages baselessly attacking whistleblower Cicero;

g. All current Board members in May, 2006, except Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, accepted the Rodriguezmacedo report as the final word on the Wal-Mex bribery scandal and closed the matter, despite the fact that the

report was hastily put together, lacked support for its conclusions, and was criticized by members of the Company's own investigatory team;

h.   All current Board members have either explicitly or implicitly endorsed the Company's inexplicable exoneration and continued promotion of defendant Castro-Wright, who they knew or should have known to have been directly implicated by both Cicero and their own internal investigation as orchestrating the illegal bribery scheme at Wal-Mex;

i.   All current Board members in December, 2011 caused the Company to issue a false and misleading Form 10Q which strongly suggests that the Company first learned of the Wal-Mex FCPA violations in 2012, then and only as the result of a voluntary internal review. This conceals the fact that they Company had known about the corrupt practices in Mexico concerning Wal-Mex's bribery scheme.

99.   The Company has a governance and reporting system by which all the Director Defendants are presumably informed of all important and/or material aspects of Wal-Mart's business, including the activities of its largest global subsidiary, Wal-Mex.  For example, the Company's Corporate Governance Guidelines requires directors to participate in an orientation plan upon his or her election to the Board, which includes "familiarizing new directors with the Company's strategic plans, *its significant financial, accounting and risk management issues, its compliance programs*, its Statement of Ethics, its principal officers, and its internal and independent auditors." (emphasis added.)

100.   Because the Company has a corporate governance structure in place, there is a presumption that the corporate governance and reporting procedures were followed and that all of the Director Defendants knew of the bribery scheme at Wal-Mex and subsequent cover-up and yet decided against further investigating, reporting, or rectifying this wrongdoing, or punishing any official implicated in the scheme.

101.   As alleged above, all current Board members except for Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson received a large number of reports of the bribery scheme at Wal-Mex.   Moreover, because the Company's Corporate Governance Guidelines, it may

reasonably be inferred that all Director Defendants knew of Wal-Mex's continued misconduct and chose to disregard it. Given the extensive paper trail generated by both a Wal-Mex whistleblower and the Company's own investigation team concerning the violations, the Board's direct and/or inferred awareness of the problems, and the ensuring effort to cover-up the wrongdoing from public discovery, there was a sustained and systematic failure of the board to exercise oversight which can only be considered intentional, in that the directors knew of the violations of law and yet took no steps in an effort to prevent or remedy the situation. The Board's failure to take any action regarding illegal activity of such substantial magnitude and duration until threatened with exposure by the media indicates that the directors' decision to not act was not made in good faith and was contrary to the best interests of the company, and has and will result in substantial losses to the Company.

102.    Director Defendants, as a result of their control over the internal controls relating to Wal-Mart's investigation and subsequent cover-up of the Wal-Mex bribery scheme and their knowledge of the deficiencies in internal controls associated therewith, caused the Company to illegally sanction what they knew or should have known were violations of the FCPA, and thus there is reasonable doubt that their actions resulted from the exercise of valid business judgment.

103.    Director Defendants, as a result of their control over the internal controls relating to Wal-Mart's investigation and subsequent cover-up of the Wal-Mex bribery scheme and their knowledge of the deficiencies in internal controls associated therewith, elected not to maintain adequate internal controls over the business practices by Wal-Mex and/or ensure that all such practices were legally performed, and thus there is reasonable doubt that their actions resulted from the exercise of valid business judgment.

104.    Director Defendants, despite having direct evidence of substantial wrongdoing by and amongst the Individual Defendants, has chosen not to hold any of these individuals

37

accountable for causing harm to Wal-Mart and exposing the Company to serious reputational and pecuniary damages. This inaction by the Board is not surprising given that Director Defendants themselves are directly implicated in the wrongdoing by their cover-up of the Company's violations of the FCPA and their own deliberate neglect in failing to plan or maintain internal controls to ensure Wal-Mart's compliance with the FCPA.

105.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on intentional, reckless and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the current Board, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

106.   There is a substantial likelihood that a majority of the Director Defendants will be held liable for their breaches of fiduciary duties, as alleged herein, and therefore are not disinterested in this action. Director Defendants S. Walton, Scott, J. Walton, Daft, Breyer, Burns, Williams, and Wolf would have had contemporaneous knowledge of the fraudulent and criminal conduct occurring at Wal-Mex and the resultant effort to cover-up the wrongdoing from being exposed and the wrongdoers from being held accountable.   Director Defendants Alvarez, Cash, Corbett, Penner, Reinemund and Sorenson, if sufficiently informed of material matters at the Company, would have had after-acquired knowledge of the fraudulent and criminal conduct that occurred at Wal-Mex and the resultant effort to cover-up the wrongdoing from being exposed and the wrongdoers from being held accountable. Therefore, there is a substantial likelihood that all of these Director Defendants will be held liable for breach of fiduciary duty, and are therefore self-interested and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

Accordingly, demand is excused.

107.   Additionally, there is a substantial likelihood that the members of the Audit Committee (Alvarez, Cash, Sorenson and Williams) will be held liable for breaches of their duty to review and monitor the Company's compliance with all legal and regulatory requirements, as alleged herein, and therefore are not disinterested in this action. These defendants are directly responsible for overseeing Wal-Mart's compliance with the FCPA. In this capacity, Director Defendant Williams breached his fiduciary duties by both (1) knowingly and/or recklessly undermining the Company's attempts to investigate, report, or rectify the bribery scandal at Wal-Mex or discipline employees implicated in the scheme; and (2) recklessly failing to install internal controls sufficient to avoid violations of the FCPA.  All Audit Committee members, including Alvarez, Cash, Sorenson, who serve along side Williams, due to the corporate governance and reporting system in place at the Company and their reporting relationship with the CEO and others with knowledge of the corruption scheme at Wal-Mex, are charged with knowledge of and responsibility for the Company's non-compliance with FCPA and thus have acquiesced in the cover-up of the Wal-Mex scandal forgoing steps to remedy the Company's internal controls in this area.  These breaches of duty by the Director Defendants on the Audit Committee render them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

108.   Defendants Scott is interested due to the fact that he reaped millions of dollars in opportunistic sales of his Wal-Mart shares in the months preceding *The New York Times* exposé but after the Company learned that the newspaper was investigating possible FCPA infractions. As the table below demonstrates, the trading records of Defendant Scott demonstrates that he began divesting his shares in Wal-Mart in apparent anticipation of the publication of *The New York Times* article and the corresponding stock drop that would undoubtedly occur, and did occur.

During the three trading days after *The New York Times'* April 21, 2012 exposé, Wal-Mart stock dropped eight percent, wiping out all of its gains in 2012.   In the months preceding this precipitous drop, Scott sold/executed 1,458,385 shares/options on December 20, 2012 for gains of $3,950,401, 635,220 shares/options on March 2, 2012 for gains of $3,295,043, and 100,000 shares/options on March 27, 2012 for gains of $6,122,490.  These uncharacteristically large stock sales were executed by Defendant Scott while he possessed the materially adverse nonpublic information that the Company was exposed to undisclosed liability for massive FCPA penalties and other contingencies relating to the bribes and cover-up.  Due to the fact that Scott benefited from undisclosed adverse inside knowledge of the corruption at Wal-Mex, demand on him is futile.

109.   Furthermore, there are other facts which cast a reasonable doubt that certain Director Defendants can independently and/or disinterestedly consider a demand to sue in this matter, for the following reasons:

a.   Defendants Rob Walton and Jim Walton are brothers. Because of entangling professional, business and familial relationships with the Walton family, none of them will take the action requested by plaintiff herein against one another;

b.   Defendant Penner is the son-in-law of Defendant Rob Walton.  He owes his career and status to Rob Walton, as from 2002 to 2005, he served as Wal-Mart's Senior Vice President and CFO–Japan. Because of entangling professional, business and familial relationships with the Walton family, none of them will take the action requested by plaintiff herein against one another.

c.   Defendants Duke and Scott lack disinterest and independence given their long term relationship on the Wal-Mart Board and their mutual service on the advisory board of the Tsinghua University School of Economics and Management in Beijing, China;

d.   Defendants Duke, Rob Walton and Jim Walton lack disinterest and independence because Duke sits on the Board of Arvest Bank, a Walton family-owned bank of which Jim Walton is Chairman of the Board and CEO. As such, Duke serves at the pleasure of Rob Walton, Jim Walton, and the Walton family. The Walton family, which exerts considerable control over the Board, will not wish to oust Duke in connection with the bribery probe;

e.  Defendant Duke's principal professional occupation is his employment with Wal-Mart, pursuant to which he has received and continues to receive substantial monetary compensations and other benefits.  In 2011, defendant Duke, who is a high-ranking officer of the Company, received more than $18 million in compensation from Wal-Mart and expects to receive more than $18 million in compensation again in 2012.  Wal-Mart is controlled by Chairman of the Board Rob Walton, Jim Walton and the Walton family, which collectively owns nearly 50% of the Company and controls two Board seats.  There is reasonable doubt that Duke would jeopardize his lucrative compensation package by bringing suit against these members of the Walton family or other Board members who control his compensation. Thus demand is futile as to defendant Duke.

f.  Defendant Sorenson's primary employment is the President, CEO and director of Marriott International, Inc., which during fiscal 2012 received payments from Wal-Mart of approximately $19 million.  Marriott, on the other hand, made over $1 million in purchases from Wal-Mart stores.  Due to these entangling business relationships which benefit the Marriott company lead by Sorenson which would be placed in substantial jeopardy, there is reasonable doubt that he will take the action requested by the plaintiff against his fellow Wal-Mart directors.

## COUNT I

### On Behalf of Wal-Mart Against Individual
### Defendants for Breach of Fiduciary Duties

110.  Plaintiff repeats and re-alleges each allegation set forth herein.

111.  The Individual Defendants owed and have violated fiduciary duties of care, loyalty, candor, good faith, and reasonable inquiry owed under Delaware law to the public shareholders of Wal-Mart by acting in defiance of those duties and placing their personal interests ahead of the interests of the Company and its shareholders.

112.  The Individual Defendants have violated their fiduciary duties by authorizing, benefitting, acquiescing in, and/or failing to prevent or remedy the wrongful acts complained of herein, to wit, having actual and/or constructive knowledge of a massive bribery and corruption scheme perpetrated by officials at its single largest global subsidiary, Wal-Mex, during the Relevant Period, and taking affirmative steps to undermine any investigation, reporting, remedying or punishment  that may have emerged as a result of this scheme; to cover-up this

wrongdoing and mask the Company's and their own violations of any applicable federal or state laws, rules, or regulatory scheme, including the FCPA; to cause the Company to fail in its obligations to establish internal controls sufficient to comply with federal and state laws, rules, or regulatory schemes, including the FCPA; to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate, did not mislead investors and conformed to federal and state securities laws;

113.   By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to advance their interests at the expense of Wal-Mart and its shareholders.

114.   Because the Individual Defendants dominate and control the business and corporate affairs of Wal-Mart, and are in possession of private corporate information concerning Wal-Mart business transactions, they were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the federal and state laws as alleged herein. Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings.   These actions by Individual Defendants exposed the Company to liability for violations of federal and state law, and therefore could not be the product of a valid exercise of business judgment. Instead, this was a complete abdication of their duties as officers and/or directors of the Company.

115.   Each of the Individual Defendants' acts in causing or permitting the Company to disseminate to the investing public material misrepresentations and omissions and abdicating their oversight responsibilities to the Company has subjected the Company to liability for violations of federal and state law, and therefore could not be the product of a valid exercise of business judgment. Instead, this was a complete abdication of their duties as officers and/or directors of the

Company. As a result of the Individual Defendants' breaches, Wal-Mart has lost market capitalization and has had its reputation in the business community and financial markets irreparably tarnished.

116.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Wal-Mart has sustained significant damages and is subjected to unreasonable risks of loss and expenses, and therefore Individual Defendants are liable to the Company

117.   Plaintiff, on behalf of Wal-Mart, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants jointly and severally and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, together with interest thereon;

B.   Granting any appropriate extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including a declaration that that plaintiff has adequately plead demand futility and may maintain this action on behalf of Wal-Mart; an order attaching, impounding, imposing a constructive trust on the excessive compensation, wrongfully gained benefits, or their other assets so as to assure that plaintiff on behalf of Wal-Mart has an effective remedy; and an order directing Wal-Mart to take all necessary actions to reform its corporate governance practices to comply with Company policies and all applicable laws, rules, and regulations;

C.   Awarding to Wal-Mart restitution from Individual Defendants, together with pre- and post-judgment interest, and ordering disgorgement of all profits, benefits and other compensation obtained by these defendants;

43

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.     Granting such other and further relief as the Court deems just and proper.

DATED: May 17, 2012                          Respectfully Submitted,

James A. Streett (2007092)
Alex G. Streett (65038)
STREETT LAW FIRM, P.A.
107 West Main
Russellville, AR 72801
(479) 968-2030
james@streettlaw.com
alex@streettlaw.com


Joe P. Leniski, Jr. (TN Bar No. 22891) (pro hac vice)
BRANSTETTER, STRANCH &
    JENNINGS, PLLC
227 2nd Avenue North, 4th Floor
Nashville, TN 37201
(615) 254-8801
jleniski@branstetterlaw.com

44

## VERIFICATION

NATHAN F. AUSTIN, certifies under penalty of perjury that: (1) he is a resident of in the State of Arkansas residing in Pope County; (2) he is a shareholder of Wal-Mart, Inc.; (3) he has reviewed the factual allegations Complaint against the current Board of Directors and certain other directors and officers of Wal-Mart Inc. and believes them to be true to the best of its knowledge, information, and belief and (4) he authorizes his attorneys to file the Complaint on his behalf.

Dated: May 17, 2012.

                 _____
                 NATHAN F. AUSTIN

```
STATE OF ARKANSAS)
COUNTY OF POPE   )
```

      Subscribed and sworn to before me this 17th day of May, 2012.



                 Notary Public

```
My Commission Expires:
    2-15-2013
```

PATSY D. BROWN
Pope County
My Commission Expires
February 15, 2013